# EXHIBIT A-1

# NOTICE OF REMOVAL

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| IV Media, LLC, a Minnesota limited liability company, and IV Media Properties, LLC, a Minnesota limited liability company, | Court File No. 25-cv-1358 |
| Plaintiffs, | |
| v. | **COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |
| Pontus IMB Portfolio, LLC, a Delaware limited liability company, and Pontus Net Lease Advisors, LLC, a Delaware limited liability company, | |
| Defendants. | |

---

IV Media, LLC ("IV Media"), and IV Media Properties, LLC ("IV Properties," and together with IV Media, "Plaintiffs"), by and for their complaint against Pontus IMB Portfolio, LLC ("Pontus IMB") and Pontus Net Lease Advisors, LLC ("Pontus Net Lease," and together with Pontus IMB, "Defendants"), state and allege as follows:

## INTRODUCTION

1. Plaintiffs are the successors-in-interest to the Chapter 11 Liquidating Bankruptcy Trustee in *In re iMedia Brands, Inc., et al.*, Court File Number 1:23-bk-10852-KBO ("the Bankruptcy"), pending in the United States Bankruptcy Court for the District of Delaware ("the Bankruptcy Court"), where it is assigned to Judge Karen B.

Owens.[1]

2.  Plaintiffs have purchased from the Bankruptcy estate all of the relevant Bankruptcy estates' federal and state avoidance claims under 11 U.S.C. §§ 544, 547, 548, 549, and 550 to avoid the wrongful transfers and obligations alleged herein and any similar state law claims, and/or are entitled to refunds of overpayments.

3.  This is an action to avoid certain obligations and transfers that were part of a sale-leaseback transaction in which Defendants strategically caused immense financial distress to insolvent companies, and then exploited that distress to extract far more value than Defendants provided, including obtaining a multi-million dollar building in Eden Prairie, Minnesota, for which Defendants paid nothing.

4.  First, Defendants forced bankruptcy debtor EP Properties, LLC ("EP Properties") (described in more detail below) to transfer to Defendants two buildings in Minnesota for the price of one — thereby taking a multi-million dollar property without providing anything in return, and adversely affecting not only EP Properties, but also its affiliates, VVI Fulfillment Center, Inc. ("VVI") (described in more detail below), and iMedia Brands, Inc. ("iMedia Brands") (described in more detail below).

---

[1]  The debtors in these Chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: ValueVision Media Acquisitions, Inc. (8670); Legacy IMBDS, Inc., formerly known as iMedia Brands, Inc. (3770); ValueVision Interactive, Inc. (8730); Portal Acquisition Company (3403); VVI Fulfillment Center, Inc. (5552); ValueVision Retail Inc. (2155); JWH Acquisition Company (3109); PW Acquisition Company, LLC (0154); EP Properties, LLC (3951); FL Acquisition Company (3026); Norwell Television, LLC (6011); and 867 Grand Avenue, LLC (2642).

5.     Second, Defendants subjected bankruptcy debtor iMedia Brands to onerous lease terms for its continued right and ability to use its properties — including the building that Defendants had wrongly taken for free and had no right to own, lease, or monetize in the first place.

6.     Plaintiffs bring this action pursuant to 11 U.S.C. §§ 548(a)(1)(B), 550(a), and 544, Minn. Stat. §§ 513.44(a)(2) and 513.45(a), and other applicable state and federal law.

7.     Plaintiffs seek entry of judgment:

     i.     voiding the Purchase and Sale Agreement and Joint Escrow Instructions (Multi-State) Agreement dated December 20, 2022, between Defendant Pontus Net Lease and EP Properties and VVI, subsequently assigned by Pontus Net Lease to Defendant Pontus IMB (the "Sale-Leaseback Agreement");

     ii.     restoring title to the real estate and personal property at issue in the Sale-Leaseback Agreement, substituting Plaintiff IV Media for EP Properties and VVI pursuant to the Bankruptcy Court's orders, and thus awarding title solely to Plaintiff IV Media or, in the alternative, awarding Plaintiff IV Media a monetary judgment for the value thereof;

     iii.     voiding the Master Lease Agreement dated April 10, 2023, between Pontus IMB and iMedia Brands (the "Master Lease"), to which Master Lease Plaintiff IV Properties was substituted pursuant to the

Bankruptcy Court's orders;

iv.      awarding Plaintiff IV Properties — as successor-in-interest to iMedia
Brands pursuant to the Bankruptcy Court's orders — a judgment
against Pontus IMB for the amount of all rent and security deposits
paid, and all maintenance and repair obligations incurred that do not
accrue to permanent value of the Kentucky Properties and the
Minnesota Properties, from April 10, 2023, through the date of
judgment;

v.       voiding the iMedia Post-Closing Obligations Agreement dated April
10, 2023, between Pontus IMB and EP Properties, VVI, and iMedia
Brands; and

vi.      awarding Plaintiff IV Media — as successor-in-interest to EP
Properties and VVI pursuant to the Bankruptcy Court's orders — or,
alternatively, Plaintiff IV Properties — as successor-in-interest to
iMedia Brands pursuant to the Bankruptcy Court's orders — a
monetary judgment against Pontus IMB for the principal amount of
escrowed "Repair Costs reserve" funds of $958,500, plus interest.

vii.     In the alternative, entering a declaratory judgment under 28 U.S.C.
§ 2201(a) that the provision in Article 26 of the Master Lease
terminating the iMedia Group's right to subdivide the 6700 Shady
Oak Road, Eden Prairie, Minnesota, lot to separate the land and the
building located at 6690 Shady Oak Road, Eden Prairie, Minnesota

(the "6690 Property") from the land and the building located at 6740
Shady Oak Road, Eden Prairie, Minnesota, solely as a result of the
iMedia Group's bankruptcy filing is unenforceable under 11 U.S.C.
§ 365(e)(1)(B) and that IV Media and IV Properties — as successors-
in-interest to the iMedia Group's rights under the Master Lease —
have the right to subdivide the 6700 Shady Oak Road, Eden Prairie,
Minnesota, lot as otherwise provided for in Article 26 of the Master
Lease.

## PARTIES

8.    Plaintiff IV Media is a Michigan limited liability company and has its principal
place of business in Hennepin County, Minnesota.

9.    Plaintiff IV Properties is a Minnesota limited liability company and has its principal
place of business in Hennepin County, Minnesota.

10.   Defendant Pontus IMB is a Delaware limited liability company.

11.   Upon information and belief, Pontus IMB's principal place of business is in
California.

12.   Pontus IMB is an affiliate of Pontus Capital LLC ("Pontus Capital"), a Nevada
limited liability company with a principal place of business in California.

13.   Defendant Pontus Net Lease is a Delaware limited liability company.

14.   Upon information and belief, Pontus Net Lease's principal place of business is in
California.

15. At all relevant times, Defendant Pontus Net Lease was an affiliate of Pontus Capital LLC, its managed funds, and its affiliates.

## JURISDICTION AND VENUE

16. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because the causes of action arise under federal statutes, 11 U.S.C. §§ 548 and 550.

17. This Court additionally has supplemental jurisdiction under 28 U.S.C. § 1367 over all claims that are so related to the federal-question claims that they form part of the same case or controversy under Article III of the United States Constitution.

18. This Court has personal jurisdiction over Pontus IMB because it owns real property in Hennepin County, Minnesota, which is at issue in this action, such that the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

19. This Court has personal jurisdiction over Pontus Net Lease because it entered into agreements relating to the real property in Hennepin County, Minnesota, now owned by Defendant Pontus IMB, and engaged in the acts complained of herein with respect to the Hennepin County, Minnesota, real property.

20. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the causes of action, or substantial parts thereof, arose in Hennepin County, Minnesota, and the real property that is at issue in this action is located in Hennepin County, Minnesota.

## FACTUAL ALLEGATIONS

21. In 2022, EP Properties, a now administratively-dissolved Minnesota limited liability

company, owned two buildings on one lot in Eden Prairie, Minnesota, with street addresses of 6690 Shady Oak Road and 6740 Shady Oak Road, Eden Prairie, Minnesota 55343.

22.    For purposes of the Hennepin County Recorder and the Hennepin County Assessor, the lot comprising 6690 Shady Oak Road and 6740 Shady Oak Road is 6700 Shady Oak Road, Eden Prairie, Minnesota 55343.

23.    A "Limited Property Condition Assessment Report" dated August 20, 2021, contains the following overview:



24.    Also in 2022, VVI, a now administratively-dissolved Minnesota limited liability company, owned two buildings with street addresses of 4811 and 4813 Nashville Road, in Bowling Green, Kentucky 42101 (jointly "the Kentucky Properties").

25.     EP Properties and VVI were at all relevant times subsidiaries of iMedia Brands, a now administratively-dissolved Minnesota corporation.

26.     The building located at 6740 Shady Oak Road was used as the operational headquarters of iMedia and affiliated entities (jointly "the iMedia Group") and is referred to herein as the "the Headquarters Building."

27.     The 6690 Property and the Headquarters Building are jointly referred to herein as the "Minnesota Properties."

28.     The Kentucky Properties were used as the principal distribution facilities for an interactive media enterprise that capitalized on the convergence of entertainment, ecommerce, and advertising, all under the corporate umbrella of the iMedia Group.

29.     In August 2021, the iMedia Group had signed an asset-backed loan agreement ("ABL Agreement") with Siena Lending Group, LLC ("Siena") that provided an $80 million revolver facility with a term of 26 months.

30.     The iMedia Group saw revenues decline over 2021-2023 as inflationary pressures contributed to a reduction in at-home discretionary spending by consumers, resulting in significant financial losses.  From January 1, 2022, through September 30, 2022, the iMedia Group suffered an operating loss of $41.4 million in the business segment that typically accounted for the iMedia Group's largest revenue stream.

31.     By the fall of 2022, the iMedia Group's relationship with Siena had begun to deteriorate and it expected to incur debts beyond its ability to pay when they became due.

32.    Between August 2021 and the fall of 2022, Siena charged the iMedia Group $3
       million in fees over and above the amounts otherwise provided for under the ABL
       Agreement, in exchange for which Siena provided seven amendments to Siena's
       senior debt-leverage ratio covenant, and increased the interest rate from 5% to 10%.

33.    By the fall of 2022, the iMedia Group owed more than $63.5 million under the ABL
       Agreement, and had not complied with the net senior-leverage ratio and the
       minimum-liquidity covenant of that agreement.

34.    In October 2022, the iMedia Group's financial situation became even more dire
       when Siena refused to waive the iMedia Group's covenant defaults before the filing
       of iMedia Group's 10-Q, and reduced iMedia Group's liquidity by $10 million.

35.    By October 29, 2022, the iMedia Group could not reasonably expect to pay debts as
       they became due and became insolvent because of a number of factors, including
       declining sales, falling inventory levels, tightening of trade terms, and the ongoing
       reduction in borrowing-base availability.

36.    In a December 13, 2022 10-Q with the United States Securities and Exchange
       Commission, the iMedia Group acknowledged that as of October 29, 2022, there
       was substantial doubt about its ability to continue as a going concern for the next 12
       months.

37.    The iMedia Group did not file another 10-Q during the rest of 2022 or in 2023.

38.    To address its liquidity issues and issues with Siena, the iMedia Group sought to
       refinance the Siena debt with PNC Bank ("PNC").

39.    To generate cash and facilitate the refinancing with PNC, the iMedia Group began

marketing some of its real estate, including the Kentucky Properties and the Headquarters Building.

40. In November 2022, iMedia agreed to and accepted a Letter of Intent ("LOI") from Defendant Pontus Net Lease, setting forth the proposed terms of a sale and leaseback to the iMedia Group of the Kentucky Properties and the Headquarters Building, but not the 6690 Property.

41. A true and correct copy of the LOI is attached hereto as **Exhibit 1**.

42. A "sale-leaseback" transaction is a tool to raise capital where the owner of commercial real estate sells the real estate to a third party, then leases it back, usually to generate cash for a business from the equity value in the real estate.

43. The sale-leaseback seller gets an immediate cash infusion and retains use of the real property, while the sale-leaseback buyer gets a stream of rental income which repays the purchase price with a return on investment.

44. iMedia agreed to and accepted the LOI after a robust marketing process with multiple potential counterparties.

45. iMedia selected the LOI over other potential transactions presented to them in the open market.

46. The LOI provided that the iMedia Group would sell the Kentucky Properties and the Headquarters Building to Pontus Net Lease for a purchase price of $48 million, and that Pontus Net Lease would then lease those three properties back under "absolute triple net master leases with the ability to sublease each property to each of the proposed single-purpose entity tenants operating at each of the Properties."

(Exhibit 1 at 1.)

47.   A triple-net lease means that the tenant pays (a) the base rent, (b) property taxes, insurance, and maintenance costs, and (c) utilities, effectively shifting property operating expenses from the landlord to the tenant.

48.   EP Properties would retain ownership of the 6690 Property, which was excluded from the LOI.

49.   The LOI provides for a lease term of 21 years, annual base rent of $4,320,000, a cash security deposit or letter of credit equal to six months of Base Rent, and rent escalations of 2.5% per year.

50.   In exchange, the iMedia Group granted Pontus Net Lease a 60-day exclusivity period following the execution of the LOI.

51.   In the LOI, Pontus Net Lease further represented that it would complete its review of due diligence materials by the later of: (a) 10 business days following the delivery to Pontus Net Lease of the environmental report, zoning report, property condition report, title commitment, and survey or (b) 40 days after the mutual execution of the Purchase Agreement ("the Due Diligence Period").

52.   Pontus Net Lease also agreed that closing would occur 15 business days following expiration of the Due Diligence Period.

53.   To sell the Headquarters Building separate from the 6690 Property, the iMedia Group began subdivision proceedings for the 6700 Shady Oak Road lot during the negotiations of the LOI and purchase agreement.

54.   The iMedia Group hired an engineering firm to complete a survey and proposed site

plan for the lot split.

55.    The iMedia Group had extensive discussions with the City of Eden Prairie about the

lot split.

56.    Pontus Net Lease, EP Properties, and VVI executed the Sale-Leaseback Agreement

on December 20, 2022, to govern the sale of the Headquarters Building and the

Kentucky Properties to Pontus Net Lease for $48 million.

57.    A true and correct copy of the Sale-Leaseback Agreement is attached hereto as

**Exhibit 2**.

58.    The Sale-Leaseback Agreement provided that the parties would negotiate a master

lease agreement under which Pontus Net Lease would lease the three buildings back

to iMedia Brands on terms consistent with the LOI.  (Sale-Leaseback Agreement

§ 1.03 and Schedule A, *Tenant*.)

59.    Also on December 20, 2022, the iMedia Group entered a forbearance agreement

with Siena, in which Siena agreed to forebear from exercising remedies under the

ABL Agreement until January 31, 2023 (the "January 31 Siena Forbearance

Period").

60.    Consistent with the LOI, the Sale-Leaseback Agreement excluded the 6690 Property

from the purchase and associated purchase price.

61.    The Sale-Leaseback Agreement's recitals and section 1.06 of the Sale-Leaseback

Agreement set forth the iMedia Group's intent to legally divide the 6690 Property

(referred to in the Sale-Leaseback Agreement as the "Shady Oak Property") from

the Headquarters Building, and sell only the Headquarters Building to Pontus Net

Lease.

62.    Section 1.06 of the Sale-Leaseback Agreement further provided that, if the subdivision could not be completed by the closing date of the sale, the iMedia Group would be permitted to repurchase the 6690 Property for $100, free and clear of any liens or mortgages created by Pontus Net Lease.

63.    The Sale-Leaseback Agreement also stated that the iMedia Group would submit an acceptable agreement to Pontus Net Lease that would give both the 6690 Property and the Headquarters Building reciprocal access to drives, parking, stormwater, and utility easements, signage, and maintenance ("REA"), and Pontus Net Lease promised to respond promptly if it objected to the proposed REA.  (Sale-Leaseback Agreement § 1.07.)

64.    Closing the Sale-Leaseback Agreement and the master lease was crucial to the iMedia Group because — as Pontus Net Lease and Pontus Capital knew — PNC required that the iMedia Group complete the sale-leaseback transaction with Pontus Net Lease before PNC would close the refinancing of the iMedia Group's debt with Siena.  The iMedia Group was thus under immense pressure to close the Sale-Leaseback Agreement by January 31, 2023, when the January 31 Siena Forbearance Period was set to expire.

65.    After signing the Sale-Leaseback Agreement, and fully understanding the liquidity pressure the iMedia Group faced, Pontus Net Lease executed a strategy to place iMedia Group under even more duress to extract far more value than Pontus Net Lease provided.

66.   Pontus Net Lease exploited the iMedia Group's desperate financial situation.

67.   Pontus Net Lease's strategy worked. Not only did Pontus Net Lease hike the lease obligations (and thereby effectively slash the purchase price of the properties being sold), but Pontus Net Lease also maneuvered the iMedia Group into conveying the 6690 Property, worth at least $7 million dollars, to Pontus Net Lease for free.

68.   The Sale-Leaseback Agreement provided that Pontus Net Lease and iMedia Group would negotiate and enter a triple-net lease within a 40-day inspection period ("the Inspection Period").

69.   The Inspection Period ended before the January 31 Siena Forbearance Period and the same weekend as the end of the iMedia Group's fiscal year — January 29, 2023.

70.   Pontus Net Lease and the iMedia Group exchanged drafts of the master lease agreement provided for by the Sale-Leaseback Agreement throughout January 2023, and the iMedia Group responded promptly to any Pontus Net Lease concern.

71.   The iMedia Group provided Pontus Net Lease with a draft REA related to the subdivision of the 6690 Property on January 19, 2023, but Pontus Net Lease never responded to the draft REA, instead telling the iMedia Group they would "get to it" and then failing to do so.

72.   In a May 1, 2023 8-K filing with the United States Securities and Exchange Commission, the iMedia Group made the following public disclosures about its financial condition as of January 28, 2023:

> The Company anticipates that its statement of operations for
> the three-month period ended January 28, 2023, will reflect (1)
> a decrease in net sales to approximately $133.5 million,

compared with net sales of $193.8 million for the comparable prior year period, (2) a significant increase in the pre-tax net loss to approximately $62.7 million, compared with a pre-tax net loss of $5 million for the comparable prior year period, and (3) a significant increase in operating expenses to approximately $102.9 million, compared with operating expenses of $74.5 million for the comparable prior year period.

The Company anticipates that its statement of operations for the fiscal year ended January 28, 2023, will reflect (1) a decrease in net sales to approximately $544.5 million, compared to net sales of $551.1 for the prior fiscal year, (2) a significant increase in the pre-tax net loss to approximately $108.6 million, compared to a $22 million pre-tax net loss for the prior fiscal year, and (3) a significant increase in operating expenses to approximately $295.8 million, compared to operating expenses of $295.7 million for the prior fiscal year.

73. In fact, by January 28, 2023, not only was iMedia Brands experiencing financial distress, both EP Properties and VVI were insolvent, in that their liabilities greatly exceeded their assets.

74. With the January 31 Siena Forbearance Period about to expire, Pontus Net Lease seized on the iMedia Group's duress to revamp the deal to its benefit and to the iMedia Group's detriment.

75. By the time Pontus Net Lease was done, the iMedia Group was forced to sell the 6690 Property valued at $7 million for no additional consideration. Beyond that, Pontus Net Lease's draft master lease imposed on the iMedia Group far more onerous terms than provided for under the LOI and the original Sale-Leaseback Agreement.

76.     Table 1 lists some of the key changes at the iMedia Group's expense.

**TABLE 1**

|  | Original | Final |
|---|---|---|
| **Annual Base Rent** | $4,320,00 | $4,536,000 |
| **Lease Term** | 21 years | 25 years |
| **Annual rent escalations** | 2.5% | 3.0% |
| **Security Deposit** | Six months' rent | One year's rent |

77.     On January 30, 2023, Pontus Net Lease started to backtrack in its negotiation of the master lease agreement.

78.     Pontus Net Lease's January 30, 2023, draft master lease agreement included triple-net lease provisions far outside the industry norm, such as (a) a provision that the lease tenant (one of iMedia's affiliates) could not cure a default until the landlord (Pontus Net Lease) gave written notice that the tenant had cured; and (b) landlord (Pontus Net Lease) would not be liable for damages (only injunctive relief for failing to give appropriate consent) but tenants would be liable for consequential damages for any defaults.  Although the iMedia Group received nothing in exchange, it had no practical choice but to agree.

79.     On January 30, 2023, Pontus Net Lease provided the iMedia Group with a conditional acceptance letter.

80.     Pontus Net Lease asked to extend the Inspection Period for five business days to provide the parties with time to: (a) negotiate the lease; and (b) finalize outstanding actions relating to title.

81.   The same day, Pontus Net Lease called iMedia's CEO and stated the reason for the
      delay was to add two "small asks": (a) Pontus demanded a "right of first offer" with
      respect to the 6690 Property to ensure iMedia did not sell it at a discount that would
      reduce the value of the Headquarters Building; and (b) instead of a letter of credit
      for the six-month $2-million security deposit, Pontus demanded a cash deposit,
      further straining iMedia Group's cash availability.

82.   As Pontus Net Lease already knew, the iMedia Group had no choice but to agree to
      both.

83.   As a result of the delay caused by Pontus Net Lease's shifting demands, the iMedia
      Group also had no choice but to again amend its forbearance agreement with Siena
      to avoid a default.

84.   This Ninth Amendment to the ABL, dated February 1, 2023, came at considerable
      cost, as the iMedia Group had to commit to a $100,000 amendment fee, payable on
      the earlier of the closing of: (a) the Pontus Net Lease sale-leaseback closing or
      maturity date; or (b) February 28, 2023, the new forbearance-termination date.

85.   A true and correct copy of the Ninth Amendment to the ABL is attached hereto as
      **Exhibit 3** (the "Ninth Amendment").

86.   The Ninth Amendment further reduced the iMedia Group's borrowing base by $5
      million (Exhibit 3 at § 4(b)(h)), and added a guaranty and liens on all equity of
      German subsidiaries (*id.* at § 4(e)).

87.   This left the iMedia Group even more desperate — without PNC replacing Siena as
      lender, the iMedia Group did not expect to be able pay its debts as they became due.

88.  By February 4, 2023, the iMedia Group had largely finalized the terms under which
     PNC would refinance the Siena debt, but the refinancing remained conditional on
     closing the Pontus Net Lease sale-leaseback transaction.

89.  The same day, the iMedia Group informed Pontus Net Lease that it agreed to the
     latter's latest draft of the master lease agreement and the iMedia Group considered
     it final.

90.  The iMedia Group expected that Pontus Net Lease would immediately send a notice
     to close, beginning the countdown to close, up to 15 business days.

91.  But Pontus Net Lease moved the goal posts yet again, seeking a call with the iMedia
     Group about a "title issue."

92.  The "title issue" was pretext.

93.  Alternatively, if and to the extent the "title issue" were not pretext, the iMedia Group
     offered to buy, at its own expense, insurance to address any perceived risk to Pontus
     Net Lease, but the latter delayed the closing and demanded even more, maneuvering
     to take the 6690 Property for no additional consideration by adding a provision to
     the draft master lease barring the iMedia Group from subdividing the 6690 Property
     for two years.

94.  Pontus Net Lease further structured the transfer as a "two-year delay" of the
     subdivision, believing that if the iMedia Group filed for bankruptcy, Pontus Net
     Lease could evade fraudulent-transfer laws even though Pontus Net Lease provided
     nothing for the 6690 Property.

95.  Section 548 of the Bankruptcy Code allows debtors to challenge any transfer made

within two years before filing if the debtor is insolvent and did not receive reasonably-equivalent value.

96.    To circumvent this statute, Pontus Net Lease inserted provisions in the draft master lease that would convey outright ownership of the 6690 Property to Pontus Net Lease, for no consideration, by terminating the iMedia Group's rights upon a bankruptcy filing.

97.    Pontus Net Lease sought to gain ownership of the 6690 Property simply because of the iMedia Group's failure to subdivide the property, which Pontus prohibited, and not as a result of a separate "transfer" of the Property that could and would be challenged.

98.    Pontus Net Lease then continued to take positions in the negotiation to ensure a prompt bankruptcy filing, so that it could take the 6690 Property for itself.

99.    On or about February 6, 2023, Pontus Net Lease issued another conditional notice to close, this time demanding additional time to finalize certain items of due diligence and making closing conditional upon: (a) receipt of an environmental assessment of the Headquarters Building in an acceptable form; (b) equity-level property-condition reports in an acceptable form; (c) finalization of title pro forma and a survey for the Kentucky Properties; (d) third-party reports addressed and certified with reliance letters; and (e) execution no later than five days before closing of a post-closing agreement under which the tenant-to-be would make financially-significant improvements to the real estate being conveyed.

100.    By February 8, 2023, Siena began to question Pontus Net Lease's delay tactics and

refused to fund any of the iMedia Group's requests unless and until Siena spoke with Pontus Net Lease to determine whether Pontus Net Lease was serious about closing the sale-leaseback transaction.

101. On the call, Pontus Net Lease indicated that there were only a handful of issues left, mainly getting updated reports, the completion of which were already underway.

102. In reality, Pontus Net Lease schemed to keep delaying the closing and force even more concessions from the iMedia Group.

103. By February 14, 2023, final drafts of a PNC credit agreement to take out Siena were circulated, still conditional on the closing of the Pontus Net Lease transaction.

104. Pontus Net Lease used the opportunity to wring even more concessions out of the iMedia Group, while providing nothing in return.

105. Pontus Net Lease sent two successive notices to close on February 24, 2023, and again on February 28, 2023, the same day the forbearance period ended under the Ninth Amendment.

106. In the notices, Pontus Net Lease demanded: (a) that the lease term increase to 22 years; (b) that the rent escalators increase to 3%; (c) that the iMedia Group refinance with PNC Bank concurrent with the Pontus Net Lease closing; and (d) that the iMedia Group provide evidence before closing of a right to redeem an amount equal to 50% of the current outstanding balance of a $19.9 million note with a third party in the period 12 months following closings.

107. Pontus Net Lease's strategic delays caused PNC to abandon the transaction, putting the iMedia Group in an even more precarious position and vulnerable to Pontus Net

Lease's unreasonable demands.

108.  In response to Pontus Net Lease's February 28, 2023 notice to close, PNC announced that Pontus Net Lease's delay required PNC to go back to its credit committee and again obtain approval of the refinancing.

109.  From that point on, the sale-leaseback transaction kept getting worse for the iMedia Group.

110.  On March 9, 2023, Pontus Net Lease sent a third amended conditional notice to close, this time: (a) increasing the base rent to $4,536,000; (b) increasing the lease term to 25 years; (c) requiring the iMedia Group to obtain a loan amendment from Siena no earlier than September 30, 2023, with at least one 90-day extension; (d) requiring the iMedia Group to complete a Private Investment in Public Equity (PIPE) of not less than $3,000,000 before closing; and (e) requiring the iMedia Group to provide, within three days before closing, evidence that it had redeemed at least 50% of an unrelated outstanding note, and paying that $19.99 million note in full within 12 months following closing.

111.  On March 31, 2023, Siena sent the iMedia Group a notice of default and reservation of rights letter, with extensive defaults noticed.

112.  Finally, Pontus Net Lease assigned all of its rights and obligations under the Sale-Leaseback Agreement to Defendant Pontus IMB, and on April 10, 2023, the sale-leaseback transaction closed and Pontus IMB entered into the Master Lease with iMedia Brands.

113.  A true and correct copy of the Master Lease is attached hereto as **Exhibit 4**.

114. The Master Lease covered properties located at "6740 Shady Oak Lane, Eden Prairie, Minnesota," 4811 Nashville Road, Bowling Green, Kentucky, and 4813 Nashville Road, Bowling Green, Kentucky.

115. Eden Prairie, Minnesota, does not contain a street named "Shady Oak Lane." Instead, the street is named "Shady Oak Road."  It is this street that was intended to be referred to in the Master Lease.

116. The Master Lease's "primary term" or "Original Lease Term" ends on April 30, 2048.

117. Section 3.2 of the Master Lease provides that the "Tenant shall have the option to extend the term of this Lease for up to two (2) separate options periods of ten (10) years each upon and subject to the terms set forth in this Section 3.2."  (Underlining in original.)

118. On April 10, 2023, and in connection with the Master Lease, Pontus IMB, iMedia Brands, EP Properties, and VVI also entered into the post-closing letter agreement referenced in paragraph 99 above ("the Letter Agreement").

119. A true and correct copy of the Letter Agreement is attached hereto as **Exhibit 5**.

120. Under the Letter Agreement, Pontus IMB required the tenants of the properties sold and leased back to perform repairs to those properties totaling more than $958,500.

121. Pontus IMB also required EP Properties to deposit $886,800 into an escrow account to cover the repairs to the Headquarters Building, and required the deposit of an additional $98,700 into escrow, for a total escrow deposit of $985,500.

122. These requirements were not provided for by the LOI or Sale-Leaseback Agreement

and further reduced the liquidity of the iMedia Group.

123.    Thus, by April 2023, Pontus Net Lease and Pontus IMB had extracted from the iMedia Group: (a) base rent of $4,536,000 per year, rather than the $4,320,000 set forth in the LOI and provided for by the Sale-Leaseback Agreement; (b) the 6690 building worth roughly $7,000,000 for no additional consideration or payment, instead of that property being retained by EP Properties; (c) a 25-year initial lease term, instead of the 21-year initial lease term set forth in the LOI and provided for by the Sale-Leaseback Agreement; (d) annual rent escalations of 3.0% annually, rather than 2.5% as set forth in the LOI and provided for in the Sale-Leaseback Agreement; (e) a security deposit of one year's rent, rather than the six-months' rent security deposit set forth in the LOI and provided for by the Sale-Leaseback Agreement; and (f) a property-repair requirement requiring the expenditure of more than $958,500, of which $985,500 was prefunded into escrow, to be reimbursed after the improvements were completed, straining cash flow.

124.    Pontus IMB also insisted on a complex set of provisions locking in its receipt of the 6690 Property, while paying the iMedia Group nothing for it.

125.    For example, Article 26 of the final Master Lease precluded the iMedia Group from subdividing the property before October 2023.

126.    The Master Lease further provides that if the iMedia Group files for bankruptcy protection, then its right to subdivide and purchase the 6690 Property from Pontus IMB for $100 would terminate. (Master Lease § 26.1.)

127.    Pontus IMB also would have the right to buy the 6690 Property for $100 after a

bankruptcy filing (*id.*), further evidencing that Pontus IMB never intended to provide reasonable value for the 6690 Property.

128.    On June 28, 2023 — less than three months after the iMedia Group closed the sale-leaseback with Pontus IMB and conveyed four buildings to Pontus IMB for limited short-term liquidity — the iMedia Group filed a Chapter 11 bankruptcy petition in the Bankruptcy Court.

129.    On August 10, 2023, the iMedia Group held an auction in which IV Media was selected as the winning bidder, after which the iMedia Group entered into an Asset and Equity Purchase Agreement ("the AEPA") with IV Media.

130.    A true and correct copy of the AEPA is attached hereto as **Exhibit 6**.

131.    The Bankruptcy Court approved the AEPA on August 15, 2023, in a Sale Order (ECF 461).

132.    On January 24, 2024, counsel for the Bankruptcy debtors (which included iMedia Brands), filed a notice of designation of assumption and assignment of the Master Lease (ECF 923), in which the debtors provided notice of their intent to assume and assign the Master Lease to "Buyer designee" IV Properties.

133.    The Bankruptcy Court accepted IV Properties' substitution as "Buyer designee" with respect to the Master Lease and related agreements in a February 12, 2024 Order (ECF 964 at 2).

134.    The Court's Order directed that:

> Effective upon payment of [$40,534.03], the Pontus Master Lease Agreement shall be deemed assumed by the Debtors and assigned to Buyer designee IV Media Properties LLC in

accordance with the terms of the Sale Order, as further set forth herein. Thereafter, (a) the Pontus Master Lease Agreement shall be a Purchased Contract under the Asset and Equity Purchase Agreement approved by the Sale Order, (b) the Pontus Objection shall be deemed withdrawn, and (c) the Pontus Administrative Claim shall be deemed satisfied and withdrawn.

(ECF 964 at 2 & 964-1.)

135. IV Properties duly paid Pontus the sum of $40,534.03, whereafter it became the Tenant (as that term is defined in the Master Lease) under the Master Lease.

136. Section 14.3 of the Master Lease provides, in relevant part, that "Tenant shall have the right to sublet any portion of the Property at any time without Pontus' consent (a) to any sublessee that is owned by or under common control of Tenant."

137. Pursuant to section 14.3 of the Master Lease and as permitted under section 14.3, IV Properties granted a non-exclusive license effective as of February 12, 2024, to Plaintiff IV Media — an affiliate of IV Properties and under common control with IV Properties — to occupy and use the leased premises.

## CAUSES OF ACTION

### COUNT I
### AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS/OBLIGATIONS
### 11 U.S.C. §§ 548(a)(1)(B), 550(a)
### (AGAINST PONTUS IMB PORTFOLIO, LLC AND PONTUS NET LEASE ADVISORS, LLC)

138. Plaintiffs incorporate paragraphs 1 through 137 as if fully set forth herein.

139. EP Properties, VVI, and iMedia Brands entered into the Sale-Leaseback Agreement and Letter Agreement, transferred the Kentucky Properties and Minnesota Properties to

Pontus IMB, and deposited $985,500 into escrow for the benefit of Pontus IMB, but did not receive reasonably equivalent value in exchange, with no consideration being provided for the Headquarters Building, and the reduction in value affecting not only EP Properties, but also, indirectly, iMedia Brands and VVI.

140.    Pontus IMB and Pontus Net Lease received the 6690 Property — valued at about $7 million — for free.

141.    When EP Properties, VVI, and iMedia Brands entered into the Sale-Leaseback Agreement and the Letter Agreement, transferred the Kentucky Properties and the Minnesota Properties to Pontus IMB, and deposited $985,500 into escrow, they (a) were insolvent on the date that the transfer was made and the obligations were incurred, or became insolvent as a result of such transfers and/or obligations; (b) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with EP Properties, VVI, and iMedia Brands was an unreasonably small capital; and/or (c) intended to incur, or believed that EP Properties, VVI, and iMedia Brands would incur, debts that would be beyond their ability to pay as such debts matured.

142.    Based on the foregoing, all of EP Properties', VVI's, and iMedia Brands' obligations under the Sale-Leaseback Agreement and the Letter Agreement relating to the Minnesota Properties and Kentucky Properties, the transfers of the Minnesota Properties and Kentucky Properties to Pontus IMB and Pontus Net Lease, and the transfer of $985,500 into escrow for the benefit of Pontus IMB and Pontus Net Lease may be avoided as fraudulent transfers/obligations under 11 U.S.C. § 548(a)(1)(B).

143.    Because IV Media and IV Properties stand in the shoes of the Bankruptcy Trustee, having purchased all "avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law," among other causes of action, (AEPA § 2.01(n)), IV Media and IV Properties here seek and are entitled to entry of an order and judgment avoiding as fraudulent transfers/obligations under 11 U.S.C. §§ 548(a)(1)(B) and 550(a) all of EP Properties', VVI's, iMedia Brands', IV Media's, and IV Properties' obligations under the Sale-Leaseback Agreement and the Letter Agreement relating to the Minnesota Properties and the Kentucky Properties, the transfers of the Minnesota Properties and the Kentucky Properties to Pontus IMB, and the transfer of $985,500 into escrow for the benefit of Pontus IMB, and awarding IV Media and IV Properties a judgment against Pontus IMB and Pontus Net Lease awarding IV Media and IV Properties all real estate and personal property conveyed in the Sale-Leaseback Agreement or, in the alternative, a monetary judgment for the value of the Minnesota Properties and the Kentucky Properties, and a monetary judgment for the $985,500 escrow payment.

## COUNT II
### AVOIDANCE AND RECOVERY OF FRAUDULENT
### TRANSFERS/OBLIGATIONS
### 11 U.S.C. §§ 548(a)(1)(B), 550(a)
### (AGAINST PONTUS IMB PORTFOLIO, LLC)

144.    Plaintiffs incorporate paragraphs 1 through 143 as if fully set forth herein.

145.    Under the Master Lease, Pontus IMB purported to lease the Kentucky Properties and the Minnesota Properties to iMedia Brands and purports to now lease the

Kentucky Properties and the Minnesota Properties to IV Properties.  Additionally, under the Letter Agreement, iMedia Brands was required to make certain repairs to the Kentucky Properties and the Minnesota Headquarters, which obligation was assumed by IV Properties.  But under Count I, Pontus IMB's ownership interest in the Kentucky Properties and the Minnesota Properties is voidable and will be voided.  Therefore, Pontus IMB had and has (a) no right to lease the Kentucky Properties and the Minnesota Properties to iMedia Brands or IV Properties and (b) no right to obligate iMedia Brands or IV Properties to make repairs to the Kentucky Properties and the Minnesota Headquarters.

146.    iMedia Brands entered into the Master Lease and the Letter Agreement with Pontus IMB and did not receive reasonably equivalent value in exchange.  Under the Master Lease and the Letter Agreement, iMedia Brands and IV Properties must pay rent to Pontus IMB for the Kentucky Properties and the Minnesota Properties, and perform other obligations relating to the Kentucky Properties and the Minnesota Properties, even though under Count I Pontus IMB does not own or have any interest in the Kentucky Properties and the Minnesota Properties.

147.    When EP Properties, VVI, and iMedia Brands entered into the Master Lease and the Letter Agreement with Pontus IMB, EP Properties, VVI, and iMedia Brands (a) were insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (b) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with EP Properties, VVI, and iMedia

Brands was an unreasonably small capital; and/or (c) intended to incur, or believed that EP Properties, VVI, and iMedia Brands would incur, debts that would be beyond their ability to pay as such debts matured.

148. Based on the foregoing, all of EP Properties', VVI's, and iMedia Brands' obligations under the Master Lease and the Letter Agreement relating to the Kentucky Properties and the Minnesota Properties, including, without limitation, rent, security deposits, maintenance and repair obligations, and the $985,500 escrow payment, may be avoided as fraudulent transfers/obligations under 11 U.S.C. § 548(a)(1)(B).

149. Because IV Media and IV Properties stand in the shoes of the Liquidating Trustee, having purchased all "avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law," among other causes of action, (AEPA § 2.01(n)), IV Media and IV Properties here seek and are entitled to entry of an order and judgment avoiding as fraudulent transfers/obligations under 11 U.S.C. § 548(a)(1)(B) and 550(a) all of EP Properties', VVI's, iMedia Brands', IV Media's, and IV Properties' obligations under the Master Lease and the Letter Agreement relating to the Kentucky Properties and the Minnesota Properties, including, without limitation, rent, security deposits, maintenance and repair obligations, and the $985,500 escrow payment, and awarding IV Media and IV Properties a monetary judgment against Pontus IMB for the amount of all rent and security deposits paid, all maintenance and repair obligations incurred that do not accrue to permanent value of the Kentucky

Properties and the Minnesota Properties, and the $985,500 escrow payment.

## COUNT III
### UNIFORM VOIDABLE TRANSACTIONS ACT
### MINN. STAT. §§ 513.44(a)(2), 513.45(a), AND 11 U.S.C. § 544
### (AGAINST PONTUS IMB PORTFOLIO, LLC AND
### PONTUS NET LEASE ADVISORS, LLC)

150.    Plaintiffs incorporate paragraphs 1 through 137 as if fully set forth herein.

151.    Many pre-petition creditors had state law Voidable-Transfer Act claims against the

Defendants.

152.    When the Bankruptcy was filed, the Bankruptcy Trustee acquired all state law

Uniform Voidable-Transfer Act claims and through the Bankruptcy sale assigned

those rights to IV Media, which now may assert state law Uniform Voidable

Transactions Act claims against the Defendants.

153.    EP Properties, VVI, and iMedia Brands entered into the Sale-Leaseback Agreement

and Letter Agreement, transferred the Kentucky Properties and Minnesota

Properties to Pontus IMB, and deposited $985,500 into escrow for the benefit of

Pontus IMB, but did not receive reasonably equivalent value in exchange, with no

consideration being provided for the Minnesota Headquarters, and the reduction in

value affecting not only EP Properties, but also, indirectly, iMedia Brands and VVI.

154.    Pontus IMB and Pontus Net Lease received the 6690 Property — valued at about

$7 million — for free.

155.    When EP Properties, VVI, and iMedia Brands entered into the Sale-Leaseback

Agreement and the Letter Agreement, transferred the Kentucky Properties and the

Minnesota Properties to Pontus IMB, and deposited $985,500 into escrow, they (a)

were engaged or were about to engage in a business or a transaction for which the remaining assets of the debtors were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtors would incur, debts beyond the debtors' ability to pay as they became due.

156. Based on the foregoing, all of EP Properties', VVI's, and iMedia Brands' obligations under the Sale-Leaseback Agreement and the Letter Agreement relating to the Minnesota Properties and Kentucky Properties, the transfers of the Minnesota Properties and Kentucky Properties to Pontus IMB and Pontus Net Lease, and the transfer of $985,500 into escrow for the benefit of Pontus IMB and Pontus Net Lease may be avoided under Minn. Stat. §§ 513.44(a)(2), 513.45(a), and 11 U.S.C. § 544.

157. Because IV Media and IV Properties stand in the shoes of the Liquidating Trustee, having purchased all "avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law," among other causes of action, (AEPA § 2.01(n)), IV Media and IV Properties here seek and are entitled to entry of an order and judgment avoiding under Minn. Stat. §§ 513.44(a)(2), 513.45(a), and 11 U.S.C. § 544 all of EP Properties', VVI's, iMedia Brands', IV Media's, and IV Properties' obligations under the Sale-Leaseback Agreement and the Letter Agreement relating to the Minnesota Properties and Kentucky Properties, the transfers of the Minnesota Properties and Kentucky Properties to Pontus IMB, and the transfer of $985,500 into escrow for the benefit of Pontus IMB, and awarding IV Media and IV Properties a judgment

against Pontus IMB and Pontus Net Lease awarding IV Media and IV Properties all real estate and personal property conveyed in the Sale-Leaseback Agreement or, in the alternative, a monetary judgment for the value of the Minnesota Properties and the Kentucky Properties, and a monetary judgment for the $985,500 escrow payment.

### COUNT IV
### UNIFORM VOIDABLE TRANSACTIONS ACT
### MINN. STAT. §§ 513.44(a)(2), 513.45(a), AND 11 U.S.C. § 544
### (AGAINST PONTUS IMB PORTFOLIO, LLC)

158.    Plaintiffs incorporate paragraphs 1 through 137 and paragraphs 151 through 157 as if fully set forth herein.

159.    Under the Master Lease, Pontus IMB purported to lease the Kentucky Properties and the Minnesota Properties to iMedia Brands and purports to now lease the Kentucky Properties and the Minnesota Properties to IV Properties. Additionally, under the Letter Agreement, iMedia Brands was required to make certain repairs to the Kentucky Properties and the Minnesota Headquarters, which obligation was assumed by IV Properties. But under Count III, Pontus IMB's ownership interest in the Kentucky Properties and the Minnesota Properties is voidable and will be voided. Therefore, Pontus IMB had and has (a) no right to lease the Kentucky Properties and the Minnesota Properties to iMedia Brands or IV Properties and (b) no right to obligate iMedia Brands or IV Properties to make repairs to the Kentucky Properties and the Minnesota Headquarters.

160.    iMedia Brands entered into the Master Lease and the Letter Agreement with Pontus

IMB and did not receive reasonably equivalent value in exchange. Under the Master Lease and the Letter Agreement, iMedia Brands and IV Properties must pay rent to Pontus IMB for the Kentucky Properties and the Minnesota Properties, and perform other obligations relating to the Kentucky Properties and the Minnesota Properties, even though under Count III Pontus IMB does not own or have any interest in the Kentucky Properties and the Minnesota Properties.

161.    When EP Properties, VVI, and iMedia Brands entered into the Master Lease and the Letter Agreement with Pontus IMB, EP Properties, VVI, and iMedia Brands, they (a) were engaged or were about to engage in a business or a transaction for which the remaining assets of the debtors were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the debtors would incur, debts beyond the debtors' ability to pay as they became due.

162.    Based on the foregoing, all of EP Properties, VVI, and iMedia Brands' obligations under the Master Lease and the Letter Agreement relating to the Kentucky Properties and the Minnesota Properties, including, without limitation, rent, security deposits, maintenance and repair obligations, and the $985,500 escrow payment, may be avoided under Minn. Stat. § 513.44(a)(2) and 11 U.S.C. § 544.

163.    Because IV Media and IV Properties stand in the shoes of the Liquidating Trustee, having purchased all "avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law," among other causes of action, (AEPA § 2.01(n)), IV Media and IV Properties here

seek and are entitled to entry of an order and judgment avoiding under Minn. Stat. §§ 513.44(a)(2), 513.45(a), and 11 U.S.C. § 544 all of EP Properties', VVI's, iMedia Brands', IV Media's, and IV Properties' obligations under the Master Lease and the Letter Agreement relating to the Kentucky Properties and the Minnesota Properties, including, without limitation, rent, security deposits, maintenance and repair obligations, and the $985,500 escrow payment, and awarding IV Media and IV Properties a monetary judgment against Pontus IMB for the amount of all rent and security deposits paid, all maintenance and repair obligations incurred that do not accrue to permanent value of the Kentucky Properties and the Minnesota Properties, and the $985,500 escrow payment.

## COUNT V
### *PLEADED IN THE ALTERNATIVE*
### DECLARATORY JUDGMENT 28 U.S.C. § 2201(a)
### (AGAINST PONTUS IMB PORTFOLIO, LLC)

164.    Plaintiff incorporates paragraphs 1 through 137 as if fully set forth herein.

165.    Count V is pleaded in the alternative to Counts I through IV.

166.    Article 26 of the Master Lease terminated the iMedia Group's right to subdivide the  6690 Property solely as a result of its bankruptcy filing.   This provision is unenforceable under 11 U.S.C. § 365(e)(1)(B).

167.    A justiciable controversy exists between the parties as to the enforceability of this provision in Article 26 of the Master Lease.

168.    28 U.S.C. § 2201(a) grants this Court the power to declare the rights and other legal relations of any interested party seeking such declaration, whether or not further

relief is or could be sought.

169. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

170. IV Media and IV Properties seek, and are entitled to, a declaratory judgment under 28 U.S.C. § 2201(a) that the provision in Article 26 of the Master Lease terminating the iMedia Group's right to subdivide the 6690 Property solely as a result of its bankruptcy filing is unenforceable under 11 U.S.C. § 365(e)(1)(B).

171. As a result, IV Media and IV Properties seek, and are entitled to, a declaratory judgment under 28 U.S.C. § 2201(a) that they — as successors-in-interest to the iMedia Group's rights under the Master Lease — have the right to subdivide the 6700 Shady Oak Road, Eden Prairie, Minnesota, lot to separate the 6690 Property and its land from the Headquarters Building and its land, as otherwise provided for in Article 26 of the Master Lease.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1. Entry of a judgment voiding the Sale-Leaseback Agreement;

2. Entry of a judgment restoring title to the real estate and personal property at issue in the Sale-Leaseback Agreement, substituting Plaintiff IV Media, LLC for EP Properties and VVI Fulfillment Center pursuant to the Bankruptcy Court's orders, and thus awarding title solely to Plaintiff IV Media, LLC or, in the alternative, awarding Plaintiff IV Media a monetary judgment for the value thereof;

3.    Entry of a judgment voiding the Master Lease;

4.    Entry of a judgment awarding Plaintiff IV Properties — as successor-in-interest to
      iMedia Brands pursuant to the Bankruptcy Court's orders — a judgment against
      Pontus IMB for the amount of all rent and security deposits paid and all maintenance
      and repair obligations incurred that do not accrue to permanent value of the
      Kentucky Properties and the Minnesota Properties, made from April 10, 2023,
      through the date of judgment;

5.    Entry of a judgment voiding the iMedia Post-Closing Obligations Agreement dated
      April 10, 2023, between Pontus IMB and EP Properties, VVI, and iMedia Brands;

6.    Entry of a monetary judgment in favor of Plaintiff IV Media — as successor-in-
      interest to EP Properties and VVI pursuant to the Bankruptcy Court's orders — and
      in favor of Plaintiff IV Properties — as successor-in-interest to iMedia Brands
      pursuant to the Bankruptcy Court's orders — against Pontus IMB for the principal
      amount of escrowed "Repair Costs reserve" funds of $958,500, plus interest.

7.    In the alternative, entering a declaratory judgment under 28 U.S.C. § 2201(a) that
      the provision in Article 26 of the Master Lease terminating the iMedia Group's right
      to subdivide the 6690 Property solely as a result of its bankruptcy filing is
      unenforceable under 11 U.S.C. § 365(e)(1)(B) and that IV Media and IV Properties
      — as successors-in-interest to the iMedia Group's rights under the Master Lease —
      have the right to subdivide the 6700 Shady Oak Road, Eden Prairie, Minnesota, lot
      to separate the 6690 Property and its land from the Headquarters Building and its
      land, as otherwise provided for in Article 26 of the Master Lease.

8.    Awarding Plaintiffs such additional and further relief as the Court may deem just

and equitable, including pre- and post-judgment interest.

### JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

*Signature block on next page*                    **STOEL RIVES LLP**

 DATED:  April 10, 2025                    *s/  Marc A. Al*
                                           Marc A. Al  (247923)
                                           33 South Sixth Street, Suite 4200
                                           Minneapolis, MN  55402
                                           Telephone: (612) 373-8801
                                           Facsimile:  (612) 373-8881
                                           marc.al@stoel.com

                                           Bryan T. Glover
                                               (Washington State Bar No. 51045)
                                               (*pro hac vice* petition to be submitted)
                                           600 University Street, Suite 3600
                                           Seattle, WA  98101
                                           bryan.glover@stoel.com

                                           **COUNSEL FOR PLAINTIFFS
                                           IV MEDIA, LLC, AND
                                           IV MEDIA PROPERTIES, LLC**

# EXHIBIT 1

DocuSign Envelope ID: ...



November 8, 2022

Al Lieberman
Principal
B Riley Real Estate, LLC
875 N. Michigan Ave Suite 3900
Chicago, IL 60611

RE:  Sale-Leaseback of iMedia Brands Facilities

Dear Al:

B Riley Real Estate, LLC ("**Advisor**") has requested that Pontus Net Lease Advisors, LLC, an affiliate of Pontus Capital, LLC, its managed funds, affiliates and assigns ("**Purchaser**") consider purchasing the iMedia Brands facilities identified on Exhibit A attached hereto (each, a "**Property**" and collectively, the "**Properties**") and simultaneously entering into absolute triple net master leases with the ability to sublease each property to each of the proposed single-purpose entity tenants operating at each of the Properties ("**Tenant**").  Purchaser is willing to consider acquiring the Property substantially under the terms and conditions set forth in the Outline of Proposed Terms and Conditions attached hereto ("**Term Sheet**").  Purchaser's proposal for the acquisition is subject to, among other things, the satisfaction of the terms and conditions contained in this proposal letter and in the Term Sheet.

Seller and Purchaser acknowledge that the Term Sheet is intended as an outline only and does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions that would be contained in definitive legal documentation. Any commitment by Seller and Purchaser will be subject to, among other things, the negotiation and execution of definitive documents. Such definitive legal documentation shall be in form and substance satisfactory to Purchaser, Seller and Tenant.

**This proposal letter and the attached Term Sheet are not intended to be, and shall not be deemed to be or construed as, a commitment by Purchaser to acquire the Property from Seller or Seller to sell the Property to Purchaser, or for Purchaser and Tenant to enter into a lease.** Purchaser's willingness to acquire the Property is subject to its satisfaction with such analyses and reviews of Tenant and its continuing satisfaction with the results thereof. Furthermore, if Purchaser discovers information not previously known to it which it believes is materially negative information with respect to the condition (financial or otherwise), business, operations, assets, liabilities or prospects of Tenant, any other credit party, their respective assets and businesses or the Property, Purchaser *may*, in its sole discretion, suggest alternative purchase amounts or structures that assure adequate protection for it or decline to acquire the Property.

This proposal letter, including the attached Term Sheet, (i) supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect thereto, and (ii) shall be governed by the laws of the State in which the properties are located, without giving effect to the conflicts of law or choice of law provisions thereof. Should the terms and conditions of the proposal contained herein meet with your approval, please indicate your acceptance by signing and returning a copy of this proposal letter to Purchaser. The terms and conditions of this proposal letter shall expire at the end of day on Wednesday, November 9, 2022.

Very truly yours,

**Pontus Net Lease Advisors, LLC**

By: _Michael Press_

Name:  Michael Press

Title:    Managing Partner

Agreed and Accepted on this ___ day of November, 2022:

**iMedia Brands**

By: _____

Name:  Tim Peterman

Title:  CEO

DocuSign Envelope ID: ACD7EB9B-B15D-4306-A17E-E585C6BB2B79

## OUTLINE OF PROPOSED TERMS AND CONDITIONS

| | |
|---|---|
| **Seller:** | iMedia Brands, Inc |
| **Tenant / Lessee:** | To be determined. |
| **Lease Guarantor** | iMedia Brands, Inc. |
| **Purchaser / Lessor:** | A newly formed special purpose entity affiliated with Purchaser, or its assignees. |
| **Title Company:** | First American Title Insurance Company, New York. |
| **Contract:** | Purchaser shall draft, and Purchaser and Seller shall endeavor to negotiate and execute, a definitive asset purchase agreement ("**APA**"), all within twenty (20) business days following the execution of this Term Sheet. |
| **Due Diligence Period:** | Upon execution of the APA, Purchaser shall draft a form of Lease which form shall be used for each of the Properties, and which form shall contain provisions contained herein and customarily found in agreements for similar transactions, and Seller shall provide Purchaser with reasonable applicable diligence information in Seller's actual possession regarding the applicable Property, including any existing third-party reports and diligence with respect to environmental, title, zoning, property condition, geotechnical, and survey matters. Purchaser may seek reasonable new or updated third party property reports and Seller shall be responsible for the reasonable and documented costs thereof (as more fully described, and subject to the limitations set forth, below in the section entitled "**Third Party Due Diligence**"). Purchaser shall complete its review of the diligence materials by the date that is the later of (i) ten (10) business days following the delivery to Purchaser of the environmental report, zoning report, property condition report, title commitment and survey, or (ii) forty (40) days after the mutual execution of the APA ("**Due Diligence Period**"). |
| **Closing Date:** | Closing shall occur fifteen (15) business days following expiration of the Due Diligence Period. |
| **Property:** | The land and building improvements, including any fixtures, permanent equipment, and other unencumbered equipment or fixtures that are critical to the operations of the Property that are located at the Property and to be further detailed in the Lease, as identified on Exhibit A attached hereto ("**Property**"). |
| **Purchase Price:** | The Purchase Price shall be Forty Eight Million Dollars ($48,000,000) ("**Purchase Price**"). |

DocuSign Envelope ID: ACD1EB5B-B19D-4306-A17E-E548C9BB2879

| **Purchaser Deposit:** | Once Purchaser delivers a notice to Seller during the Due Diligence Period to confirm that Purchaser has affirmatively completed its Due Diligence to its satisfaction, described herein  Purchaser shall deposit $400,000 with the Title Company as a good faith deposit, which shall be applicable to the Purchase Price at Closing. |
|---|---|
| **Commitment Fee:** | Pontus Net Lease Advisors, LLC shall earn a commitment fee equal to one percent (1%) of the Purchase Price. $150,000 of the commitment fee will be payable within three (3) days following execution of the APA **"Deposit"**.  The remaining balance will be due and payable on the closing date, provided, however the remaining balance will only not be owed in the event of a Purchaser default under the PSA.  If Purchaser terminates the transaction during the Due Diligence Period (at no fault of Seller), then Purchaser shall return the Deposit, less its out of pocket expenses incurred to date. |
| **Purpose:** | Sale-leaseback proceeds shall be used to pay down outstanding Guarantor debt. |
| **Financing:** | The proposal and this Term Sheet assume that Purchaser intends to close with mortgage financing on the Property, however Purchaser does not require any financing or a mortgage on the Property to complete the transaction and the transaction shall not be subject to any Purchaser financing contingency or condition. |
| **Lease Type:** | Purchaser shall draft and the parties shall negotiate in an effort to agree to a single, triple-net master lease for the Properties (the **"Lease"**).  To the extent that the Lessor sells or transfers its interests in any of the properties (**"Lease Transfer"**), the Tenant will execute a new, triple net lease, which shall be on substantially identical terms to the Lease and contain a rent advancement provision. |
| **Primary Lease Term:** | Twenty one (21) years. |
| **Renewal Options:** | Two (2), ten-year renewal options exercisable by Tenant no less than twelve (12) months prior to the expiration of the then-current term, so long as no default remains uncured beyond any applicable notice and cure period.  Tenant may exercise renewals in its sole discretion. |
| **Annual Base Rent:** | Upon commencement of the Lease, the Annual Base Rent for the Property shall be $4,320,000. |
| | Annual Base Rent shall be net of all taxes, insurance, and property maintenance expenses related to the Property after Closing, which taxes, insurance, and property maintenance expense shall be paid by Tenant. |

| | |
|---|---|
| **Security Deposit:** | At Closing, the Tenant shall provide Landlord with a letter of credit or cash security deposit equal to six (6) months of Base Rent. The Lease shall provide for an adjustment to the Security Deposit, provided Tenant is not then in default under the Lease and based upon certain credit metrics or operating benchmarks, which shall be mutually agreed upon by Landlord and Tenant. |
| **Rent Escalations:** | The Annual Base Rent shall increase by two and one half percent (2.5%) per year, including during the renewal option periods, if exercised. |
| **Lease Assignment:** | Tenant may freely assign the Lease without Lessor consent (a "**Lease Assignment**") provided that either (i) such Lease Assignment occurs in connection with a sale of all or substantially all of Tenant's assets, stock or other interests (or the stock or interests of Tenant's corporate parent(s) – i.e. a direct or indirect change of control), or (ii) the assignee has an investment grade credit rating as provided for by S&P / Moody's, or has creditworthiness substantially equal to or superior than that of Tenant at the time of such Lease Assignment, based on standards reasonably determined by the Lessor. Any other Lease Assignment is subject to the Lessor's consent, not to be unreasonable withheld, conditioned or delayed.  Upon Lease Assignment, Tenant and Guarantor will be released from any future obligations. |
| **Subleases:** | Tenant shall have the right to sublet any portion of the Property at any time to any entity (i) owned by or under common control of Tenant, or (ii) that is subject to Lessor's consent, which can't be unreasonably withheld, provided that any such sublease shall not release Tenant from any of its obligations under the Lease nor extend beyond the controllable term of Tenant.  Lessor shall execute and deliver a non-disturbance agreement to a subtenant upon Tenant's request, subject to reasonable conditions agreed upon by Lessor and Tenant. |

DocuSign Envelope ID: ACD7EB5B-B16D-4306-A17E-E645C6BB2879

| | |
|---|---|
| **Covenants:** | The Lease will contain covenants customarily found in agreements for similar transactions, including continuous operation requirements, and periodic financial reporting with respect to (i) the Property individually on a quarterly basis (YTD P&L), and (ii) the Guarantor on an annual (audited) and quarterly (company prepared and only if available) basis. Tenant shall also provide quarterly Property-level P&Ls on a trailing twelve month basis. |
| **Alterations:** | Any alterations of the Property which are structural in nature or cost more than $500,000 for any one of the Properties will require Lessor consent, not to be unreasonably withheld, conditioned or delayed. |
| **Insurance:** | The Lease will contain insurance requirements customarily found in agreements for similar transactions and others appropriate to the specific transaction. |
| **Casualty & Condemnation:** | The Lease will contain casualty and condemnation provisions customarily found in agreements for similar transactions and others appropriate to the specific transaction. |
| **Representations & Warranties:** | The Lease and the Agreement shall contain representations and warranties customarily found in agreements for similar transactions and others appropriate to the specific transaction. |
| **Third Party Due Diligence:** | Purchaser shall be entitled to conduct at its cost (except as otherwise herein indicated) due diligence with respect to environmental, title, zoning, survey matters, and property condition for the Property; provided that such due diligence shall be non-invasive and shall be customary for similar transactions and appropriate to the specific transaction. Purchaser shall have the right to visually inspect the Property prior to the Closing. Seller shall reasonably cooperate with Purchaser's reasonable requests in connection with such due diligence. The APA shall contain a customary indemnification by Purchaser for any direct and actual damages caused to the Property as a result of Purchaser's diligence inspections. |
| | To the extent Seller or Tenant have existing vendors in connection with the survey, zoning, property condition, geotechnical or environmental reports, Purchaser agrees to accept such vendors, provided the same are commercially reasonable and appropriately licensed in their respective fields. Provided Purchaser promptly requests such new or updated diligence in writing, Tenant shall be responsible for the costs of any new environmental reports, land surveys according to "ALTA" (or local equivalent) standard requirements, zoning reports and property condition reports (collectively, **"Third Party Reports"**). In addition, Seller or Tenant shall be responsible for the premium for a standard owner's policy of title insurance in the amount of the Purchase Price, transfer |

DocuSign Envelope ID: ACDTEB5B-B15D-430B-A17E-E545C5BB2879

taxes, deed preparation, recording, and escrow fees. Seller shall be responsible for the cost of any endorsements to the owner's title policy(ies) of title insurance, and the Purchaser shall be responsibility for the costs associated with any financing by Purchaser, if applicable. Each party shall bear the costs of its own legal fees.

**Conditions Precedent:**

The conditions to the closing of the sale-leaseback transaction will be those customarily found in similar agreements and others appropriate to the specific transaction, including:

- Current organizational chart including Tenant and all affiliates.

- Negotiation of a master triple net lease.

- Review of sources and uses at close, and proforma balance sheet.

- Management meeting and property inspections.

- Detail on historical and anticipated capex.

- The Lessor shall have completed its satisfactory review of Third Party Due Diligence material with respect to the underlying Property and completed its inspections with satisfactory results, in each case, within the Due Diligence Period.

- No material adverse change in the Tenant's or Guarantor's financials, which the Lessor reasonably deems material to its business, condition (financial or otherwise), operations, performance, property or prospects shall have occurred which would reasonably be expected to impair Tenant's or Guarantor's ability to perform its obligation as Tenant under the Lease.

- All documentation relating to the Lease shall be in form and substance reasonably satisfactory to the Lessor and Tenant.

- The Lessor shall have received such corporate resolutions, certificates and other authorization documents as the Lessor shall reasonably request to evidence Seller's authority to enter into the APA and/or Tenant's and Guarantor's authority to enter into the Lease, as applicable.

- No order, stay, injunction or restraining order, or any pending or threatened litigation shall exist which, if decided against Seller, Tenant or Guarantor, (i) would be likely to have a material adverse effect on the business, condition (financial or otherwise), operations, performance, property or prospects of the Seller, Tenant or Guarantor, or (ii) would be likely to have a material adverse effect on (a) the ability of Seller to consummate the transaction contemplated by the APA, (b) the ability of Tenant or Guarantor to perform its obligations under the Lease documentation, or (c) the Lessor's rights and remedies under the Lease.

**Events of Default:** The Lease will contain events of default pertaining to the Tenant customarily found in similar agreements and others appropriate to the specific transaction, subject to reasonable notice and cure periods, including, but not limited to, failure to pay rent or fees when due; any representation or warranty materially incorrect when made or deemed made; failure to perform or observe Lease covenants; reorganization, liquidation, voluntary or involuntary bankruptcy or insolvency proceedings or other bankruptcy defaults, or default under any material agreement, including but not limited to leases or agreements with lenders.

**Compliance with Laws:** Tenant shall ensure material compliance with all applicable laws, provided that the Lease shall provide Tenant with reasonable customary cure periods and contest rights.

**Indemnification:** The Lease will contain indemnification provisions customarily found in similar agreements and others appropriate to the specific transaction, subject in each case to lease accounting and tax considerations.

**Assignment and Participation:** The Lease will include such provisions with respect to assignment and participation by the Lessor as are customarily found in similar agreements.

**Governing Law:** California.

**Confidentiality:** The proposal letter and this Term Sheet are confidential and should be treated accordingly. Each of the parties hereto agrees to keep the acquisition of the Property as outlined herein in strict confidence and shall not disclose the purchase price, terms or any aspect of the proposal letter and this Term Sheet with any other party, other than Tenant, Tenant's franchisor, Purchaser and their respective representatives, advisors, equity holders, and financing sources.

**Exclusivity:** For sixty (60) days following the full execution of this Term Sheet (the "**Exclusivity Period**"), Tenant and its advisors will cease all discussions with prospective sale-leaseback providers or other

asset-based financing sources.  In addition, Seller and Tenant will not solicit or accept any additional offers, binding or otherwise, during the Exclusivity Period.

Except for the provisions relating to the Exclusivity period, Commitment Fee, Confidentiality, and Expenses as provided herein, (i) it should be understood that this proposal is not intended to bind the parties and that its submission in no way creates rights or obligations for Purchaser, Tenant or Seller with respect to the terms contained herein and (ii) unless and until binding transaction documents with respect to the transactions contemplated under the proposal and this Term Sheet are approved and unconditionally delivered by all parties, the terms contained herein are to be used for discussion purposes only.

### EXHIBIT A – PROPERTY SUMMARY

1. 4811 Nashville Rd, Bowling Green, KY
2. 4813 Nashville Rd, Bowling Green, KY
3. 6740 Shady Oak Lane, Eden Prairie, MN

# EXHIBIT 2

# PURCHASE AND SALE AGREEMENT AND
# JOINT ESCROW INSTRUCTIONS (MULTI-STATE)

**THIS PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (MULTI-STATE)** (this "<u>Agreement</u>") is made and entered into as of December 20, 2022 ("<u>Effective Date</u>"), by and between **PONTUS NET LEASE ADVISORS, LLC**, a Delaware limited liability company, its successors and/or assigns ("<u>Purchaser</u>"), and **EP PROPERTIES, LLC,** a Minnesota limited liability company ("<u>EPP</u>") and **VVI FULFILLMENT CENTER, INC.**, a Minnesota corporation ("<u>VVIF</u>" and together with EPP, individually a "<u>Seller</u>"). Except as otherwise expressly defined herein, capitalized terms will have the meanings set forth on <u>Schedule A</u> attached hereto and incorporated herein by this reference.

## RECITALS

A.    EPP owns that certain parcel of real property in Minnesota legally described on <u>Exhibit A</u> attached hereto (the "<u>Shady Oak Property</u>").

B.    Pursuant to Section 1.06 below, Seller intends to legally subdivide the Shady Oak Property into the two parcels depicted on the attached <u>Exhibit A-1</u> as the "<u>Minnesota Property</u>" and the "<u>Seller Retained Parcel</u>", and convey the Minnesota Property to Purchaser pursuant to the terms of this Agreement (with Seller retaining ownership of the Seller Retained Parcel).

C.    VVIF (i) owns those certain parcels of real property in Kentucky legally described on <u>Exhibit A</u> attached hereto (the "<u>Kentucky Owned Property</u>"), and (ii) is the lessee of certain parcels of real property legally described on <u>Exhibit A</u> attached hereto (the "<u>Kentucky Bond Property</u>", and together with the Kentucky Owned Property, the "<u>Kentucky Property</u>"), pursuant to that certain Agreement of Lease between VVIF and United States of America Commonwealth of Kentucky County of Warren, Kentucky dated December 1, 2014 (the "<u>Bond Lease</u>"). The Minnesota Property and Kentucky Property are referred to herein as the "<u>Real Property</u>".

D.    Unless Purchaser provides written approval of the Bond Lease during the Inspection Period, VVIF agrees to exercise its option under the Bond Lease to purchase the Kentucky Bond Property prior to Closing.

E.    EPP agrees to sell, transfer and convey its interest in the Minnesota Property to Purchaser, and VVIF agrees to sell, transfer and convey its interest in the Kentucky Property to Purchaser, and Purchaser agrees to purchase the Minnesota Property from EPP and the Kentucky Property from VVIF, all on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants, representations, conditions and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby agrees to sell to Purchaser, and Purchaser hereby agrees to purchase from Seller, the Property, on the following terms and conditions:

DocuSign Envelope ID: 15B43028-00D3-441A-987B-289D12E3F153

# ARTICLE I
# PURCHASE OF PROPERTY

**Section 1.01    Agreement to Purchase**. Purchaser agrees to purchase, and Seller agrees to sell in accordance with the terms, conditions and stipulations set forth in this Agreement (the "Transaction"), all of Seller's right, title and interest in and to (a) Seller's interest in the Real Property as described in the Recitals; (b) all improvements located on or about the Real Property and any fixtures, permanent equipment and other unencumbered equipment or fixtures, excluding Seller's Retained Property; (c) personal property Owned by Seller, excluding Seller's Retained Property; (d) all licenses, contracts and permits associated with the ownership and operation of the Real Property (excluding those related to the business conducted thereon by Seller), if any, to the extent transferable and assignable pursuant to applicable law, but only to extent relating solely to the Real Property; and (e) all rights and appurtenances pertaining to the land, including any and all mineral and water rights Owned by Seller, and all right, title and interest of Seller in and to adjacent streets, alleys or rights-of-way, if any, all of which will be included in the Lease as equipment that is leased to tenant (collectively, the "Property"), provided, however, the Property shall not include: (i) any of Seller's personal property used by Seller in connection with the operation of its business on the Real Property, (ii) any trade fixtures and used by Seller in connection with the operation of its business on the Real Property, if any, that are identified in an exhibit to the Lease as items owned by tenant, and (iii) any of Seller's or Tenant's intellectual property, trademarks, trade names, brand marks, brand names, trade dress or logos relating thereto, provided that anything affixed to the improvements shall be identified in an exhibit of the Lease as items owned by tenant (collectively, "Seller's Retained Property").  Notwithstanding the foregoing or anything to the contrary contained herein, a specific list of Seller's Retained Property will be finalized and agreed upon by the parties during the Inspection Period and included as an exhibit to the Lease Agreement (defined below).

**Section 1.02    Purchase Price.** The purchase price to be paid by Purchaser to Seller for the purchase of the Property is Forty-Eight Million Dollars ($48,000,000.00) (the "Purchase Price"), which shall be allocated between the Real Property by Seller prior to Closing, which allocation shall be subject to Purchaser's approval, which approval shall not be unreasonably withheld, conditioned or delayed; provided that the foregoing approval rights only apply if Purchaser's allocation is materially unreasonable.  The Purchase Price shall be payable as follows:

(a)    ***Independent Consideration***.  Simultaneously with the execution of this Agreement, Purchaser shall deliver to Title Company the sum of One Hundred and No/100 Dollars ($100) as "contract consideration" which Seller acknowledges is adequate consideration for Seller entering into this Agreement with Purchaser.

(b)    ***Deposit***.  Within three (3) business days following Purchaser's delivery of its Notice to Close, Purchaser shall deliver by wire transfer of funds to the account of Title Company designated in writing by the Title Company a sum in the amount of Four Hundred Thousand and 00/100 Dollars ($400,000.00) (which earnest money deposit, together with any interest and dividends earned thereon, is herein referred to as the "Deposit") with the Title Company. The Deposit shall be non-refundable, except as otherwise expressly provided in this Agreement.

(c)    ***Balance***.  The balance of the Purchase Price plus or minus other adjustments required under this Agreement, shall be paid by Purchaser at Closing by wire transfer of immediately

US.354152029.06
4874-6198-0479.8

available funds in such amount in accordance with the written instructions delivered by the Title Company to the Purchaser.

**Section 1.03    Lease of Property.** Prior to the termination of the Inspection Period, (i) Tenant and Purchaser shall engage in good faith negotiations to draft and agree upon a triple-net master lease agreement in form and substance reasonably satisfactory to Tenant and Purchaser (the "Lease Agreement"). The Lease Agreement shall contain the essential terms and conditions provided in the Letter of Intent (the "Minimum Lease Terms") and any additional terms contemplated in this Agreement; it being understood if Tenant deviates from or attempts to renegotiate the Minimum Lease Terms, then Purchaser shall have the option of terminating this Agreement at any time prior to the end of the Inspection Period, in which event the Deposit, if previously paid, shall be returned to Purchaser, and Seller shall pay to Purchaser such amount to satisfy all of Purchaser's costs and expenses incurred in reliance on this Agreement (including, without limitation, its due diligence costs (to the extent not directly paid by Seller) and attorneys' fees and costs, and neither party shall have any further obligation or liability, except for the obligations set forth herein which are expressly stated to survive termination of this Agreement. Purchaser acknowledges that (i) the Minimum Lease Terms do not include all the terms of a lease agreement and, in some cases, do not expressly and clearly described in full the matters reflected, and Tenant shall not be limited in its negotiation of any of the remaining terms that are not expressly and clearly described in full in the Minimum Lease Terms, and (ii) while the parties shall negotiate in good faith, each of Purchaser and Tenant, as the case may be, may use their sole and absolute discretion in negotiating the final terms of the Lease Agreement.  If Purchaser and Tenant have not agreed in writing on the final form of the Lease Agreement before the end of the Inspection Period, either Purchaser or Seller may terminate this Agreement by delivering written notice of such election to the other at any time until Purchaser and Tenant have agreed in writing on the final form of the Lease Agreement and, upon such termination, the Deposit shall be returned to Purchaser.  If the parties have agreed on the final form of the Lease Agreement as provided herein, on the Closing Date, Tenant and Purchaser shall execute and deliver the Lease Agreement, pursuant to which Purchaser shall lease the Property to Tenant, at the rent and pursuant to the terms and conditions contained therein.

**Section 1.04    Prorations.** In view of the subsequent lease of the Property to Tenant pursuant to the Lease Agreement and Tenant's obligations thereunder, there shall be no proration of insurance, taxes, special assessments, utilities or any other costs related to the Property between Seller and Purchaser at Closing. All real and personal property and other applicable taxes and assessments, utilities and other charges relating to the Property which are due and payable on or prior to the Closing Date shall be paid by Seller, in the ordinary course of its business, at or prior to Closing, and all other taxes and assessments, utilities and any such other charges shall be paid by Tenant in accordance with the terms of the Lease Agreement.

**Section 1.05    Transaction Costs.** Seller shall be responsible for the payment of the Due Diligence Expenses incurred by Purchaser (or by Seller directly on behalf of Purchaser) in connection with the Transaction. "Due Diligence Expenses" means any and all reasonable out-of-pocket costs and expenses incurred by Purchaser (or by Seller directly on behalf of Purchaser), including, without limitation, those costs and expenses set forth in Section 2.03, the costs of any new or updated Reports (as defined below), the Survey (as defined below), the Title Commitment (as defined below), and the Title Policy (as defined below) including all endorsements, escrow fees, applicable State and local transfer taxes, document recording fees related to any closing and escrow fees charged by the Title Company (including costs charged by any Title Company branch office).  Each party shall be

3

responsible for the payment of the fees and expenses of its respective legal counsel, accountants and other professional advisers. Purchaser shall be solely responsible for any fees or costs related to financing the Property, including any lender's title insurance policy, mortgage fees or costs or mortgage recording taxes.

**Section 1.06    Shady Oak Property Subdivision**. As described in the Recitals, Seller shall, at its sole cost and expense, use commercially reasonable efforts to legally subdivide the Shady Oak Property into the two parcels depicted on the attached Exhibit A-1 as Lot 2 (the "Minnesota Property") and Lot 1 (the "Seller Retained Parcel"), and convey the Minnesota Property to Purchaser pursuant to the terms of this Agreement. Purchaser acknowledges that the boundary lines depicting the lot split of the Shady Oak Property are not final and is subject to modification as reasonably determined by Seller. Prior to submission of the subdivision application to the applicable governmental authority for approval, but in all events not later than ten (10) days prior to the end of the Inspection Period, Seller shall deliver a final copy of the subdivision map to Purchaser for its approval. If Purchaser disapproves of the subdivision map, it shall deliver written notice specifying such objections in writing within five (5) days after its receipt of such approval request. If Purchaser disapproves the subdivision map, Purchaser and Seller shall negotiate in good faith for a period of five (5) additional days to agree on the final location of the subdivision boundaries. If Purchaser and Seller cannot agree on the final subdivision map to be submitted within such five (5) day discussion period, either party may terminate this Agreement by delivering written notice of such election to the other at any time within five (5) business days thereafter. Once the final subdivision boundaries are approved by Purchaser and Seller, this Agreement shall be amended to replace the current depiction of the Minnesota Property and Seller Retained Parcel attached as Exhibit A-1 with an updated depiction reflecting the final approved boundaries of each parcel. At Seller's expense, each of Purchaser and Seller shall reasonably cooperate to complete the subdivision. If the subdivision cannot be completed until after Closing Date specified in Section 3.01, Seller, at Seller's option, may elect either to (i) extend the Closing Date to a date determined by Seller to accomplish the subdivision, provided that (x) Seller exercises its right to extend the Closing Date prior to expiration of the Inspection Period, and (y) any extended Closing Date is subject to the approval of Purchaser, which approval shall not be unreasonably withheld; or (ii) convey the entirety of the Shady Oak Property to Purchaser at Closing without any change in the Purchase Price, lease it back pursuant to the Lease Agreement, and include in the Lease Agreement. Following such subdivision, Seller may repurchase the Seller Retained Parcel from Purchaser for $100, free and clear of any liens or mortgages created by or through Purchaser, and record the REA (as defined below). If the subdivision is not accomplished or the Seller Retained Parcel is not conveyed back to Seller during the term of the Lease Agreement for any reason, then Seller's purchase option as set forth in this Agreement shall be null and void and of no further force and effect. The term "Minnesota Property" as it is referred to herein shall automatically be amended to mean the Shady Oak Property, and the Lease shall (i) permit Tenant's sublease of the Seller Retained Parcel during the term of the Lease, and (ii) Tenant shall have a right of first offer to repurchase the entire Minnesota Property, subject to and upon the terms and conditions to be specified in the Lease.

**Section 1.07    REA**. In the event Seller completes the subdivision of the Shady Oak Property as contemplated in Section 1.06, concurrently with the recording of the subdivision map in the County records, Seller intends to record a reciprocal easement and operating agreement encumbering each of the Minnesota Property and the Seller Retained Parcel that contains certain reciprocal easements and agreements pertaining to the use and operation of the Shady Oak Property, including shared access drives, parking, stormwater and utility easements, signage and maintenance (the "REA"). Promptly following the final determination of the boundary lines for the subdivision pursuant to Section 1.06,

US.354152029.06
4874-6198-0479.8

Seller shall prepare a preliminary draft of the REA and deliver it to Purchaser for its approval, in its reasonable discretion. If Purchaser disapproves of the proposed REA, it shall deliver written notice specifying such objections in writing within ten (10) days after its receipt of such approval request. If Purchaser disapproves the proposed REA, Purchaser and Seller shall negotiate in good faith for a period of ten (10) additional days to agree on the final REA. If Purchaser and Seller cannot agree on the final REA within such ten (10) day discussion period, either party may terminate this Agreement by delivering written notice of such election to the other at any time before the earlier to occur of the end of the Inspection Period or ten (10) days after the end of such ten (10) day discussion period.

## ARTICLE II
## DUE DILIGENCE

**Section 2.01    Title Insurance.**

(a)    ***Survey, Title Commitment and Title Policy.*** Seller has delivered to Purchaser, a title insurance commitment (the "Title Commitment") with respect to each Real Property issued by the Title Company, as well as copies of all documents referred to as exceptions to title in the Title Commitment. The Title Commitment has been issued by the St. Louis branch of the Title Company. Seller shall coordinate with Title Company so the Closing shall occur using the New York branch of Title Company. Seller shall deliver to Purchaser an existing survey of each Real Property and cause a licensed surveyor or civil engineer to update such survey or provide a new survey, in sufficient detail to provide ALTA owner's coverage to Purchaser in connection with the Title Policy (the "Survey"). It shall be a condition to Purchaser's obligation to consummate the Transaction that the Title Company shall issue to Purchaser at Closing an ALTA Owner's Title Insurance Policy, together with any endorsements to the ALTA Owner's Title Insurance Policy that Purchaser may reasonably require (collectively, the "Title Policy"). The Title Commitment, the Title Policy (including all endorsements) and updates to the existing survey or a new survey shall be paid by Seller to the extent not otherwise reimbursed by Seller to Purchaser as Due Diligence Expenses.

(b)    ***Title Company.*** The Title Company is hereby engaged by the parties to act as Title Company in connection with this Transaction. This Agreement shall be used as instructions to the Title Company, which may provide its standard conditions of acceptance of escrow; provided, however, that in the event of any inconsistency between such standard conditions of acceptance and the terms of this Agreement, the terms of this Agreement shall prevail. The Title Company's receipt of this Agreement and the opening of an escrow pursuant to this Agreement shall be deemed to constitute conclusive evidence of the Title Company's agreement to be bound by the terms and conditions of this Agreement pertaining to the Title Company.

(c)    ***Title Company Actions.*** The Title Company shall not cause the Transaction to close unless and until it has received written instructions from Purchaser and Seller to do so.

(d)    ***Title Objections.***

(i)    No later than ten (10) days prior to expiration of the Inspection Period, Purchaser shall notify Seller in writing of Purchaser's objection to any exceptions or other title matters shown on the Title Commitment or survey matters shown on the Survey of any parcel

5

of the Real Property (each, a "Title Objection"). Seller shall notify Purchaser in writing (the "Title Response"), within five (5) Business Days of Seller's receipt of the Title Objections, whether it will attempt to remove or resolve such Title Objection prior to the Closing Date, not being under any obligation to do so.  Any matters Seller agrees to attempt to remove or resolve prior to Closing will become a condition to Closing.  Failure to respond to any such Title Objection shall be deemed an election by Seller not to cure such Title Objection.  If Seller elects not to remove or resolve any Title Objection, then Purchaser shall have the option, as its sole remedy, upon written notice to Seller within five (5) Business Days after Purchaser's receipt of the Title Response (or Seller's deemed election upon expiration of such response period), to waive such Title Objection or to terminate this Agreement, whereupon the Deposit shall be returned to Purchaser and neither Purchaser nor Seller shall have any further duties or obligations under this Agreement, except as otherwise provided herein. Any Title Objections that are waived hereunder shall be Permitted Encumbrances.

(ii)    If any supplement to a Title Commitment or the survey discloses any additional title defects not shown on the original Title Commitment which were not created by or with the consent of Purchaser, Purchaser shall notify Seller in writing of its objection thereto (each, an "Additional Title Objection") within five (5) Business Days following receipt of such supplement or revision, but in no event later than the Closing Date. If any Additional Title Objection is not removed or resolved by Seller to Purchaser's reasonable satisfaction prior to the Closing Date, then Purchaser shall have the option, as its sole remedy, either to waive such Additional Title Objection and proceed to Closing or to terminate this Agreement upon written notice to Seller on or before the Closing Date, and if terminated, the Deposit shall be returned to Purchaser and neither Purchaser nor Seller shall have any further duties or obligations under this Agreement, except as otherwise provided herein. Any Title Objections that are waived hereunder shall be Permitted Encumbrances.

(iii)    Purchaser's failure to timely deliver a Title Objection or an Additional Title Objection within the applicable time period shall be deemed Purchaser's acceptance of the matters disclosed by the Title Commitment and Survey. If Purchaser does not terminate this Agreement by reason of any Title Objection or Additional Title Objection as provided in this Section, then such Title Objection or Additional Title Objection shall be deemed waived and approved by Purchaser and shall thereafter be deemed Permitted Encumbrances. Notwithstanding the above, Seller shall cause the removal of any and all monetary liens, mechanics liens, judgments, delinquent property taxes and any other monetary encumbrances created by Seller that can be cured by the payment of money.

**Section 2.02   Seller Documents**. Purchaser acknowledges that Seller has provided Buyer due diligence documents set forth on the attached Exhibit C ("Due Diligence Documents").  To the extent not  included in the Due Diligence Documents or otherwise delivered to Purchaser, but in no event later than five (5) Business Days following the Effective Date, Seller shall deliver or make available to Purchaser the following items to the extent they are in Seller's possession or under its reasonable control (collectively, the "Seller Documents"), receipt of which shall be promptly acknowledged by Purchaser: (a) existing title reports or title policies and surveys related to the Real Property; (b) existing title commitments related to the Real Property; (c) existing environmental reports related to the Real Property (including without limitation, Phase I and Phase II environmental investigation reports); (d) guaranties and warranties in effect with respect to the Property; (e) to the extent not publicly accessible, Tenant's consolidated year-to-date financial statements prepared in accordance with

6

DocuSign Envelope ID: 15E1EE219-0PD7-442A-9B7B-B89D2E3E152B

Case 23-03046-01366-JMB-11B-Elev 05/02/25 -2 Entered 05/02/25 15:22:38 Desc
Exhibit(s) A-1 court pleadings    Page 57 of 327

Tenant's ordinary accounting practices (collectively, the "Financial Statements"); (f) profit and loss statements (or equivalent) for the individual Bowling Green facilities; (g)-existing property condition and zoning reports related to the Property; (h) any material contracts and agreements relating to the operation of the Real Property; (i) the Bond Lease and other documents related thereto, and (j) such other existing third party customary real estate diligence documents related to the ownership, lease and operation of the Property (as opposed to the business conducted thereon) reasonably requested by Purchaser.  Seller shall also use commercially reasonable efforts to provide to Purchaser any other information requested by Purchaser after the Effective Date with respect to the Real Property.

**Section 2.03   Inspections.** Subject to the terms, provisions and limitations set forth in this Agreement, and provided that such inspections are conducted in a manner so as not to unreasonably interfere with the normal operations of the business, following not less than two (2) Business Days' advance written notice in each instance and provided that Purchaser will coordinate with Seller regarding the timing of any Inspection and shall endeavor to have Inspections performed during normal business hours on Business Days or as otherwise agreed upon by the parties, (a) Purchaser may perform reasonable investigations, tests and inspections (collectively, the "Inspections") with respect to the Property that Purchaser deems reasonably appropriate; and (b) Seller shall, upon written request from Purchaser, (i) provide Purchaser with reasonable access to the Property and the Seller Documents, and (ii) except as otherwise limited in this Agreement, allow Purchaser to make such reasonable inspections, tests, copies, and verifications as Purchaser reasonably considers necessary. Without limiting the foregoing, "Inspections" shall include, among other things, Purchaser's (W) inspection of any permanent equipment installed on, or special purpose/customization of the Property, (X) review of the operating expenses of the Property for the last three (3) years, (Y) meetings with representatives of the Property's management team, and (Z) confirmation of the final sources and uses of sale-leaseback proceeds in accordance with the terms of this Agreement.

Seller has ordered a phase I environmental report, property condition report, and zoning report for the Property (collectively, the "Reports"), from a duly licensed vendor in their respective fields. The cost of each of the Reports shall be paid by Seller. If the Transaction fails to close for any reason, Purchaser shall return any Seller-provided diligence or property materials (including the Seller Documents, the Reports and any existing, new or updated third-party diligence) to Seller at Seller's written request. Seller shall be entitled to receive and use any and all Reports prepared by or at the expense of Seller, including using them with future prospective purchasers; provided, however, that Purchaser makes no representations or warranties of any kind whatsoever to Seller as to the accuracy or completeness of the content of any documents or other information delivered to Seller pursuant to Section 2.02 or this Section 2.03.

Purchaser shall use best efforts to cause all Inspections performed at the Property pursuant to this Section 2.03 to be performed in a manner that does not unreasonably disturb or disrupt the business operations at the Property. Purchaser's agents, employees, representatives and contractors entering onto the Property shall carry not less than Two Million and No/100 Dollars ($2,000,000.00) commercial liability insurance coverage by a company licensed to do business in the State where each Property is located insuring all activity and conduct of Purchaser and such representatives and insuring Purchaser's indemnity obligations arising under this Agreement. In the event that, as a direct result of Purchaser's Inspections, any damage occurs to the Property, then Purchaser shall promptly repair such damage at Purchaser's sole cost and expense. Purchaser hereby indemnifies, protects, defends and holds Seller harmless from and against any and all actual losses, damages, claims, causes of action, judgments, damages, costs and expenses (including reasonable fees of attorneys) that Seller suffers or

7

incurs as a result of (i) a breach of Purchaser's agreements set forth in this Section 2.03 in connection with the Inspections or (ii) physical damage to the Property or bodily injury caused by any act or omission of Purchaser or its agents, employees or contractors in connection with the right of inspection granted under this Section 2.03. The indemnity provision of this Section 2.03 shall survive the termination of this Agreement or Closing.

**Section 2.04    Purchaser's Right to Terminate.** Notwithstanding any provision contained herein, in addition to its right to terminate this Agreement as set forth in Section 2.01, if Purchaser determines, in its sole discretion, for any reason or no reason, that it elects not to purchase the Property, and Purchaser provides written notice thereof to Seller on or before the expiration of the Inspection Period, Purchaser shall have the option to terminate this Agreement on or prior to the expiration of the Inspection Period, and if terminated, neither Seller nor Purchaser shall have any further duties or obligations under this Agreement except as otherwise provided herein.  If Purchaser does not provide the Notice to Close prior to the expiration of the Inspection Period, then upon the expiration of the Inspection Period, Purchaser shall have been deemed to terminate this Agreement in accordance with this Section 2.04.

**Section 2.05    Purchaser's Right to Modify Agreement.** Notwithstanding anything contained in this Agreement to the contrary, if prior to the expiration of the Inspection Period, Purchaser determines that (i) any Report or Seller Document reflects environmental issues or concerns with any parcel of the Property, including recognized environmental conditions, (ii) the value of any parcel of the Property is impaired based on Purchaser's review of any Seller Document or Report,  (iii) any characteristic of any parcel of the Property adversely impacts the value of such parcel of the Property, and/or (iv) the financial projections of any parcel of the Property materially differ from those of the remaining parcel(s) of the Property as determined by Purchaser in its reasonable discretion, then Purchaser shall have the option, in lieu of terminating this Agreement, to remove such parcel(s) of the Property from this Agreement and proceed to Closing with the remaining parcel(s) of Property ("Real Property Removal").  Purchaser shall provide written notice to Seller at any time prior to the expiration of the Inspection Period of its desire for a Real Property Removal.  In the event of a Real Property Removal, the Purchase Price and Rent due under the Lease Agreement shall be reduced and adjusted by a value that is equivalent to the allocations set forth on Schedule B attached hereto and incorporated hereby with respect to the Location being the subject of the Real Property Removal.

### ARTICLE III
### CLOSING

**Section 3.01    Closing Date.** Subject to the provisions of Article V of this Agreement and satisfaction of any applicable closing conditions in Section 4.03 and Section 4.04, the closing date of the Transaction contemplated by this Agreement (the "Closing") shall occur on that date which is fifteen (15) business days following the expiration of the Inspection Period (the "Closing Date").  The parties shall deposit with the Title Company all documents (including without limitation, the executed Transaction Documents) as necessary to comply with the parties' respective obligations hereunder on or before the Closing Date or as otherwise mutually agreed upon by the parties. The parties shall deposit all funds required hereunder with the Title Company on or before the Closing Date.

**Section 3.02    Kentucky Bond Property**. Notwithstanding anything to the contrary in Section 3.01, if Seller does not believe in its commercially reasonable discretion that it will receive by the Closing Date fee title to the Kentucky Bond Property in the condition required pursuant to the terms of the

8

Bond Lease from Warren County, Kentucky, then Seller, at Seller's option, may elect to extend the Closing for up to thirty (30) days (the "Bond Property Condition") to satisfy the Bond Property Condition, provided that Seller exercises its right to extend the Closing Date prior to expiration of the Inspection Period.  If the Bond Property Condition remains unsatisfied by the Closing Date, and Purchaser does not elect to provide such additional time to Seller to satisfy the Bond Property Condition as Purchaser may determine, then a Seller Default shall have deemed to have occurred, and Purchaser shall have all rights and remedies set forth in Section 6.02 below.

**Section 3.03    Possession.** Possession of the Property, free and clear of all liens, encumbrances and parties in possession, except for the Permitted Encumbrances, shall be delivered to Purchaser on the Closing Date.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND COVENANTS; CLOSING CONDITIONS

**Section 4.01    Seller.** Each Seller with respect to its respective Property represents and warrants to, and covenants with, Purchaser as follows:

(a)      *Organization and Authority.* Seller is duly organized or formed, validly existing and in good standing under the laws of its state of organization, and qualified as a foreign limited liability company to do business in any jurisdiction where such qualification is required. Seller has all requisite limited liability company power and authority to own and operate the Property, to execute, deliver and perform its obligations under this Agreement and all of the other Transaction Documents, and to carry out the Transaction. The Person who has executed this Agreement and the other documents contemplated by this Agreement on behalf of Seller has been duly authorized to do so.

(b)      *Enforceability of Documents.* To Seller's knowledge, upon execution by Seller and Tenant, this Agreement and the other Transaction Documents shall constitute the legal, valid and binding obligations of Seller and Tenant, enforceable against Seller and Tenant in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium, or other similar laws relating to or affecting the rights of creditors generally, or by general equitable principles or any other laws of the states where the Real Property is located pertaining to the sale or leasing of real property.

(c)      *No Other Agreements and Options.* Except as disclosed to Purchaser in writing or in the Title Commitment, none of Seller or Tenant, or, to the best of Seller's knowledge, the Property is subject to any commitment, obligation, or agreement, including, without limitation, any right of first refusal, option to purchase or lease granted to a third party, which would prevent Seller from completing or impair Seller's ability to complete the consummate the Transaction as provided in this Agreement, the subsequent lease of each Property by Purchaser pursuant to the Lease Agreement, or which would bind Purchaser subsequent to consummation of the Transaction.

(d)      *No Violations.* The authorization, execution, delivery and performance of this Agreement and the other Transaction Documents will not (i) violate any provisions of the certificate of formation or other charter documents of Seller and Tenant, (ii) result in a

9

violation of or a conflict with, or constitute a default (or an event which, with or without due notice or lapse of time, or both, would constitute a default) under any other document, instrument or agreement to which Seller or Tenant is a party or by which Seller, Tenant, any of the property of Seller or Tenant or, to the best of Seller's knowledge, the Property is subject or bound, which in any way materially and adversely affects the Property, the ability of Seller or Tenant to perform under this Agreement, or any other Transaction Documents, (iii) except for the Lease Agreement or any charges or costs arising from the conveyance of the Property, result in the creation or imposition of any Lien, restriction, charge or limitation of any kind, upon each Seller, Tenant or the Property, or (iv) in and of itself, violate any applicable law, statute, regulation, rule, ordinance, code, rule or order of any court or Governmental Authority which in any way materially and adversely affects the Property, the ability of Seller and Tenant to perform under this Agreement, the Lease Agreement or any other Transaction Documents.

(e)    **Compliance.** Seller has not received any written notification that the Property is in violation of any Legal Requirements which in any way materially and adversely affects the Property, the ability of Seller and Tenant to perform under this Agreement, or any other Transaction Documents.

(f)    **Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws.** Seller and Tenant are not currently identified on the OFAC List, and are not a Person with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States.

(g)    **Litigation.** There is no legal, administrative, arbitration or other proceeding, claim or action of any nature or investigation pending or involving or, to the best of Seller's knowledge, threatened against, Seller, Tenant or the Property before any Governmental Authority which in any way materially and adversely affects the ability of Seller and Tenant to perform under this Agreement or any other Transaction Documents to which it is a party; and to the best of Seller's knowledge, there is no valid basis for any such legal, administrative, arbitration or other proceeding, claim or action of any nature or investigation.

(h)    **Condition of Property.** The Property and all of the material equipment located thereon are of good workmanship and materials, fully equipped and operational, in reasonably good condition and repair.  Seller shall maintain the Property in good working condition and in compliance with all applicable laws.

(i)    **Condemnation.** No condemnation or eminent domain proceedings affecting the Property has been commenced or, to the best of Seller's knowledge, are contemplated except as disclosed to Purchaser in writing.

(j)    **Environmental.** Except as provided in the Environmental Reports and Seller Documents, to Seller's actual knowledge:

(i)    No Hazardous Materials, except in material compliance with Hazardous Materials Laws, exist on, under or about the Property or have been transported to or from the Property or used, generated, manufactured, stored or disposed of on, under or about the Property. The Property is not in material violation of any Hazardous

10

Materials Laws on, under or about the Property, including, without limitation, air, soil and groundwater conditions.

(ii)    Seller has not received any written notice or other written communication from any Person (including but not limited to a Governmental Authority) alleging a violation of Hazardous Materials Laws on the Property, or that require remediation thereof pursuant to applicable Hazardous Materials Laws, or that Seller has any liability pursuant to Hazardous Materials Law with respect to environmental conditions in connection with the Property, or any actual or, to Seller's knowledge, threatened administrative or judicial proceedings in connection with any of the foregoing.

(k)    **Solvency.** There is no contemplated, pending or threatened Insolvency Event or similar proceedings, whether voluntary or involuntary, affecting Seller or Tenant, or to Seller's knowledge, any of their shareholders or Affiliates.

(l)    **Use of Net Proceeds.** All Net Proceeds from the Transaction shall be used by Seller to purchase Seller notes and pay down of Seller's corporate debts unless otherwise agreed upon by the parties prior to expiration of the Inspection Period.

(m)    **Seller Documents.** To Seller's knowledge, the Seller Documents are all of the material documents within Seller's possession or control that have a material effect on the use, occupancy or value of the Property.

All representations and warranties of Seller made in this Agreement shall be true in all material respects as of the date of this Agreement, shall be deemed to have been made again at and as of the Closing Date in all material respects to the extent circumstances have not changed and such changes have been disclosed to Purchaser in writing, and shall survive Closing for a period of twelve (12) months from the Closing Date. For purposes of this Agreement, Seller's "actual knowledge" with respect to the Minnesota Property shall mean the actual, present consciousness of Joe Anderson and with respect to the Kentucky Property Rick Ward, each without any duty of inquiry or investigation. Purchaser acknowledges that Purchaser has conducted its own due diligence on the Real Property. Except as expressly set forth above, Seller makes no representations or warranties of any kind or nature regarding the condition of the Real Property and Seller disclaims any and all warranties and representations relating to the Real Property.

**Section 4.02  Purchaser.** Purchaser represents and warrants to, and covenants with, Seller as follows:

(a)    **Organization and Authority.** Purchaser is duly organized, validly existing and in good standing under the laws of its state of formation. Purchaser has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and all of the other Transaction Documents to which it is a party and to carry out the Transaction. The Person who has executed this Agreement on behalf of Purchaser has been duly authorized to do so.

(b)    **Enforceability of Documents.** To Purchaser's knowledge, upon execution by Purchaser, this Agreement and the other Transaction Documents to which it is a party, shall constitute the legal, valid and binding obligations of Purchaser, enforceable against Purchaser

DocuSign Envelope ID: 18B48249-9DD5-441A-987D-769D73E6B153

in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium, or other similar laws relating to or affecting the rights of creditors generally, or by general equitable principles.

(c) **No Violations.** The authorization, execution, delivery and performance of this Agreement and the other Transaction Documents will not (i) violate any provisions of the articles of incorporation or other charter documents of Purchaser, (ii) result in a violation of or a conflict with, or constitute a default (or an event which, with or without due notice or lapse of time, or both, would constitute a default) under any other document, instrument or agreement to which Purchaser is a party or by which Purchaser is subject or bound, (iii) result in the creation or imposition of any Lien, restriction, charge or limitation of any kind, upon Purchaser, or (iv) violate any applicable law, statute, regulation, rule, ordinance, code, rule or order of any court or Governmental Authority.

(d) **Compliance with Anti-Terrorism, Embargo, Sanctions and Anti-Money Laundering Laws.** Purchaser is not currently identified on the OFAC List, and is not a Person with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States.

(e) **Litigation.** There are no actions or proceedings pending against or involving Purchaser before any Governmental Authority which in any way materially and adversely affects Purchaser's ability to perform under this Agreement or any other Transaction Documents to which it is a party.

(f) **Satisfaction of Conditions Precedent.** From the Effective Date through the Closing Date, Purchaser agrees to use its best efforts to satisfy all conditions set forth in this Agreement on or prior to the Closing Date.

All representations and warranties of Purchaser made in this Agreement shall be true in all material respects as of the date of this Agreement, shall be deemed to have been made again at and as of the Closing Date in all material respects to the extent circumstances have not changed and such changes have been disclosed to Seller in writing, and shall survive Closing for a period of twelve (12) months from the Closing Date.

**Section 4.03   Conditions to Purchaser's Obligation to Purchase.** Purchaser's obligation to close the Transaction and purchase the Property is expressly conditioned upon each of the following conditions being satisfied prior to or at the Closing:

(a) **Performance by Seller.** Timely performance of each obligation, covenant, and delivery required of Seller.

(b) **Accuracy of Representations.** All of Seller's representations and warranties contained in or made pursuant to this Agreement shall be true and correct in all material respects as of the Closing Date to the extent circumstances have not changed and such changes have been disclosed to Purchaser, and Seller shall have complied in all material respects with all of Seller's covenants and agreements contained in or made pursuant to this Agreement to be complied with by Seller prior to Closing, except for failures to be so true and correct or to

12

comply as would not in the aggregate be reasonably likely to have a material adverse effect on and as of the Closing Date, and Seller shall have delivered all of the documents required to be delivered by Seller into escrow with the Title Company as required hereunder.

(c)    **Change in Conditions**. If any of the conditions in this Section 4.03 change in a material respect after having been satisfied or waived by Purchaser before the Closing of this Transaction occurs, then such condition(s) shall be reinstated as if having never been satisfied or waived by Purchaser, subject to the terms and conditions of this Agreement.

(d)    **Title Policy.**   The Title Company must be irrevocably committed to issuing the Title Policy at Closing in an amount up to the Purchase Price, subject to Permitted Encumbrances, and otherwise in the form reasonably agreed upon by Purchaser pursuant to Section 2.01(a), above.

(e)    **Tenant Financial Condition**.  There shall have been no material adverse changes in the Tenant's financials or operations (which would reasonably be expected to materially impair Tenant's ability to perform its material obligations under the Lease Agreement.

(f)    **No Litigation**.  There is no order, stay, injunction or restraining order, or any pending or threatened litigation which, if decided against Seller or Tenant, (i) would be likely to have a material adverse effect on the business, condition (financial or otherwise), operations, performance, properties or prospects of the Seller or Tenant, or (ii) would be likely to have a material adverse effect on (X) the ability of Seller or Tenant to consummate the Transaction, (Y) the ability of Tenant to perform its obligations under the Lease Agreement, or (Z) Purchaser's rights and remedies as lessor under the Lease Agreement.

(g)    **Satisfaction of Conditions Precedent.** Seller shall have used commercially reasonable efforts to satisfy in all material respects the conditions set forth in this Agreement to be satisfied by Seller on or prior to the Closing Date.

(h)    **Kentucky Bond Property**.  Seller shall have received fee title to the Kentucky Bond Property in the condition required pursuant to the terms of the Bond Lease from Warren County, Kentucky.

The foregoing conditions contained in this Section 4.03 are solely for the benefit of Purchaser. If any of the foregoing conditions are not satisfied or approved by Purchaser on or before the Closing Date, Purchaser may, in its sole election, as its sole remedy, either (i) waive the condition in question and proceed with the purchase of the Property pursuant to all of the other terms of this Agreement and close and acquire the Property without reduction of the Purchase Price as a result of such failed condition, or (ii) terminate this Agreement, at which time the Deposit shall be returned to Purchaser and this Agreement will have no further force or effect, and the parties will have no further obligations to each other except as expressly provided herein.

**Section 4.04   Conditions to Seller's Obligation to Sell.** Seller's obligation to close the Transaction and sell the Property is expressly conditioned upon each of the following conditions being satisfied prior to or at the Closing

13

(a)    **Performance by Purchaser.** Timely performance of each obligation, covenant, and delivery required of Purchaser.

(b)    **Accuracy of Representations.** All of Purchaser's representations and warranties contained in or made pursuant to this Agreement shall have been true and correct in all material respects at the Closing Date to the extent circumstances have not changed and such changes have been disclosed to Seller, and Purchaser shall have complied in all material respects with all of Purchaser's covenants and agreements contained in or made pursuant to this Agreement to be complied with by Purchaser prior to Closing, except for failures to be so true and correct or to comply as would not in the aggregate be reasonably likely to have a material adverse effect on and as of the Closing Date, and Purchaser shall have delivered all of the documents required to be delivered by Purchaser into escrow with the Title Company as required hereunder.

(c)    **Payment of Purchase Price.** Payment of the Purchase Price (less the Due Diligence Expenses to be reimbursed to Purchaser as provided in this Agreement) at the Closing in the manner provided in this Agreement.

(d)    **Satisfaction of Conditions Precedent.** Purchaser shall have used commercially reasonable efforts to satisfy in all material respects the conditions set forth in this Agreement to be satisfied by Purchaser on or prior to the Closing Date.

The conditions set forth in this Section 4.04 are solely for the benefit of Seller and may be waived by Seller only, in writing, in Seller's sole discretion. If one or more of the conditions in this Section 4.04 are not satisfied as of the Closing, then Seller may elect to terminate this Agreement and the Deposit, the Seller Documents, the Survey, the Title Commitment and the Reports promptly shall be delivered to Seller, at which time this Agreement will have no further force or effect, and the parties will have no further obligations to each other except as expressly provided herein.

## ARTICLE V
## CLOSING DELIVERIES

**Section 5.01    Seller's Closing Deliveries.** On or before Closing, Seller or Tenant or their affiliates, as appropriate, shall deliver to the Title Company the following items:

(i)    The Deeds, pursuant to which all of Seller's right, title and interest in and to the Real Property is conveyed to Purchaser, free and clear of all liens (including Environmental Liens), restrictions, encroachments and easements, except the Permitted Encumbrances, in the forms attached as Exhibit D-1 and Exhibit D-2 hereto (the "Deed");

(ii)    Such documents evidencing the authority of Seller or Tenant to execute the applicable Transaction Documents, legal status and good standing of Sellers and Tenant that may be reasonably required by the Title Company for issuance of the Title Policy, including, without limitation, certificates of good standing;

(iii)    Fully executed originals of (A) the Lease Agreement, together with fully executed originals of a memoranda thereof (the "Memoranda of Lease"), and (B) all of the other Transaction Documents;

14

(iv)     Certificates evidencing the insurance coverage, limits and policies to be carried by Tenant under and pursuant to the terms of the Lease Agreement, on the forms and containing the information required under the Lease Agreement ("Lease Proof of Insurance");

(v)     A duly executed affidavit from Seller stating that Seller is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and 1984 Tax Reform Act, in the form attached hereto as Exhibit E ("Non-Foreign Seller Certificate");

(vi)     The SNDA (as defined below);

(vii)     Closing settlement statement to reflect the credits, prorations, and adjustments contemplated by or specifically provided for in this Agreement;

(viii)     All documents required to be delivered by Seller under this Agreement and the other Transaction Documents; and

(ix)     Such further documents as reasonably may be required by Seller or the Title Company in order to fully and legally close this Transaction.

**Section 5.02    Purchaser's Closing Deliveries.**    On or before Closing, Purchaser shall have delivered to the Title Company:

(i)     The Purchase Price, less the Due Diligence Expenses that have not already been paid by Seller;

(ii)     Fully executed originals of all Transaction Documents, including without limitation, the Lease Agreement and the Memoranda of Lease;

(iii)     If Purchaser will obtain a loan and place a mortgage on the Property at Closing, a subordination, non-disturbance and attornment agreement in form set forth in the Lease (the "SNDA");

(iv)     Closing settlement statement to reflect the credits, prorations, and adjustments contemplated by or specifically provided for in this Agreement; and

(v)     Such further documents as may reasonably be required by Purchaser in order to fully and legally close this Transaction.

**ARTICLE VI**
**DEFAULTS; REMEDIES**

**Section 6.01    Seller's Default.** Each of the following shall be deemed an event of default by Seller (each, a "Seller Default"):

(a)     If any representation or warranty of Seller set forth in this Agreement or any other Transaction Document is false in any material respect, and Seller does not cure such breach within three (3) Business Days of Seller's receipt of written notice of such failure; provided, however, if any such failure cannot reasonably be cured within such three (3) Business Day

15

period and Seller is diligently pursuing a cure of such breach, then Seller shall have a reasonable period to cure such failure beyond such three (3) Business Day period, which period shall in no event exceed thirty (30) days after receiving notice of such failure from Purchaser; or

(b)    If Seller fails to convey the Property to Purchaser on the Closing Date in breach of its obligations to do so under this Agreement; or

(c)    If Seller fails to keep or perform any of the terms or provisions of this Agreement in any material respect, and does not cure such failure within three (3) Business Days of Seller's receipt of written notice of such failure; provided, however, if any such failure cannot reasonably be cured within such three (3) Business Day period and Seller is diligently pursuing a cure of such failure, then Seller shall have a reasonable period to cure such failure beyond such three (3) Business Day period, which period shall in no event exceed thirty (30) days after receiving notice of such failure from Purchaser.

**Section 6.02    Remedies.** In the event of any Seller Default, Purchaser shall be entitled to exercise, at its option, one of the following sole and exclusive remedies:

(a)    Purchaser may terminate this Agreement by giving written notice to Seller within the earlier of the Closing Date or ten (10) Business Days after Purchaser becomes aware of the Seller Default, in which event the Deposit shall be returned to Purchaser and Seller shall pay to Purchaser such amount to satisfy all of Purchaser's third-party costs and expenses incurred in reliance on this Agreement, including, without limitation, its due diligence costs (to the extent not directly paid by Seller) and Purchaser's reasonable out-of-pocket attorneys' fees and costs, not to exceed an aggregate amount of One Hundred Thousand Dollars ($100,000), and neither party shall have any further obligation or liability, except for the obligations set forth herein which are expressly stated to survive termination of this Agreement; or

(b)    Purchaser may waive the Seller Default and promptly proceed with the Closing, without any abatement or reduction in the Purchase Price; or

(c)    If available, Purchaser may specifically enforce the performance of this Agreement by filing an action for specific performance of Seller's express obligations hereunder, without abatement of, credit against, or reduction in the Purchase Price, provided that any action for specific performance shall be commenced within sixty (60) days of Seller Default. Notwithstanding the foregoing, in the event that the remedy of specific performance is unavailable to Purchaser due to actions of Seller, then Purchaser shall be entitled to pursue all available rights and remedies at law or in equity.

**Section 6.03    Purchaser's Default**. Each of the following shall be deemed an event of default by Purchaser (each, a "Purchaser Default"):

(a)    If any representation or warranty of Purchaser set forth in this Agreement or any other Transaction Document is false in any material respect or if Purchaser renders any false statement;

(b)    If Purchaser fails to consummate the Transaction on the Closing Date in breach of its obligations to do so under this Agreement; or

16

DocuSign Envelope ID: 1B848248-90D5-441A-987D-786D73E88152

(c)    If Purchaser fails to keep or perform any of the terms or provisions of this Agreement in any material respect at or prior to the Closing Date and does not cure such failure within three (3) Business Days of Purchaser's receipt of written notice of such failure; provided, however, if any such failure cannot reasonably be cured within such three (3) Business Day period, such failure or default is not a monetary default (i.e., a failure to pay any sum owed by Purchaser under this Agreement), and Purchaser is diligently pursuing a cure of such non-monetary failure, then Purchaser shall have a reasonable period to cure such failure beyond such three (3) Business Day period, which period shall in no event exceed thirty (30) days after receiving notice of such failure from Seller.  In no event shall the three (3) Business Day cure period be extended to cure any monetary default.

**Section 6.04   Seller Remedies.** In the event of any Purchaser Default, Seller, as its sole and exclusive remedy, may terminate this Agreement by giving written notice to Purchaser, in which event the Deposit shall be delivered by the Title Company to Seller, as liquidated damages and in satisfaction of all of Seller's costs and expenses incurred in reliance on this Agreement.  Notwithstanding anything to the contrary in this Agreement, in no event shall Purchaser be liable to Seller for any consequential, indirect, speculative or punitive damages under this Agreement.

## ARTICLE VII
## MISCELLANEOUS

**Section 7.01   Transaction Characterization.** The parties intend the Lease Agreement to be a true lease and not a transaction creating a financing lease, capital lease, equitable mortgage, mortgage, deed of trust, security interest or other financing arrangement, and the economic realities of the Lease Agreement are those of a true lease.

**Section 7.02   Risk of Loss.**

(a)    *Condemnation.* If, prior to Closing, action is threatened in writing or initiated to take any portion of any Property, by eminent domain proceedings or by deed in lieu thereof, either Seller or Purchaser may elect at or prior to Closing, to terminate this Agreement, in which event the Deposit shall be returned to Purchaser and the Seller and Purchaser shall be relieved and discharged of any further liability or obligation under this Agreement, except as otherwise expressly set forth herein (including without limitation, the payment of Due Diligence Expenses and the other expenses as set forth in Section 1.05).  If neither party elects to terminate this Agreement pursuant to the previous sentence, the parties shall proceed to close without any modification of the Purchase Price and divide the condemnation proceeds in a manner acceptable to Seller and Purchaser.

(b)    *Casualty.* Seller assumes all risks and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Closing has been consummated. If any portion of any Property suffers any damage prior to the Closing from fire or other casualty that exceeds twenty percent (20%) of the Purchase Price allocated to the damaged Property, Purchaser may elect at or prior to Closing, to (i) terminate this Agreement, in which event the Deposit, if previously paid, shall be returned to Purchaser and the Seller and Purchaser shall be relieved and discharged of any further liability or obligation under this Agreement, except as otherwise expressly set forth herein, or (ii) consummate the Closing, in which event all of Seller's right, title and interest in and to the proceeds of any insurance

17

covering damage to the improvements on the applicable Property shall be assigned to Purchaser at Closing (to be applied to restoration pursuant to the terms of the Lease Agreement), and Purchaser shall be entitled to a credit in the amount of Seller's deductible at Closing.

(c)    **Maintenance of Property and Insurance.** From the Effective Date until Closing, Seller shall continue to maintain the Real Property in the same or similar condition as maintained as of the Effective Date, ordinary wear and tear excepted, and shall continue to maintain its insurance for the Property in the same or greater amounts, with the same or greater coverage, and subject to the same deductibles as in existence as of the Effective Date.

**Section 7.03   Notices.** All notices, demands, designations, certificates, requests, offers, consents, approvals, appointments and other instruments given pursuant to this Agreement (collectively called "Notices") shall be in writing and given by (a) hand delivery, (b) express overnight delivery service by a reputable courier, or certified or registered mail, return receipt requested, or (d) electronic mail with confirmation from recipient of receipt, and shall be deemed to have been delivered upon (i) receipt, if hand delivered, (ii) the next Business Day, if delivered by a reputable express overnight delivery service, (iii) the third Business Day following the day of deposit of such notice with the United States Postal Service, if sent by certified or registered mail, return receipt requested, or (iv) upon confirmation of receipt of an email so long as the email was delivered before 5:00 pm Pacific Time. Notices shall be provided to the parties and addresses specified below:

| | |
|---|---|
| If to Seller: | c/o iMedia Brands, Inc.<br>6740 Shady Oak Road<br>Eden Prairie, MN  55344<br>Attn: Tim Peterman<br>Telephone: (952) 943-6158<br>Email: tpeterman@imediabrands.com |
| With a copy to: | c/o iMedia Brands, Inc.<br>6740 Shady Oak Road<br>Eden Prairie, MN  55344<br>Attn: Alex Wasserburger<br>Telephone: (952) 943-6517<br>Email: awasserburger@imediabrands.com |
| With a copy to: | Faegre Drinker Biddle & Reath LLP<br>2200 Wells Fargo Center<br>90 South 7th Street<br>Minneapolis, MN  55402<br>Attn: Allen Wheeler<br>Telephone: (612) 766-8282<br>Email: allen.wheeler@faegredrinker.com |
| If to Purchaser: | PONTUS NET LEASE ADVISORS, LLC<br>Attn: Scott Stokas<br>875 Prospect Street, Suite 303<br>La Jolla, CA 92037 |

18

Phone: (858) 345-4544
Email: sstokas@pontuscapital.com

With a copy to:          Foley & Lardner LLP
301 E. Pine Street, Suite 1200
Orlando, Florida 32801
Attn: Pamela M. Brown, Esq.
Telephone: (407)244-3271
Email: pbrown@foley.com

or to such other address or such other Person as either party may from time to time hereafter specify to the other party in a notice delivered in the manner provided above. Whenever in this Agreement the giving of Notice is required, the giving thereof may be waived in writing at any time by the Person or Persons entitled to receive such Notice.

A copy of any Notice delivered pursuant to this Section shall also contemporaneously be delivered in the manner herein specified to any mortgagee or assignee of Purchaser's interest which shall have duly notified Seller in writing of its name and address.

**Section 7.04    Assignment.** Purchaser may assign its rights under this Agreement to an affiliate in whole or in part at any time; provided that no such assignment or transfer shall release the transferring Purchaser from its obligations hereunder.

**Section 7.05    Brokerage Commission.** Each of the parties represents and warrants to the other that neither party has dealt with, negotiated through or communicated with any broker in connection with this Transaction except for B. Riley Real Estate ("**Broker**"), who shall be paid by Seller pursuant to a separate agreement between Seller and Broker. Each party shall indemnify, defend and hold harmless the other party from and against any and all claims, loss, costs and expenses, including reasonable attorneys' fees, resulting from any claims that may be made against the indemnified party by any broker claiming a commission or fee by, through or under such indemnifying party. The parties' respective obligations under this Section 7.05 shall survive Closing or termination of this Agreement.

**Section 7.06    Reporting Requirements.** The parties agree to comply with any and all reporting requirements applicable to the Transaction which are set forth in any law, statute, ordinance, rule, regulation, order or determination of any Governmental Authority, and further agree upon request, to furnish the other party with evidence of such compliance.

**Section 7.07    Disclosures.** Except as expressly set forth in Section 7.22 and this Section 7.07 and as required by law or judicial action, prior to Closing neither Seller nor Purchaser will make any public disclosure of this Agreement or the other Transaction Documents, the Transaction or the provisions of the Transaction Documents without the prior consent of the other party hereto. The parties further agree that, notwithstanding any provision contained in this Agreement, any party (and each employee, representative or other agent of any party) may disclose to any and all Persons, without limitation of any kind, any matter required under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended.  The foregoing shall not limit Seller from disclosing information regarding the Transaction contemplated herein and in the Transaction Documents on a strictly confidential basis to contractors, directors, officers, Affiliates, employees, attorneys, accountants, consultants, prospective lenders, and advisors who are directly involved in the performances required under this

19

Agreement, investors and potential investors, and except as is necessary to comply with applicable law, required by court or administrative agency order, or is regarding information already in the public domain.

**Section 7.08    Time is of the Essence.** The parties hereto expressly agree that time is of the essence with respect to this Agreement.

**Section 7.09    Non-Business Days.** If the Closing Date or the date for delivery of a notice or performance of some other obligation of a party falls on a Saturday, Sunday or legal holiday in the state in which the Property is located, then the Closing Date or such notice or performance shall be postponed until the next Business Day.

**Section 7.10    Waiver and Amendment.** No provision of this Agreement shall be deemed waived or amended except by a written instrument unambiguously setting forth the matter waived or amended and signed by the party against which enforcement of such waiver or amendment is sought. Waiver of any matter shall not be deemed a waiver of the same or any other matter on any future occasion.

**Section 7.11    Limited Liability.**

(a)    *Purchaser's Liability.* Notwithstanding anything to the contrary provided in this Agreement, it is specifically understood and agreed that (a) there shall be absolutely no personal liability on the part of any director, officer, manager, member, employee or agent of Purchaser with respect to any of the terms, covenants and conditions of this Agreement, (b) Seller waives all claims, demands and causes of action against Purchaser's directors, officers, managers, members, employees and agents in the event of any breach by Purchaser of any of the terms, covenants and conditions of this Agreement to be performed by Purchaser, and (c) Seller shall be limited to those remedies set forth in Section 6.04 in the event of any breach by Purchaser of any of the terms, covenants and conditions of this Agreement to be performed by Purchaser, such exculpation of liability to be absolute and without any exception whatsoever.

(b)    *Seller's Liability.* Notwithstanding anything to the contrary provided in this Agreement, it is specifically understood and agreed that (a) there shall be absolutely no personal liability on the part of any director, officer, manager, member, employee or agent of Seller and its Affiliates or subsidiaries or other entity which, directly or indirectly, controls, or is controlled by, or is also controlled by the same entity having a controlling interest in Seller with respect to any of the terms, covenants and conditions of this Agreement, (b) Purchaser waives all claims, demands and causes of action against the directors, officers, managers, members, employees and agents of Seller and its Affiliates or subsidiaries or other entity which, directly or indirectly, controls, or is controlled by, or is also controlled by the same entity having a controlling interest in Seller in the event of any breach by Seller of any of the terms, covenants and conditions of this Agreement to be performed by Seller, and (c) Purchaser shall be limited to those remedies set forth in Section 6.02 in the event of any breach by Seller of any of the terms, covenants and conditions of this Agreement to be performed by Seller, such exculpation of liability to be absolute and without any exception whatsoever.

**Section 7.12    Headings; Internal References.** The headings of the various sections and exhibits of this Agreement have been inserted for reference only and shall not to any extent have the effect of

US.354152029.06
4874-6198-0479.8

modifying the express terms and provisions of this Agreement. Unless stated to the contrary, any references to any section, subsection, exhibit and the like contained herein are to the respective section, subsection, exhibit and the like of this Agreement.

**Section 7.13    Construction Generally.** This is an agreement between parties who are experienced in sophisticated and complex matters similar to the Transaction and the other Transaction Documents, is entered into by both parties in reliance upon the economic and legal bargains contained herein and therein, and shall be interpreted and construed in a fair and impartial manner without regard to such factors as the party which prepared the instrument, the relative bargaining powers of the parties or the domicile of any party. Seller and Purchaser were each represented by legal counsel competent in advising them of their obligations and liabilities hereunder.

**Section 7.14    Further Assurances.** Each of the parties agrees, whenever and as often as reasonably requested so to do by the other party, or the Title Company, to execute, acknowledge, and deliver, or cause to be executed, acknowledged, or delivered, any and all such further conveyances, assignments, confirmations, satisfactions, releases, instruments, or other documents as may be necessary, expedient or proper, in order to complete any and all conveyances, transfers, sales and assignments herein provided and to do any and all other acts and to execute, acknowledge and deliver any and all documents as so reasonably requested in order to carry out the intent and purpose of this Agreement, in each case pursuant to the terms of this Agreement.

**Section 7.15    Attorneys' Fees.** In the event of any controversy, claim, dispute, or proceeding between the parties concerning this Agreement, the prevailing party shall be entitled to recover all of its reasonable attorneys' fees and other costs, in addition to any other relief to which it may be entitled.

**Section 7.16    Entire Agreement.** This Agreement, all other Transaction Documents and all other certificates, instruments or agreements to be delivered hereunder and thereunder constitute the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements, written or oral, between Seller and Purchaser with respect to the subject matter of this Agreement. Notwithstanding anything in this Agreement to the contrary, upon the execution and delivery of this Agreement by Seller and Purchaser, (a) this Agreement shall supersede any previous discussions, letters of intent, agreements and/or term or commitment letters relating to the Transaction, including without limitation, the Letter of Intent, any and all agreements related to exclusivity, non-competition, non-solicitation of employees, non-solicitation or pursuit of any business opportunity represented by the Transaction, or any other term or condition which restricts any business activity of Purchaser or its Affiliates, (b) the terms and conditions of this Agreement shall control notwithstanding that such terms are inconsistent with or vary from those set forth in any of the foregoing agreements, and (c) this Agreement may only be amended by a written agreement executed by Purchaser and Seller. The provisions of this Section 7.16 shall survive the Closing.

**Section 7.17    Forum Selection; Jurisdiction; Venue.** For purposes of any action or proceeding arising out of this Agreement, the parties hereto expressly submit to the jurisdiction of all federal and state courts located in the State of California, County of Los Angeles. Each of Seller and Purchaser consent that it may be served with any process or paper by registered mail or by personal service within or without the State of California, County of Los Angeles in accordance with applicable law. Furthermore, each of Seller and Purchaser waive and agree not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or

proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper.

**Section 7.18    Severability; Binding Effect; Governing Law.** Each provision hereof shall be separate and independent, and the breach of any provision by Purchaser or Seller shall not discharge or relieve the other from any of its obligations hereunder. Each provision hereof shall be valid and shall be enforceable to the extent not prohibited by law. If any provision hereof or the application thereof to any Person or circumstance shall to any extent be invalid or unenforceable, the remaining provisions hereof, or the application of such provision to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby. Subject to the provisions of Section 7.04, all provisions contained in this Agreement shall be binding upon, inure to the benefit of and be enforceable by the successors and assigns of each party hereto, including, without limitation, any United States trustee, any debtor-in-possession or any trustee appointed from a private panel, in each case to the same extent as if each successor and assign were named as a party hereto. This Agreement shall be governed by, and construed with, the laws of the State of California, without giving effect to any state's conflict of laws principles.

**Section 7.19    Waiver of Jury Trial and Certain Damages.** THE PARTIES HERETO SHALL AND THEY HEREBY DO KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND/OR ANY CLAIM OR INJURY OR DAMAGE RELATED THERETO. EACH OF SELLER AND PURCHASER FURTHER WAIVE THE RIGHT IT MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER IN ANY ACTION, PROCEEDING OR COUNTERCLAIM WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT AND/OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.

**Section 7.20    1031 Exchange**. Purchaser and Seller agree that any party may elect to structure the conveyance of the Property as an exchange pursuant to Section 1031 of the Code.  If such an exchange is elected by such party (the "**Electing Party**"), the Electing Party will assume all costs and expenses, including attorneys' fees, incurred in connection with such election to structure the transaction as an exchange in accordance with Section 1031 of the Code.  Seller and Purchaser agree that, at the request of the Electing Party, each will execute such agreements and other documents as may be necessary, in the reasonable opinion of respective counsel for the parties, to complete and otherwise effectuate any exchange in accordance with Section 1031 of the Code.  The Electing Party agrees that it will indemnify and hold the other party(ies) harmless in connection with any actual loss, cost or damages suffered by such other party concerning or arising out of such exchange or deferred exchange, which indemnification shall survive the closing hereof.  Purchaser and Seller acknowledge and confirm that the terms and provisions of this Section shall apply to any "reverse exchange" made or undertaken by either party pursuant to I.R.S. Rev. Proc. 2000-37 (or any other term or provision of the Code or any regulations promulgated thereunder), as well as any other exchange made pursuant to Section 1031 of the Code.

**Section 7.21    Exclusivity**.  On the Effective Date and through January 7, 2023, Seller shall not initiate, solicit, entertain, negotiate, accept or discuss, directly or indirectly, any proposal or offer, oral

22

DocuSign Envelope ID: 18B48249-9DD5-441A-987D-78DD73E86152

or written, from any prospective sale-leaseback providers or any other person or party for the purchase, lease, license or occupancy of the Property; provided that this Section 7.21 shall not prohibit Tenant from securing asset-based financing that will not interfere with the transaction contemplated herein, it being understood that such financing may include leasehold financing related to Tenant's interest under the Lease and any of Tenant's personal property under the Lease.

**Section 7.22    Confidentiality**. This Agreement is entered into by the Purchaser and Seller on the condition, and subject to the covenants, that Purchaser shall not disclose the existence of (i) this Agreement and its terms, (ii) any information contained in the Seller Documents or any other documentation provided by Seller or Tenant to Purchaser in connection with this Agreement, or (iii) identified by Purchaser as a result of the Investigations of the Property, to any person, except on a strictly confidential basis to their contractors, directors, officers, Affiliates, employees, attorneys, accountants, consultants, prospective lenders, and advisors who are directly involved in the performances required under this Agreement, investors and potential investors, and except as is necessary to comply with applicable law, required by court or administrative agency order, or is regarding information already in the public domain. The parties shall not make, and shall use their best efforts to ensure that the foregoing third parties do not make, any public announcement of this Agreement without the prior consent of Purchaser and Seller, which consent may be withheld by either party in its sole and absolute discretion, unless such public announcement is necessary to comply with applicable law, required by court or administrative agency order, or is information already in the public domain.

**Section 7.23    Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all such counterparts shall be deemed to constitute one and the same instrument and may be evidenced by facsimile, PDF format or similarly-imaged pages.

**Section 7.24    Exhibits Incorporated By Reference.** All exhibits attached to this Agreement are incorporated herein by reference.

**Section 7.25    State Specific Laws**.

(a)    Minnesota. Without limiting the choice of law provision set forth in Section 7.17, the following provisions shall apply to the extent that the laws of the State of Minnesota govern the interpretation or enforcement of this Agreement with respect to any Property located in such state, as determined by a court of competent jurisdiction:

(i)    Wells.  Seller does not know of any "well" (as defined in Minnesota Statutes § 103I.005, Subd. 21) located about the Minnesota Property.  Seller has delivered to Purchaser the well disclosure statement required pursuant to Minnesota Statutes § 103I.235, Subd. 1(a).

(ii)    Individual Sewer System.  There is no "subsurface sewage treatment system" (as defined in Minnesota Statutes § 115.55, Subd. 1(h)) located about the Minnesota Property. Seller has delivered to Purchaser the individual sewage treatment system disclosure statement required pursuant to Minnesota Statutes § 115.55, Subd. 6.

(iii)    Methamphetamine.  To Seller's knowledge, no methamphetamine production has occurred on the Minnesota Property.

US.354152029.06
4874-6198-0479.8

DocuSign Envelope ID: 1BB48248-00D7-4A1A-987D-798D73F26152

Case 26-03043-JMB Doc 1MB-1 Filed 05/02/25-2 Entered 05/02/25 15:20:13.35 Desc
Exhibit(s) A-1 court pleadings    Page 74 of 327

      (b)    <u>Kentucky</u>.  Without limiting the choice of law provision set forth in Section 7.17, the following provisions shall apply to the extent that the laws of the Commonwealth of Kentucky govern the interpretation or enforcement of this Agreement with respect to any Property located in such state, as determined by a court of competent jurisdiction:

      (i)    None.

*[Remainder of page intentionally left blank; signature page(s) to follow]*

24

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

**PURCHASER:**

**PONTUS NET LEASE ADVISORS, LLC**, a Delaware limited liability company

By: _Michael Press_
    5DBB0A41AA44469...

Name: _Michael Press_

Title: _President_

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first set forth above.

**SELLER:**

**EP Properties, LLC,** a Minnesota limited liability company

By: _____

Name: _____Tim Peterman_____

Title: _____CEO_____

**VVI Fulfillment Center, Inc.,** a Minnesota corporation

By: _____

Name: _____Tim Peterman_____

Title: _____CEO_____

<u>Schedule A</u>: Defined Terms
<u>Schedule B</u>: Real Property Removal

<u>Exhibits</u>:

A:         The Real Property
A-1:       Depiction of Minnesota Property and Seller Retained Parcel
B:         Intentionally Omitted
C.         Due Diligence Documents
D-1.       Form Minnesota Deed
D-2.       Form of Kentucky Deed
E:         Non-Foreign Seller Certificate

List of Exhibits

## SCHEDULE A

## DEFINED TERMS

To the extent not expressly defined in the body of this Agreement, the following terms shall have the following meanings for all purposes of this Agreement:

"*Additional Title Objection*" has the meaning set forth in Section 2.01(d)(ii).

"*Affiliate*" or any derivation thereof, means any Person which directly or indirectly controls, is under common control with, or is controlled by any other Person. For purposes of this definition, "controls", "under common control with" and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or otherwise.

"*Business Day*" means a day on which banks located in Los Angeles, California are not required or authorized to remain closed.

"*Closing*" shall have the meaning set forth in Section 3.01.

"*Closing Date*" means the date specified as the closing date in Section 3.01.

"*Due Diligence Expenses*" has the meaning set forth in Section 1.05.

"*Effective Date*" has the meaning set forth in the introductory paragraph of this Agreement.

"*Environmental Liens*" means all Liens (excluding Permitted Encumbrances) imposed on the Property pursuant to any Hazardous Materials Law, except for such deed restrictions and institutional controls utilized in connection with any required remediation of Hazardous Materials at the Property.

"*Governmental Authority*" means the United States of America, any state or other political subdivision thereof, any other entity exercising executive, judicial, regulatory or administrative functions of or pertaining to government and any corporation or other entity owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing.

"*Hazardous Materials*" includes: (a) oil, petroleum products, flammable substances, explosives, radioactive materials, hazardous wastes or substances, toxic wastes or substances or any other materials, contaminants or pollutants defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "toxic substances", "contaminants", "pollutants", or words of similar import under any applicable local, state or federal law or under the regulations adopted, orders issued, or publications promulgated pursuant thereto, including, but not limited to: (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq.; (ii) the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §1801, et seq.; (iii) the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901, et seq.; and (iv) regulations adopted and publications promulgated pursuant to the aforesaid

SCHEDULE A

laws; and (b) asbestos in any form which is or could become friable, urea formaldehyde foam insulation, and polychlorinated biphenyls.

"*Hazardous Materials Laws*" includes any and all federal, state and local laws, rules, regulations, statutes, and requirements pertaining or relating to the environmental condition of the Property or to Hazardous Materials.

"*Insolvency Event*" means (a) a Person's (i) failure to generally pay its debts as such debts become due; (ii) admitting in writing its inability to pay its debts generally; or (iii) making a general assignment for the benefit of creditors; (b) any proceeding being instituted by or against any Person (i) seeking to adjudicate it a bankrupt or insolvent; (ii) seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors; or (iii) seeking the entry of an order for relief or the appointment of a receiver, trustee, or other similar official for it or for any substantial part of its property, and in the case of any such proceeding instituted against any such Person, either such proceeding shall remain undismissed for a period of 120 days or any of the actions sought in such proceeding shall occur; or (c) any Person taking any corporate or other formal action to authorize any of the actions set forth above in this definition.

"*Inspection Period*" means the time period commencing on the Effective Date and ending at 5:00 Pacific Time on the fortieth (40th) day after the Effective Date.

"*Inspections*" has the meaning set forth in Section 2.03.

"*Lease Agreement*" has the meaning set forth in Section 1.03.

"*Lease Proof of Insurance*" has the meaning set forth in Section 5.01.

"*Legal Requirements*" shall mean "all applicable federal, state, county, municipal, local, or other laws, statutes, codes, ordinances, rules, and regulations.".

"*Letter of Intent*" means that certain Letter of Intent dated November 8, 2022 between Purchaser and iMedia Brands, Inc., with respect to the Transaction, and any amendments or supplements thereto.

"*Lien*" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction).

"*Losses*" means any and all claims, lawsuits, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, interest, charges, fees, expenses, judgments, decrees, awards, amounts paid in settlement and damages of whatever kind or nature (including, without limitation, attorneys' fees, court costs and costs incurred in the investigation, defense and settlement of claims).

SCHEDULE A

"*Memoranda of Lease*" has the meaning set forth in Section 5.01(a)(iii).

"*Net Proceeds*" means the Purchase Price less any costs, expenses, prorations, Due Diligence Expenses, and other fees and expenses required to be paid by Seller in connection with the Transaction.

"*Non-Foreign Seller Certificate*" has the meaning set forth in Section 5.01(a)(vi).

"*Notices*" has the meaning set forth in Section 7.03.

"*Notice to Close*" means Purchaser's written notice to Seller that the Inspection Period has ended, Purchaser has concluded the Property is suitable, the Purchaser is paying the Deposit within three (3) business days following its delivery of the Notice to Close and Purchaser is affirmatively moving to Closing as provided in this Agreement.

"*OFAC List*" means the list of specially designated nationals and blocked Persons subject to financial sanctions that is maintained by the U.S. Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S. Treasury Department, Office of Foreign Assets Control pursuant to any Legal Requirements, including, without limitation, trade embargo, economic sanctions, or other prohibitions imposed by Executive Order of the President of the United States. The OFAC List currently is accessible through the internet website www.treas.gov/ofac/t11sdn.pdf.

"*Permitted Encumbrances*" means (a) the lien of any real estate taxes not yet due and payable; (b) those recorded easements, restrictions, liens and encumbrances and survey matters that have been determined to be Permitted Encumbrances pursuant to Section 2.01(d); and (c) the Lease Agreement.

"*Person*" means any natural person, firm, corporation, partnership, limited liability company, other entity, state, political subdivision of any state, the United States of America, any agency or instrumentality of the United States of America, any other public body or other organization or association.

"*Property*" has the meaning set forth in Section 1.01.

"*Purchase Price*" means the amount specified in Section 1.02.

"*Purchaser Default*" has the meaning set forth in Section 6.03.

"*Regulated Substances*" means "petroleum" and "petroleum-based substances" or any similar terms described or defined in any Hazardous Materials Laws and any applicable federal, state, county or local laws applicable to or regulating USTs.

"*Reports*" has the meaning set forth in Section 2.03.

"*Seller Default*" has the meaning set forth in Section 6.01.

SCHEDULE A

DocuSign Envelope ID:

"*Seller Documents*" has the meaning set forth in Section 2.02.

"*Seller Entity*" or "*Seller Entities*" means individually or collectively, as the context may require, Seller, Tenant and any Affiliate of Seller or Tenant.

"*Seller's Retained Property*" has the meaning set forth in Section 1.01.

"*Tenant*" means iMedia Brands, Inc.

"*Title Commitment*" has the meaning set forth in Section 2.01(a).

"*Title Company*" shall mean First American Title Insurance Company (New York office) located at 666 Third Avenue, 5th Floor, New York, New York 10017, Attention: Jed Levine.

"*Title Objection*" has the meaning set forth in Section 2.01(d)(i).

"*Title Policy*" has the meaning set forth in Section 2.01(a).

"*Transaction*" has the meaning set forth in Section 1.01.

"*Transaction Documents*" means the Lease Agreement, the Memoranda of Lease, the Deed, the Non-Foreign Seller Certificate, any and all documents referenced herein and therein, and such other documents, payments, instruments and certificates as are reasonably required by the Title Company.

"*UST Regulations*" means 40 C.F.R. § 298 Subpart H – Financial Responsibility, or any equivalent state law, with respect to petroleum underground storage tanks (as such term is defined under 40 C.F.R. § 290.12 or any equivalent state law).

"*USTs*" means any underground storage tank systems that are regulated by UST Regulations.

SCHEDULE A

DocuSign Envelope ID: 1B848348-9DB5-44AA-987D-798DF3E861E3

Case 25-03043-hdh-11 Doc 1-2 Filed 05/02/25 Entered 05/02/25 15:20:13 Desc
Exhibit(s) A-1 court pleadings    Page 82 of 327

## SCHEDULE B

## REAL PROPERTY REMOVAL VALUES

|      |                   |              |    | Minimum      | Maximum      |
|------|-------------------|--------------|----|--------------|--------------|
| DC 1 | 4811 Nashville Rd | Bowling Green | KY | $14,100,000 | $16,800,000 |
| DC 2 | 4813 Nashville Rd | Bowling Green | KY | $20,000,000 | $23,900,000 |
| HQ   | 6740 Shady Oak Lane | Eden Prairie | MN | $12,000,000 | $14,300,000 |

Rent under Lease Agreement to be proportionally adjusted based on percentage reduction to Purchase Price.

SCHEDULE B

## EXHIBIT A

## THE REAL PROPERTY

**1.  Kentucky Owned Property**

BEING LOT 1 OF "SUBDIVISION REVISION OF LOTS 1 & 2 OF THE LEON TARTER & GARLAND REEVES PROPERTY SUBDIVISION" AS SHOWN OF RECORD IN PLAT BOOK 42, PAGES 27-29, IN THE WARREN COUNTY CLERK'S OFFICE, WARREN COUNTY, KENTUCKY.

BEING A PORTION OF THE SAME PROPERTY CONVEYED TO VVI FULFILLMENT CENTER, INC., A MINNESOTA CORPORATION FROM DSC VENTURE 100, A KENTUCKY PARTNERSHIP, BY DEED DATED DECEMBER 11, 1996 AND OF RECORD IN DEED BOOK 736, PAGE 262, IN THE WARREN COUNTY CLERK'S OFFICE; AND, BEING A PORTION OF THE SAME PROPERTY CONVEYED TO VVI FULFILLMENT CENTER, INC., A MINNESOTA CORPORATION FROM LEON TARTER AND GARLAND REEVES, A KENTUCKY PARTNERSHIP, AND RHEA K REEVES, WIFE OF GARLAND REEVES, BY DEED DATED DECEMBER 11, 1996 AND OF RECORD IN DEED BOOK 736, PAGE 258, IN THE WARREN COUNTY CLERK'S OFFICE.

**2.  Kentucky Leased Property**

BEING LOT 1-1 OF "SUBDIVISION REVISION OF LOTS 1 & 2 OF THE LEON TARTER & GARLAND REEVES PROPERTY SUBDIVISION" AS SHOWN OF RECORD IN PLAT BOOK 42, PAGES 27-29, IN THE WARREN COUNTY CLERK'S OFFICE, WARREN COUNTY, KENTUCKY.

BEING THE SAME PROPERTY CONVEYED TO WARREN COUNTY, KENTUCKY FROM VVI FULFILLMENT CENTER, INC., A MINNESOTA CORPORATION BY DEED DATED DECEMBER 1, 2014, AND OF RECORD IN DEED BOOK 1088, PAGE 37, IN THE WARREN COUNTY CLERK'S OFFICE.

**3.  Minnesota Property**

Real property in the City of Eden Prairie, County of Hennepin, State of Minnesota, described as follows:

Lot 1, Block 1, Shady Oak Industrial Park Third Addition, according to the recorded plat thereof, Hennepin County Minnesota; except that part of Lot 1, Block 1, Shady Oak Industrial Park Third Addition which lies westerly of Line 1 described below:

Line 1. Commencing at the southeast corner of said Lot 1, Block 1, SHADY OAK INDUSTRIAL PARK THIRD ADDITION; thence westerly along the south line of said Lot 1 on an azimuth of 273 degrees

EXHIBIT A

14 minutes 16 seconds for 254.31 feet to the point of beginning of Line 1 to be described; thence on an azimuth of 345 degrees 06 minutes 52 seconds for 190.55 feet; thence on an azimuth of 349 degrees 49 minutes 38 seconds for 509.12 feet to a point hereinafter referred to as Point "A"; thence on an azimuth of 350 degrees 37 minutes 54 seconds for 133.00 feet to the northwest line of said Lot 1 and there terminating.

(abstract property)

EXHIBIT A

DocuSign Envelope ID: 1B948248-9DB5-44A4-987B-76BD73E661F2

# EXHIBIT A-1

## DEPICTION OF MINNESOTA PROPERTY AND SELLER RETAINED PARCEL

EXHIBIT A-1



EXHIBIT A-1

4874-6198-0479.8

DocuSign Envelope ID: 1B948248-9D57-44A4-987D-79DD73E661E1

Case 20-03043-1-MB Doc 1MB-1 Filed 05/02/25-2 Entered 05/02/25 15:20:38 Desc
Exhibit(s) A-1 court pleadings    Page 87 of 327

# EXHIBIT B

## INTENTIONALLY OMITTED

DocuSign Envelope ID: ...

## EXHIBIT C

## DUE DILIGENCE DOCUMENTS

1.  **ALTA/NPS Land Title Survey dated July 14, 2021 prepared by Westwood for Kentucky Owned Property and Kentucky Bond Property**
2.  **ALTA/NPS Land Title Survey dated July 20, 2021 prepared by Loucks Inc. for Minnesota Property**
3.  **Phase I Environmental Site Assessment prepared by ECI Environmental Services dated June 2, 2021 for the Kentucky Property**
4.  **Phase I Environmental Site Assessment prepared by ECI Environmental Services dated June 15, 2021 for the Minnesota Property**
5.  **Loan Policy of Title Insurance dated August 27, 2021 issued by First American Title Insurance Company as Policy No.: 1066471 for Minnesota Property**
6.  **Loan Policy of Title Insurance dated August 9, 2021 issued by First American Title Insurance Company as Policy No.: 1066469 2 for Kentucky Bond Property**
7.  **Loan Policy of Title Insurance dated August 9, 2021 issued by First American Title Insurance Company as Policy No.: 1066469 Kentucky Owned Property**
8.  **ALTA/NPS Land Title Survey dated December 2, 2022 prepared by Westwood for Kentucky Owned Property and Kentucky Bond Property**
9.  **ALTA/NPS Land Title Survey dated December 12, 2022 prepared by Loucks Inc. for Minnesota Property**
10. **Phase I Environmental Site Assessment prepared by GRS Group dated December __, 2022 for the Kentucky Property**
11. **Phase I Environmental Site Assessment prepared by GRS Group dated December __, 2022 for the Minnesota Property**
12. **Property Condition Assessments dated and December 5 and 2022 December 7, 2022 prepared by GRS Group for the Kentucky Property**
13. **Property Condition Assessment dated December 5, 2022 prepared by GRS Group for the Minnesota Property**
14. **Title Insurance Commitment dated December 2, 2022 issued by First American Title Insurance Company for the Kentucky Property**
15. **Title Insurance Commitment dated November 15, 2022 issued by First American Title Insurance Company for the Minnesota Property**

EXHIBIT C

4874-6198-0479.8

# EXHIBIT D-1

## FORM OF MINNESOTA DEED

**(Top 3 Inches Reserved for Recording Data)**

| **LIMITED WARRANTY DEED** | **Minnesota Uniform Conveyancing Blanks** |
|---|---|
| **Business Entity to Business Entity** | **Form 10.2.9 (2011)** |

eCRV: _____

DEED TAX DUE: _____          DATE: _____

FOR VALUABLE CONSIDERATION, _____**("Grantor"),** hereby conveys and quitclaims to _____, a _____ limited liability company **("Grantee"),** real property in Hennepin County, Minnesota, legally described as follows:

  See **Exhibit A** attached hereto and made a part hereof.

*Check here if part or all of the described real property is Registered (Torrens)*

together with all improvements, hereditaments and appurtenances belonging thereto (collectively, the "**Property**").

This Deed conveys after acquired title**:** Grantor warrants that Grantor has not done or suffered anything to encumber the property, EXCEPT:  See **Exhibit B** attached hereto.

*Check applicable box:*

☒  The Seller certifies that the Seller does not know of any wells on the described real property.

☐  A well disclosure certificate accompanies this document or has been electronically filed. (If electronically filed, insert WDC number:_____.)

☐  I am familiar with the property described in this instrument and I certify that the status and number of wells on the described real property have not changed since the last previously filed well disclosure certificate

Grantor:

By: _____

Name_____

Its: _____t

4874-6198-0479.8

State of Minnesota          )
                           ) ss.
County of Hennepin         )


This instrument was acknowledged before me on this_____day of _____, 202__,
by_____, as_____of
_____ on behalf of _____.



                    (Stamp)                    _____
                                               *(signature of notarial officer)*
                                               Title (and
                                               Rank):        **Notary Public**
                                                             _____

                                               My commission
                                               expires:      _____
                                                             *(month/day/year)*



THIS INSTRUMENT WAS DRAFTED BY:            TAX STATEMENTS FOR THE REAL PROPERTY DESCRIBED IN
*(insert name and address)*                THIS INSTRUMENT SHOULD BE SENT TO:
                                           *(insert legal name and residential or business address of Grantee)*

  Faegre Drinker Biddle & Reath LLP (BSB)
  2200 Wells Fargo Center
  90 South Seventh Street
  Minneapolis, MN 55402

Exhibit A

Legal Description

Real property in the City of Eden Prairie, County of Hennepin, State of Minnesota, described as follows:

Lot 1, Block 1, Shady Oak Industrial Park Third Addition, according to the recorded plat thereof, Hennepin County Minnesota; except that part of Lot 1, Block 1, Shady Oak Industrial Park Third Addition which lies westerly of Line 1 described below:

Line 1. Commencing at the southeast corner of said Lot 1, Block 1, SHADY OAK INDUSTRIAL PARK THIRD ADDITION; thence westerly along the south line of said Lot 1 on an azimuth of 273 degrees 14 minutes 16 seconds for 254.31 feet to the point of beginning of Line 1 to be described; thence on an azimuth of 345 degrees 06 minutes 52 seconds for 190.55 feet; thence on an azimuth of 349 degrees 49 minutes 38 seconds for 509.12 feet to a point hereinafter referred to as Point "A"; thence on an azimuth of 350 degrees 37 minutes 54 seconds for 133.00 feet to the northwest line of said Lot 1 and there terminating.

(abstract property)

<u>Exhibit B</u>

Permitted Encumbrances

[To be inserted prior to Closing and reflect Permitted Encumbrances]

*Signature Page to Deed*

# EXHIBIT D-2

## FORM OF KENTUCKY DEED

**RECORDING REQUESTED BY AND**
**WHEN RECORDED RETURN TO:**

## SPECIAL WARRANTY DEED

      For the consideration of _____ and No/100 Dollars ($_____), and other valuable considerations, **[INSERT GRANTOR'S NAME]**, a(n) _____ ("**Grantor**"), having an address at _____, hereby grants, bargains, sells and conveys with special warranty to **[INSERT GRANTEE'S NAME]**, a(n) _____ ("**Grantee**"), having an address at _____, the following described real property situated in _____ County, Kentucky (the "**Property**"):

      See legal description set forth in <u>Exhibit "A"</u> attached and incorporated by this reference,

together with all improvements, buildings, structures and fixtures located thereon; all easements, if any, benefiting the Property; all rights, benefits, privileges and appurtenances pertaining to the Property, including any right, title and interest of Grantor in and to any property lying in or under the bed of any street, alley, road or right-of-way, open or proposed, abutting or adjacent to the Property; the strips, gaps or gores, if any, between the Property and abutting property; all water, water rights, oil, gas or other mineral interests in, on, under or above the Property; and all rights and interests to receive any condemnation awards from any condemnation proceeding pertaining to the Property, sewer rights, water courses, wells, ditches and flumes located on or appurtenant to the Property.

      SUBJECT, HOWEVER, to those matters set forth in <u>Exhibit "B"</u> attached and incorporated by this reference.

      Grantor warrants the title to the Property against all acts of Grantor and any persons claiming by, through or under Grantor, but no other.

      Tax bills should be sent to _____.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.*
*SIGNATURE AND NOTARY PAGE TO FOLLOW.]*

DocuSign Envelope ID: 18B48248-9DD7-441A-987D-796DD73E28153

Case 25-03043-JMB Doc 1MB-1 Filed 05/02/25-2 Entered 05/02/25 15:20:35 Desc
Exhibit(s) A-1 court pleadings    Page 94 of 327

*Signature and Notary Page to*
*Special Warranty Deed*

IN WITNESS WHEREOF, Grantor has caused this Deed to be executed by its duly authorized and empowered representative as of the _____ day of _____, 202___.

**GRANTOR**:

[INSERT GRANTOR'S NAME],
a(n) _____

By: _____
Printed Name: _____
Title: _____

STATE OF MINNESOTA         )
                             ) ss:
COUNTY OF HENNEPIN     )

On this _____ day of _____, 202___, before me, personally appeared _____, the _____ of [INSERT GRANTOR'S NAME], a(n) _____, on behalf of said _____, who is personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to this instrument, and acknowledged to me that he executed it in such capacity and on behalf of said _____.

_____
Notary Public

My Commission Expires:         A resident of _____ County, Minnesota
_____

Commission Number:
_____

US.354152029.06
4874-6198-0479.8

## CONSIDERATION CERTIFICATE

The parties certify that the consideration stated in this Special Warranty Deed is the full consideration paid for the Property.  The parties acknowledge that falsification of the stated consideration or sale price of the Property is a criminal offense punishable by fine, imprisonment, or both fine and imprisonment.

IN TESTIMONY WHEREOF, witness the signature of Grantor on the day, month and year first above written.

**GRANTOR**:

[INSERT GRANTOR'S NAME],
a(n) _____

By: _____
Printed Name: _____
Title: _____

STATE OF MINNESOTA            )
                              ) ss:
COUNTY OF HENNEPIN            )

Sworn to before me and subscribed in my presence on this _____ day of _____,

2022, by _____ of VVI Fulfillment Center, Inc., a Minnesota corporation, on

behalf of said Grantor.

_____
Notary Public

My Commission Expires:              A resident of _____ County, Indiana

_____

Commission Number:

_____

**GRANTEE**:

[INSERT GRANTEE'S NAME],
a(n) _____

By: _____
Printed Name: _____
Title: _____

STATE OF _____)
                              ) ss:
COUNTY OF _____)

       Sworn to before me and subscribed in my presence on this _____ day of _____,

2022, by _____ of [INSERT GRANTOR'S NAME], a(n)

_____, on behalf of said _____.

_____
Notary Public

My Commission Expires:_____

This instrument was prepared with the assistance of Kentucky Counsel by:
B. Shane Barnes
Faegre Drinker Biddle & Reath LLP
2200 Wells Fargo Center, 90 South Seventh Street
Minneapolis, Minnesota 55402

Signature of Preparer:

_____
[Name of Preparer]

DocuSign Envelope ID: 1BB48248-9DB5-4A1A-987D-796DF3E88152

# EXHIBIT "A"

## LEGAL DESCRIPTION

BEING LOT 1 OF "SUBDIVISION REVISION OF LOTS 1 & 2 OF THE LEON TARTER & GARLAND REEVES PROPERTY SUBDIVISION" AS SHOWN OF RECORD IN PLAT BOOK 42, PAGES 27-29, IN THE WARREN COUNTY CLERK'S OFFICE, WARREN COUNTY, KENTUCKY.

BEING A PORTION OF THE SAME PROPERTY CONVEYED TO VVI FULFILLMENT CENTER, INC., A MINNESOTA CORPORATION FROM DSC VENTURE 100, A KENTUCKY PARTNERSHIP, BY DEED DATED DECEMBER 11, 1996 AND OF RECORD IN DEED BOOK 736, PAGE 262, IN THE WARREN COUNTY CLERK'S OFFICE; AND, BEING A PORTION OF THE SAME PROPERTY CONVEYED TO VVI FULFILLMENT CENTER, INC., A MINNESOTA CORPORATION FROM LEON TARTER AND GARLAND REEVES, A KENTUCKY PARTNERSHIP, AND RHEA K REEVES, WIFE OF GARLAND REEVES, BY DEED DATED DECEMBER 11, 1996 AND OF RECORD IN DEED BOOK 736, PAGE 258, IN THE WARREN COUNTY CLERK'S OFFICE.

Parcel No. _____

# EXHIBIT "B"

## **PERMITTED ENCUMBRANCES**

[TO BE INSERTED]

EXHIBIT E

DocuSign Envelope ID: 1B848948-09D5-4AA-987D-798DF3E60152

Case 25-03043-JMB-11 Doc 1MB-11 Filed 05/02/25-2 Entered 05/02/25 15:20:30 Desc
Exhibit(s) A-1 court pleadings    Page 99 of 327

## EXHIBIT E

## NON-FOREIGN SELLER CERTIFICATE

STATE OF    _____ )
                                 ) ss:
COUNTY OF   _____ )

_____, a _____ ("Seller") is a disregarded entity as defined in Section 1.1445-2(b)(2)(iii) of the regulations promulgated under the IRC. _____ _____, a Delaware limited liability company ("Transferor") as owner of the Property, hereby executes this Certification of Non-Foreign Status to inform the below transferee, that withholding of tax is not required upon the disposition of a U.S. real property interest by Transferor. Transferor hereby certifies the following to the transferee listed below:

1.      That Transferor's office address is _____.

2.      That the United States taxpayer identification number for the Transferor is _____.

3.      That Transferor is not a "foreign person" as that term is defined in Section 1445(f) of the United States Internal Revenue Code of 1986, as amended (the "Code").

3.      That Transferor is not a disregarded entity as defined in § 1.1445 2(b)(2)(iii) of the regulations promulgated under the Code.

This affidavit is given to _____, a _____, the transferee of the Property, for the purpose of establishing and documenting the nonforeign affidavit exemption to the withholding requirement of Section 1445 of the Code. Transferor understands that this affidavit may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, Transferor declares that the undersigned has examined this certification and, to the best of the undersigned's knowledge and belief, it is true, correct and complete and that the undersigned has authority to sign.

                         [_____], a
                         [_____]

                         By: _____
                         Name:_____
                         Title: _____

Subscribed and sworn to before me this _____ day of _____, 2_____.

Notary Public: _____        (SEAL)
My Commission Expires: _____

EXHIBIT E

EXHIBIT E

US.354152029.06
4874-6198-0479.8

# EXHIBIT 3

## NINTH AMENDMENT TO
## LOAN AND SECURITY AGREEMENT AND FIRST AMENDMENT TO
## FORBEARANCE AGREEMENT

THIS NINTH AMENDMENT TO LOAN AND SECURITY AGREEMENT AND FIRST AMENDMENT TO FORBEARANCE AGREEMENT (this "*Amendment*"), dated as of February 1, 2023, is entered into by and among IMEDIA BRANDS, INC., a Minnesota corporation ("*iMedia*" or "*Borrowing Agent*"), VALUEVISION INTERACTIVE, INC., a Minnesota corporation ("*Value Interactive*"), VALUEVISION RETAIL, INC., a Delaware corporation ("*Value Retail*"), PW ACQUISITION COMPANY, LLC, a Minnesota limited liability company ("*PW Acquisition*"), FL ACQUISITION COMPANY, a Minnesota corporation ("*FL Acquisition*"), VALUEVISION MEDIA ACQUISITIONS, INC., a Delaware corporation ("*Value Media*"), JWH ACQUISITION COMPANY, a Minnesota corporation ("*JWH Acquisition*"), NORWELL TELEVISION, LLC, a Delaware limited liability company ("*Norwell*"), 867 GRAND AVENUE LLC, a Minnesota limited liability company ("*867 Grand Avenue*"), PORTAL ACQUISITION COMPANY, a Minnesota corporation ("*Portal*" and together with iMedia, Value Interactive, Value Retail, PW Acquisition, FL Acquisition, Value Media, JWH Acquisition, Norwell, 867 Grand Avenue and any other Person who from time to time becomes a Borrower under the Loan Agreement, collectively, the "*Borrowers*"), VVI FULFILLMENT CENTER, INC., a Minnesota corporation ("*VVI Fulfillment*"), EP PROPERTIES, LLC, a Minnesota limited liability company ("*EP Properties*"), IMEDIA&123TV HOLDING GMBH ("*iMedia&123tv Holding*" and together with VVI Fulfillment, and EP Properties, collectively, the "*Guarantors*"), SIENA LENDING GROUP LLC, as a lender ("*Siena*" and together with any other financial institutions who become part to the Loan Agreement referred to below from time to time, each a "*Lender*" and collectively, the "*Lenders*") and SIENA LENDING GROUP LLC, as administrative and collateral agent for the Lenders (in such capacity, the "*Agent*"). Terms used herein without definition shall have the meanings ascribed to them in the Loan Agreement defined below.

### RECITALS

A.      Agent, Lenders and Borrowers have previously entered into (i) that certain Loan and Security Agreement dated as of July 30, 2021 (as amended, modified and supplemented from time to time, the "*Loan Agreement*"), pursuant to which Lenders have made certain loans and financial accommodations available to Borrowers, and (ii) that certain Forbearance Agreement and Eighth Amendment to Loan and Security Agreement dated as of December 20, 2022 (the "*Forbearance Agreement*").

B.      The Specified Defaults (as defined in the Forbearance Agreement) have occurred and are continuing.

C.      Borrowers have requested that the Agent and Lenders amend the Loan Agreement and the Forbearance Agreement as hereafter provided, and Agent and Lenders have agreed to such amendment subject to the terms and conditions set forth in this Amendment.

D.      Borrowers and Guarantors are entering into this Amendment with the understanding and agreement that, except as specifically provided herein, none of Agent's or any

Lender's rights or remedies as set forth in the Loan Agreement or any other Loan Document are being waived or modified by the terms of this Amendment.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.        <u>Acknowledgments by Loan Parties</u>.  Each Loan Party acknowledges and agrees as follows:

(a)        <u>Acknowledgment of Debt</u>. As of the close of business on January 31, 2023, each Loan Party is indebted, jointly and severally, to Lenders and Agent, without defense, deduction, setoff, claim or counterclaim, of any nature, under the Loan Agreement and the other Loan Documents in the aggregate principal amount of $42,619,982.76, plus accrued and continually accruing interest and all fees, costs and expenses.

(b)        <u>Acknowledgment of Specified Defaults</u>.  That on and as of the date hereof: (i) the Specified Defaults exist and continue to exist under the Loan Agreement and other Loan Documents; (ii) neither the Agent nor any Lender has waived in any respect any or all of such Specified Defaults or their rights and remedies with respect thereto; and (iii) as a result of the Specified Defaults, except as expressly provided in the Forbearance Agreement, Agent and Lenders are permitted to immediately exercise all rights and remedies available under the Loan Documents, applicable law and/or otherwise.

(c)        <u>Acknowledgment that Liabilities Continue in Full Force and Effect</u>.  That the Loans and all other liabilities and obligations of the Borrowers under the Loan Documents shall, remain in full force and effect, and shall not be released, impaired, diminished or in any other way modified or amended as a result of the execution and delivery of this Amendment or by the agreements and undertakings of the parties contained herein.

(d)        <u>Acknowledgment of Perfection of Security Interest</u>.  As of the date hereof, the security interests and Liens granted to the Agent, for its benefit and the benefit of the Lenders, under the Loan Documents securing the Obligations are in full force and effect, are properly perfected and are enforceable in accordance with the terms of the Loan Documents.

2.        <u>Ratification of Forbearance Agreement; Reservation of Rights.</u>

(a)        <u>Forbearance Agreement</u>.  The Forbearance Agreement, as amended by this Amendment, is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed and shall constitute the legal, valid, binding and enforceable obligations of Borrowers and Guarantors to Agent and Lenders.

(b)        <u>Preservation of Rights</u>.  By entering into this Amendment, Agent and Lenders do not waive the Specified Defaults or any other Event of Default that may be outstanding on the date hereof or any Event of Default that may occur after the date hereof (whether the same as, or similar to, the Specified Defaults or otherwise).  The Specified Defaults and any other Events

2

of Default which may be continuing on the date hereof or any Events of Default which may occur after the date hereof (whether the same as, or similar to, the Specified Defaults or otherwise) are hereby preserved.  Agent and Lenders specifically reserve all options, rights and remedies available to it and them under the Loan Agreement, the other Loan Documents, applicable law or otherwise.  Each Loan Party acknowledges and agrees that upon the occurrence and during the continuance of any Default or Event of Default (other than the Specified Defaults) or upon the expiration of the Forbearance Period (as defined in the Forbearance Agreement), (i) neither Agent nor any Lender is obligated or required to make any Loans or any other extension of credit to Borrowers under the Loan Agreement or the other Loan Documents and (ii) any Loans or other extensions of credit made by Agent or any Lender to Borrowers during the continuance of a Default or an Event of Default (other than the Specified Defaults) shall be made at the sole discretion of Agent or such Lender and shall not obligate Agent or any Lender to make any additional Loans or make any other extension of credit to Borrowers.

3.    Covenants. In consideration of the agreements set forth herein, Borrowers hereby covenant and agree as follows:

(a)    [Reserved].

(b)    Commencing on February 7, 2023, and on Tuesday of each week thereafter, Borrowers shall deliver to Agent a detailed projection and analysis of cash disbursements expected to be made by any Loan Party during such week, in form and substance satisfactory to Agent.

(c)    Commencing on February 14, 2023, and on Tuesday of each week thereafter, Borrowers shall deliver to Agent a detailed summary of cash disbursements made by any Loan Party during the immediately preceding week, in form and substance satisfactory to Agent.

(d)    On or before February 15, 2023, Borrowers shall deliver to Agent updated monthly business projections for Fiscal Year 2023 for the Loan Parties on a consolidated basis, which updated projections shall include profit and loss projections, balance sheet projections, income statement projections, cash flow projections and liquidity projections, including Borrowing Base calculations, together with appropriate supporting details and a statement of underlying assumptions used in preparing such projections.

(e)    Borrowers shall promptly, and in any event within one Business Day following Borrowers' receipt thereof, deliver to Agent copies of any amendment or modification to the commitment letter dated January 23, 2023 issued by PNC Bank, National Association to iMedia.

(f)    Borrowers shall promptly, and in any event within one Business Day following Borrowers' receipt thereof, deliver to Agent copies of each updated copy of the closing checklist and transaction calendar with respect to the Pontus Sale Leaseback.

(g)    Borrowers shall promptly, and in any event within one Business Day following Borrowers' receipt thereof, deliver to Agent a copy of the final "Notice to Close" (as defined in the Pontus Purchase Agreement).

3

(h)     Borrowers shall promptly, and in any event within one Business Day following Borrowers' receipt thereof, deliver to Agent any (i) material amendment or modification to the draft master lease agreement being negotiated pursuant to the Pontus Purchase Agreement and (ii) amendment or modification to the pro forma sources and uses memo with respect to the Pontus Sale Leaseback.

(i)     Borrowers shall provide evidence to Agent that the Deposit (as defined in the Pontus Purchase Agreement) has been made on or before the earlier of (i) four business days after receipt of the Notice to Close, and (ii) February 10, 2023.

Notwithstanding anything to the contrary in any Loan Document (including, without limitation, Section 7.1 of the Loan Agreement) the Borrowers' failure to comply in all respects with any covenant in this Section 3 shall constitute an immediate Event of Default.

4.     <u>Amendments to Loan Agreement and Forbearance Agreement</u>.

(a)     Schedule B of the Loan Agreement is amended to add the following new definitions in the appropriate alphabetical order as follows:

"***Availability Block***" means an amount equal to $5,000,000.

"***Ninth Amendment***" means that certain Ninth Amendment to Loan and Security Agreement and First Amendment to Forbearance Agreement, dated as of the Ninth Amendment Effective Date, among the Agent, Lenders and Loan Parties.

"***Ninth Amendment Effective Date***" means February 1, 2023.

(b)     Schedule B of the Loan Agreement is amended to amend and restate the definition of "***Borrowing Base***" as follows:

"***Borrowing Base***" means, as of any date of determination, the Dollar Equivalent Amount as of such date of determination of:

(a) the aggregate amount of Eligible Consumer Accounts of each Borrower multiplied by the Accounts Advance Rate; plus

(b) the aggregate amount of In-transit Credit Card Receipts multiplied by the Accounts Advance Rate (but in no event to exceed the In-transit Credit Card Receipts Sublimit); plus

(c) the aggregate amount of Eligible Portal Accounts of Portal multiplied by the Portal Accounts Advance Rate (but in no event to exceed the Portal Accounts Sublimit); plus

(d) the Net Orderly Liquidation Value of the applicable Eligible Inventory multiplied by the Inventory Advance Rate (but not to exceed the sublimit applicable to all Inventory); plus

4

(e) the Net Orderly Liquidation Value of the applicable Eligible Slow Moving Inventory multiplied by the Inventory Advance Rate (but not to exceed the sublimit applicable to Eligible Slow Moving Inventory); plus

(f) the Net Orderly Liquidation Value of Eligible In-Transit Inventory multiplied by the Inventory Advance Rate (but not to exceed the sublimit applicable to Eligible In-Transit Inventory); minus

(g) all Reserves which Agent has established pursuant to Section 1.2*, minus*

[1] *(h) the Availability Block.*

(c)    Clause (a) to Schedule E of the Loan Agreement is amended and restated in its entirety as follows:

**(a)    [Reserved]**.

(d)    Section 2(a)(i) of the Forbearance Agreement is amended and restated in its entirety as follows:

"(i) February 28, 2023;"

(e)    Section 3(d) of the Forbearance Agreement is amended and restated in its entirety as follows:

(d)    In consideration for Agent and Lenders' agreement to amend clause (a) to Schedule E of the Loan Agreement as set forth in the Ninth Amendment, as soon as reasonably practicable, *but in any event within 10 Business Days after the Ninth Amendment Effective Date,* Borrowers shall deliver to Agent:

(i) a customary German law guaranty and pledge agreement and appropriate stock certificates and stock transfer powers, granting Agent and Lenders, as security for the Obligations, a Lien in all of the Equity Interests issued by iMedia&123tv Holding GmbH and each of its direct and indirect Subsidiaries, including without limitation, 1-2-3.TV GmbH,

(ii) a customary opinion of Borrowers' German counsel with respect to the deliverables described in the foregoing clause (i) and the following clause (iii), and

(iii) such other customary agreements, documents and deliverables reasonably requested by Agent, in consultation with Agent's German counsel, in connection with the foregoing clauses

---

[1] NTD: for ease of reference, new language is included in *italics*.

(i) and (ii), in each case under this clause (d), in form and substance reasonably satisfactory to Agent.

(f)     Section 3(i) of the Forbearance Agreement is amended and restated in its entirety as follows: [Reserved]

5.     <u>Release; Covenant Not to Sue</u>.

(a)     Each Loan Party hereby absolutely and unconditionally releases and forever discharges Agent and each Lender, and any and all of their respective participants, parent corporations, subsidiary corporations, affiliated corporations, insurers, indemnitors, successors and assigns thereof, together with all of the present and former directors, officers, agents and employees of any of the foregoing (each a "***Released Party***"), from any and all claims, demands or causes of action of any kind, nature or description, whether arising in law or equity or upon contract or tort or under any state or federal law or otherwise, which any Loan Party has had, now has or has made claim to have against any such person for or by reason of any act, omission, matter, cause or thing whatsoever arising from the beginning of time to and including the date of this Amendment, whether such claims, demands and causes of action are matured or unmatured or known or unknown.  It is the intention of each Loan Party in providing this release that the same shall be effective as a bar to each and every claim, demand and cause of action specified.

(b)     Each Loan Party acknowledges that it may hereafter discover facts different from or in addition to those now known or believed to be true with respect to such claims, demands, or causes of action and agree that this instrument shall be and remain effective in all respects notwithstanding any such differences or additional facts.  Each Loan Party understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)     Each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Released Party above that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Released Party on the basis of any claim released, remised and discharged by any Loan Party pursuant to the above release.  If any Loan Party or any of its successors, assigns or other legal representatives violates the foregoing covenant, such Loan Party, for itself and its successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Released Party may sustain as a result of such violation, all attorneys' fees and costs incurred by such Released Party as a result of such violation.

6.     <u>Amendment Fee</u>.  In consideration of the agreements set forth herein, Borrowers hereby agree to jointly and severally pay to Agent for the ratable benefit of the Lenders, a fee in the amount of $100,000 (the "***Amendment Fee***"), which Amendment Fee is non-refundable when paid and is fully-earned as of the date of this Amendment and due and payable on the earliest of (i) February 28, 2023, (ii) the date on which the Pontus Sale Leaseback closing occurs, and (iii) the Maturity Date.  Borrowers hereby authorize Agent to charge Borrowers' Loan Account in full payment of the Amendment Fee on the due date therefor in accordance with this Section 6.

140690.01140/130244005v.12

7.    <u>Effectiveness of this Amendment</u>.  This Amendment shall become effective upon the satisfaction, as determined by Agent, of the following conditions (the "***Ninth Amendment Effective Date***"):

(a)    <u>Amendment</u>.  Agent shall have received this Amendment fully executed by the other parties hereto;

(b)    <u>[Reserved]</u>. ;

(c)    <u>Representations and Warranties</u>.  The representations and warranties set forth herein and in the Loan Agreement must true and correct in all material respects (without duplication of materiality qualifiers therein) as of the date hereof (or to the extent any representations or warranties are expressly made solely as of an earlier date, such representations and warranties shall be true and correct in all material respects (without duplication of materiality qualifiers therein) as of such earlier date), other than those representations and warranties which are incorrect solely as a result of the existence of the Specified Defaults; and

(d)    <u>Other Required Documentation</u>.  All other documents and legal matters in connection with the transactions contemplated by this Amendment shall have been delivered or executed or recorded, as reasonably required by Agent in its Permitted Discretion.

8.    <u>Representations and Warranties</u>.  Each Loan Party represents and warrants as follows:

(a)    <u>Authority</u>.  Such Loan Party has the requisite corporate power and authority to execute and deliver this Amendment, and to perform its obligations hereunder, under the Loan Agreement (as amended or modified hereby) and under the other Loan Documents to which it is a party.  The execution, delivery and performance by such Loan Party of this Amendment have been duly approved by all necessary corporate action and no other corporate proceedings are necessary to consummate such transactions.

(b)    <u>Enforceability</u>.  This Amendment has been duly executed and delivered by each Loan Party.  This Amendment, the Loan Agreement (as amended or modified hereby) and each other Loan Document is the legal, valid and binding obligation of each Loan Party, enforceable against each Loan Party in accordance with its terms, and is in full force and effect.

(c)    <u>Representations and Warranties</u>.  The representations and warranties contained in the Loan Agreement and each other Loan Document (other than any such representations or warranties that, by their terms, are specifically made as of a date other than the date hereof) are correct on and as of the date hereof as though made on and as of the date hereof, other than those representations and warranties which are incorrect solely as a result of the existence of the Specified Defaults.

(d)    <u>Due Execution</u>.  The execution, delivery and performance of this Amendment are within the power of each Loan Party, have been duly authorized by all necessary corporate action, have received all necessary governmental approval, if any, and do not contravene any law or any contractual restrictions binding on any Loan Party.

7

(e)  <u>No Default</u>.  Other than the Specified Defaults, no event has occurred and is continuing that constitutes a Default or an Event of Default.

(f)  <u>No Duress</u>.  This Amendment has been entered into without force or duress, of the free will of each Loan Party.  Each Loan Party's decision to enter into this Amendment is a fully informed decision and such Loan Party is aware of all legal and other ramifications of such decision.

(g)  <u>Counsel</u>.  Each Loan Party has read and understands this Amendment, has consulted with and been represented by legal counsel in connection herewith, and has been advised by its counsel of its rights and obligations hereunder and thereunder.

9.  <u>Choice of Law</u>.  THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATION LAW).  FURTHER, THE LAW OF THE STATE OF NEW YORK SHALL APPLY TO ALL DISPUTES OR CONTROVERSIES ARISING OUT OF OR CONNECTED TO OR WITH THIS AMENDMENT AND ALL SUCH RELATED LOAN DOCUMENTS WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATION LAW).

10.  <u>Counterparts; Facsimile Signatures</u>.  This Amendment may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by a party by e-mail, Docusign, facsimile or other similar form of electronic transmission shall be deemed to be an original signature hereto.

11.  <u>Reference to and Effect on the other Loan Documents</u>.

(a)  Upon and after the effectiveness of this Amendment, each reference in the Loan Agreement to "***this Agreement***", "***hereunder***", "***hereof***" or words of like import referring to the Loan Agreement and each reference in the other Loan Documents to "***the Loan Agreement***", "***thereof***" or words of like import referring to the Loan Agreement shall mean and be a reference to the Loan Agreement as modified and amended hereby.

(b)  Except as specifically amended above, the Loan Agreement and all other Loan Documents, are and shall continue to be in full force and effect and are hereby in all respects ratified and confirmed and shall constitute the legal, valid, binding and enforceable obligations of Borrowers and Guarantors to Agent and Lenders.

(c)  The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of Agent or any Lender under the Loan Agreement or any of the other Loan Documents, nor constitute a waiver of any provision of the Loan Agreement or any of the other Loan Documents.

8

(d)    To the extent that any terms and conditions in any of the other Loan Documents shall contradict or be in conflict with any terms or conditions of the Loan Agreement, after giving effect to this Amendment, such terms and conditions are hereby deemed modified or amended accordingly to reflect the terms and conditions of the Loan Agreement as modified or amended hereby.

12.    <u>Ratification</u>.  Each Loan Party hereby restates, ratifies and reaffirms each and every term and condition set forth in the Loan Agreement, as amended hereby, and the other Loan Documents effective as of the date hereof.

13.    <u>Integration</u>.  This Amendment, together with the Loan Agreement and the other Loan Documents, incorporates all negotiations of the parties hereto with respect to the subject matter hereof and is the final expression and agreement of the parties hereto with respect to the subject matter hereof.

14.    <u>Severability</u>.  If any part of this Amendment is contrary to, prohibited by, or deemed invalid under Applicable Laws, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

15.    <u>Waivers</u>.  Each Loan Party waives and renounces all rights that are waivable under Article 9 of the Uniform Commercial Code as such rights relate to such Loan Party's relationship with Agent and Lenders, whether such rights are waivable before or after default, including, without limitation, those rights with respect to compulsory disposition of collateral (U.C.C. §§9-610, 9-615 and 9-620), any right of redemption under U.C.C. §9-623, and any right to notice relating to disposition of collateral under U.C.C. §9-611.

16.    <u>Guarantors' Acknowledgment</u>.  With respect to the amendments to the Loan Agreement effected by this Amendment, each Guarantor hereby acknowledges and agrees to this Amendment and confirms and agrees that its Guaranty (as modified and supplemented in connection with this Amendment) is and shall continue to be, in full force and effect and is hereby ratified and confirmed in all respects except that, upon the effectiveness of, and on and after the date of this Amendment, each reference in such Guaranty to the Loan Agreement, "***thereunder***", "***thereof***" or words of like import referring to the Loan Agreement, shall mean and be a reference to the Loan Agreement as amended or modified by this Amendment.  Although Lender has informed the Guarantors of the matters set forth above, and each Guarantor has acknowledged the same, each Guarantor understands and agrees that Lender has no duty under the Loan Agreement, any Guaranty or any other agreement with any Guarantor to so notify any Guarantor or to seek such an acknowledgement, and nothing contained herein is intended to or shall create such a duty as to any transaction hereafter.

[remainder of page intentionally blank]

9

IN WITNESS WHEREOF, the parties have entered into this Amendment as of the date first above written.

**BORROWERS:**

**IMEDIA BRANDS, INC.**

By: _____
    Name: Timothy Peterman
    Its: CEO

**VALUEVISION RETAIL, INC.**

By: _____
    Name: Timothy Peterman
    Its: CEO

**FL ACQUISITION COMPANY**

By: _____
    Name: Timothy Peterman
    Its: CEO

**PW ACQUISITION COMPANY, LLC**

By: _____
    Name: Timothy Peterman
    Its: CEO

**VALUEVISION MEDIA ACQUISITIONS, INC.**

By: _____
    Name: Timothy Peterman
    Its: CEO

[Signature Page to Ninth Amendment to Loan and Security Agreement]

**JWH ACQUISITION COMPANY**

By:_____
        Name: Timothy Peterman
        Its: CEO


**NORWELL TELEVISION, LLC**

By:_____
        Name: Timothy Peterman
        Its: CEO


**867 GRAND AVENUE LLC**

By:_____
        Name: Timothy Peterman
        Its: CEO


**VALUEVISION INTERACTIVE, INC.**

By:_____
        Name: Timothy Peterman
        Its: CEO


**PORTAL ACQUISITION COMPANY**

By:_____
        Name: Timothy Peterman
        Its: CEO


**GUARANTORS**:

**VVI FULFILLMENT CENTER, INC.**

By:_____
        Name: Timothy Peterman
        Its: CEO

[Signature Page to Ninth Amendment to Loan and Security Agreement]

**EP PROPERTIES, LLC**

By:_____
     Name: Timothy Peterman
     Its: CEO


**IMEDIA&123TV HOLDING GMBH**

By:_____
     Name:   Timothy Peterman
     Its:     Managing Director


[Signature Page to Ninth Amendment to Loan and Security Agreement]

**SIENA LENDING GROUP LLC**, as Agent

By: _____

Name:   Renee Singer

Title:   Authorized Signatory

By: _____

Name:   Steven Sanicola

Title:   Authorized Signatory

**SIENA LENDING GROUP LLC**, as a Lender

By: _____

Name:   Renee Singer

Title:   Authorized Signatory

By: _____

Name:   Steven Sanicola

Title:   Authorized Signatory

[Signature Page to Ninth Amendment to Loan and Security Agreement]

**CRYSTAL FINANCIAL SPV LLC**, as a Lender

By: _____
Name:
Title:      Mirko Andric
            Senior Managing Director

**CRYSTAL FINANCIAL LLC D/B/A SLR
CREDIT SOLUTIONS**, as a Lender

By: _____
Name:
Title:      Mirko Andric
            Senior Managing Director

**NORTH MILL CAPITAL LLC D/B/A SLR
BUSINESS CREDIT**, as a Lender

By: _____
Name:
Title:

**CRYSTAL FINANCIAL SPV LLC**, as a Lender

By: _____
Name:
Title:

**CRYSTAL FINANCIAL LLC D/B/A SLR
CREDIT SOLUTIONS**, as a Lender

By: _____
Name:
Title:

**NORTH MILL CAPITAL LLC D/B/A SLR
BUSINESS CREDIT**, as a Lender

By: _____
Name:
Title:

# EXHIBIT 4

**MASTER LEASE AGREEMENT**
April 10, 2023

**LANDLORD:**

Pontus IMB Portfolio, LLC, a Delaware limited liability company

**TENANT:**

iMedia Brands, Inc., a Minnesota corporation

# LEASE AGREEMENT

This Master Lease Agreement (this "**Lease**"), dated for reference purposes only as of April 10, 2023 (the "**Effective Date**"), is made by and between Pontus IMB Portfolio, LLC, a Delaware limited liability company ("**Landlord**"), and iMedia Brands, Inc., a Minnesota corporation ("**Tenant**"), with reference to the recitals set forth below.

## RECITALS

**A.**     Landlord is the owner of certain properties located at (i) 6740 Shady Oak Lane, Eden Prairie, Minnesota (the "**Minnesota Property**"); (ii) 4811 Nashville Road, Bowling Green, Kentucky; and (iii) 4813 Nashville Road, Bowling Green, Kentucky (the "**Kentucky Property**," and collectively with the Minnesota Property, the "**Property**" or "**Properties**"). Legal Descriptions of the Properties are attached as Exhibit A to this Lease.

**B.**     The Property for purposes hereof includes all of Landlord's right, title and interest in and to all easements, appurtenances and rights relating to the Property, including without limitation, the machinery, equipment and systems necessary for the operation of the Property, including, (i) all apparatus, equipment, fixtures or articles, whether in single units or centrally controlled, used to supply heat, air-conditioning, water, lights, power, ventilation or other services; (ii) water heaters, boilers, sinks, water closets, water basins, pipes, faucets, or other plumbing fixtures; (iii) lighting, light fixtures and signage supports; and (iv) all items of equipment attached to the Property such that its separation therefrom will materially injure the Property, including the racking systems and any related accessories (collectively, the "**Property Equipment**."); provided that the Property Equipment shall not include (i) the software system that operates the sorting equipment located on the Kentucky property, and (ii) any personal property purchased by Tenant which has an initial cost basis of under $25,000.

**C.**     Landlord desires to lease the Properties to Tenant and Tenant desires to lease the Properties from Landlord pursuant to the provisions of this Lease.

## ARTICLE 1.  DEFINITIONS

The following terms, when used in this Lease, shall have the meaning set forth in this Article 1.

1.1     <u>Affiliates</u>.  The term "**Affiliate(s)**" means with respect to any specified Person, any other Person(s) directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" (including, with correlative meanings, "controlling", "controlled by", and "under common control with") means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and, it being understood and agreed that with respect to a corporation, limited liability company or partnership, control shall mean direct or indirect ownership of 50% or more of the voting stock or limited liability company interest or general partnership interest or voting interest in any such corporation, limited liability company or partnership.

1.2     <u>Environmental Condition</u>.  The term "**Environmental Condition**" means the presence of Hazardous Materials on or about the Properties (including the air, soil, sediment,

surface water, groundwater, sewer, septic system, or waste treatment, storage, or disposal systems), in violation of Environmental Laws.

1.3    <u>Environmental Laws</u>.  The term "**Environmental Laws**" means any and all applicable federal, state, or local laws, statutes, ordinances, orders, codes, rules, regulations, judgments, decrees, injunctions or agreements with any Governmental Entity, relating to the protection of human health or the environment, the release, discharge or disposal of any material or substance, the safety, health or Environmental Condition of property transferred, natural resource damages, pipelines, or human health and safety. Environmental Laws also include civil or common law doctrines (including without limitation negligence, nuisance, trespass, strict liability, personal injury, property damage, and product liability) to the extent that claims under such doctrines arise out of the presence of, release of, or exposure to a Hazardous Material.

1.4    Intentionally Deleted.

1.5    <u>Hazardous Material</u>.  The term "**Hazardous Material**" means any hazardous or toxic substances, materials or wastes, which are regulated under any applicable Environmental Laws including without limitation, any material, waste or substance which is (i) petroleum, (ii) asbestos, (iii) polychlorinated biphenyls, or (iv) included in the definition of "hazardous" or "dangerous" "material" "substance" or "waste" or words of similar import under applicable Environmental Laws.

1.6    <u>Lease Year</u>.  The term "**Lease Year**" shall mean the first twelve (12) full calendar months after the Commencement Date (as defined in Section 3.1) and each subsequent twelve (12) month period thereafter during the term and any extensions.  If the Commencement Date is other than the first day of the calendar month, then the first Lease Year also will include the partial calendar month in which the Commencement Date occurs.

1.7    <u>Party</u>.  The term "**Party**" means each of Landlord and Tenant.

1.8    <u>Person</u>.  The term "**Person**" means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, trust, estate, unincorporated organization or Governmental Authority; references to any Person includes reference to any successors in title and permitted assigns.

1.9    <u>Release</u>.  The term "**Release**" means any spilling, leaking, seeping, pumping, pouring, emitting, emptying, injecting, discharging, escaping, leaching, dumping, disposing or releasing of a Hazardous Material into the environment (including the air, soil, sediment, surface water, groundwater, sewer, septic system, or waste treatment, storage, or disposal systems) of any kind whatsoever, including the abandonment or discarding of barrels, containers, tanks or other receptacles containing or previously containing a Hazardous Material.

1.10    <u>Remediation</u>.    The term "**Remediation**" means investigating, monitoring, correcting, cleaning-up, implementing corrective action, or remediating of an Environmental Condition, (including, but not limited to, tests, inspections, borings, engineering studies, surveys, appraisals, environmental studies, 'operations, excavations, well installations, soil and groundwater sampling, activities associated with the construction, operation or maintenance of remediation, together with treatment equipment and systems for the treatment of contaminated soil, groundwater and free product and measures to contain, monitor or limit contamination),

which is required to address an Environmental Condition, comply with Environmental Laws, or fulfill the terms of a written agreement with, or written order or directive from, a Governmental Entity or a litigation settlement or judgment.

    1.11    <u>Tenant Retained Parcel</u>.  The term "**Tenant Retained Parcel**" means that portion of the Minnesota Property that is identified as Lot 1 of the Subdivision Map attached <u>Exhibit A-1</u> (the "**Subdivision Map**") as the Tenant Retained Parcel.

## ARTICLE 2. CONDITION OF PROPERTY

    2.1    Landlord leases to Tenant and Tenant leases from Landlord the Properties in their "**AS IS, WHERE IS, WITH ALL FAULTS**" condition with no representations or warranties whatsoever and on the terms and conditions set forth in this Lease.  By affixing its initials below, Tenant acknowledges and agrees that: (i) no representations have been or are made, or responsibility assumed by Landlord with respect to the Properties, their operations, or the condition or repair of the Properties, or as to any fact, circumstance, thing or condition which may affect or relate to the Properties, except as specifically set forth in this Lease; (ii) the Properties are leased in their "**AS IS, WHERE IS, WITH ALL FAULTS**" condition as of the Commencement Date; and (iii) Landlord shall have no obligation to alter, restore, improve, repair or develop the Properties, and further shall have no obligation to remove therefrom any parties or items of personal property, or other trade fixtures or equipment which may be upon the Properties.

## ARTICLE 3. TERM

    3.1    <u>Primary Term</u>.  The effective date (the "**Commencement Date**") of this Lease shall be the date of execution and delivery of this Lease by both parties.  The expiration date (the "**Expiration Date**") of this Lease shall be April 30, 2048 (the "**Original Lease Term**").  Except as otherwise expressly stated, the terms and conditions of this Lease shall remain in effect during the Term (as defined below), including any extension, renewal or holdover of the Term, unless terminated.  Concurrently with the execution hereof, a Memorandum of Lease substantially in the form of Exhibit B, attached hereto and incorporated herein, shall be recorded by and at the expense of Tenant with respect to the Properties.  The term ("**Term**"), as used herein, shall be the period from the Commencement Date through the Expiration Date as may be extended, unless sooner terminated as hereinafter set forth.

    3.2    <u>Option Period</u>.

        (a)    Tenant shall have the option to extend the term of this Lease for up to two (2) separate option periods of ten (10) years each upon and subject to the terms set forth in this <u>Section 3.2</u>. The first option period (the "**First Option Period**") shall commence at the expiration of the Original Lease Term. The second option period (the "**Second Option Period**") shall commence at the expiration of the First Option Period. The First Option Period and the Second Option Period are sometimes referred to herein collectively as the "**Option Periods**" and individually as an "**Option Period**." Each Option Period shall continue for a period of ten (10) years from the commencement date of such Option Period.  Except as otherwise expressly provided herein, all of the terms and conditions of this Lease applicable to the Original Lease Term shall continue to apply during each Option Period.

(b)  To validly extend the Lease Term for the First Option Period, (i) Tenant must deliver to Landlord written notice of Tenant's election to so extend not later than twelve (12) months prior to the expiration of the Original Lease Term; and (ii) as of both the date such written notice is delivered to Landlord and as of the date the First Option Period is scheduled to commence, there shall be no existing default or Event of Default under this Lease.

(c)  To validly extend the Lease Term for the Second Option Period, (i) Tenant must have validly extended this Lease for the First Option Period, (ii) Tenant shall deliver to Landlord written notice of Tenant's election to so extend not later than twelve (12) months prior to the expiration of the First Option Period; and (iii) as of both the date such written notice is delivered to Landlord and as of the date the Second Option Period is scheduled to commence, there shall be no existing default or Event of Default under this Lease.

(d)  Time is of the strictest essence in the performance of each provision of this Section 3.2.  Either party, upon request of the other, shall execute and acknowledge, in form suitable for recording, an instrument confirming any Option Period, with the party requesting such recordation paying all applicable recording costs and transfer taxes.

3.3  Surrender of Properties; Holding Over.  On the last day or sooner termination of the term of this Lease, Tenant shall quit and surrender the Properties, together with all alterations, and improvements thereon and thereto, in a broom clean condition, vacant and free of all tenancies and any leasehold rights created therein by Tenant and, subject to Section 24.7, in the same or better condition and repair as was present as of the Commencement Date, normal wear and tear, casualty and condemnation excepted, and shall surrender all keys for the Properties to Landlord at the place then fixed for the payment of rent and shall inform Landlord of all combinations of locks, safes, and vaults, if any, in the Properties. If Tenant does not do so with respect to the Properties, then after expiration of this Lease, Tenant will, with respect to such Properties only, become a month-to-month tenant-at-will upon the applicable conditions of this Lease.  If Tenant holds over in possession after the expiration or earlier termination of this Lease, then such holding over shall not be deemed to extend the Lease Term or renew this Lease, but rather the tenancy thereafter shall continue as a tenancy at sufferance pursuant to the terms and conditions contained in this Lease, at one hundred fifty (150%) of the Base Rent otherwise then applicable (in addition to all Additional Rent); and, if Landlord has delivered at least thirty (30) days written notice to Tenant that Landlord is contractually obligated to deliver a Property to a third party after the Expiration Date or earlier termination of this Lease or Landlord must commence making alterations to the applicable Property and Tenant fails to surrender such Property to Landlord on or before the later of the end of such thirty (30) day notice period or the Expiration Date or earlier termination of this Lease, Tenant shall be responsible for the consequences of any unauthorized holdover and shall indemnify, defend, protect (with counsel selected by Landlord) and hold Landlord Parties wholly free and harmless of, from and against any and all actual damages, losses, costs, expenses and claims arising therefrom, including reasonable attorneys' fees and costs. This Article will survive expiration or termination of this Lease.  Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease.

## ARTICLE 4. BASE MONTHLY RENT

4.1  Net-Net-Net Lease.  This is a net-net-net lease. It is the intention of Landlord and Tenant that the Base Monthly Rent (as defined below) and other sums and charges provided herein

shall be absolutely net to Landlord.  Except as otherwise specifically set forth in this Lease, Tenant shall pay, as Additional Rent, all costs, charges, obligations, assessments, and expenses of every kind and nature against or relating to the Properties or the use, occupancy, area, possession, leasing, operation, management, maintenance, or repair thereof, which may arise or become due during the term hereof, or which may pertain to this transaction, whether or not now customary or within the contemplation of the parties hereto, and which, except for the execution and delivery of this Lease, would have been payable by Landlord.  Tenant shall be solely responsible for the operation, management and maintenance of the Properties as provided in this Lease and Landlord shall not be entitled to receive any fees or costs in connection therewith, except only in the event Tenant fails to perform its obligations under this Lease and Landlord incurs expenses to cure such failure as expressly provided in this Lease.

4.2    <u>Base Monthly Rent</u>.  As used herein, subject to the annual increases as hereinafter provided, the initial annual "**<u>Base Rent</u>**" for the Properties shall be $4,536,000.00, payable in equal monthly installments of $378,000.00.  Tenant shall pay to Landlord Base Rent, in advance, without demand therefor, on or before the first day of each and every calendar month during the Lease Term, and if the Commencement Date is not the first day of a calendar month, the Base Rent for that month shall be prorated based upon a thirty (30) day month and the actual number of days from and after the Commencement Date to the end of the calendar month.  Base Rent shall be paid by automatic debit, wire transfer or such other automatic transfer method that is acceptable to Landlord in its sole and absolute discretion.

4.3    <u>Base Rent Increase</u>.  On each Adjustment Date (as defined below) throughout the Lease Term (including any Option Periods, subject to subsection (c), below), the monthly Base Rent immediately prior to such Adjustment Date shall be increased by three percent (3.0%) over the prior year's Base Rent.  The term "Adjustment Date" shall mean the date, occurring once each calendar year, which falls on the anniversary of the Commencement Date, unless such date is a day other than the first day of a month, in which case the Adjustment Date shall be the first day of the next succeeding month.

4.4    <u>Base Rent Increase/Option Periods</u>.  On the first day of the First Option Period and each year thereafter, including during the Second Option Period, the Base Rent will be increased by three percent (3.0 %) over the prior year's Base Rent.

4.5    <u>Security Deposit</u>.  Upon the execution of this Lease, Tenant shall deliver a security deposit to Landlord for the Properties, and at all times maintain a Security Deposit equal to twelve (12) months of the initial monthly Base Rent ("Security Deposit").  The Security Deposit shall be held by Landlord without liability for interest (unless required by Law) as security for the performance of Tenants obligations.  The Security Deposit is not an advance payment of Rent or a measure of damages.  Landlord may use all or a portion of the Security Deposit to satisfy past due Rent, Additional Rent, or to cure any Default by Tenant.  If Landlord uses any portion of the Security Deposit, Tenant shall, within five (5) business days after demand, restore the Security Deposit to the required amount.  Landlord shall return any unapplied portion of the Security Deposit to Tenant within forty-five (45) days after the later to occur of: (a) determination of the final Rent due from Tenant; or (b) the later to occur of the Termination Date or the date Tenant surrenders the Properties to Landlord in compliance with this Lease.  Landlord may assign the Security Deposit to a successor, transferee or lender and, following the assignment, Landlord shall have no further liability for the return of the Security Deposit.  Landlord shall not be required to

4854-8636-9096.14

keep the Security Deposit separate from its other accounts.  Tenant acknowledges and agrees that Tenant shall, at Landlord's request, upon no less than thirty (30) days' prior written notice, convert the security deposit to a standby, unconditional, irrevocable, transferable letter of credit, in form and substance acceptable to Landlord in its reasonable discretion.

Notwithstanding anything to the contrary contained herein, <u>provided</u> <u>that</u> no Event of Default by Tenant under this Lease has occurred during the Term, at the point that all of the following metrics have been achieved (collectively, the "<u>Metrics</u>"):

(a)    Consolidated EBITDA (unadjusted) exceeds $40.0 million; and

(b)    Fixed Charge Coverage Ratio (as defined by Tenant's senior lender) is greater than 2.0x; and

(c)    Tenant's net liquidity is greater than $15.0 million.

The Metrics will be tested annually following Tenant's fiscal year end.  In the event that the Metrics are tested but have not been achieved, then the Security Deposit will remain in place.  At such time as the Metrics are tested and have been achieved, Tenant may reduce the Security Deposit to six (6) months of the then current monthly Base Rent.

Further notwithstanding anything to the contrary contained herein, <u>provided</u> <u>that</u> (i) no Event of Default by Tenant under this Lease has occurred during the Term, and (ii) the Metrics set forth above are satisfied, and the following Metrics have been achieved:

(a)    Consolidated EBITDA (unadjusted) exceeds $70.0 million; and

(b)    Total leverage (total debt / adjusted EBITDA) is less than 3.0x; and

(c)    Tenant has successfully refinanced corporate bonds maturing in 2026 with new long-term debt; and

(d)    Tenant is in compliance with all financial covenants associated with all outstanding debt instruments.

The Metrics will be tested annually following Tenant's fiscal year end.  In the event that the Metrics are tested but have not been achieved, then the Security Deposit will remain in place.  At such time as the Metrics are tested and have been achieved, Tenant may reduce the Security Deposit to three (3) months of the then current monthly Base Rent.

## ARTICLE 5. ADDITIONAL RENT

5.1    As used herein, "**<u>Additional Rent</u>**" means any and all fees, expenses, taxes and charges of every kind and nature arising in connection with or relating to the Properties (other than Base Rent) that arise prior to or during the Term, including, without limitation: (i) any and all taxes (including, without limitation, Real Estate Taxes (as defined below) and any applicable tax on rental of real property and any applicable discretionary sales surtax), fees, utility service charges, maintenance expenses, insurance premiums, and other costs, and any amounts owed by Tenant under any indemnity to Landlord hereunder; (ii) all actual fees and penalties that may accrue on

any amounts due from Tenant hereunder if Tenant fails to pay such amounts in a timely manner; (iii) all other damages, costs and expenses (including, without limitation, reasonable Landlord's and Landlord's Lender's attorneys' fees and other legal and court costs) that Landlord may suffer or incur in enforcing this Lease (whether or not any formal action is brought by Landlord against Tenant) or in otherwise taking actions permitted under this Lease following an Event of Default by Tenant; (iv) any and all other sums which may become due, or costs and expenses that may be incurred by Landlord, by reason of any default or Event of Default by Tenant under this Lease; and (v) any and all actual and reasonable costs of maintaining, repairing and restoring the Properties. In addition, "**Additional Rent**" includes any rent or other income received by Tenant from any subtenant of the Property to the extent applicable to periods after the expiration or termination of this Lease as to the Property. "**Additional Rent**" also includes any fees, charges, fines, costs, assessments, taxes, demands, orders, directives, or other requirements by any governmental agency asserting jurisdiction, or under any Environmental Laws which arise from or relate to Tenant's use of, or Tenant's activities at, the Properties, including, but not limited to, any applicable fees, and any consultant or attorneys' fees related to or arising under any Environmental Laws.

5.2     Without limiting anything contained in subsection (a), above, Tenant shall pay, as Additional Rent all Real Estate Taxes (as hereinafter defined). As used herein, the term "**Real Estate Taxes**" means all taxes and general and special assessments and other impositions in lieu thereof, as a supplement thereto and any other tax that is measured by the value of land and assessed on a uniform basis against the owners of land, including any substitution in whole or in part therefor due to a future change in the method of taxation, in each case assessed against, or allocable or attributable to, the Properties and accruing during the Lease. Real Estate Taxes will be prorated if the Lease commences or terminates with respect to a Property during a taxable period. If by law, any general or special assessment or like charge may be paid in installments without any penalty or interest whatsoever, then such assessment may be paid in such installments, and Tenant shall be liable for the entire portion thereof as it becomes due. If such assessment or charge may be payable in installments with interest, Tenant may pay such assessment or charge in installments, provided that if such installments extend beyond the Lease, Landlord shall have the option to repay all remaining installments coming due following the Lease without interest. Notwithstanding the foregoing, in no event shall Tenant be required to pay any net income taxes (i.e., taxes which are determined taking into account deductions for depreciation, interest, taxes and ordinary and necessary business expenses), estate, gift, inheritance or other taxes in lieu thereof of Landlord or franchise taxes (unless imposed in lieu of other taxes that would otherwise be the obligations of Tenant under this Lease, including, without limitation, any "gross receipt tax" or any similar tax based upon gross income or receipts of Landlord which does not take into account deductions from depreciation, interest, taxes or ordinary or necessary business expenses) or inheritance, estate, gift or any similar taxes of Landlord, or any tax imposed with respect to the sale, exchange or other disposition by Landlord, in whole or in part, of the Property or Landlord's interest in this Lease.

5.3     Tenant shall pay all Real Estate Taxes directly to the collecting authority no less than fifteen (15) business days prior to the delinquency date thereof and shall provide Landlord upon Landlord's written request, or if Tenant has engaged an outside tax service, periodically as such reports are provided to Tenant, reports on Real Estate Taxes due and paid for the specified reporting period, together with such backup documentation as Landlord may request. Notwithstanding the foregoing, upon the occurrence of both of the following events, Tenant shall

pay Real Estate Taxes to Landlord (the "**Real Estate Taxes Reserve**") in lieu of the applicable collecting authority: (i) delivery to Tenant of a written request therefor from Landlord, and (ii) the existence of any default or breach of this Section 5.3 by Tenant, or any Event of Default under any provision in this Lease (the foregoing clause (ii) may be hereinafter referred to as a "**Real Estate Taxes Reserve Trigger**"). Following the imposition of a Real Estate Tax Reserve, in the event Tenant completes a twelve (12) consecutive month period without the occurrence of a Real Estate Taxes Reserve Trigger, then following written request by Tenant, Landlord shall disburse any funds in the Real Estate Taxes Reserve to Tenant, and Tenant shall no longer be obligated to pay the Real Estate Taxes to Landlord in lieu of the applicable collecting authority until the occurrence of another Real Estate Taxes Reserve Trigger. If Tenant fails to pay the appropriate party (Landlord or the collecting authority, as provided herein) all Real Estate Taxes when due hereunder, then Tenant shall, without limiting any other remedies available to Landlord, reimburse Landlord for any and all penalties or interest, or portion thereof, incurred by Landlord as a result of such nonpayment or late payment by Tenant.

**ARTICLE 6. USE OF THE PROPERTIES; COMPLIANCE; FINANCIAL COVENANTS**

6.1    Use of the Properties.

(a)    Tenant may use the Properties as they are generally used on the Commencement Date, including for warehouse, office, distribution and television studios (each use, a "**Use**" and collectively "**Uses**"), but for no other uses without the prior written consent of Landlord. Notwithstanding the foregoing, Tenant may use the Tenant Retained Parcel for any lawful use. Tenant has or will obtain, prior to the Commencement Date, all necessary permits, consents, licenses and other permissions required for the lawful operation of each Property for the Uses thereon and shall comply with all applicable laws, codes, ordinances and regulations, including all zoning and other use restrictions and regulations applicable to the Properties.

(b)    Tenant covenants and agrees that it shall not install and, it shall during the term of this Lease prevent any sublessee or other occupant of the Properties from installing, any water well or other water tank, pump or related equipment for the storage or use of potable water at the Properties. In addition, Tenant covenants and agrees that it shall not improve or use, and shall prohibit any sublessee or other occupant of the Properties from using or improving, the Properties for residential purposes.

6.2    Compliance. Tenant, at Tenant's sole expense, shall promptly comply with all applicable statutes, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements, including Environmental Laws, in effect during the term or any part (or extension) of the term hereof, regulating the applicable Uses by Tenant of each Property, including, without limitation, the obligation at Tenant's cost, to alter, maintain, or restore the Properties in compliance and conformity with all laws relating to the condition, use or occupancy of the Properties during the term (including, without limitation, any and all requirements as set forth in the Americans with Disabilities Act and any Environmental Law) as soon as practicable after any such requirements shall arise and regardless of (i) whether such laws require structural or non-structural improvements, (ii) whether the improvements were foreseen or unforeseen, and (iii) the period of time remaining in the term. Notwithstanding anything contained in this Section 6.2. to the contrary or the obligations of any other person, Tenant shall alter, maintain or restore the Properties

compliance and conformity with all applicable laws relating to the condition, use or occupancy of the Properties.

6.3     Covenant to Operate.  Notwithstanding anything contained herein to the contrary, Tenant covenants and agrees that it shall continuously operate the Properties (other than the Tenant Retained Parcel) for the Use.  Tenant shall have no obligation to conduct any portion of its business in the Tenant Retained Parcel.  In the event Tenant elects to remodel or reconstruct any improvements on the Properties, Tenant shall use commercially reasonable efforts to commence and thereafter diligently pursue to completion any such restoration, remodeling, replacement or reconstruction.  The aforementioned obligations of Tenant are referred to herein as the "Covenant to Operate."  Tenant shall indemnify, defend, and protect Landlord, and hold Landlord harmless from and against any and all loss, cost, damage, expense, liability (including, without limitation, court costs and reasonable attorneys' fees) incurred in connection with Tenant's breach of the Covenant to Operate.

6.4     Books and Records.  Tenant shall keep accurate books and records of account of the Properties and the financial performance of Tenant sufficient to permit the preparation of financial statements in accordance with generally accepted accounting principles as in effect in the United States of America from time to time ("**GAAP**"), or if Tenant's books, as applicable, are not kept in accordance with GAAP, in accordance with sound accounting principles consistently applied.  Tenant shall provide, or cause to be provided, to Landlord, in addition to any other financial statements required under this Lease, the following financial statements and information:

(a)     Promptly and in any event within one-hundred eighty (180) days after the end of each of Tenant's fiscal years, audited statements of financial position of Tenant as of the end of each such calendar year, including a balance sheet and statement of profits and losses, expenses and retained earnings, changes in financial position and cash flows for such calendar year, which statements shall be duly certified by an officer of Tenant to fairly represent the financial condition of Tenant, as of the date thereof, prepared by Tenant in accordance with GAAP, and accompanied by a statement of the regionally recognized  accounting firm retained by Tenant, that such financial statements present fairly, in all material respects, the financial condition of Tenant as of the end of the calendar year being reported on and that the results of the operations and cash flows for such year were prepared, and are being reported on, in conformity with GAAP, or in accordance with sound accounting principles consistently applied;

(b)     Promptly and in any event within forty-five (45) days after the end of each calendar quarter, internally prepared statements of financial position of Tenant as of the end of each such calendar year, including a balance sheet and statement of profits and losses, expenses and retained earnings, changes in financial position and cash flows for such calendar quarter.

(c)     Promptly and in any event within forty-five (45) days after the end of each calendar quarter, profit/loss statements in respect to each Property for the trailing twelve (12) month period; and

(d)     Promptly and in any event within forty-five (45) days after the end of each calendar quarter, any covenant compliance certificates required under Tenant's senior credit facility;

(e)    Such other information with respect to the Properties or Tenant that may be reasonably requested from time to time by Landlord, for such other purpose as Landlord reasonably determines, and all such financial information shall be provided within a reasonable time after the applicable request; and

(f)    In addition to the foregoing, Tenant shall include Landlord as a "notice party" in connection with any written notice sent by Siena Lending concerning a default by Tenant under any loan documents entered into by Tenant.

## ARTICLE 7. PROPERTY PAYMENTS, ASSESSMENTS AND UTILITIES

7.1    Tenant's Required Payments.  In addition to Additional Rent, Tenant acknowledges and agrees it is obligated to and shall perform all obligations of the owner of the Properties under, and pay all costs and expenses which the owner of the Properties may be required to pay in accordance with, any reciprocal easement agreements or any other documents or instruments of record now (or of record in the future if created or filed by or with the consent of Tenant) affecting the Properties, herein referred to collectively as the "**REAs**."  Tenant shall promptly comply with all of the terms and conditions of the REAs during the term of this Lease.  Landlord shall not amend any REAs or add new REAs during the Term without Tenant's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

7.2    Assessments.  If any assessment for a capital improvement made by a public or governmental authority shall be levied or assessed against the Properties, and the assessment is payable either in a lump sum or on an installment basis, then Tenant shall have the right to elect the basis of payment; provided however, that throughout the entire term of this Lease, Tenant shall pay all assessments that accrue during or are otherwise allocable to the term of this Lease.

7.3    Utility Payments.  Tenant shall promptly pay when due all charges for water, gas, electricity, and all other utilities furnished to or used upon the Properties, including all charges for installation, termination, and relocations of such service.  Landlord, at its option, may require Tenant to furnish Landlord with evidence of payment of such charges upon ten (10) business days' written notice to Tenant.

7.4    Tenant's Right to Contest Utility Charges, Contest Taxes and Seek Reduction of Assessed Valuation of the Properties.  Tenant, at Tenant's sole cost and expense, shall have the right, at any time, to seek a reduction in the assessed valuation of the Properties or to contest any taxes (including Real Estate Taxes) or utility charges that are to be paid by Tenant; provided however, Tenant shall (i) give Landlord written notice of any such intention to contest at least ten (10) business days before any delinquency could occur; (ii) indemnify and hold Landlord harmless from all liability on account of such contest; (iii) take such action as is necessary to remove the effect of any lien which attached to any of the Properties or the improvements thereon due to such contest; and (iv) in the event of a final determination adverse to Tenant, prior to enforcement, foreclosure or sale, pay the amount involved together with all penalties, fines, interest, costs, and expenses which may have accrued.  Tenant may use any means allowed by statute to protest Taxes or utility charges as defined in this Section 7.4 as long as Tenant remains current as to all other terms and conditions of this Lease.  If the protested Taxes have not been paid, then at Landlord's request Tenant shall furnish to Landlord a surety bond issued by an insurance company qualified to do business in the state where the Properties are located.  The amount of bond shall equal one hundred ten percent (110%) of the total amount of Taxes in dispute.  The bond shall hold Landlord

4854-8636-9096.14

and the Properties harmless from any damage arising out of the proceeding or contest and shall insure the payment of any judgment that may be rendered.  If Tenant seeks a reduction or contests any Taxes or utility charges, the failure on Tenant's part to pay the Taxes or utility charges shall not constitute a default as long as Tenant complies with the provisions of this Section.  In connection with any such contest, Tenant shall receive from any refund or rebate obtained from such contest the sum of all reasonable costs relating to such contest plus any refund or rebate received by Tenant or Landlord with respect to periods for which such amounts were (or are to be) paid by Tenant.

7.5     <u>Landlord Not Required to Join in Proceedings or Contest Brought by Tenant</u>. Landlord shall not be required to join in any proceeding or contest brought by Tenant unless (a) the provisions of applicable law require that the proceeding or contest be brought by or in the name of Landlord or the owner of the Properties or (b) if Tenant's counsel reasonably believes that Landlord's non-participation in such suit may adversely affect the outcome of such proceedings. In either such case, Landlord shall join in the proceeding or contest or permit it to be brought in Landlord's name, as long as Tenant agrees to pay or, at Landlord's option, reimburse, Landlord for any cost or expense relating thereto or arising as a result thereof.  Tenant, on final determination of the action, proceeding or contest, shall immediately pay or discharge any decision or judgment rendered, together with all costs, charges, interest, and penalties incidental to the decision or judgment.

## ARTICLE 8. FURNITURE, FIXTURES AND EQUIPMENT

8.1     <u>Furniture, Fixtures, and Equipment</u>.  During the term, Tenant may, at Tenant's sole cost and expense, place or install such furniture, trade fixtures, equipment, machinery, furnishings, face plates of signage and other articles of movable personal property (collectively, "**Tenant's Personal Property**") on the Properties as may be reasonably necessary for the conduct of Tenant's business.  It is expressly understood that the term Tenant's Personal Property as used herein shall in no event extend to the Property Equipment.  Tenant shall keep the Property Equipment on the Properties (other than the Tenant Retained Parcel) in good working order and repair, shall replace the Property Equipment as necessary, shall not remove the Property Equipment from the Properties and shall not permit any lien or other encumbrance to attach to the Property Equipment. Tenant may, from time to time, retire or replace the Property Equipment with new items of equipment purchased by Tenant, in which event such replaced equipment shall constitute the Property Equipment.  All Property Equipment shall be the property of Landlord, and Tenant shall execute such instruments and documents as Landlord may require to evidence such ownership by Landlord.

8.2     <u>Tenant Financing</u>.  Tenant may finance or lease Tenant's Personal Property at any time and from time to time during the term of this Lease.  Tenant may, at its option, remove and replace Tenant's Personal Property periodically during the term of this Lease.

8.3     <u>Removal of Tenant's Personal Property at Expiration of Lease</u>.  At the expiration or earlier termination of the Lease, all Tenant's Personal Property (but not the Property Equipment) shall be removed by Tenant.  Tenant shall immediately make such repairs to and restoration of the Properties as may be necessary to repair any damage to the Properties from the removal of all such Tenant's Personal Property.  Any of such Tenant's Personal Property not so removed within a reasonable time shall be deemed abandoned, and Landlord may cause such property to be removed

from the Properties and disposed of, but the cost of any such removal shall be payable by Tenant upon written demand therefor by Landlord.  The provisions of this paragraph shall survive the expiration or earlier termination of this Lease.

       8.4    <u>Right to Affix Signs</u>. Tenant shall have the right to decorate the Properties and affix signs customarily used in its business upon the windows, doors, interior and exterior walls of the Properties, and such free-standing signs as may seem appropriate to Tenant and are authorized by any governmental authority having jurisdiction over the Properties and permitted by any covenants, conditions and restrictions encumbering the Properties.  Upon the expiration or earlier termination of the Lease, Tenant shall remove such signs within a reasonable time following receipt of written notice from Landlord; provided, however, in no event may Tenant remove free-standing signage (such as pole-mounted or monument signs) from the Properties.  Tenant promptly shall make such repairs and restoration of the Properties as are necessary to repair any damage to the Properties from the removal of the signs.

## ARTICLE 9. MAINTENANCE AND REPAIRS OF THE PROPERTIES

       9.1    <u>Obligation to Maintain the Properties</u>.  Tenant, at its sole cost and expense, shall maintain each of the Properties (other than the Tenant Retained Parcel) and each part thereof, structural and non-structural, in good order, condition and repair (including all sidewalks, driveways, landscaping, trash enclosures, and trash compacting and loading areas on the Properties), in a neat and clean condition), and repair or replace, in good condition and in compliance with applicable law, all: (i) structural parts of the buildings and other improvements located on the Properties, including without limitation, the foundations, bearing and exterior walls, subflooring and roof; (ii) utility systems within or serving the Properties, including unexposed electrical, gas, plumbing, and sewage systems, including, without limitation, those portions of the systems lying outside the improvements; (iii) window frames, gutters and downspouts on the improvements in which the Properties are located; (iv) heating, ventilating, and air-conditioning systems servicing the Properties; (v) the exterior grounds, landscaping, sidewalks, curbs, gutters, fences, and parking and paved areas of the Properties; (vi) the Property Equipment; and (vii) the interior and all other portions of the Properties and shall make any necessary Repairs thereto, interior and exterior, whether extraordinary, foreseen or unforeseen but subject to the casualty and condemnation provisions of this Lease.  When used in this Article 9, the term **"Repairs"** includes all such replacements, renewals, alterations, additions and betterments necessary for Tenant to properly maintain each of the Properties in good order and condition and in compliance will all applicable laws.  The adequacy of any and all Repairs to the Properties required or conducted pursuant to this Article 9 shall be measured by and meet, at minimum, all of the following standards: (1) at least equal in quality of material and workmanship to the condition of the relevant Property(ies) prior to the need for such Repairs; (2) avoidance of any and all structural damage or injury to the building or persons therein; and (3) any and all repairs, replacements or upgrades necessary to ensure compliance with the rules and regulations of all government agencies having jurisdiction over the relevant Property(ies), including all Environmental Laws and shall conform to the requirements of any covenants, conditions, restrictions or other permitted encumbrances which are of record. Landlord shall have no duty whatsoever to maintain, replace, upgrade, or repair any portion of the Property(ies), and Tenant hereby expressly waives the right to make repairs at the expense of Landlord, which right may be provided for under applicable law now or hereafter in effect; provided that Landlord shall be obligated to make any repair or replacement that is necessitated by the intentional misconduct or gross negligence of Landlord.  Tenant's obligation to maintain, repair or

replace the Tenant Retained Parcel and its related Property Equipment shall be strictly limited to maintaining the Tenant Retained Parcel and its related Property Equipment in compliance with applicable laws.

       9.2   <u>Repair Notice</u>.  If Tenant fails or neglects to commence and diligently proceed with all necessary repairs or fulfill its other obligations as set forth above (for the purposes hereof, the receipt by Tenant of a building permit (if necessary under applicable law to commence the applicable repair) shall be deemed to constitute the commencement of a repair under this Article) within thirty (30) days after the later of (i) the reasonable period necessary to obtain any required building permit, and (ii) receipt of written notice of the need therefor describing the applicable repair or other obligation (a "**Repair Notice**") (except in emergency situations involving risk of further damage to the Property(ies) or injury to persons, in which case no such grace period shall be applicable, and Tenant shall be obligated to commence immediately all necessary repairs and diligently proceed to complete same), then Landlord or its agents may enter the Property(ies) for the purpose of making such repairs or fulfilling such obligations. All out of pocket costs and expenses incurred as a consequence of such Landlord's action shall be paid by Tenant to Landlord within thirty (30) days after Landlord delivers to Tenant copies of invoices for such repairs or other obligations. Such invoices shall be prima facie evidence of the payment of the charges to be paid by Tenant.

## ARTICLE 10. ALTERATIONS AND IMPROVEMENTS

       10.1   <u>Right to Make Alterations</u>.  Subject to the provisions of this <u>Article 10</u>, Tenant shall have the right to make changes, alterations or additions (collectively, "**Alterations**") to the Properties that are required and necessary, in Tenant's reasonable judgment, to operate the Use on the Properties.  In addition, if the Alterations constitute a Minor Project, as defined below, or are strictly to the Tenant Retained Parcel, then Tenant may make such Alteration without prior written consent of Landlord (such Minor Project, together with required and necessary repairs, each a "**Pre-Approved Alteration**"); provided, however, in no event shall any Alterations be made which, after completion, would:  (i) reduce or adversely affect the value of the Building as they exist at the time that such Alterations are proposed; or (ii) affect the structural integrity of the Building.  Tenant will provide Landlord notice and a description of any Alterations that are not Pre-Approved Alterations.  Any and all Alterations made by Tenant shall be at Tenant's sole cost and expense.  Prior to the commencement of construction, (but excluding non-structural minor maintenance or repair projects and cosmetic refresh projects involving only painting, carpeting, floor covering and installation of moveable replacement Property Equipment, unless the cost exceeds $500,000.00 (a "**Minor Project**")), Tenant shall deliver promptly to Landlord detailed cost estimates for any such proposed Alterations, as well as all drawings, plans and other information regarding such Alterations (such estimates, drawings, plans and other information are collectively referred to herein as the "**Alteration Information**").  Delivery of the Alteration Information shall not be required for Pre-Approved Alterations.  For Alterations other than Pre-Approved Alterations, Tenant must obtain Landlord's prior written consent before making such Alteration, but Landlord agrees not to unreasonably withhold, condition or delay its consent to such Alteration.  Landlord's review of any Alteration Information shall in no event constitute any representation or warranty of Landlord regarding (x) the compliance of any Alteration Information with any governmental or legal requirements, (y) the presence or absence of any defects in any Alteration Information, or (z) the safety or quality of any of the Alterations constructed in accordance with any plans or other Alteration Information.  Landlord's review of any of the

Alteration Information shall not preclude recovery by Landlord against Tenant based upon the Alterations, the Alteration Information, or any defects therein. In making any and all Alterations, Tenant also shall comply with all of the following conditions:

(a)    No Alterations shall be undertaken until Tenant shall have (i) procured and paid for, so far as the same may be required, all necessary permits and authorizations of all governmental authorities having jurisdiction over such Alterations, and (ii) delivered to Landlord prior to commencing any such Alterations written evidence of all such required permits and authorizations. Landlord shall, to the extent necessary (but at no cost, expense, or risk of loss to Landlord), join in the application for such permits or authorizations whenever necessary, promptly upon written request of Tenant.

(b)    Any and all structural Alterations of the Building shall be performed under the supervision of an architect and/or structural engineer.

(c)    Except for Pre-Approved Alterations, Tenant shall notify Landlord at least fifteen (15) days prior to commencing any Alterations so as to permit, and Tenant shall permit, Landlord access to the relevant Property(ies) in order to post and keep posted thereon such notice(s) as may be provided or required by applicable law to disclaim responsibility for any construction on the relevant Property(ies).

(d)    Any and all Alterations shall be conducted and completed in a commercially reasonable time period (subject to the terms of Article 10), in a good and workmanlike manner, and in compliance with all applicable laws, municipal ordinances, building codes and permits, and requirements of all governmental authorities having jurisdiction over the relevant Property(ies), and of the local Board of Fire Underwriters, if any; and, upon completion of any and all Alterations, Tenant shall obtain and deliver to Landlord a copy of the amended certificate of occupancy for the relevant Property(ies), if required under applicable law or by governmental authority. To the extent reasonably practicable, any and all Alterations shall be made and conducted so as not to disrupt Tenant's business.

(e)    The cost of any and all Alterations shall be promptly paid by Tenant so that the Property at all times shall be free of any and all liens for labor and/or materials supplied for any Alterations subject to the next succeeding sentence. In the event any such lien shall be filed, Tenant shall, within five (5) days after receipt of notice of such lien, deliver written notice to Landlord thereof, and Tenant shall, within thirty (30) days after receipt of notice of such lien, discharge the same by bond or payment of the amount due the lien claimant. However, Tenant may in good faith contest such lien provided that within such thirty (30) day period Tenant provides Landlord with a surety bond or other form of security reasonably acceptable to Landlord, protecting against said lien. Upon written request from Landlord, Tenant shall provide Landlord promptly with evidence reasonably satisfactory to Landlord that all contractors, subcontractors or materialmen have been paid in full with respect to such Alterations and that their lien rights have been waived or released. In the event Tenant fails to either discharge such lien or protect against such lien in accordance with the foregoing, then Landlord shall have the option (but not the obligation) to pay such lien or post a bond to protect against such lien and pass through such costs to Tenant as Additional Rent.

(f)    Any and all Alterations to the Properties shall become the property of Landlord upon termination of this Lease (except for Tenant's Personal Property). Landlord may,

4854-8636-9096.14

nonetheless, require Tenant to remove any fixtures, equipment, alterations and other improvements installed on the Property(ies) (the "**Additional Improvements**"), and restore the Property(ies) to its original condition, reasonable wear and tear and damage caused by casualty or condemnation excepted; provided that Landlord informed Tenant in writing at the time that Landlord approved Tenant's request to install the Additional Improvements that such Additional Improvements must be removed by Tenant at the end of the Term (failing which Tenant shall not be required to remove such Additional Alterations).  In addition, Tenant shall not be required to remove any fixtures, equipment, alterations and other improvements installed on the Property(ies) existing on the Propery(ties) on the Commencement Date.  In the event that Landlord so elects, and Tenant fails to remove the Additional Improvements, Landlord may remove the Additional Improvements at Tenant's cost, and Tenant shall pay Landlord on demand all reasonable costs actually incurred in removing Additional Improvements and restoration of the Premises as required.

## ARTICLE 11. INDEMNITY AND INSURANCE

11.1    <u>Indemnification</u>.

(a)    As used in this Lease, (w) "**Landlord Parties**" means, collectively, Landlord, Landlord's Affiliates and Landlord's Lenders; (x) "**Landlord's Affiliates**" means Landlord's members, partners, officers, directors, shareholders, employees, agents or any person or entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with Landlord (for purposes of this definition, the term "**control**," "**controlled** by" or "**under common control with**" means the power, direct or indirect, to direct or cause the direction of the management and policies of Landlord, whether through the ownership of voting stock, by contract, as trustee or executor, or otherwise); and (y) "**Landlord's Lenders**" means any persons or entities providing financing to Landlord or Landlord's Affiliates, secured by a mortgage, deed of trust, deed to secure debt or similar interest, encumbering Landlord's fee simple interest in the Properties or portion thereof (whether or not any such person or entity is also a Landlord's Lender).  To the extent not prohibited by law, none of the Landlord Parties shall be liable, under any circumstances, and Tenant hereby releases all Landlord Parties, for any loss, injury, death or damage to person or property (including but not limited to the business or any loss of income or profit therefrom) of Tenant, Tenant's members, officers, directors, shareholders, agents, employees, contractors, customers, invitees, or any other person in or about the Properties, whether the same are caused by (a) fire, explosion, falling plaster, steam, dampness, electricity, gas, water, rain; or (b) breakage, leakage or other defects of sprinklers, wires, appliances, plumbing and plumbing fixtures, water or gas pipes, roof, air conditioning, lighting fixtures, street improvements, or subsurface improvements; or (c) theft, acts of God or nature, acts of the public enemy, riot, strike, insurrection, civil unrest, war, court order, requisition or order of governmental body or authority; or (d) any act or omission of any other occupant of the Properties; or (e) operations in construction of any private, public or quasi-public work; or (f) Landlord's reentering and taking possession of the Properties in accordance with the provisions of this Lease or removing and storing the property of Tenant as herein provided; or (g) any other cause, including damage or injury which arises from the condition of the Properties, from occupants of adjacent property, from the public, or from any other sources or places, and regardless of whether the cause of such damage or injury or the means of repairing the same are inaccessible to Tenant, or which may arise through repair, alteration or maintenance of any part of the Properties or failure to make any such repair, from any condition or defect in, on or about the Properties; provided, however, that the foregoing release set forth in this Section 11.1 shall not be applicable to any claim against a Landlord Party

15

to the extent, and only to the extent, that such claim is directly attributable to the gross negligence or willful misconduct of such Landlord Party, as determined by a final, non-appealable judgment (or by a judgment which such Landlord Party elects not to appeal) by a court of competent jurisdiction.  Without limiting the foregoing, Tenant hereby waives any right to any direct or indirect consequential or punitive damages against any Landlord Parties arising out of any claim in connection with or related to this Lease, the Properties, or any portion thereof.

(b)     In addition to any and all other obligations of Tenant under this Lease (including, without limitation, under any indemnity or similar provision set forth herein), to the extent permitted by law, Tenant hereby agrees to fully and forever indemnify, protect, defend (with counsel selected by Landlord) Landlord, and hold all Landlord Parties free and harmless or, from and against any losses, cost, damage, expense and/or liability (including, without limitation, court costs and reasonable attorneys' fees) incurred in connection with or arising at any time and from any cause whatsoever in or about the Properties, claims, demands, actions, causes of action, settlements, obligations, duties, indebtedness, debts, controversies, remedies, choses in action, liabilities, costs, penalties, fines, damages, injury, judgments, forfeiture, or expenses (including, without limitation reasonable attorneys', consultant, testing and investigation and expert fees and court costs), whether known or unknown, whether liquidated or unliquidated: (a) arising out of or in any way related to or resulting directly or indirectly from: (i) the use, occupancy or activities of Tenant, its subtenants, agents, employees, contractors or invitees in or about the Properties; (ii) any failure on the part of Tenant to comply with any applicable law, code or regulation, including, without limitation, all Environmental Laws; (iii) any Event of Default under this Lease (including, without limitation, as a result of any termination by Landlord, following an Event of Default, of any sublease, license, concession, or other consensual arrangement for possession entered into by Tenant and affecting the Properties; (iv) any other loss, injury or damage described in this Section 11.1(b); (v) in connection with mold at the Properties; or (vi) work or labor performed, or materials or supplies furnished to or at the request of Tenant or in connection with obligations incurred by or performance of any work done for the account of Tenant in, on or about the Properties; and (b) whether heretofore now existing or hereafter arising out of or in any way related to or resulting directly or indirectly from the presence or Release at, on, under, to or from the Properties of Hazardous Materials in violation of Environmental Law. All of the personal or any other property of Tenant kept or stored at, on or about the Properties shall be kept or stored at the sole risk of Tenant. Without limiting the foregoing, Tenant shall pay on demand all reasonable out-of-pocket fees and costs of Landlord (including, without limitation, reasonable attorneys' fees and costs) in connection with any enforcement by Landlord of the terms of this Lease and any amendment to this Lease requested by Tenant.

(c)     The provisions of this Article 11 are Surviving Obligations (defined below). To the extent permitted by applicable laws, Tenant hereby waives the provisions of any applicable laws restricting the release of claims, or extent of release of claims, which Tenant does not know or suspect to exist at the time of release, which, if known, would have materially affected Tenant's decision to agree to the release contained in this Article 11.  In this regard, Tenant hereby agrees, represents, and warrants to Landlord that Tenant realizes and acknowledges that factual matters now unknown to Tenant may hereafter give rise to causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are presently unknown, unanticipated and unsuspected, and Tenant further agrees, represents and warrants that the release provided hereunder has been negotiated and agreed upon in light of that realization and that Tenant nevertheless hereby intends to release, discharge and acquit the parties set forth herein above from

4854-8636-9096.14

any such unknown causes of action, claims, demands, debts, controversies, damages, costs, losses and expenses which are in any manner set forth in or related to this Lease, the Properties and all dealings in connection therewith. For purposes of this Lease, "**Surviving Obligations**" means any obligations of Tenant under this Lease, actual or contingent, which arise on or prior to the expiration or prior termination of this Lease or which survive such expiration or termination by their own terms.

11.2    Insurance.

(a)    Insurance Company Requirement.  Insurance required by this Lease shall be issued by companies holding a general policyholder's rating of A/VIII or better as set forth in the most current issue of Best's Insurance Guide or A- and better by S&P, and authorized to do business in the state in which the Properties are located. If this publication is discontinued, then another insurance rating guide or service generally recognized as authoritative shall be substituted by Landlord.

(b)    Insurance Certificate Requirements.  Tenant shall deliver to Landlord evidence of the existence and amounts of the insurance with additional insured endorsements and loss payable clauses as required herein. Tenant shall deliver to Landlord a Certificate of Liability Insurance in connection with Tenant's liability policy(ies), and an Evidence of Property Insurance in connection with Tenant's property policy(ies).  No policy shall be cancelable or subject to reduction of coverage or other modification that reduces the then-current coverage limits except after thirty (30) days' prior written notice to Landlord.  Neither the issuance of any insurance policy required hereunder, nor the minimum limits specified herein with respect to any insurance coverage, shall be deemed to limit or restrict in any way the liability of Tenant arising under or out of this Lease.

(c)    Blanket Policies.  The insurance required to be maintained herein may be carried under blanket policies. The insurance shall provide for payment of loss to Landlord and Landlord shall be reflected as an additional insured.

(d)    Minimum Acceptable Insurance Coverage Requirements.

(i)    Tenant shall, at Tenant's expense, obtain and keep in full force during the term of this Lease a Commercial General Liability policy of bodily injury and property damage insurance written on an occurrence basis insuring Tenant (with Landlord as an additional insured) against any liability arising out of ownership, use, occupancy, or maintenance of the Properties and all of their appurtenant areas.  The insurance shall be in an amount not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in aggregate per Property; provided however, following receipt of written notice to Tenant, the limits of such insurance may be increased from time to time during the term of the Lease to such amount as may be deemed commercially reasonable by Landlord in the area where the Properties are located for properties reasonably similar to the Properties.  The policy shall provide blanket contractual liability coverage.  However, the limits of the insurance shall not limit the liability of Tenant.  In addition, Tenant shall, at Tenant's expense, obtain and keep in full force during the term of this Lease an umbrella liability policy in an amount not less than Ten Million Dollars ($10,000,000) in excess of primary insurance.  The insurance to be maintained by Tenant pursuant to this Section (d) shall be primary and not contributory to any other insurance maintained by Landlord.

(ii)    Tenant shall, at Tenant's expense, obtain and keep in force during the term of this Lease a "Special Form" (as such term is used in the insurance industry) policy of property insurance covering loss or damage to the Properties. The insurance shall be in an amount not less than the full guaranteed replacement cost of the building(s). The policy shall contain only standard printed exclusions; include an agreed value endorsement waiving any co-insurance penalty, and an ordinance or law coverage endorsement covering increased costs resulting from changes in laws or codes, demolition and removal of the damaged structure, and terrorism. Tenant shall have commercially reasonable deductibles for such insurance; provided that only if the Properties generate an annual cash flow of at least $1,000,000 for two (2) consecutive years, then the deductible can be an amount up to $50,000.

(iii)    Equipment Breakdown (also known as boiler and machinery) Insurance covering the full replacement cost.

(iv)    If any of the Properties are located in Flood Zone A or V as defined by the Federal Emergency Management Agency (FEMA), Tenant shall, at Tenant's expense, obtain and keep in force during the term of this Lease a policy of insurance covering loss or damage due to flood with respect to those Properties, which shall include National Flood and Excess Flood insurance.

(v)    Tenant shall also obtain and keep in force during the term of this Lease a policy of Business Interruption insurance covering a period of eighteen (18) months. This insurance shall cover all Taxes and insurance costs for the same period in addition to eighteen (18) months' lease rent amount.

(vi)    Tenant shall also obtain and keep in force during the term of this Lease a worker's compensation policy, insuring against and satisfying Tenant's obligations and liabilities under the worker's compensation laws of the state in which each of the Properties are located, including Employer's Liability insurance, in an amount of not less than One Million Dollars ($1,000,000).

(vii)    Should any financial assurance requirements pursuant to Environmental Laws be imposed on Tenant's use of, or activities at, the Properties, Tenant promptly and timely shall comply with those requirements as they take effect. Tenant shall maintain, in form and content acceptable to Landlord (and only containing those exclusions and exceptions acceptable to Landlord) pollution liability insurance in favor of Landlord which names Landlord as, an additional insured as set out in Section 11.2(e) herein, and any third parties which might be affected, in an amount of at least One Million Dollars ($1,000,000) per occurrence providing coverage for the investigation and/or remediation of any Hazardous Materials released at, on, under or from the Properties, property damage (including, without limitation, natural resource damages) and compensation for personal injuries, specifically including all pre-existing conditions. Tenant shall provide a certificate of insurance evidencing such required coverage prior to the Commencement Date, and such certificate shall provide that the policy may not be cancelled or amended in any material respect without thirty (30) days' prior written notice to Landlord.

(e)    _Additional Insureds_. Tenant shall name as additional insureds (by way of a CG 20 26 endorsement or similar endorsement) and loss payees on all insurance, Landlord, Landlord's Mortgagee, Landlord's successor(s), assignee(s), nominee(s), nominator(s), and agents with an insurable interest as follows:

**TENANT, ITS OFFICERS, DIRECTORS, MEMBERS AND ALL SUCCESSOR(S), ASSIGNEE(S), SUBSIDIARIES, CORPORATIONS, PARTNERSHIPS, PROPRIETOR-SHIPS, JOINT VENTURES, FIRMS, AND INDIVIDUALS AS HERETOFORE, NOW, OR HEREAFTER CONSTITUTED ON WHICH THE NAMED INSURED HAS THE RESPONSIBILITY FOR PLACING INSURANCE AND FOR WHICH SIMILAR COVERAGE IS NOT OTHERWISE MORE SPECIFICALLY PROVIDED.**

11.3    <u>Mortgage Endorsement</u>.    If requested by Landlord, the policies of insurance required to be maintained hereunder shall bear a standard first mortgage endorsement in favor of any holder or holders of a first mortgage lien or security interest in the property with loss payable to such holder or holders as their interests may appear; provided that insurance proceeds relating to a casualty shall be applied as described in Section 12.

11.4    <u>Renewals, Lapses or Deficiencies</u>.    Tenant shall, within ten (10) business days prior to the expiration of such policies, furnish Landlord with renewal certificates of insurance or renewal binders.    Should Tenant fail to provide to Landlord the renewals or renewal binders, or in the event of a lapse or deficiency of any insurance coverage specified herein for any reason, Landlord may immediately replace the deficient insurance coverage with a policy of insurance covering the Properties of the type and in the limits set forth above.    Upon written notice from Landlord of the placement of insurance, Tenant shall immediately pay to Landlord, as Additional Rent, an amount equal to the total cost of premiums and expense of such insurance placement plus reasonable handling fees.    Tenant shall not do or permit to be done anything that shall invalidate the insurance policies.    If Tenant does or permits to be done anything which shall increase the cost of the insurance policies, then upon Landlord's demand Tenant shall immediately pay to Landlord, as Additional Rent, an amount equal to the additional premiums attributable to any acts or omissions or operations of Tenant causing the increase in the cost of insurance.

11.5    <u>Waiver of Subrogation</u>.    Each of Landlord and Tenant hereby waives and releases any and all right of recovery against the other, including, without limitation, their respective employees and agents, arising during the term of this Lease for any and all loss (including, without limitation, loss of rental) or damage to property located within or constituting a part of the Properties that is covered by the insurance required to be maintained herein.    This waiver is in addition to any other waiver or release contained in this Lease.    Tenant shall have its insurance policies issued in such form as to waive any right of subrogation that might otherwise exist, and shall provide written evidence thereof to Landlord upon written request.

**ARTICLE 12. PARTIAL AND TOTAL DESTRUCTION OF THE PROPERTIES**

12.1    <u>Restoration</u>.    If at any time during the Lease Term, any Property (other than the Tenant Retained Parcel) or any part thereof shall be damaged or destroyed by fire or other casualty of any kind or nature, Tenant shall promptly apply for all necessary permits, but in any event not later than 60 days after the final adjustment of insurance with respect to the casualty (or, if an uninsured casualty, after the date of damage or destruction), subject to Force Majeure extension, and upon issuance of such permits thereafter diligently proceed to repair, replace or rebuild such Property (but not the Tenant Retained Parcel) as nearly as possible to their condition and character immediately prior to such damage with such variations and Alterations required by Tenant to conform to design standards then in effect for the Property in accordance with the Use or changes in applicable law and building regulations (the "**<u>Restoration Work</u>**").    In no event shall the repair

19

or replacement of a casualty at a Property extend beyond any applicable period which would cause a default under, or provide any person with a right to purchase a Property, under a real property covenant or restriction affecting such Property.  If the Tenant Retained Parcel is damaged during the Term, Tenant may elect in its sole discretion whether to complete the Restoration Work or any portion thereof; provided that in any event, the Tenant Retained Parcel must remain in compliance with applicable laws.

12.2    All property and casualty insurance proceeds payable to Landlord or Tenant (except (i) insurance proceeds payable to Tenant on account of Tenant's Personal Property and any portion of insurance proceeds related to improvements on the Tenant Retained Parcel provided that Landlord has received sufficient funds to restore the Property back to its original condition; and (ii) insurance proceeds payable from comprehensive general public liability insurance, or any other liability insurance) at any time as a result of casualty to the Properties shall be paid jointly to Landlord and Tenant for purposes of payment for the cost of the Restoration Work, except as may be otherwise expressly set forth herein. Landlord and Tenant shall cooperate in order to obtain the largest possible insurance award lawfully obtainable and shall execute any and all consents and other instruments and take all other actions necessary or desirable in order to effectuate same and to cause such proceeds to be paid as hereinbefore provided.  The proceeds of any such insurance in the case of loss shall, to the extent necessary, be used first for the Restoration Work with the balance, if any, payable to Tenant.  If insurance proceeds as a result of a casualty to the relevant Property(ies) are insufficient to complete the Restoration Work necessary by reason of such casualty, then Tenant shall be responsible for the payment of such amounts necessary to complete such work.

12.3    This Lease shall not be affected in any manner by reason of the total or partial destruction to any Property or any part thereof and Tenant, notwithstanding any law or statute, present or future, waives all rights to quit or surrender any Property or any portion thereof because of the total or partial destruction of any Property (prior to the expiration of the Lease).  Base Rent and Additional Rent required to be paid by Tenant hereunder shall not abate as a result of any casualty.

## ARTICLE 13. CONDEMNATION

13.1    <u>Vesting Date</u>.  If 50% or more of any Property, or more than 50% of the existing access to or from any Property, or if reasonable means of access to or from any Property, shall be taken for any public or quasi-public use under any statute or by right of eminent domain, or by purchase in lieu thereof and such taking makes such Property unusable for the purposes set forth in Article IV (a "**Total Taking**"), then this Lease shall terminate as to such Property as of the date that possession has been so taken (the "**Vesting Date**").

13.2    <u>Condemnation</u>.

(a)    In the event of a taking of less than 50% of any Property or 50% of the access thereto, Tenant may elect to terminate this Lease as to such entire Property (and not just the portion thereof so taken) and not restore such Property if, by reason of the taking, the taking shall result in a diminution in value of more than 25% of the Property and as a result of such taking Tenant's business at the Property has been materially and adversely affected.  Tenant's business at the Property will be deemed materially adversely affected only if there is (i) a taking of a portion of the Building located at any Property making the Building obsolete or not reasonably usable for

20

Tenant's Use in substantially the same manner as before such taking, (ii) a taking of access to the Property in which an alternative access is not available, or (iii) a taking of a significant number of parking spaces where the remaining spaces are inadequate for Tenant's Use or violates applicable laws and alternative parking spaces are not available, or (iv) a taking that would preclude use of the Property for its current use under applicable zoning or other use regulations.

(b)     In the event of a Total Taking described in Section 13.1, or Tenant elects by reason of any of the events described in Section 13.2(a) to terminate the Lease as to a Property ("**Condemned Property**"), Tenant shall give written notice to Landlord of its intention to so terminate within 60 days after the Vesting Date or the date of such taking, and this Lease shall terminate with respect to the Condemned Property as of the date of such taking. In the event the condemning authority revokes or terminates its condemnation proceeding, Landlord, prior to the date set for termination of this Lease with respect to the Condemned Property may, by notice to Tenant, elect to rescind such termination. In the event of such termination, however, Tenant shall pay to Landlord, prior to such termination date, an amount equal to the Base Rent and any then accrued Additional Rent in each case payable under this Lease to the date of such termination, and neither party shall have any further rights or liabilities under this Lease with respect to the Condemned Property (except for rights and liabilities that explicitly survive termination or expiration of the Lease as set forth herein).  With respect to any items of Additional Rent which are payable by Tenant in the event of such termination, but which are not then ascertainable, Tenant shall pay to Landlord an amount equal to such Additional Rent as and when the same is determined. The covenants and agreements with respect to the adjustment and payment of items of Additional Rent shall survive the termination of this Lease.

13.3    Termination.  In the event of a taking resulting in the termination of this Lease with respect to a Condemned Property pursuant to the provisions of Sections 13.1 or 13.2, the parties hereto agree to cooperate in applying for and in prosecuting any claim for such taking and further agree that the aggregate net award shall be distributed as follows:

(a)     Landlord shall have the unqualified right to pursue its remedies against the condemnor for the full value of Landlord's fee interest and other property interests in and to the Properties (excluding the Tenant Retained Parcel) including, without limitation, the Building and Property Equipment.

(b)     Tenant shall have the right to pursue its remedies against the condemnor for the full value of Tenant's leasehold estate and the Property Equipment including, without limitation, the interruption of its business, loss of goodwill, and moving expenses, provided that any such claim does not serve to diminish, in any respect, Landlord's potential award.

13.4    Reconstruction.  In case of a taking of less than 50% of any Property or 50% of the access thereto, Tenant shall proceed with diligence (subject to reasonable time periods for purposes of adjustment of any award and unavoidable delays) to repair or reconstruct the affected Property to a complete architectural unit (all such repair, reconstruction and work being referred to in this Article as "**Reconstruction Work**").  Landlord shall reimburse Tenant for the cost of the Reconstruction Work up to and not exceeding the net compensation amount realized by Landlord as a result of such taking (i.e., the gross amount of the compensation received by Landlord from the taking authority less all costs and expenses reasonably incurred by Landlord in pursuing,

prosecuting, and/or recovering its claim to such award). All Reconstruction Work shall be performed pursuant to (and subject to) the requirements for Alterations set forth in Article 10.

13.5    <u>Base Rent Reduction</u>. In case of a taking of less than 50% of a Property, or less than 50% of the access thereto, and if this Lease is not terminated as to such Property as provided in Section 13.2 above, the Base Rent payable hereunder shall, from and after the date of such taking, be reduced by an amount equal to the product of (i) 6.0% multiplied by (ii) the net condemnation proceeds retained by Landlord after the application of any such proceeds to the repair, restoration, or replacement necessitated by the condemnation.

13.6    <u>Temporary Taking Compensation</u>. Any compensation for a temporary taking shall be payable to Tenant without participation by Landlord, except to the proportionate extent such temporary taking extends beyond the end of the Lease Term, and there shall be no abatement of Rent as a result thereof.

13.7    <u>Base Rent Reduction Due to Lease Termination</u>. Upon a condemnation event in which the Lease is terminated with respect to a Condemned Property, Tenant shall pay all Base Rent and Additional Rent and other charges with respect to the Condemned Property to the date of termination. After such date, Base Rent due under this Lease shall be reduced by a fraction of the Base Rent, which fraction will have a numerator equal to the net condemnation proceeds retained by Landlord  in such Condemned Property (as determined in connection with the condemnation proceeding or the agreement between the condemnor and Landlord in settlement of such proceeding) and the denominator of which equals the sum of the greater of the (i) then-current appraised value of all of the Properties (including the condemned Property but excluding the Tenant Retained Parcel) or (ii) Landlord's total cost basis in the Property(ies). The cost of any appraisals shall be paid out of applicable condemnation proceeds.

## ARTICLE 14. ASSIGNMENT AND SUBLETTING

14.1    <u>Tenant's Right of Assignment and Subletting</u>. Tenant shall not voluntarily or by operation of law assign or sublease its interest in this Lease or in the Properties, without first obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Any such assignment or sublease made without Landlord's consent shall be voidable and, at Landlord's election, shall constitute a default under this Lease. Notwithstanding the foregoing, Landlord shall not unreasonably withhold its consent to any sublease request provided that such sublease (i) prohibits any noxious use, (ii) does not release Tenant from any obligation under this Lease, (iii) such sublease does not extend beyond the Term, and (iv) Landlord is named as a notice party in the sublease; and (v) Landlord receives copies of all sublease documents reasonably requested. It shall not be unreasonable for Landlord to withhold its consent to any proposed sublease if the proposed transferee or sublessee does not meet certain reasonable criteria, including, but not limited to, the transferee's financial condition, the nature, quality and character of the transferee, the identity or business character of the transferee, the nature of the use and occupancy and the transferee's business experience. Tenant shall promptly reimburse Landlord for any actual costs incurred by Landlord relating to any request for an assignment or sublease as set forth in this Article 14.

14.2    <u>Permitted Assignment</u>. Notwithstanding Section 14.1 above, Tenant may assign this Lease without Landlord's consent (a "**Permitted Assignment**") and Tenant shall be released from liability under this Lease from and after the effective date of such Permitted Assignment,

provided that: (i) Tenant has not previously received written notice from Landlord of an Event of Default that is continuing as of the effective date of such assignment; (ii) no later than ten (10) days after the effective date of such assignment, Landlord is provided with written notice and copies of all conveyance or transfer documents in connection with such assignment; (iii) such Permitted Assignment occurs in connection with a sale of all or substantially all of Tenant's assets, stock or other interests (or the stock or interests of Tenant's corporate parents (i.e. a direct or indirect change of control), and (iv) the third party assignee has (a) an investment grade credit rating as provided for by S&P / Moody's, or (b) creditworthiness substantially equal to or superior than that of Tenant at the time of such assignment with evidence of such creditworthiness provided to Landlord, based on standards reasonably determined by the Landlord.

14.3    Subletting.  Tenant shall have the right to sublet any portion of the Property at any time without Landlord's consent (a) to any sublessee that is owned by or under common control of Tenant, or (b) to any sublessee of the Tenant Retained Parcel.  Otherwise, Landlord's consent shall be required for any subletting of the Property, which consent shall not be unreasonably withheld, conditioned or delayed, provided that such sublease (i) prohibits any Noxious Use, (ii) does not release Tenant from any of its obligations under the Lease, (iii) does not extend beyond the primary term of the Lease, and (iv) Landlord is named as notice party and receives copies of all sublease documentation reasonably requested by Landlord.  Upon any sublease, Landlord may require the Tenant and subtenant to execute a subordination, non-disturbance and attornment agreement in form reasonably acceptable to Landlord, Tenant and subtenant; provided that the terms of such sublease shall not be modified thereby.  In addition, if the subtenant or Landlord requests the other to execute a subordination, non-disturbance and attornment agreement in connection with such sublease, subtenant or Landlord will not unreasonably withhold or delay its consent to such agreement, provided that in the event of the cancellation or termination of this Lease for any reason whatsoever or of the surrender of this Lease by operation of law prior to the expiration date of the sublease, subtenant shall make full and complete attornment to Landlord under either the terms of this Lease or the terms of the sublease, in Landlord's sole and absolute discretion.  In the event that this Lease is terminated or cancelled, and Landlord, following request by a subtenant, elects to apply the terms of this Lease to a subtenant, Base Rent for the Properties subleased to such subtenant shall be determined by fair market value appraisal obtained by Landlord at the time of termination of this Lease, but not less than any allocation of Base Rent to the Property in this Lease.

14.4    Landlord's Option to Preserve Subtenancies.  In the event of Tenant's surrender of this Lease or the termination of this Lease in any other manner as provided herein, Landlord may, at its option, either terminate any or all subtenancies or succeed to the interest of Tenant as sublandlord thereunder.  No merger shall result from Tenant's sublease of the Properties under this Section 14.4, Tenant's surrender of this Lease, or the termination of this Lease in any other manner.

14.5    Tenant's Assignment of All Rent from Subletting as Security for Tenant's Obligations.  Tenant immediately and irrevocably assigns to Landlord, as security for Tenant's obligations under this Lease, all rent from any subletting of all or a part of the Properties (other than the Tenant Retained Parcel) as permitted by this Lease, which assignment shall become effective immediately upon an uncured Event of Default.  Until a default by Tenant beyond any applicable cure period, Tenant may collect and retain all rents from any subletting of all or a part of the Properties (other than the Tenant Retained Parcel).  In the event of a material default by Tenant beyond any applicable cure period, Landlord, as assignee, or a receiver for Tenant

appointed on Landlord's application, may collect the rent and apply it toward Tenant's obligations under this Lease.

14.6    Continuing Obligation of Tenant.  Except as otherwise expressly provided herein, no transfer permitted by this Article 14 shall release Tenant or any guarantor of Tenant's obligations under this Lease or change Tenant's primary liability to pay the rent and to perform all other obligations of Tenant under this Lease. Landlord's acceptance of rent from any other person is not a waiver of any provision of this Article 14.  Consent to one transfer is not a consent to any subsequent transfer.  If Tenant's transferee defaults under this Lease past any applicable cure period, Landlord may proceed directly against Tenant without pursuing remedies against the transferee.  Landlord may consent to subsequent assignments or modifications of this Lease by Tenant's transferee, without notifying Tenant or obtaining its consent.  Such action shall not relieve Tenant's liability under this Lease, except that Tenant shall not be liable for any extension of the term or increase in rentals made without Tenant's prior written consent.

14.7    Landlord's Right of Assignment.   This Lease shall be fully assignable by the Landlord or its successors and assigns.  From and after the effective date of any such assignment, provided that the assignee has expressly assumed Landlord's obligations hereunder, Landlord will be released from any liability thereafter arising with respect to the Properties.  Without limiting the foregoing, Tenant agrees that Landlord may agree with any purchaser or assignee of the Properties to provide (or have a Landlord's Affiliate provide) asset management and/or act as servicer regarding the Properties, provided that such services shall not interfere with or impede Tenant's use and occupancy of the Properties.

14.8    Creation of New Leases.  Notwithstanding anything to the contrary in this Lease, at any time and from time to time, Landlord may, without consent or approval from Tenant: (i) sever this Lease with respect to one or more of the Properties and thereby remove such Property(ies) from this Lease and subject such Property(ies) to one or more new lease agreements (each, a "**New Lease**") that will be on substantially the same terms and conditions as are in this Lease (except for (A) revisions to the amount of Base Rent which shall be determined by Landlord and allocated to such Property(ies), (B) revisions to the annual escalation of Base Rent as set forth below, (C) the commencement date of such New Lease, which shall be set forth therein and (D) the deletion of this Section 14.8 from such New Lease), which New Lease will be for the purpose of transferring title to such Property and the New Lease to a third party; (ii) sever this Lease with respect to one or more of the Properties, and cause such Property(ies) to be subject to one or more separate lease agreements between Landlord and Tenant upon substantially the same terms and conditions as this Lease, except for revisions to the description of the Property(ies) and the amount of Base Rent; or (iii) assign to a third party any part of this Lease or any lease agreement created pursuant to this Section 14.8.  The landlord under any such New Lease is referred to herein as the "**Successor Landlord**".  The Base Rent under the New Lease may be increased, at Landlord's sole election, by an amount that will cause the aggregate Base Rent over the remaining term of the New Lease, after accounting for the revised rent escalation structure set forth below, to be equal to the aggregate Base Rent payable for such Properties over the remaining term of this Lease if this Lease had not been amended and restated.  The new Base Rent will become effective as of the date Landlord (or Successor Landlord) and Tenant execute the New Lease (such increase being referred to as the "**Base Rent Increase**").  The new rent, as established under the Base Rent Increase will escalate by two percent (2.0%) per annum.  Notwithstanding anything to the contrary herein, while Landlord may modify the Base Rent and escalations as provided herein, in no event will the

aggregate amount of modified Base Rent and escalations for the remainder of the Term exceed the aggregate amount of the original Base Rent and escalations for the remainder of the Term before such modifications. The New Lease shall be executed by Tenant within ten (10) days after request from Landlord to sever this Lease as provided herein.  In the event that Tenant does not execute the New Lease within such ten (10) day period, and Tenant does not further execute the New Lease following a second notice of five (5) days, then an automatic Event of Default will be deemed to have occurred and Landlord shall have all remedies provided under this Lease. Any New Leases may, at Landlord's election, contain default provisions that cross-default the New Leases with each other or with this Lease provided that all such cross-defaulted leases are held by one landlord or affiliated landlords.

14.9    <u>Tenant's Leasehold Financing</u>.  Notwithstanding anything to the contrary herein, Tenant may, without the prior consent of Landlord, encumber, hypothecate or mortgage its leasehold estate and Tenant's Personal Property herein (the "**Leasehold Mortgage**").  The Leasehold Mortgage shall encumber only Tenant's interest under this Lease, and in no event shall the right granted herein to the Tenant to mortgage or otherwise encumber the Tenant's leasehold interest be deemed or interpreted as a subordination by the Landlord of the Landlord's interest in this Lease or fee interest in the Property(ies), it being expressly agreed that, under no circumstances, shall the Tenant have any right to mortgage or encumber the Landlord's interest in this Lease or fee interest in the Property(ies).

## ARTICLE 15. DEFAULT AND TERMINATION

15.1    <u>Event of Default</u>. The occurrence of any of the following events (each an "**Event of Default**") shall constitute a default under this Lease by Tenant:

(a)    <u>Nonpayment of Base Rent</u>. Failure to pay any installment of Base Rent hereunder when payment is due; provided, however, notwithstanding the occurrence of such a default, Landlord shall not be entitled to exercise its remedies set forth below other than the imposition of a Late Fee and default interest, as set forth below, unless and until Landlord shall have given Tenant notice of such default and a period of five (5) business days from the actual receipt of such notice shall have elapsed without such default being cured ; provided that Landlord shall only be required to provide one (1) notice for a default under this <u>Section 15.1(a)</u> during any twelve (12) month period of the Lease, and any subsequent default following receipt of such 1st notice under this <u>Section 15.1(a)</u> during such 12-month period shall be an immediate Event of Default in which event Landlord may serve a written five (5) days' notice of termination of this Lease or any portion thereof upon Tenant, and, upon the expiration of such five (5) days, this Lease or any portion thereof and the Term hereunder shall end and expire as fully and completely as if the date of expiration of such five (5) day period were the day herein definitely fixed for the end and expiration of this Lease and the term hereof and Tenant shall then quit and surrender the Premises to Landlord but Tenant shall remain liable as hereinafter provided.

(b)    <u>Nonpayment of Additional Rent</u>. Failure to pay any amount of Additional Rent on or before the date when due and such failure continuing for twenty-one (21) days following delivery to Tenant by Landlord of written notice specifying such failure.

(c)    <u>Insolvency</u>. If at any time during the Term, (i) proceedings in bankruptcy are instituted (voluntarily or involuntarily) by or against Tenant, that result in the filing of a voluntary petition or the entry of an order for relief, or (ii) Tenant files, or any creditor or other

person files against Tenant, any petition in bankruptcy (i.e., seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief) under the Bankruptcy Code of the United States of America (or under any other present or future federal or state statute, law or regulation of similar intent or application), and such filing is not vacated or withdrawn within sixty (60) days thereafter, or (iii) a trustee or receiver is appointed to take possession of any of the Property, or of all or substantially all of the business or assets of Tenant, and such appointment is not vacated or withdrawn and possession restored to Tenant within sixty (60) days thereafter, or (iv) a general assignment or arrangement is made by Tenant for the benefit of creditors, or (v) any sheriff, marshal, constable or other duly-constituted public official takes possession of any of the Properties, or of all or substantially all of the business or assets of Tenant by authority of any attachment, execution, or other judicial seizure proceedings, and if such attachment or other seizure remains undismissed or undischarged for a period of sixty (60) days after the levy thereof, or (vi) Tenant files an answer admitting or failing timely to contest a material allegation of a petition filed against Tenant, respectively, in any such proceeding; or (viii) within ninety (90) days after the commencement of any proceeding against Tenant seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such proceeding shall not have been dismissed. In the event that under applicable law the trustee in bankruptcy or Tenant has the right to affirm this Lease and continue to perform the obligations of Tenant hereunder, such trustee or Tenant shall, within such time period as may be permitted by the bankruptcy court having jurisdiction, cure all defaults of Tenant hereunder outstanding as of the date of the affirmance of this Lease and provide to Landlord such adequate assurances as may be necessary to ensure Landlord of the continued performance of Tenant's obligations under this Lease.

(d)    <u>Misrepresentation</u>. The discovery by Landlord that any representation, warranty or financial statement given to Landlord by Tenant, or any affiliate of Tenant, was materially false or misleading when given.

(e)    <u>Required Documents</u>.    The failure by Tenant to deliver any of the documents required pursuant to this Lease (the "**Required Documents**"), within the time periods required pursuant to such sections.  In addition to any rights or remedies otherwise set forth herein, if Tenant fails to provide to Landlord or its designee any of the Required Documents within the applicable time periods set forth in this Lease, Tenant shall pay to Landlord, at Landlord's option and in its discretion, an amount equal to $500 per diem for each Required Document (up to a maximum of $10,000 per document) that is not delivered within five (5) days after written notice thereof.

(f)    <u>Financial Information; Property Exclusions; Liens</u>. Tenant fails in any of its obligations set forth in <u>Section 6.4</u>, where any such failure continues for a period of fifteen (15) days after written notice of such failure is delivered by Landlord to Tenant; or any claim of lien is recorded against any Property, and such claim of lien continues for thirty (30) days without discharge (by bonding or other means available pursuant to applicable law), satisfaction or provision for payment being made by or on behalf of Tenant.

(g)    <u>Insurance</u>. Any failure of Tenant to maintain the policies of insurance required under this Lease, and such breach continues for a period of five (5) business days after written notice of such failure is delivered to Tenant.

(h)    Other Obligations. The failure by Tenant to timely perform any obligation, agreement or covenant under this Lease, other than those matters specified in Sections 15.1(a)-(g) above and any such failure continues for a period of thirty (30) days after written notice of such failure is delivered to Tenant; provided, however, if Tenant's failure to comply cannot reasonably be cured within such thirty (30) days period, Tenant shall be allowed up to sixty (60) additional days (for a total of ninety (90) days) to cure the failure so long as Tenant begins the cure within such thirty (30) day period and diligently pursues the cure to completion.  Any notice delivered pursuant to this Section 15.1 shall be in lieu of, and not in addition to, any notice required by law.

15.2    Landlord's Remedies.  Landlord shall have any one or more of the following remedies after the occurrence of an uncured default by Tenant.  These remedies are not exclusive; they are cumulative in addition to any remedies now or later allowed by law, in equity, or otherwise:

(i)    Landlord shall have the right, with or without notice or demand, immediately upon expiration of any applicable grace period specified herein, to terminate this Lease (or Tenant's possession to all or any of the Properties), and at any time thereafter recover possession of all or any of the Properties and expel and remove therefrom Tenant and any other person occupying the same by any lawful means, and repossess and enjoy all or any of the Properties without prejudice to any of the remedies that Landlord may have under this Lease.  If Tenant fails to so surrender the Properties, then Landlord, without prejudice to any other remedy it has for possession of the Properties or arrearages in rent or other damages, may re-enter and take possession of the Properties and expel or remove Tenant and any other person or entity occupying the Properties or any part thereof, without being liable for any damages, whether caused by negligence of Landlord or otherwise.  If Landlord elects to terminate this Lease (or to terminate Tenant's right of possession), Landlord shall also have the right to reenter the Property or any portion thereof and take possession of and remove all personal property of Tenant, if any, in the Properties.  If Landlord elects to terminate this Lease and/or Tenant's right to possession, or if Tenant's right to possession is otherwise terminated by operation of law, Landlord may recover as damages from Tenant the following:  (i) all Rent then due under this Lease through the date of termination; (ii) the worth at the time of the award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided (discounted by the discount rate of the Federal Reserve Bank of San Francisco plus one percent (1%), (iv) the cost of reletting the Properties, including without limitation, the anticipated period of vacancy until the Properties can be re-let at its respective fair market rental value; and (v) any other costs and expenses that Landlord may reasonably incur in connection with the Event of Default, including but not limited to, tenant improvement costs; reasonable attorneys' fees; brokers' commissions; any costs required to return the Properties to the condition required at the end of the Term; the costs of refurbishment, alterations, renovation and repair of the Property; and removal (including the repair of any damage caused by such removal) and storage (or disposal) of Tenant's personal property, equipment, fixtures, alterations, tenant improvements and any other items which Tenant is required under this Lease to remove but does not remove; and (vi) all other monetary damages allowed under applicable law.  Efforts by Landlord to mitigate the damages caused by the Event of Default (or Tenant's Default under this Lease) shall not waive Landlord's right to recover damages under the foregoing provisions.

As used in this underline(i), the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).  To the extent permitted by applicable laws, Tenant hereby waives for Tenant and all those claiming under Tenant all right now or hereafter existing, including, without limitation, any rights to redeem by order or judgment of any court or by any legal process or writ, Tenant's right of occupancy of the Properties after any termination of this Lease.  Tenant hereby waives for Tenant and all those claiming under Tenant all right now or hereafter existing, to redeem by order or judgment of any court or by any legal process or writ, Tenant's right of occupancy of the Properties after any termination of this Lease.

(ii)    If Landlord does not elect to terminate this Lease, then this Lease shall continue in effect, and Landlord may enforce all of its rights and remedies under this Lease, including, without limitation, the right to recover Rent as it becomes due, and Landlord, without terminating this Lease, may exercise all of the rights and remedies of a landlord under law. Landlord shall not be deemed to have terminated this Lease except by an express statement in writing.  Acts of maintenance or preservation, efforts to relet the Properties, or the appointment of a receiver upon application of Landlord to protect Landlord's interest under this Lease shall not constitute an election to terminate Tenant's right to possession unless such election is expressly stated in writing by Landlord. Notwithstanding any such reletting without such termination, Landlord may at any time thereafter elect to terminate Tenant's right to possession and this Lease. If Landlord elects to relet the Properties or any portion thereof for the account of Tenant, the rent received by Landlord from such reletting shall be applied as follows:  first, to the payment of any and all costs of such reletting (including, without limitation, attorneys' fees, alterations and repairs to any of the Property, and tenant improvement costs, if any); second, to the payment of any and all indebtedness other than Rent due hereunder from Tenant to Landlord; third, to the payment of any and all  Rent due and unpaid hereunder; and the balance, if any, shall be held by Landlord and applied in payment of future Rent as it becomes due.  If the rent received from the reletting is less than the sum of the costs of reletting, other indebtedness due by Tenant, and the Rent due by Tenant, then Tenant shall pay the deficiency to Landlord promptly upon demand by Landlord. Such deficiency shall be calculated and paid monthly.

(iii)    Landlord may pursue any other remedy now or hereafter available to Landlord under the laws and judicial decisions of States in which the Properties are located in addition to and not as an alternative remedy to those provided hereunder.

(iv)    In the event Tenant incurs any monetary default related to any existing indebtedness that secures the Properties and which is not cured within one hundred and fifty (150) days, Landlord shall have the right terminate the Lease.

(v)    Upon the occurrence of an Event of Default, Landlord shall have all rights and remedies hereunder and under applicable law immediately.  Except only as may be required by statute which cannot be waived lawfully, (i) Landlord shall have no obligation to give any notice after an Event of Default as a condition to Landlord's pursuit of any right or remedy; and (ii) Landlord shall have no obligation to accept the attempted or purported cure of, or to waive, any Event of Default, regardless of tender of delinquent payments or other performance by Tenant, or any other event or condition whatsoever; and Tenant shall not have any right to cure any Event of Default, and no right to cure shall be implied.  Without limiting the foregoing, after the occurrence of any Event of Default (irrespective of whether or not the same consists of an ongoing

28

condition, a one-time occurrence, or otherwise), the same shall be deemed to continue at all times thereafter; provided, however, that such Event of Default shall cease to continue only if Landlord executes and delivers a written agreement in which Landlord expressly states that such Event of Default has ceased to continue.  Landlord shall not be obligated under any circumstances whatsoever to execute and deliver any such writing until such default is cured.  Without limitation, this Section shall govern in any case where reference is made in this Lease to (x) any "cure" (whether by use of such word or otherwise) of any Event of Default, (y) "during an Event of Default" or "the continuance of an Event of Default" (in each case, whether by use of such words or otherwise), or (z) any condition or event which continues beyond the time when the same becomes an Event of Default.

        (vi)     Nothing in this Article shall be deemed to affect Tenant's obligation to indemnify, defend, protect and hold harmless Landlord and the other Landlord Parties under this Lease.

        The term "**Rent**" as used in this Section 15.2 means all sums payable by Tenant pursuant to the Lease, including, without limitation, all Base Monthly Rent, Additional Rent, Taxes, and insurance.

        15.3    Whether or not Landlord elects to terminate this Lease or Tenant's right to possession of the Properties on account of any default by Tenant, Landlord shall have all rights and remedies at law or in equity, including, but not limited to, the right to re-enter the Properties and, to the maximum extent provided by law, Landlord shall have the right to terminate any and all subleases, licenses, concessions, or other consensual arrangements for possession entered into by Tenant and affecting the Properties or, in Landlord's sole discretion, may succeed to Tenant's interest in such subleases, licenses, concessions, or arrangements.  In the event of Landlord's election to succeed to Tenant's interest in any such subleases, licenses, concessions, or arrangements, Tenant shall have no further right to or interest in the rent or other consideration receivable thereunder as of the date of notice by Landlord of such election.

        15.4    <u>Waiver of Notice/Performance by Landlord</u>.  Notwithstanding any provision herein, (a) if Tenant is required to comply with any governmental requirement, Tenant shall not be entitled to notice of default from Landlord and right to cure beyond the period within which such compliance may be required by applicable law or government agency; and (b) if in Landlord's reasonable determination the continuance of any default by Tenant for the full period of notice provided for herein will constitute a threat of injury or harm to persons, or damage or loss of value to property, Landlord may, with or without notice, elect to perform those acts with respect to which Tenant is in default for the account and at the expense of Tenant.  If by reason of such governmental requirement or default by Tenant, Landlord is compelled or elects to pay any sum of money (including, without limitation, attorneys' fees, consultant fees, testing and investigation fees, expert fees and court costs), such sums so paid by Landlord, plus an administrative charge of fifteen percent (15%) of such sums, shall be due to Landlord from Tenant within ten (10) days after written demand therefor from Landlord, in addition to any other amounts to be paid by Tenant under this Lease.

        15.5    <u>Late Charge</u>.  In addition to any interest charged to Tenant under this <u>Section 15.5</u>, if any payment of Base Rent or Additional Rent is not received by Landlord from Tenant when such payment is due to Landlord hereunder, such payment shall be deemed delinquent and cause

4854-8636-9096.14

Landlord to incur additional administrative expense in connection with this Lease. Landlord and Tenant agree that such cost to Landlord is difficult to anticipate or ascertain, and agree that a reasonable estimate of such additional cost to Landlord will cause Tenant to incur a late fee of five percent (5%) on each such delinquent payment (the "**Late Fee**"), due and payable immediately with the delinquent Base Rent or delinquent Additional Rent, as the case may be.

15.6    Interest.  Tenant hereby acknowledges that late payment by Tenant of Base Rent, Additional Rent and/or any other sums due by Tenant hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges. Accordingly, in addition to any Late Fee due from Tenant hereunder, any sum due by Tenant under this Lease which is not paid when due shall bear interest at the greater of twelve percent (12%) per annum of such sums (including on the amount of the Late Fee, from the date it is incurred), or the maximum rate allowed under applicable law, from the date such sum becomes due and payable by Tenant hereunder until paid, unless otherwise expressly provided in this Lease. Payment of interest and Late Fees shall be in addition to any expenses incurred as Additional Rent on account of such delinquent payment of Base Rent or Additional Rent.

15.7    Right of Landlord to Re-Enter.  In the event of any termination of this Lease, Landlord shall have the immediate right to enter upon and repossess the Properties, and any personal property of Tenant may be removed from the Properties and stored in any public warehouse at the risk and expense of Tenant.

15.8    Surrender of Properties.  No act or thing done by Landlord or any agent or employee of Landlord during the Term shall be deemed to constitute an acceptance by Landlord or a surrender of either or both of the Properties unless such intent is specifically acknowledged in a writing signed by Landlord.  The delivery of keys to either of the Properties to Landlord or any agent or employee of Landlord shall not constitute a surrender of the Properties or effect any partial or full termination of this Lease, whether or not the keys are thereafter retained by Landlord and, notwithstanding such delivery, Tenant shall be entitled to the return of such keys at any reasonable time upon request until this Lease shall have been terminated properly.  The voluntary or other surrender of this Lease by Tenant, whether accepted by Landlord or not, or a mutual termination hereof, shall not work a merger, and at the option of Landlord shall operate as an assignment to Landlord of all subleases or subtenancies affecting the Properties.

15.9    Form of Payment After Default.  Without limiting any other obligation of Tenant under this Lease, if Tenant fails to pay any amount due to Landlord under this Lease within the applicable notice and cure periods set forth in this Lease, or if Tenant attempts to pay any such amount by drawing a check on an account with insufficient funds, then Landlord shall have the right to require that any and all subsequent amounts paid by Tenant to Landlord under this Lease (to cure a default or otherwise) be paid in the form of cashier's or certified check drawn on an institution acceptable to Landlord, or any other reasonable and lawful form approved by Landlord in its sole and absolute discretion, notwithstanding that Landlord may have previously accepted payments from Tenant in a different form.

15.10    Acceptance of Rent Without Waiving Rights.  Payment by Tenant shall be deemed to be other than on account of the earliest sum due from Tenant hereunder, nor shall any endorsement or statement by Tenant on any check or any letter accompanying such payment be

30

deemed an accord and satisfaction of any amount in dispute between Tenant and Landlord or otherwise. Landlord may accept any and all of Tenant's payments without waiving any right or remedy under this Lease, including but not limited to the right to commence and pursue an action to enforce rights and remedies under a previously served notice of default, without giving Tenant any further notice or demand.

15.11   <u>Remedies Cumulative</u>.  All rights, privileges, elections, and remedies of Landlord are cumulative and not alternative with all other rights and remedies hereunder, at law or in equity to the fullest extent permitted by law. The exercise of one or more rights or remedies by Landlord shall not impair Landlord's rights to exercise any other right or remedy to the fullest extent permitted by law.  The remedies available to Landlord pursuant to this <u>Article 15</u> shall survive the expiration or termination of this Lease

15.12   <u>Tenant's Default</u>.  If Tenant is in default of the Lease beyond any applicable cure period, then:

(a)      For so long as Landlord does not terminate Tenant's right to possession of the Properties, if Tenant obtains Landlord's sole and absolute consent, Tenant will have the right to assign or sublet its interest in the Lease, but Tenant will not be released from liability.

(b)      All costs of de-identification of the Properties shall be paid by Tenant whether or not Landlord terminates this Lease.

15.13   <u>Default by Landlord</u>.  Landlord shall be in default if Landlord fails to perform any provision of this Lease required of it and the failure is not cured within thirty (30) days after written notice has been given to Landlord.  If, however, the failure cannot reasonably be cured within the cure period, Landlord shall not be in default of this Lease if Landlord commences to cure the failure within the cure period and diligently and in good faith continues to cure the failure.  Notices given under this Section 15.13 shall specify the alleged breach and the applicable Lease provisions. If Landlord shall at any time default beyond the applicable notice and cure period, Tenant shall have the right, for so long as such default is continuing, to cure such default on Landlord's behalf. Any sums expended by Tenant in doing so, and all reasonably necessary incidental costs and expenses incurred in connection therewith, shall be payable by Landlord to Tenant within thirty (30) days following demand therefor by Tenant, provided, however, that Tenant shall not be entitled to any deduction or offset against any rent otherwise payable to Landlord under this Lease, and in no event may Tenant terminate this Lease in the event of a default by Landlord.

## ARTICLE 16. RIGHT OF INSPECTION

Landlord and Landlord's authorized representatives shall have the right after written notice to Tenant, to enter upon the Properties at all reasonable hours for the purpose of inspecting the Properties or of making repairs, additions or alterations in or upon the Properties (following Tenant's failure to cure any breach of such obligations), and for the purpose of exhibiting the Properties to prospective tenants, purchasers or others.  Provided Tenant is not in default beyond any applicable cure period, Landlord shall not exhibit any "for sale" signs during the term of the Lease, except during the last twelve (12) months of the Term of this Lease.

## ARTICLE 17. WAIVER OF BREACH

No waiver by Landlord of any breach of any one or more of the terms, covenants, conditions, or agreements of this Lease shall be deemed to imply or constitute a waiver of any succeeding or other breach. Failure of Landlord to insist upon the strict performance of any of the terms, conditions, covenants, and agreements of this Lease shall not constitute or be considered as a waiver or relinquishment of Landlord's rights to subsequently enforce any default, term, condition, covenant, or agreement, which shall all continue in full force and effect. The rights and remedies of Landlord under this Lease shall be cumulative and in addition to any and all other rights and remedies which Landlord has or may have.

## ARTICLE 18. NOTICES

18.1    Notice Requirements. All notices, requests, or demands herein provided to be given or made, or which may be given or made by either party to the other, shall be given or made only in writing and shall be deemed to have been duly given: (i) when delivered personally at the address set forth below, or to any agent of the party to whom notice is being given, or if delivery is rejected when delivery was attempted; or (ii) on the date delivered when sent via Overnight Mail via nationally recognized overnight air carrier service (e.g., Federal Express, UPS, DHL, etc.), properly addressed and postage prepaid; or (iii) on the date sent via electronic transmission if, within forty eight (48) hours of such transmission, a copy of such notice is also sent by one of the methods provided in subsection (i), (ii) or (iv) hereunder; or (iv) upon delivery, or if delivery is rejected when delivery was attempted of properly addressed first class mail, postage prepaid with return receipt requested. The proper address to which notices, requests, or demands may be given or made by either party shall be the address set forth at the end of this Section or to such other address or to such other person as any party shall designate. Such address may be changed by written notice given to the other party in accordance with this Section.

**If to Landlord:**

Pontus IMB Portfolio
c/o Pontus Capital
Attn: Michael Press
875 Prospect Street, Suite 303
La Jolla, California 92037
Phone Number: (858) 344-8182
Email: mpress@pontuscapital.com

With a copy to:

Foley & Lardner LLP
301 E Pine Street, Suite 1200
Orlando, Florida 32801
Attn: Pamela M. Brown
Phone Number: (407) 244-3271
Email: pbrown@foley.com

**If to Tenant:**

iMedia Brands, Inc.
6740 Shady Oak Road
Eden Prairie, MN  55344
Attn: CEO
Phone Number: (952) 943-6158
Email:

With a copy to:

iMedia Brands, Inc.
6740 Shady Oak Road
Eden Prairie, MN  55344
Attn: General Counsel
Phone Number: (952) 943-6517
Email:

18.2     <u>Payments Under Lease</u>.  Rent and all other payments due to Landlord under this Lease shall be paid in lawful money of the United States of America without offset or deduction to the name and at the address first given above or to such other persons or parties or at such other places as Landlord may from time to time designate in writing.

## ARTICLE 19. RELATIONSHIP OF THE PARTIES

This Lease shall not be deemed or construed by the parties, nor by any third party, as creating the relationship of (i) principal and agent, (ii) partnership, or (iii) joint venture between the parties. Neither the method of computation of rent nor any other provision of this Lease, nor any acts of the parties are other than in the relationship of Landlord and Tenant.

## ARTICLE 20. SUBORDINATION, ATTORNMENT AND ESTOPPEL

20.1     <u>Subordination and Non-Disturbance</u>.

(a)     This Lease and the leasehold estate created hereby shall be, at the option and upon written declaration of Landlord, subject, subordinate, and inferior to the lien and estate of any liens, trust deeds, and encumbrances ("**Mortgages**"), and all renewals, extensions, or replacements thereof, now or hereafter imposed by Landlord upon the Properties; provided, however, Landlord shall use reasonably efforts to provide Tenant with an SNDA setting forth that so long as Tenant is not in default hereunder, Tenant's rights and obligations hereunder shall remain in force and Tenant's right to possession shall be upheld.  The SNDA may contain additional provisions as are customarily requested by secured lenders with liens encumbering real property security similar to the Properties, including, without limitation, Tenant's agreement to attorn as set forth in Section 20.1(b) below.  Tenant shall, within ten (10) days following a request by Landlord, execute and acknowledge any subordination agreement in the form substantially set forth in Exhibit C attached hereto, which form shall be subject to the reasonable approval of Tenant and Landlord's Lender, or other documents required to establish of record the priority of any such encumbrance over this Lease.

33

(b)    Attornment.  In the event of foreclosure of any Mortgage, whether superior or subordinate to this Lease, then (i) this Lease shall continue in force; (ii) Tenant's quiet possession shall not be disturbed if Tenant is not in default beyond any applicable cure period hereunder; (iii) Tenant shall attorn to and recognize the mortgagee or purchaser at foreclosure sale ("**Successor Landlord of Lender**") as Tenant's landlord for the remaining term of this Lease; and (iv) the Successor Landlord shall not be bound by (a) any payment of rent for more than one month in advance; (b) any amendment, modification, or ending of this Lease without the Successor Landlord's consent after the Successor Landlord of Lender's name is given to Tenant, unless the amendment, modification, or ending is specifically authorized by the original Lease and does not require Landlord's prior agreement or consent; and (c) any liability for any act or omission of a prior landlord.  At the request of the Successor Landlord of Lender, Tenant shall execute a new lease for the Properties, setting forth all of the provisions of this Lease except that the term of the new lease shall be for the balance of the term of this Lease.

(c)    Estoppel Certificate.  Each of Landlord and Tenant shall execute and deliver to the other, within ten (10) days after receipt of a request therefor, any estoppel certificate or other statement to be furnished to the requesting party or any prospective purchaser of or any lender against the Properties or Tenant's leasehold interest hereunder.  In the event that Landlord does not deliver the executed estoppel certificate after such ten (10) day notice, then following a second notice of five (5) without receipt of such estoppel certificate, Tenant may act as Landlord's attorney-in-fact and execute such estoppel certificate on Landlord's behalf.  Such estoppel certificate shall acknowledge and certify each of the following matters, to the extent each may be true: that the Lease is in effect and not subject to any rental offsets, claims, or defenses to its enforcement; the commencement and expiration dates of the term; that Tenant is paying rent on a current basis; that any improvements required to be furnished under the Lease have been completed in all respects; that the Lease constitutes the entire agreement between Tenant and Landlord relating to the Properties; that Tenant has accepted the Properties and is in possession thereof; that the Lease has not been modified, altered, or amended except in specified respects by specified instruments; that the affirming party has no notice of any prior assignment, hypothecation, or pledge of rents or the Lease; and such other matters as reasonably may be requested.

## ARTICLE 21. ATTORNEYS' FEES

21.1    Recovery of Attorneys' Fees and Costs of Suit.  A party in default of this Lease ("**Defaulting Party**") shall reimburse the other party ("**Non-Defaulting Party**"), upon demand, for any reasonable costs or expenses incurred by the Non-Defaulting Party in connection with any breach or default under this Lease by such Defaulting Party beyond any applicable cure period; whether or not suit is commenced or judgment entered.  Such costs shall include legal fees and costs incurred for the negotiation of a settlement, enforcement of rights, or otherwise.  Furthermore, if any action for breach of or to enforce the provisions of this Lease is commenced, the court in such action shall award to the party in whose favor a judgment is entered, a reasonable sum as attorneys' fees and costs.  Such attorneys' fees and costs shall be paid by the non-prevailing party in such action.  Tenant acknowledges and confirms that Landlord may impose reasonable administrative, processing or servicing fees, and collect attorneys' fees, costs and expenses incurred by Landlord or its servicer or management company, in connection with: (i) any request for release or substitution of any of the Properties, whether or not approved in writing by Landlord; (ii) the procurement of consents, waivers and approvals with respect to any of the Properties or any matter related to this Lease;  (iii) the review of any assignment or sublease or proposed

34

assignment or sublease or the preparation or review of any subordination or non-disturbance agreement; and (iv) inspections required to make certain determinations under this Lease.

21.2    <u>Party to Litigation</u>.  Tenant shall indemnify Landlord against and hold Landlord harmless from all costs, expenses, demands, and liability incurred by Landlord if Landlord becomes or is made a party to any claim or action (i) instituted by any third party against Tenant, or by or against any person holding any interest under or using the Properties by license of or agreement with Tenant; (ii) for foreclosure of any lien for labor or material furnished to or for Tenant or such other person; (iii) otherwise arising out of or resulting from any action or transaction of Tenant or such other person; or (iv) necessary to protect Landlord's interest under this Lease in a bankruptcy proceeding, or other proceeding under Title 11 of the United States Code, as amended.  Tenant shall defend Landlord against any such claim or action at Tenant's expense with counsel reasonably acceptable to Landlord or, at Landlord's election, Tenant shall reimburse Landlord for any legal fees or costs incurred by Landlord in any such claim or action.

## ARTICLE 22. CONSENT

Landlord shall have no liability for damages resulting from, nor may Tenant terminate this Lease as a result of any default by Landlord or Landlord's failure to give any consent, approval, or instruction reserved to Landlord.  Tenant's sole remedy in any such event shall be an action for injunctive relief.

## ARTICLE 23. AUTHORITY TO MAKE LEASE; COVENANT OF QUIET ENJOYMENT

23.1    <u>Full Power and Authority to Enter Lease</u>.  The parties covenant and warrant that each has full power and authority to enter into this Lease.

23.2    <u>Quiet Enjoyment</u>.  Landlord covenants, represents and warrants that Tenant shall have and enjoy full, quiet, and peaceful possession of the Properties, their appurtenances and all rights and privileges incidental thereto during the term, as against all persons claiming by, through, or under Landlord, subject to the provisions of this Lease and any title exceptions or defects of title in existence on the Commencement Date or created after the Commencement Date by Tenant.

23.3    <u>No Violation of Covenants and Restrictions</u>.  Tenant leases the Properties subject to all encumbrances, covenants, conditions, restrictions, easements, rights of way, and all other matters of record affecting the Properties.  Tenant shall not violate, permit a violation, or cause Landlord to violate any recorded covenants and restrictions affecting the Properties.  Tenant shall defend, indemnify, and hold harmless Landlord from any costs or expenses incurred from such a violation.

## ARTICLE 24. HAZARDOUS MATERIAL

24.1    <u>Environmental Compliance</u>.    Tenant shall comply with all laws, including Environmental Laws, relating to the use, storage, transportation, disposal, dispensing, sale or Release of Hazardous Materials at the Properties arising from and after the Commencement Date. Without limiting the foregoing, Tenant shall comply with all laws and any groundwater monitoring wells or other monitoring or Remediation environmental equipment located or installed on the Properties, their construction, operation, maintenance, calibration and alarm systems, and

promptly shall implement any and all upgrade requirements promulgated by any government agency having jurisdiction at the earliest possible time, but in no event, no later than any applicable deadline announced or promulgated by the government agency. Tenant shall provide Landlord with copies of all reports, studies, complaints, claims, directives, citations, demands, inquiries, notices of violation, or orders relating to any Release at the Properties, at any time, or any alleged non-compliance with Environmental Laws at the Properties, reasonably promptly (and in no event later than thirty (30) days) after such documents are provided to or generated by Tenant). Tenant also shall promptly notify Landlord of any Release at, on, under or from any Property and promptly shall perform Remediation of any Environmental Conditions as required under Section 24.2 below. All reporting, investigation and/or Remediation requirements under any Environmental Law with respect to any and all Environmental Conditions existing or occurring at the Properties prior to or during the term of this Lease shall not be the responsibility of Tenant.

24.2    <u>Tenant's Responsibility for Hazardous Materials</u>. Environmental Conditions currently or previously existing or Releases occurring at the Properties shall be the responsibility of Tenant and Tenant shall be liable for and responsible for Remediation of any such Environmental Conditions and Releases in accordance with Environmental Laws, including without limitation, at Tenant's sole cost (i) Remediation of such Environmental Conditions and Releases as directed by any governmental agency, as required by Environmental Laws; (ii) damages, costs, expenditures and claims for injury to persons, property, the Properties and surrounding air, land, surface water, sediment, and ground water resulting from such Environmental Conditions or Releases; (iii) claims by any governmental agency or third party associated with injury to surrounding air, land, surface water, sediment and ground water or other damage resulting from such Environmental Conditions or Releases; (iv) damages for injury to the buildings, fixtures, appurtenances, equipment and other personal property of Landlord to the extent caused by such Environmental Conditions or Releases; (v) fines, costs, fees, assessments, taxes, demands, orders, directives or any other requirements imposed in any manner by any governmental agency asserting jurisdiction, or under any Environmental Laws with respect to such Environmental Conditions or Releases; (vi) damages, costs and expenditures for injury to natural resources to the extent caused by such Environmental Conditions or Releases as directed by any governmental agency or otherwise as required by applicable law, including Environmental Laws; and (vii) compliance with Environmental Laws regarding the use, storage, transportation, release, disposal, dispensing or sale of Hazardous Materials.

24.3    <u>Tenant's Environmental Indemnification</u>. Tenant shall indemnify, defend (with counsel acceptable to Landlord) and hold each Landlord Party harmless from any and all claims, demands, directives, requirements, orders, suits, judgments, damages, natural resources damage, injuries, fees, penalties, fines, assessments, taxes, costs (including without limitation, reasonable attorneys' fees, consultant fees and expert fees), liabilities or losses asserted against or incurred by Landlord, which arise from: (i) Hazardous Materials present or Released in violation of Environmental Laws or in excess of applicable reporting standards at or from the Properties prior to or during the Term; (ii) any violation of Environmental Laws by Tenant with respect to the Properties prior to or during the Term; (iii) Tenant's breach of its obligations, responsibilities and undertakings in this Article; (iv) claims by a governmental entity or unaffiliated third-party or requirements of governmental entities arising out of Hazardous Materials present or Released at, on or from the Properties prior to or during the Lease Term; (v) only in the event the Properties can no longer be used for the Permitted Use, diminution in value of the Properties arising as a sole and direct result of the presence or Release of Hazardous Materials at the Properties prior to or

during the Lease Term or the removal or remediation thereof; or (vi) only in the event and to the extent that the Properties cannot temporarily or permanently be used for the Permitted Use, loss of rent at the Properties arising as a sole and direct result of the presence or Release of Hazardous Materials at the Properties prior to or during the Lease Term or the removal or remediation thereof, provided that Landlord proves that such rent was lost as a sole and direct result of such Release of Hazardous Materials and/or the removal or remediation thereof, and provided further that, with respect to (v) and (vi) above, Landlord shall have the obligation to reasonably mitigate such damages (hereinafter collectively referred to as "**Environmental Losses**"). This indemnification of Landlord by Tenant includes, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by Environmental Laws because of Hazardous Materials present in the soil or ground water on, under or emanating from the Properties arising from Hazardous Materials present or Released at, on or from the Properties prior to or during the Term. Provided that Tenant timely conducts a Termination Investigation (as defined below), Tenant's obligations under this Section shall survive the expiration or earlier termination of this Lease for a period of ten (10) years, provided that Tenant's obligations shall continue to survive with respect to (i) any claims for defense or indemnification by Landlord asserted hereunder against Tenant within such ten (10) year period; and (ii) any Environmental Losses (including without limitation, any claims, demands, directives, orders, or suits) asserted against or incurred by Tenant within such ten (10) year period.

24.4    Records.    Tenant shall maintain inventory reconciliation records and release detection and monitoring records and reporting records for any releases of Hazardous Substances, in accordance with applicable Environmental Laws.  Tenant shall make, such records available for inspection by Landlord upon reasonable request made by advance (i.e., at least two business days) written notice during normal business hours.

24.5    Tenant's Notification Obligation.  Tenant promptly shall notify Landlord of any of the following:  (i) any correspondence or communication received by Tenant from any governmental agency regarding the Properties or Tenant's operation of the Properties alleging a Release on a Property or violation of Environmental Law; (ii) any material change in Tenant's operations on the Properties that will change or has the potential to change Tenant's obligations or liabilities under the Environmental Laws in any material respect; and (iii) any Releases or suspected Releases of any and all Hazardous Materials at or from the Properties.

24.6    Landlord's Right of Entry.  In Landlord's sole discretion and at Landlord's sole cost and expense, Landlord, or its representatives or consultants, shall have the right, upon reasonable prior written notice and at times which will have the least impact on the operations of Tenant's business, to enter upon the Properties for the purpose of conducting a non-invasive environmental audit or assessment to assure that the Properties are in compliance with any applicable Environmental Laws and to participate in any ongoing or planned inspection, tests, borings, measurements, investigation or assessment in order to determine the presence of Hazardous Materials; provided, however, that Landlord shall have the right to conduct Phase II Environmental Assessments if the non-invasive environmental assessment obtained in accordance with this Section 24.6 recommends obtaining a Phase II Environmental Assessment. Notwithstanding anything to the contrary in this Article 24, Landlord shall not be entitled to claim or seek indemnity or defense under this Article 24 above where the relevant Environmental Condition or Remediation obligation results solely from the gross negligence or willful misconduct of Landlord (its agent or contractor) in conducting any below ground investigation of soil or

37

groundwater or other surface or sub-surface water, unless and except for such investigations as are required by Environmental Laws.

24.7    <u>Termination Investigation</u>.  Upon the expiration or earlier termination of this Lease with respect to a Property, ("**End of the Term**"), Landlord may, at Tenant's sole cost and expense, conduct a phase I non-invasive environmental site assessment of such Property or all of the Properties ("**End of Term Phase I**") using a reputable, nationally-recognized environmental consultant selected by Landlord.  In the event and to the extent that, as a result of the End of Term Phase I, an environmental consultant identifies Recognized Environmental Conditions (as defined in the ASTM Standard El 527-05 or its equivalent in any amended or superseding ASTM Standard for Phase I environmental site assessments in effect at the End of the Term) ("**RECs**") and the environmental consultant recommends a Phase II to confirm the presence or absence of a Release of Hazardous Materials or other conditions associated with such RECs ("**Termination Investigation**"), then Landlord may, in its sole and absolute discretion, elect to conduct an invasive investigation of any applicable Property ("**Phase II**") at Tenant's sole cost and expense. Tenant shall have the right to be present and split samples taken during the Phase II.  If the Termination Investigation reveals violations of applicable Environmental Laws or environmental conditions which require reporting or notice to any governmental agency under applicable Environmental Laws ("**Violations or Conditions**"), Tenant, at its sole cost and expense, shall promptly undertake such further action as may be necessary or required to cure, investigate or remediate any such Violations or Conditions that are required by Environmental Laws to meet the applicable legal standards for properties similar to the applicable Property ("**Cure All Violations and Remediate All Conditions**"). Tenant shall obtain Landlord's approval (not to be unreasonably conditioned, withheld or delayed) of any proposed plans to cure or remediate any Violations or Conditions (including any proposed institutional or engineering controls), as well as the consultant Tenant proposes to retain to conduct or perform the work. Expiration or termination of this Lease shall not relieve Tenant of its obligations hereunder to Cure All Violations and Remediate All Conditions. If Tenant has not Cured All Violations and Remediated All Conditions as set forth herein prior to the End of the Term, then Landlord hereby agrees to grant Tenant, for the limited purpose of carrying out the provisions of this Section, a right and license to enter upon any of the Properties following the expiration or earlier termination of this Lease and continuing until such time as Tenant has Cured All Violations and Remediated All Conditions or otherwise satisfied its obligations under this Article. Said right and license shall be granted by way of a license agreement at the End of the Term, which license agreement shall be in form and substance reasonably acceptable to Landlord and Tenant, and for the avoidance of doubt, Tenant's entry upon any of the Properties in connection with such cure and remediation shall not be considered a holding-over under this Lease.

24.8    <u>Records Retention</u>.  Tenant shall maintain inventory reconciliation records and release detection and monitoring records and reporting records for releases of Hazardous Materials in accordance with applicable Environmental Laws. Tenant shall make such records available for inspection by Landlord during the Term at Tenant's offices upon reasonable prior written notice, during normal business hours.

24.9    <u>Survival</u>.  Provisions of this Article 24 shall survive until ten (10) years after the expiration or earlier termination of the tenancy.

# ARTICLE 25. GENERAL PROVISIONS

25.1    <u>Recitals</u>.  The Recitals set forth above are hereby incorporated by this reference.

25.2    <u>Gender; Number</u>.  The use of (i) the neuter gender includes the masculine and feminine and (ii) the singular number includes the plural, whenever the context requires.

25.3    <u>Captions</u>.  Captions in this Lease are inserted for the convenience of reference only and do not define, describe, or limit the scope or the intent of this Lease or any of its terms.

25.4    <u>Exhibits</u>.  All attached exhibits are a part of this Lease and are incorporated in full by this reference.  Except as specifically provided herein, if any provision contained in any exhibit hereto is inconsistent or in conflict with any provisions of this Lease, the provisions of this Lease shall supersede the provisions of such exhibit and shall be paramount and controlling.

25.5    <u>Entire Agreement</u>.  This Lease contains the entire agreement between the parties relating to the transactions contemplated hereby and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into this Lease.

25.6    <u>Drafting</u>.  This Lease shall not be construed more strictly against one party than the other because it may have been drafted by one of the parties or its counsel, each having contributed substantially and materially to the negotiation and drafting hereof.

25.7    <u>Modification</u>.  No modification, waiver, amendment, discharge, or change of this Lease shall be valid unless it is in writing and signed by the party against which the enforcement of the modification, waiver, amendment, discharge, or change is or may be sought.

25.8    <u>Joint and Several Liability</u>.  If any party consists of more than one person or entity, the liability of each such person or entity signing this Lease shall be joint and several.

25.9    <u>Enforceability</u>.  Tenant warrants and represents that the terms of this Lease are fully enforceable in the locality in which the Properties are located.  In the event any provision contained in this Lease is inconsistent or in conflict with local law, custom, or practice, the provisions of this Lease shall supersede and shall be paramount and controlling.

25.10    <u>Severability</u>.  In the event any term, covenant, condition, or provision of this Lease is held to be invalid, void, or otherwise unenforceable by any court of competent jurisdiction, the fact that such term, covenant, condition, or provision is invalid, void, or otherwise unenforceable shall in no way affect the validity or enforceability of any other term, covenant, condition, or provision of this Lease.

25.11    <u>Successors and Assigns</u>.  Except as otherwise provided herein, all terms of this Lease shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective legal representatives, successors, and assigns.

25.12    <u>Independent Covenants</u>.  This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent, and Tenant hereby expressly waives the benefit of any statute to the contrary and agrees that, except as otherwise expressly provided under this Lease, if Landlord fails to perform its obligations set forth herein,

4854-8636-9096.14

Tenant shall not be entitled to make any repairs or perform any acts hereunder at Landlord's expense or to any offset of the rent or other amounts owing hereunder against Landlord; provided, however, the foregoing shall in no way impair the right of Tenant to commence a separate action against Landlord for any violation by Landlord of the provisions hereof so long as notice is first given to Landlord and an opportunity is granted to Landlord and such holder to correct such violation as provided above.

25.13    <u>Information Provided</u>.  Tenant warrants and represents that all information Tenant has provided to Landlord is accurate and correct in all material respects and Tenant acknowledges that Landlord has relied upon such information in entering into this Lease.

25.14    <u>Limitation of Landlord's Liability</u>.  Notwithstanding anything contained in this Lease to be contrary, Landlord shall not incur any liability beyond Landlord's interest in the Properties upon a breach of this Lease, and Tenant shall look exclusively to such interest in the Properties for the payment and discharge of any obligations imposed upon Landlord under this Lease.

25.15    <u>True Lease</u>.  Landlord and Tenant agree that this Lease constitutes a true lease and not a financing or other form of transaction, and is intended to constitute an operating lease. In furtherance of the foregoing, Landlord and Tenant each waives any claim or defense based upon the characterization of this Lease as anything other than a true lease and operating lease and irrevocably waives any claim or defense which asserts that this Lease is anything other than a true lease. Landlord and Tenant covenant and agree that they will not assert that this Lease is anything but a true lease. Landlord and Tenant each stipulate and agree not to challenge the validity, enforceability or characterization of this Lease of the Properties as a true lease and further stipulate and agree that nothing contained in this Lease creates or is intended to create a joint venture, partnership (either de jure or de facto), equitable mortgage, trust, financing device or arrangement, security interest or the like. Landlord and Tenant each shall support the intent of the parties that this Lease of the Properties pursuant to this Lease is a true lease and does not create a joint venture, partnership (either de jure or de facto), equitable mortgage, trust, financing device or arrangement, security interest or the like, if, and to the extent that, any challenge occurs.  For the purposes of any assumption, rejection or assignment of this Lease under 11 U.S.C. Section 365 or any amendment or successor section thereof, this is one indivisible and non-severable lease dealing with all Properties which must be assumed, rejected or assigned as a whole with respect to all (and only all) of the Properties.

25.16    <u>Force Majeure</u>.  If either party shall be prevented or delayed from punctually performing any obligation or satisfying any condition under this Lease by any condition beyond the reasonable control of such party, exclusive of financial inability of a party (including, without limitation, any of the following if beyond the control of (and not caused by) such party: strike, lockout, labor dispute, civil unrest, inability to obtain labor, materials or reasonable substitutes thereof, acts of God, present or future governmental restrictions, regulations or control, insurrection, and sabotage), then the time to perform such obligation or satisfy such condition shall be extended by the delay caused by such event, but only for a reasonable period of time not to exceed, in any event, ninety (90) days. Notwithstanding the preceding, the provisions of this Section 25.16 shall in no event operate to delay the Commencement Date or to excuse Tenant from the payment of all Rent as and when due under this Lease

25.17    <u>No Punitive Damages</u>.  **Landlord shall not be liable to Tenant, or any of Tenants Affiliates, for any punitive, special, speculative, treble or exemplary damages connected with this Lease, regardless of whether a claim is based in contract, tort (including negligence), strict liability, violation of any applicable deceptive trade practices act, or similar legal requirement or any other legal or equitable principle, even if advised of the possibility of such claims, unless such claim is made by a third party against a party hereto.**

25.18    <u>Waiver of Trial by Jury</u>.  Landlord and Tenant do hereby waive trial by jury in any action, proceeding or counterclaim brought by either party against the other, upon any matters whatsoever arising out of or in any way connected with this Lease, Tenant's use or occupancy of the Properties and/or any claim of injury or damage.  It further is agreed that in the event Landlord commences any summary proceeding for non-payment of rent or additional rent, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding.

25.19    <u>Counterparts</u>.  This Lease may be executed in any number of counterparts, each of which shall be deemed an original.  The counterparts shall together constitute but one agreement.  Any signature on a copy of this Lease or any document necessary or convenient thereto sent by facsimile shall be binding upon transmission by facsimile and the facsimile copy may be utilized for the purposes of this Lease.

25.20    <u>Confidentiality</u>.  Landlord requires and Tenant agrees to keep the economic terms and conditions of this Lease confidential from all third parties, except as Tenant may be required to disclose such economic terms and conditions to Tenant's accountant, attorney or as required by applicable law, or in connection with any actual or proposed assignment, sublease, financing or corporate transaction by such party or an actual or proposed sale of the Properties by Landlord (including, without limitation, the listing and marketing of the Properties for sale.  Tenant understands that a disclosure of the economic terms and conditions to unauthorized third (3rd) parties may have a severe economic impact on the Landlord.  The parties further specifically agree that a breach of this Article "Confidentiality of Lease Terms" shall constitute a material breach under this Lease.

25.21    <u>Patriot Act</u>.

      (a)    Tenant represents and warrants that neither Tenant nor its officers, directors, or immediate parent entity (each such owner, a "**<u>Beneficial Owner</u>**") (a) is a Person (as defined below) whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (b) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2, or (c) is a Person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order; provided, however, the covenant contained in this sentence shall not apply to any Person to the extent that such Person's interest is in or through a U.S. Publicly-Traded Entity. A "**<u>U.S. Publicly-Traded Entity</u>**" is an entity whose securities are listed on a national securities exchange or quoted on an automated quotation system in the U.S. or a wholly-owned subsidiary of such an entity. If Tenant shall at any time determine that an officer, director or Beneficial Owner of Tenant is or has become subject to Executive Order 13224 or is a

Person listed on the list referenced in foregoing clause (c) or subject to the limitations or prohibitions referenced in such clause, Tenant will take such steps as a result of such determination as may be required by applicable law. As used in this Article XLII, "**Person**" means any individual, corporation, limited liability company, partnership, joint venture, estate, trust, unincorporated association, or any other entity, any government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

(b)     Tenant represents and warrants that Tenant is in compliance with (a) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) the Uniting And Strengthening America By Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act of 2001), and each of the officers, directors and Beneficial Owners of Tenant is in compliance with such statutes, enabling legislation or executive orders to the extent applicable to such Persons; provided, however, the covenant contained in this sentence shall not apply to any Person to the extent that such Person's interest is in or through a U.S. Publicly-Traded Entity.

(c)     In the event of a transfer of such title, Landlord (and in the case of any subsequent transfers, the then grantor) shall be relieved from and after the date of such transfer, of all liability with respect to Landlord's obligations thereafter to be performed, provided that any Security Deposit in the hands of Landlord or the grantor at the time of such transfer in which Tenant has an interest shall be delivered to the grantee.  The obligations contained in this Lease to be performed by Landlord shall, subject to the above, be binding on Landlord's successors and assigns only during their respective periods of ownership.

(d)     In the event that Landlord sells the Properties, Landlord may transfer and deliver any security given by Tenant to secure the faithful performance of the provisions of this Lease to the purchaser of the real property.  Upon such transfer being made, Landlord shall be exonerated from any further liability with respect to said security.

## ARTICLE 26. TENANT RETAINED PARCEL

26.1     Tenant's Acquisition of Tenant Retained Parcel.  Tenant was the prior owner of the Minnesota Property.  Prior to the Commencement Date, Tenant commenced the process of subdividing the Minnesota Property so that Tenant could retain fee ownership of the Tenant Retained Parcel (the "**Subdivision**").  The Subdivision could not be completed prior to the Commencement Date so the Tenant Retained Parcel was, subject to the terms of this Section 26, conveyed to Landlord and included in the Property under this Lease.  Commencing on April 1, 2025 (the "**Subdivision Outside Date**"), Tenant shall, at its sole cost, use commercially reasonable efforts to complete the Subdivision reflected on the proposed Subdivision Map at Tenant's expense.  Landlord shall reasonably cooperate in assisting Tenant in completing the Subdivision at no expense to Landlord, provided that the proposed Subdivision shall not cause any violations of any laws with respect to Minnesota Parcel, including compliance with zoning and parking laws and regulations.  Notwithstanding the foregoing, on that date which is sixty (60) days prior to Tenant's good faith estimate of the completion of the Subdivision, Tenant must provide Landlord with prior written notice of such date of completion (the "**Subdivision Completion Notice**"), and Landlord shall have such sixty (60) day timeframe to advise Tenant whether Landlord intends to exercise Landlord's Purchase Rights as set forth in Section 26.5 below.  If Landlord advises Tenant

that it intends to exercise Landlord's Purchase Rights, then upon the Subdivision, Landlord shall assign Landlord's Purchase Rights to an Affiliate of Landlord or an Affiliate of Landlord's now-current managing member (the "**Landlord Purchasing Entity**"), and the Landlord Purchasing Entity shall purchase the Tenant Retained Parcel concurrently with the Subdivision for the TRP Purchase Price.  Notwithstanding anything contained in this Section 26.1 to the contrary, Tenant may commence and complete the Subdivision prior to the Subdivision Outside Date, subject to the terms set forth in Section 26.5 below.

The parties acknowledge and agree that Tenant has executed a loan amendment with Tenant's current lender, Siena Lending, as of the execution date of this Lease ("**Lender**") to extend the maturity of its loan facility (the "**Facility**") to no earlier than September 30, 2023, with at least one 90-day extension.  In the event that either: (i) the refinance of the Facility on terms and conditions materially similar, particularly in regard to loan term, availability and covenants, with the PNC Commitment Letter dated January 23, 2023, or on terms and conditions acceptable to Landlord in its sole discretion (the "**Refinance**") does not occur prior to September 30, 2023, or (ii) in the event Tenant has delivered to Lender and Lender has approved, prior to September 15, 2023, an acceptable executed commitment letter for the Refinance to Lender and Tenant does not refinance Tenant's Facility prior to December 31, 2023, or (iii) proceedings in bankruptcy are instituted (voluntarily or involuntarily) by or against Tenant, then (x) even if Tenant has completed the Subdivision, the TRP Purchase Price as set forth in Section 26.5(a) below shall be deleted in its entirety and replaced with $100 and may be exercised by Landlord at any time after the December 31, 2023, and (y) if the Subdivision is not yet completed, Tenant's Subdivision right and Repurchase Right in this Section 26 will terminate.  In the event that Tenant's Subdivision right and Repurchase Right are terminated, Landlord will purchase Tenant's rights to solely utilize the improvements on the Tenant Retained Parcel for $100 ("**Landlord Purchase**"), the Lease will continue with respect to the Tenant Retained Property, and Tenant will continue to have the sublease rights in Section 26.2.  Following such Landlord Purchase, Landlord will have the right to subdivide the Minnesota Property, at its sole cost and expense.

If any proceedings in bankruptcy are instituted (voluntarily or involuntarily) by or against Tenant, or the Refinance of the Facility has not occurred as provided above, beginning on the earlier of the bankruptcy filing, October 1, 2023 or January 1, 2024, as applicable, and (i) if the Subdivision has not occurred, or (ii) if the Subdivision has occurred and the Tenant Retained Parcel has been conveyed to Tenant and Landlord has exercised the Landlord's Purchase Right for $100 and the Tenant Retained Parcel is subjected to the Lease as required under Section 26.2, Landlord will have the right to terminate this Lease with respect to the Tenant Retained Parcel by providing Tenant at least thirty (30) days prior written notice, but without automatically terminating any existing TRP Sublease.  At Landlord's discretion, Landlord may terminate any existing TRP Sublease upon one hundred eighty (180) days' notice.  In connection with Landlord's termination of the Lease with respect to the Tenant Retained Parcel, Landlord must pay to Tenant a "Termination Fee" as follows: (a) $3,000,000 if the termination occurs after December 31, 2023 but before April 1, 2025; or (b) $6,000,000 if the termination occurs on or after April 1, 2025.  If Landlord fails to timely pay the Termination Fee by the termination date identified in Landlord's notice of termination, this Lease will continue in full force and effect with respect to the Tenant Retained Parcel.

For the avoidance of doubt, upon Tenant closing on its Refinance of the Facility prior to September 30, 2023 or December 31, 2023 as set forth above, the terms of this Section 26,

including the terms regarding Tenant's Subdivision rights and Repurchase Right will not in any way be affected.

26.2    <u>Sublease</u>.  So long as the Tenant Retained Parcel is subject to this Lease, Tenant shall have the right to sublease the Tenant Retained Parcel subject to the terms and conditions set forth in Article 14 above ("**TRP Sublease**").  Tenant shall collect and retain all rents from any TRP Sublease.  Any TRP Sublease will be subject to Landlord's commercially reasonable consent, which will not be unreasonably conditioned, withheld or delayed.  In the event Tenant exercises its Repurchase Right as outlined in 26.3 hereof and Landlord or Landlord Purchase Entity thereafter purchases the Tenant Retained Parcel pursuant to Section 26.5 hereof for $100, the Landlord, Landlord Purchasing Entity and Tenant will enter an amendment to the Lease such that the Lease terms hereof will once again apply to the Tenant Retained Parcel, without any increase or other change to Base Rent provided hereunder.  The amendment will provide that Tenant will pay the apportioned Rent to Landlord and Landlord Purchasing Entity separately, if required.  For the avoidance of doubt, in such circumstance the Tenant shall also retain its right under this Lease to collect and retain all rents from any TRP Sublease during the Term of this Lease without an attendant increase to the then-current Base Rent.

26.3    <u>Repurchase Right</u>.  Subject to and in accordance with the terms of this Section 26.3, provided that there is not an Event of Default under this Lease, within ten (10) days after all third party approvals and signatures of the Subdivision plat are received and Tenant's proforma owner's policy of title insurance are prepared and delivered to Tenant, Landlord shall convey fee title by special warranty deed to the Tenant Retained Parcel to Tenant (or Tenant's designated Affiliate) for a purchase price of One Hundred Dollars ($100) (the "**Purchase Price**") and all costs associated with such closing, including, without limitation, reasonable costs and fees of Landlord (including reasonable attorneys' fees) (the "**Repurchase Right**") in connection with the Repurchase Right.  The closing of such conveyance ("**Closing**") shall take place at the offices of First American Title Insurance Company (the "**Title Company**").  The actual date of Closing shall be referred to herein as, the "**Closing Date**". The Closing shall be an escrow closing so each Party will deliver any applicable closing documents and funds to the Title Company on or before the Closing Date.  Tenant acknowledges and agrees that this Repurchase Right is an integral part of this Lease.

(a)    At Closing, Landlord shall deliver (i) a deed in the same form that Seller received for the Tenant Retained Parcel, (ii) Landlord's signature to the Subdivision plat mylars, (iii) Landlord's counterpart to the Reciprocal Easement and Operating Agreement (the "**REA**"), in the form agreed upon between Landlord and Tenant, and (iv) a commercially reasonable and customary title affidavit required by the title company.

(b)    At Closing, Tenant shall deliver to the Title Company Tenant's counterpart to the REA, the Purchase Price and all other costs, fees or expenses to complete the Closing, including any Real Estate Taxes and transfer or deed taxes.

(c)    At Closing, Landlord and Tenant shall execute a modification to this Lease to remove the Tenant Retained Parcel from the description of the Properties.  The Rent shall not be affected by the conveyance of the Tenant Retained Parcel to Tenant.

(d)      If Landlord fails to close as required herein, Tenant may, in addition to any other remedies provided at law or equity, pursue specific performance to compel Landlord's conveyance of the Tenant Retained Parcel as provided herein.

26.4    Tenant Right of First Offer.  If, for any reason, the Subdivision is not completed pursuant to Section 26.3 above, provided that there is not an Event of Default under this Lease, Tenant shall have a right of first offer to purchase the Minnesota Property (the "**Tenant ROFO**") as more fully set forth in this Section 26.4 until the Subdivision is completed and the Tenant Retained Parcel is conveyed to Tenant pursuant to Section 26.3.  For the avoidance of doubt, only the original Tenant to this Lease (not any assignees or sublessees) shall have the Tenant ROFO.

(a)      If, prior to completion of the Subdivision and conveyance of the Tenant Retained Parcel to Tenant pursuant to Section 26.3, Landlord desires to sell the Minnesota Property to any third-party purchaser ("**Purchaser**"), then Landlord shall, as a condition to such sale, first offer the Minnesota Property to Tenant, by providing notice in writing of its intent to market the property ("**Tenant ROFO Notice**").  Tenant may, within twenty (20) days of receipt of the Tenant ROFO Notice, offer to purchase the Minnesota Property in writing and specify in detail all material terms of the proposed purchase including the closing date ("**Tenant ROFO Offer**").  Following receipt of the Tenant ROFO Offer, then Landlord shall be free to sell or transfer the Minnesota Property to a third party at a price higher than what Tenant offered to Landlord in the Tenant ROFO Offer.

(b)      Notwithstanding anything to the contrary in the last sentence of Section 26.4(a) above, if at any time within nine (9) months of the Tenant ROFO Offer, Landlord desires to sell the Minnesota Property to Tenant, then Tenant shall be required to purchase the Minnesota Property under the terms and conditions set forth in the Tenant ROFO Offer using Landlord's standard form of purchase and sale agreement.

(c)      Anything herein to the contrary notwithstanding, the right of first offer herein granted shall not apply to (i) any sale or transfer by Landlord to any Landlord Purchasing Entity, including, without limitation, any partners or joint venturers, (ii) a sale or transfer in connection with (or in lieu of) a condemnation of the Minnesota Property, or (ii) a sale or transfer of the Minnesota Property in connection with a foreclosure of any mortgage (or similar security instrument), or the first subsequent transfer thereafter.

(d)      The right of first offer set forth herein will be subject and subordinate to the lien of any Mortgage encumbering the Minnesota Property, and in furtherance thereof, Tenant agrees that upon request from any lender, Tenant will deliver to such lender and to Landlord such documentation evidencing such subordination as such lender may reasonably require.

26.5    Landlord Right of Purchase.  Following the Closing Date as defined in Section 26.3 above, the Landlord Purchasing Entity shall have a right to purchase the Tenant Retained Parcel (the "**Landlord Purchase Rights**") as more fully set forth in this Section 26.5.

(a)      At any time after the Closing Date, the Landlord Purchasing Entity shall have the option to purchase the Tenant Retained Parcel for (i) Three Million Dollars ($3,000,000.00) if the Subdivision is completed after the later of (x) October 1, 2023, or (y) the date of the Refinance, on terms and conditions materially similar, particularly in regard to loan term, availability and covenants, with that certain PNC Commitment Letter dated January 23,

2023, or on terms and conditions acceptable to Landlord in its sole discretion, or (ii) Six Million Dollars ($6,000,000.00) if the Subdivision is completed after the Subdivision Outside Date (the "**TRP Purchase Price**"); it being understood that in no event shall be Subdivision occur prior to October 1, 2023, and if the Subdivision is completed prior to October 1, 2023, then the Repurchase Right set forth in Section 26.3 above shall become null and void and of no further force and effect. Landlord shall provide Tenant with written notice of its intent to purchase the Tenant Retained Parcel, and the parties shall work together in good faith to consummate the closing as soon as reasonably practicable (the "**TRP Closing**"), provided that if Landlord exercises any right to terminate a TRP Sublease, Landlord has the right to delay Closing until a mutually agreeable date after the TRP Sublease has terminated.  Closing costs shall be allocated between the parties pursuant to local custom, and the TPR Closing shall take place at the offices of First American Title Insurance Company using the office of Landlord's choice.

   (b) If, after the Closing Date, Tenant desires to sell the Tenant Retained Parcel to any Purchaser, and Landlord does not exercise its rights under Section 26.1 above, then Tenant shall, as a condition to such sale, first offer the Tenant Retained Parcel to Landlord at the TRP Purchase Price (the "**TRP ROFO Notice**").  Landlord or the Landlord Purchasing Entity may, within fifteen (15) days of receipt of the TRP ROFO Notice, elect to purchase the Tenant Retained Parcel in writing under the terms and conditions set forth in Section 26.5(a) above, and a TRP Closing shall occur within sixty (60) days following Landlord's election to purchase the Tenant Retained Parcel.  If Landlord does not timely deliver the TRP ROFO Notice to Tenant, then Tenant shall be free to sell or transfer the Tenant Retained Parcel to a third party.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**
**[SIGNATURE PAGE TO FOLLOW]**

4854-8636-9096.14

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

LANDLORD:                                    TENANT:

**Pontus IMB Portfolio, LLC,**               **iMedia Brands, Inc.,**
a Delaware limited liability company         a Minnesota corporation

By:    Pontus IMB Managing Member, LLC,       By: _____
       a Delaware limited liability company   Date: _____ 4/7/23 _____
       its Manager

       By: _____
       Date: ___4/7/23_____


**Signature Page to Master Lease**

**by and between**

**Pontus IMB Portfolio, LLC and iMedia Brand, Inc.**

# MASTER LEASE AGREEMENT

## EXHIBIT "A"

## LEGAL DESCRIPTIONS

**1. Kentucky Property**

Parcel 1:

BEING LOT 1 OF "SUBDIVISION REVISION OF LOTS 1 & 2 OF THE LEON TARTER & GARLAND REEVES PROPERTY SUBDIVISION" AS SHOWN OF RECORD IN PLAT BOOK 42, PAGES 27-29, IN THE WARREN COUNTY CLERK'S OFFICE, WARREN COUNTY, KENTUCKY.

BEING A PORTION OF THE SAME PROPERTY CONVEYED TO VVI FULFILLMENT CENTER, INC., A MINNESOTA CORPORATION FROM DSC VENTURE 100, A KENTUCKY PARTNERSHIP, BY DEED DATED DECEMBER 11, 1996 AND OF RECORD IN DEED BOOK 736, PAGE 262, IN THE WARREN COUNTY CLERK'S OFFICE; AND, BEING A PORTION OF THE SAME PROPERTY CONVEYED TO VVI FULFILLMENT CENTER, INC., A MINNESOTA CORPORATION FROM LEON TARTER AND GARLAND REEVES, A KENTUCKY PARTNERSHIP, AND RHEA K REEVES, WIFE OF GARLAND REEVES, BY DEED DATED DECEMBER 11, 1996 AND OF RECORD IN DEED BOOK 736, PAGE 258, IN THE WARREN COUNTY CLERK'S OFFICE.

Parcel 2:

BEING LOT 1-1 OF "SUBDIVISION REVISION OF LOTS 1 & 2 OF THE LEON TARTER & GARLAND REEVES PROPERTY SUBDIVISION" AS SHOWN OF RECORD IN PLAT BOOK 42, PAGES 27-29, IN THE WARREN COUNTY CLERK'S OFFICE, WARREN COUNTY, KENTUCKY.

BEING THE SAME PROPERTY CONVEYED TO WARREN COUNTY, KENTUCKY FROM VVI FULFILLMENT CENTER, INC., A MINNESOTA CORPORATION BY DEED DATED DECEMBER 1, 2014, AND OF RECORD IN DEED BOOK 1088, PAGE 37, IN THE WARREN COUNTY CLERK'S OFFICE.

**2. Minnesota Property**

Real property in the City of Eden Prairie, County of Hennepin, State of Minnesota, described as follows:

Lot 1, Block 1, Shady Oak Industrial Park Third Addition, according to the recorded plat thereof, Hennepin County Minnesota; except that part of Lot 1, Block 1, Shady Oak Industrial Park Third Addition which lies westerly of Line 1 described below:

Line 1. Commencing at the southeast corner of said Lot 1, Block 1, SHADY OAK INDUSTRIAL PARK THIRD ADDITION; thence westerly along the south line of said Lot 1 on an azimuth of 273

degrees 14 minutes 16 seconds for 254.31 feet to the point of beginning of Line 1 to be described; thence on an azimuth of 345 degrees 06 minutes 52 seconds for 190.55 feet; thence on an azimuth of 349 degrees 49 minutes 38 seconds for 509.12 feet to a point hereinafter referred to as Point "A"; thence on an azimuth of 350 degrees 37 minutes 54 seconds for 133.00 feet to the northwest line of said Lot 1 and there terminating.

(abstract property)

**EXHIBIT "A-1"**

**SUBDIVISION MAP**



## SITE NOTES

1. ALL PAVING, CONCRETE CURB, GUTTER AND SIDEWALK SHALL BE FURNISHED AND INSTALLED IN ACCORDANCE WITH THE DETAILS SHOWN PER THE DETAIL SHEETS) AND STATE/LOCAL JURISDICTION REQUIREMENTS.

2. ACCESSIBLE PARKING AND ACCESSIBLE ROUTES SHALL BE PROVIDED PER CURRENT ADA STANDARDS AND LOCAL/STATE REQUIREMENTS.

3. ALL CURB DIMENSIONS SHOWN ARE TO THE FACE OF CURB UNLESS OTHERWISE NOTED.

4. ALL BUILDING DIMENSIONS ARE TO THE OUTSIDE FACE OF WALL UNLESS OTHERWISE NOTED.

5. TYPICAL FULL SIZED PARKING STALL IS 9' X 18' UNLESS OTHERWISE NOTED.

6. ALL CURB RADII SHALL BE 5.0' UNLESS OTHERWISE NOTED.

7. SEE SITE ELECTRICAL PLAN FOR SITE LIGHTING.

8. REFER TO ARCHITECTURAL SITE PLAN FOR BUILDING SETBACKS.

## SITE DATA

CURRENT ZONING:                    I-2 INDUSTRIAL PARK - 2 ACRE MINIMUM / PUD
PROPOSED ZONING:                   I-2 INDUSTRIAL PARK - 2 ACRE MINIMUM / PUD

PROPERTY AREA:                     ±11.48 AC
   LOT 1 (6690) AREA:              ±4.00 AC. (174,349 SF.)
   LOT 2 (6740) AREA:              ±7.47 AC. (325,600 SF.)

LOT 1 (6690) BUILDING AREA:        ±59,203 SF. **
LOT 2 (6740) BUILDING AREA:        ±115,486 SF. **

I-2 DISTRICT STANDARDS:
   MIN. LOT AREA SIZE:             2 ACRES
   MIN. LOT WIDTH:                 200 FEET
   MIN. LOT DEPTH:                 300 FEET
   MIN. LOT WIDTH AT ROW:          200 FEET
   MIN. BUILDABLE AREA:            3,500 SF.
   FRONT SETBACK:                  50 FEET
   REAR SETBACK:                   25 FEET
   SIDE SETBACKS:
      ONE SIDE:                    20 FT. MIN.
      BOTH SIDES:                  40 FT. MIN.

MAXIMUM FLOOR AREA RATIO (FAR):
   ONE STORY:                      0.3
   MULTI-STORY:                    0.5

MAXIMUM BASE AREA RATIO (BAR):     0.3

PARKING SETBACKS:
   SIDE OR REAR:                   10 FEET
   BUILDING:                       5 FEET

PARKING REQUIREMENTS:
INDUSTRIAL WAREHOUSE:              0.5 STALLS/1,000 SF. G.F.A.
OFFICE:                           5 STALLS/1,000 SF. G.F.A.

PARKING STALLS REQUIRED:
   LOT 1 (6690) WAREHOUSE:         10 STALLS (10 STALLS PROVIDED)
      (±19,988 SF. / 1,000 x 0.5 = 51 STALLS)
   LOT 1 (6690) OFFICE:            196 STALLS (187 STALLS PROVIDED)
      (±39,215 SF. / 1,000 x 5 = 196 STALLS)
   LOT 2 (6740) WAREHOUSE:         22 STALLS (22 STALLS PROVIDED)
      (±42,284 SF. / 1,000 x 0.5 = 22 STALLS)
   LOT 2 (6740) OFFICE:            366 STALLS (322 STALLS PROVIDED)
      (±73,202 SF. / 1,000 x 5 = 366 STALLS)

FLOOR AREA RATIO (FAR):            MAXIMUM OF 0.5
   LOT 1 (6690) FAR RATIO:         0.33 (CALCULATED WITH FLOOR PLANS**)
   LOT 2 (6740) FAR RATIO:         0.35 (CALCULATED WITH FLOOR PLANS**)

BASE AREA RATIO (BAR):             MAXIMUM OF 0.3
   LOT 1 (6690) BAR RATIO:         0.23 (CALCULATED WITH FLOOR PLANS**)
   LOT 2 (6740) BAR RATIO:         0.27 (CALCULATED WITH FLOOR PLANS**)

   LOT 1 (6690) BAR RATIO:         0.28 (CALCULATED WITH SURVEY FOOTPRINTS)
   LOT 2 (6740) BAR RATIO:         0.34 (CALCULATED WITH SURVEY FOOTPRINTS)

NINE MILE CREEK WATERSHED.

*SURVEY WAS DONE BY LOUCKS ON 07/28/2021.

** BUILDING AREAS AND BUILDING USE AREAS WITHIN WERE PROVIDED BY OTHERS.



SHOPHQ
6678-6740 SHADY OAK ROAD
EDEN PRAIRIE, MN 55344

SHOPHQ
6740 SHADY OAK ROAD
EDEN PRAIRIE, MN 55344



LOUCKS

PLANNING
CIVIL ENGINEERING
LAND SURVEYING
LANDSCAPE ARCHITECTURE
ENVIRONMENTAL

7200 Hemlock Lane, Suite 300
Maple Grove, MN 55369
763.424.5505
www.loucksinc.com

## CADD QUALIFICATION

CADD files prepared by the Consultant for this project are instruments of the Consultant professional services for use solely with respect to this project. These CADD files shall not be used on other projects, for additions to this project, or for completion of this project by others without written approval by the Consultant. With the Consultant's approval, others may be permitted to obtain copies of the CADD drawing files for information and reference only. All intentional or unintentional revisions, additions, or deletions to these CADD files shall be made at the full risk of that party making such revisions, additions or deletions and that party shall hold harmless and indemnify the Consultant from any & all responsibilities, claims, and liabilities.

## SUBMITTAL/REVISIONS

12-09-22        CITY REVIEW MEETING

## PROFESSIONAL SIGNATURE

I hereby certify that this plan, specification or report was prepared by me or under my direct supervision and that I am a duly Licensed Landscape Architect under the laws of the State of Minnesota.

                                          Chad E. Feigum - LA

License No.                               46508
Date

## QUALITY CONTROL

Loucks Project No.    21215.08
Project Lead          CEF
Drawn By              CEF
Checked By            CEF
Review Date

## SHEET INDEX

## CONCEPT
## SITE PLAN

# C2-1

---

LOT 1

LOT 2

LOT 2

EXISTING SKYWAY TO BE
REMOVED WITH LOT SPLIT.

INDUSTRIAL     PARK

LOT 2

BLOCK

THIRD          ADDITION



Gopher State One Call
TWIN CITY AREA: 651-454-0002
TOLL FREE: 1-800-252-1166

WARNING:
THE CONTRACTOR SHALL BE RESPONSIBLE FOR CALLING FOR LOCATIONS OF ALL EXISTING UTILITIES. THEY SHALL COOPERATE WITH ALL UTILITY COMPANIES IN MAINTAINING THEIR SERVICE AND / OR RELOCATION OF LINES.

THE CONTRACTOR SHALL CONTACT GOPHER STATE ONE CALL AT 651-454-0002 AT LEAST 48 HOURS IN ADVANCE FOR THE LOCATIONS OF ALL UNDERGROUND WIRES, CABLES, CONDUITS, PIPES, MANHOLES, VALVES OR OTHER BURIED STRUCTURES BEFORE DIGGING. THE CONTRACTOR SHALL REPAIR OR REPLACE THE ABOVE WHEN DAMAGED DURING CONSTRUCTION AT NO COST TO THE OWNER.

0    60    120

SCALE   IN   FEET

## EXHIBIT "B"

## MEMORANDUM OF LEASE

---

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE (this "Memorandum") is entered into as of February ____, 2023 by and between _____ whose mailing address is _____ ("Landlord") and **iMEDIA BRANDS, INC.**, a Minnesota corporation whose mailing address is 6740 Shady Oak Road, Eden Prairie, MN 55344 ("Tenant").

## RECITALS

A.    Landlord is the fee owner of certain improved real property, which is legally described on the attached Exhibit A (the "Land") and commonly known as 4811 and 4813 Nashville Road, Bowling Green, Kentucky (the "Buildings"). Collectively, the Land and the Buildings are hereinafter referred to as the "Premises."

B.    Tenant desires to lease from Landlord, and Landlord desires to lease to Tenant, the Premises.

NOW THEREFORE, Landlord and Tenant agree as follows:

1.    Demise. That for and in consideration of the covenants and agreements contained in that certain Master Lease Agreement dated _____, 2023, between Landlord, as landlord, and Tenant, as tenant (the "Lease"), covering the Premises, Landlord demises and leases unto Tenant, and Tenant leases from Landlord for the term specified below, the Premises, all in accordance with the terms and provisions of the Lease.

2.    Term. The Lease has an initial term commencing on the Commencement Date (as such term is defined and used in the Lease) and expiring on [September 30, 2045]. As more specifically set forth in the Lease, Tenant has the right to extend the term of the Lease for two (2) separate ten (10) year renewal terms, commencing immediately upon the expiration of the Original Lease Term.

US.355012295.17
4854-8636-9096.14

3.     <u>Conflict; Amendment</u>. This Memorandum is not a complete summary of the Lease nor may any provisions of this Memorandum be used in interpreting the provisions of the Lease. If there is any conflict between this Memorandum and the Lease, the Lease shall control. In addition, the Lease may be amended by Landlord and Tenant from time to time without the preparation or filing of an additional Memorandum.

4.     <u>Defined Terms</u>. Unless otherwise defined herein, all capitalized terms shall have the meanings set forth in the Lease.

5.     <u>Miscellaneous</u>. This Memorandum may be executed in any number of counterparts. All of the signatures to this Memorandum taken together constitute one and the same Memorandum, and any of the parties hereto may execute this Memorandum by signing any such counterpart. This Memorandum shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6.     <u>Expiration</u>. Tenant shall upon expiration or earlier termination of the Lease execute and acknowledge a written termination in recordable form, of this Memorandum.

[Remainder of page intentionally left blank]

**SIGNATURE PAGE**
**TO**
**MEMORANDUM OF LEASE**

IN WITNESS WHEREOF, Landlord has executed this Memorandum of Lease as of the date first above written.

**LANDLORD:**

By: _____
Name:
Title:

STATE OF _____)
                                              )ss.
COUNTY OF _____)

The foregoing instrument was acknowledged before this _____ day of _____, 2023, by _____, the _____ of _____, on behalf of the _____.

_____
Notary Public

**SIGNATURE PAGE**
**TO**
**MEMORANDUM OF LEASE**

IN WITNESS WHEREOF, Tenant has executed this Memorandum of Lease as of the date first above written.

**TENANT:**

**iMEDIA BRANDS, INC.,** a Minnesota corporation

By: _____
Name:
Its:

STATE OF _____ )
                                                    )ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2023, by _____, the _____ of iMedia Brands, Inc., a Minnesota corporation, on behalf of the corporation.

_____
Notary Public

THIS INSTRUMENT WAS DRAFTED BY:

Faegre Drinker Biddle & Reath LLP (BSB)
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402

US.355012295.17
4854-8636-9096.14

## EXHIBIT A

### Legal Description of Land

**Parcel 1:**

BEING LOT 1 OF "SUBDIVISION REVISION OF LOTS 1 & 2 OF THE LEON TARTER & GARLAND REEVES PROPERTY SUBDIVISION" AS SHOWN OF RECORD IN PLAT BOOK 42, PAGES 27-29, IN THE WARREN COUNTY CLERK'S OFFICE, WARREN COUNTY, KENTUCKY.

BEING A PORTION OF THE SAME PROPERTY CONVEYED TO VVI FULFILLMENT CENTER, INC., A MINNESOTA CORPORATION FROM DSC VENTURE 100, A KENTUCKY PARTNERSHIP, BY DEED DATED DECEMBER 11, 1996 AND OF RECORD IN DEED BOOK 736, PAGE 262, IN THE WARREN COUNTY CLERK'S OFFICE; AND, BEING A PORTION OF THE SAME PROPERTY CONVEYED TO VVI FULFILLMENT CENTER, INC., A MINNESOTA CORPORATION FROM LEON TARTER AND GARLAND REEVES, A KENTUCKY PARTNERSHIP, AND RHEA K REEVES, WIFE OF GARLAND REEVES, BY DEED DATED DECEMBER 11, 1996 AND OF RECORD IN DEED BOOK 736, PAGE 258, IN THE WARREN COUNTY CLERK'S OFFICE.

Parcel No. _____

**Parcel 2:**

BEING LOT 1-1 OF "SUBDIVISION REVISION OF LOTS 1 & 2 OF THE LEON TARTER & GARLAND REEVES PROPERTY SUBDIVISION" AS SHOWN OF RECORD IN PLAT BOOK 42, PAGES 27-29, IN THE WARREN COUNTY CLERK'S OFFICE.

BEING THE SAME PROPERTY CONVEYED TO WARREN COUNTY, KENTUCKY FROM VVI FULFILLMENT CENTER, INC., A MINNESOTA CORPORATION BY DEED DATED DECEMBER 1, 2014, AND OF RECORD IN DEED BOOK 1088, PAGE 37, IN THE WARREN COUNTY CLERK'S OFFICE.

Parcel No. _____

---

## **MEMORANDUM OF LEASE**

THIS MEMORANDUM OF LEASE (this "Memorandum") is entered into as of February ____, 2023 by and between _____ whose mailing address is _____ ("Landlord") and **iMEDIA BRANDS, INC.**, a Minnesota corporation whose mailing address is 6740 Shady Oak Road, Eden Prairie, MN 55344 ("Tenant").

## RECITALS

C.      Landlord is the fee owner of certain improved real property, which is legally described on the attached Exhibit A (the "Land") and commonly known as 6700 and 6740 Shady Oak Road, Eden Prairie, MN (the "Buildings"). Collectively, the Land and the Buildings are hereinafter referred to as the "Premises."

D.      Tenant desires to lease from Landlord, and Landlord desires to lease to Tenant, the Premises.

NOW THEREFORE, Landlord and Tenant agree as follows:

1.      Demise. That for and in consideration of the covenants and agreements contained in that certain Master Lease Agreement dated _____, 2023, between Landlord, as landlord, and Tenant, as tenant (the "Lease"), covering the Premises, Landlord demises and leases unto Tenant, and Tenant leases from Landlord for the term specified below, the Premises, all in accordance with the terms and provisions of the Lease.

2.      Term. The Lease has an initial term commencing on the Commencement Date (as such term is defined and used in the Lease) and expiring on [September 30, 2045].  As more specifically set forth in the Lease, Tenant has the right to extend the term of the Lease for two (2) separate ten (10) year renewal terms, commencing immediately upon the expiration of the Original Lease Term.

US.355012295.17
4854-8636-9096.14

3.      <u>Right of First Offer</u>. Tenant has certain rights of first offer to purchase a portion of the Premises as more particularly set forth in the Lease.

4.      <u>Conflict; Amendment</u>. This Memorandum is not a complete summary of the Lease nor may any provisions of this Memorandum be used in interpreting the provisions of the Lease. If there is any conflict between this Memorandum and the Lease, the Lease shall control. In addition, the Lease may be amended by Landlord and Tenant from time to time without the preparation or filing of an additional Memorandum.

5.      <u>Defined Terms</u>. Unless otherwise defined herein, all capitalized terms shall have the meanings set forth in the Lease.

6.      <u>Miscellaneous</u>. This Memorandum may be executed in any number of counterparts. All of the signatures to this Memorandum taken together constitute one and the same Memorandum, and any of the parties hereto may execute this Memorandum by signing any such counterpart. This Memorandum shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7.      <u>Expiration</u>. Tenant shall upon expiration or earlier termination of the Lease execute and acknowledge a written termination in recordable form, of this Memorandum. If this Memorandum is filed in the office of the Hennepin County Registrar of Titles, then upon the filing of any such termination, the Registrar is hereby authorized and directed to delete from the pertinent Certificate of Title any memorial of this Memorandum and of the termination instrument.


[Remainder of page intentionally left blank]

**SIGNATURE PAGE**
**TO**
**MEMORANDUM OF LEASE**

    IN WITNESS WHEREOF, Landlord has executed this Memorandum of Lease as of the date first above written.

**LANDLORD:**

By:_____

Name:

Title:

STATE OF _____)

                          )ss.

COUNTY OF _____)

    The foregoing instrument was acknowledged before this _____ day of _____, 2023, by _____, the _____ of _____, on behalf of the _____.

_____

Notary Public

**SIGNATURE PAGE**
**TO**
**MEMORANDUM OF LEASE**

IN WITNESS WHEREOF, Tenant has executed this Memorandum of Lease as of the date first above written.

**TENANT:**

**iMEDIA BRANDS, INC.,** a Minnesota corporation

By: _____
Name:
Its:

STATE OF _____ )
                          )ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____, 2023, by _____, the _____ of iMedia Brands, Inc., a Minnesota corporation, on behalf of the corporation.

_____
Notary Public

THIS INSTRUMENT WAS DRAFTED BY:

Faegre Drinker Biddle & Reath LLP (BSB)
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402

US.355012295.17
4854-8636-9096.14

## EXHIBIT A

### Legal Description of Land

Real property in the City of Eden Prairie, County of Hennepin, State of Minnesota, described as follows:

Lot 1, Block 1, Shady Oak Industrial Park Third Addition, according to the recorded plat thereof, Hennepin County Minnesota; except that part of Lot 1, Block 1, Shady Oak Industrial Park Third Addition which lies westerly of Line 1 described below:

Line 1. Commencing at the southeast corner of said Lot 1, Block 1, SHADY OAK INDUSTRIAL PARK THIRD ADDITION; thence westerly along the south line of said Lot 1 on an azimuth of 273 degrees 14 minutes 16 seconds for 254.31 feet to the point of beginning of Line 1 to be described; thence on an azimuth of 345 degrees 06 minutes 52 seconds for 190.55 feet; thence on an azimuth of 349 degrees 49 minutes 38 seconds for 509.12 feet to a point hereinafter referred to as Point "A"; thence on an azimuth of 350 degrees 37 minutes 54 seconds for 133.00 feet to the northwest line of said Lot 1 and there terminating.

(abstract property)

# EXHIBIT "C"

## SNDA

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

_____
_____
_____
_____

(Space Above For Recorder's Use)

## AGREEMENT OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT

THIS AGREEMENT OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT ("**Agreement**") is made as of _____, by and among _____, a _____ ("**Lessor**"), _____, a _____ ("**Lessee**"), and _____, a _____ (collectively "**Lender**"), with respect to the following recitals.

## RECITALS

A.     Lessor is the owner of a certain tract of land with improvements thereon ("**Property**"), and said land is more fully described on Exhibit A-1 through A-__ attached hereto and incorporated herein by this reference; and

B.     Pursuant to that certain lease ("**Lease**") dated as of _____ between Lessor and Lessee, Lessor did lease, let and demise certain premises in the Property as more fully described in Lease (the "**Premises**") to Lessee for the period of time and upon the covenants, terms and conditions therein stated; and

C.     By making a Loan, Lender has or is about to become the owner of an indebtedness and holder of a certain Promissory Note, secured by that certain (i) _____ ("**Security Instrument**"), to be recorded in the Official Records of _____ County, Florida, constituting a first lien upon the Property, and (ii) _____; and

D.     Lender desires that the Lease be subordinated to the Security Instrument, and that Lessee, at Lessor's sole option, agree to attorn to the purchaser at foreclosure of the Security Instrument in the event of such foreclosure or to Lender in the event of collection of the rent by Lender.

In consideration of the covenants, terms, conditions and agreements herein contained, and in consideration of other good and valuable consideration, each to the other, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree, covenant and warrant as follows:

1.     That the terms, covenants, provisions and conditions of the Lease and the rights of the Lessee thereunder are and will continue to be subordinate to the Security Instrument, and the lien thereof, and to any renewal, substitution, extension or replacement thereof.

2.      (A)      After notice is given by Lender that the Security Instrument is in default and that the rentals under the Lease should be paid to Lender, Lessee will attorn to Lender and pay to Lender, or pay in accordance with the directions of Lender, all rentals and other monies due and to become due to Lessor under the Lease or otherwise in respect of the Property; and such payments shall be made regardless of any right of set-off, counterclaim or other defense which Lessee may have against Lessor, whether as the tenant under the Lease or otherwise.

(B)      In addition, if Lender (or its nominee or designee) shall succeed to the rights of Lessor under the Lease through possession or foreclosure action, delivery of a deed or otherwise, or another person purchases the Property upon or following foreclosure of the Security Instrument, then at the request of Lender (or its nominee or designee) or such purchaser (Lender, its nominees and designees, and such purchaser, each being a "**Successor-Lessor**"), Lessee shall attorn to and recognize Successor-Lessor as Lessee's landlord under the Lease and shall promptly execute and deliver any instrument that Successor-Lessor may reasonably request to evidence such attornment. Upon such attornment, the Lease shall continue in full force and effect as, or as if it were, a direct lease between Successor-Lessor and Lessee upon all terms, conditions and covenants as are set forth in the Lease, except that Successor-Lessor shall not:

(i)      be liable for any previous act or omission of Lessor under the Lease;

(ii)      be subject to any off-set, defense or counterclaim which shall have theretofore accrued to Lessee against Lessor;

(iii)      be bound by any modification of the Lease or by any previous prepayment of rent or additional rent for more than one (1) month which Lessee might have paid to Lessor, unless such modification or prepayment shall have been expressly approved in writing by Lender;

(iv)      be liable for any security deposited under the Lease unless such security has been physically delivered to Lender; and

(v)      be responsible for the performance of (or contribution toward) any work to be done by the landlord under the Lease to render the Premises ready or available for occupancy by Tenant, or required to remove any person occupying the Premises or any part thereof; or.

3.      If any Successor-Lessor succeeds to the interest of Lessor under the Lease, such Successor-Lessor and Lessee hereby agree that, for so long as Lessee complies with and performs its obligations under the Lease, Successor-Lessor shall not disturb Lessee's possession of the Premises.  Notwithstanding the foregoing, in the event Lessee fails to comply with and perform its obligations under the Lease, Successor-Lessor may elect to terminate the Lease, and in such event, Lessee shall be deemed to have assigned to Successor-Lessor each and every lease regarding the Property that Lessee assumed pursuant to the Lease, or entered into subsequent to the Lease, without any further act or deed on the part of Successor-Lessor, Lessee, or otherwise.  Without limiting the foregoing, Lessee shall execute and deliver any and all additional instruments and documents that any Successor-Lessor shall request to evidence or effect such assignment.

4.      Lessee shall promptly notify Lender of any default by Lessor under the Lease and of any act or omission of Lessor which would give Lessee the right to cancel or terminate the Lease or to claim a partial or total eviction. In the event of a default by Lessor under the Lease which would give Lessee the right, immediately or after the lapse of a period of time, to cancel or terminate the Lease or to claim a partial or total eviction, or in the event of any other act or omission of Lessor which would give Lessee the right to cancel or terminate the Lease, Lessee shall not exercise such right (i) until Lessee has given written notice of such default, act or omission to Lender and (ii) unless Lender has failed, within sixty (60) days after Lender receives such notice, to cure or remedy the default, act or omission or, if such default, act or

omission shall be one which is not reasonably capable of being remedied by Lender within such sixty (60) day period, until a reasonable period for remedying such default, act or omission shall have elapsed following the giving of such notice and following the time when Lender shall have become entitled under the Security Instrument to remedy the same (which reasonable period shall in no event be less than the period to which Lessor would be entitled under the Lease or otherwise, after similar notice, to effect such remedy), provided that Lender shall with due diligence give Lessee written notice of its intention to and shall commence and continue to, remedy such default, act or omission. If Lender cannot reasonably remedy a default, act or omission of Lessor until after Lender obtains possession of the Property, Lessee may not terminate or cancel the Lease or claim a partial or total eviction by reason of such default, act or omission until the expiration of a reasonable period necessary for the remedy after Lender secures possession of the Property.  Notwithstanding anything to the contrary herein or in the Lease, within ten (10) days following receipt of Lender's written request, Lessee shall deliver to Lender copies of all written reports required to be delivered to Lessor under the Lease.

     5.    Except as specifically provided in this Agreement, Lender shall not, by virtue of this Agreement, the Security Instrument or any other instrument to which Lender may be a party, be or become subject to any liability or obligation to Lessee under the Lease.

     6.    All notices, demands, requests and other communications made hereunder shall be in writing and shall be properly given and deemed delivered on the date of delivery if sent by personal delivery or nationally recognized overnight courier and on the third business day following mailing if sent by certified or registered mail, postage prepaid, return receipt requested, as follows:

If to Lender:

        _____
        _____
        _____
        _____

If to Lessee:

        _____
        _____
        _____
        _____

     7.    The agreements herein contained shall bind and inure to the benefit of the successors and assigns in interest of the parties hereto and, without limiting such, the agreement of the Lender shall specifically be binding upon any purchaser of the Property at a sale foreclosing the Security Instrument.

     8.    This Agreement may be executed in any number of counterparts, each of which shall be an original, and all of which taken together shall constitute one and the same agreement.  Any signature page of this Agreement may be detached from any counterpart of this Agreement without impairing the legal effect of any signatures thereon and may be attached to another counterpart of this Agreement identical in form hereto but having attached to it one or more additional signature pages.

     9.    This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of _____ (without regard to conflicts of law).

**[END OF TEXT; SIGNATURES FOLLOW ON NEXT PAGES]**

US.355012295.17
4854-8636-9096.14

      **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**WITNESSES:**                                    **"LESSOR:"**


_____, a
_____

_____
Name:_____        By: _____
                                                   Name: _____
_____        Its: _____
Name:_____

**WITNESSES:**                    **"LESSEE"**

_____, a
_____

_____
Name:_____        By: _____
                                  Name: _____
_____  Its: _____
Name:_____


**[SIGNATURE PAGE TO AGREEMENT OF SUBORDINATION, NON-DISTURBANCE
AND ATTORNMENT AGREEMENT]**

**WITNESSES:**                              **"LENDER:"**

_____,

a _____

_____

Name:_____        By: _____

Name: _____

_____      Its: _____

Name:_____


**[SIGNATURE PAGE TO AGREEMENT OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT]**


**[PROPER NOTARY BLOCKS TO BE ADDED**

# EXHIBIT 5

April 7, 2023

**VIA E-MAIL**

iMedia Brands, Inc.
Attn: Tim Peterman
6740 Shady Oak Road
Eden Prairie, MN 55344
Email: tpeterman@imediabrands.com

      **Re:**    **iMedia Post-Closing Obligations**

Dear Tim:

This letter agreement (this "Agreement") sets forth the agreement by and among Pontus IMB Portfolio, LLC ("Buyer"), EP Properties, LLC and VVI Fulfillment Center, Inc. (together, "Seller") and iMedia Brands, Inc. ("Tenant") with respect to certain repairs required to be made to the property located at 6740 Shady Oak Lane, Eden Prairie, MN (the "Minnesota Property"), 4811 Nashville Road, Bowling Green, KY, and 4813 Nashville Road, Bowling Green, KY, as more particularly described on Exhibit A attached to the Lease (together, the "Kentucky Property," and collectively with the Minnesota Property, the "Property").

Seller and Buyer entered into those certain Purchase and Sale Agreement and Joint Escrow Instructions dated December 20, 2022, as amended by that certain Conditional Purchase Acceptable dated January 30, 2023, that certain Notice to Close dated February 24, 2023, and that certain Amended Notice to Close dated March 9, 2023 (collectively, the "Purchase Agreement") for the purchase and sale of the Property wherein Buyer agreed to purchase the Property from Seller and Seller agreed to sell the Property to Buyer. Upon the sale of the Property, Tenant will lease the Property from Buyer pursuant to that certain Lease Agreement dated as of the date hereof ("Lease"). Capitalized terms not otherwise defined in this Agreement shall have the meaning ascribed to such terms in the Lease. Pursuant to the Purchase Agreement and the Notice to Close, Buyer's obligation to purchase the Property is expressly conditioned upon certain Seller deliverables, including but not limited to (i) Buyer's approval of all due diligence reports, including the Property Condition Assessment ("PCA") for the Property and Phase I Environmental Site Assessment ("Phase I"), and (ii) Seller obtaining a loan amendment from Siena Lending to extend the maturity date to no earlier than September 30, 2023 with at least one 90-day extension, and on terms and conditions acceptable to Purchaser in its sole and absolute discretion.

The parties acknowledge that Buyer approved the PCA and Phase I prepared by GRS Group, dated December 5, 2022, and ECI Environmental Services, dated February 23, 2023, which identified certain items in need of repair to the Property as summarized in Exhibit "A" attached hereto and as further described in the PCA and Phase I (collectively referred to herein as "Repairs"). Buyer has agreed to proceed with the acquisition of the Property notwithstanding the Repairs, provided Tenant agrees, as part of the Lease and this post closing agreement, to be responsible for Repairs on the terms and conditions set forth below. Notwithstanding the foregoing, if there is an inconsistency or ambiguity between the Lease and this Agreement, then this Agreement shall supersede as it relates to the Exhibit A items.

Tenant shall make the necessary Repairs, within twelve (12) months following the date of this Agreement (unless indicated otherwise in Exhibit A) and provide written evidence of the same including photographs to be delivered to Buyer. All such Repairs shall be completed in accordance with Article 9 of the Lease.

Tenant's failure to timely proceed with and diligently pursue the Repairs with respect to the Property shall constitute an Event of Default under the Lease and, and subject to applicable notice and cure periods for non-monetary Events of Default under the Lease, Buyer shall have all of the rights and remedies available to Landlord under the Lease, including, without limitation, those set forth in Article 15 of the Lease, and Buyer shall have the right to recover from Tenant all fees, costs and penalties incurred by Buyer in connection with such Event of Default, including the recovery of an administrative fee of fifteen percent (15%) of any amounts due to Buyer. Without limiting the generality of the foregoing, in the event Tenant has not timely completed the Repairs as set forth herein, Buyer shall have the right, but not the obligation, upon written notice to Tenant, to cause the Repairs to be completed by a licensed contractor of Buyer's choosing. The costs incurred by Buyer in completing the Repairs shall be payable by Tenant as Additional Rent under the Lease within ten (10) days of receipt of a demand therefor. This Agreement shall be subject to the terms of the Lease.

[this page intentionally left blank]

4894-0513-2116.7

By affixing the authorized signatures below, the parties acknowledge and agree to the foregoing. This Agreement may be signed in counterparts and delivered by e-mail or facsimile, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. This Agreement will survive the Closing (as defined in the Purchase Agreement). This Agreement will be binding on each party's successors and assigns.

Pontus IMB Portfolio, LLC, a Delaware limited liability company

By:    Pontus IMB Managing Member, LLC, a Delaware limited liability company

By: _____

This letter is acknowledged and the terms and conditions agreed by:

iMedia Brands, Inc.,
a Minnesota corporation

By: _____
Name: Tim Peterman
Its: CEO

## EXHIBIT A

At the Closing described in the Purchase Agreement, Seller shall deliver to Buyer as a part of the closing escrow the amount of $958,550, which is the total amount of all Repairs set forth below (the "Repair Costs"). Buyer shall hold the Repair Costs in reserve and shall release the Repair Costs to Seller upon the completion of the Repairs in a manner reasonably acceptable to Buyer and in accordance with the terms and conditions under Article 9 of the Lease.

**4811 Nashville Road**
- **Paving and Parking Repairs**: Cracking of asphalt pavement in the northeast drive area needs to be replaced to limit further deterioration. In addition, the concrete pavement at the property entrance needs to be repaired to limit further deterioration.
  - $38,750
  - To be completed within six months
- **Roof**: Evidence of past leaks were observed at various isolated areas within the warehouse, so tenant shall engage a licensed roofing contractor to survey the roof membrane and penetrations and identify any areas that need to be repaired (i.e., resealing, penetrations, debris removal, etc.).
  - $3,000

**4813 Nashville Road**
- **Storm Water Management**: The gravel detention area needs to be repaired with a new gravel bed and underground infiltration lines to prevent sediment clogging and allow drainage during stormwater events.
  - $30,000

**6740 Shady Oak Lane**
- **Roof**: Replace roof and membrane with TPO (Thermoplastic Polyolefin) or a PVC (Poly Vinyl Chloride) with a 20-year warranty. Landlord to review and approve roofing scope of work and contractor agreement.
  - $690,000
- **HVAC**: Several HVAC units are between 28 and 35 years old, so tenant shall engage a licensed HVAC contractor to survey all older units for their functionality and efficiency, and tenant shall replace any units that are not functioning correctly.
  - $166,800
- **Building Structure**: The entrance on the east side of the building needs to be repaired to prevent further deterioration.
  - $30,000
  - To be completed within six months
- **Life / Safety**: Complete fire extinguisher inspections, obtain elevator permits, complete elevator load tests.
  - To be completed within three months

4894-0513-2116.7

# EXHIBIT 6

*Execution Version*

**ASSET AND EQUITY PURCHASE AGREEMENT**

**by and among**

**IV MEDIA, LLC,**
**as Buyer,**

**INNOVATION VENTURES, LLC,**
**as Buyer Guarantor**

**and**

**IMEDIA BRANDS, INC.**

**and**

**THE OTHER SELLERS NAMED HEREIN,**
**as Sellers**

**August 15, 2023**

# TABLE OF CONTENTS

PAGE

ARTICLE 1 DEFINITIONS ................................................................................ 1

Section 1.01.    Definitions ................................................................................. 1
Section 1.02.    Construction .............................................................................. 16

ARTICLE 2 PURCHASE AND SALE ............................................................. 17

Section 2.01.    Purchase and Sale ..................................................................... 17
Section 2.02.    Assumed Liabilities .................................................................. 20
Section 2.03.    Excluded Assets ........................................................................ 23
Section 2.04.    Excluded Liabilities .................................................................. 25
Section 2.05.    Assignment of Contracts and Rights.......................................... 27
Section 2.06.    Purchase Price ........................................................................... 30
Section 2.07.    Deposit ...................................................................................... 30
Section 2.08.    Purchase Price Allocation ......................................................... 31
Section 2.09.    Closing ...................................................................................... 31
Section 2.10.    Withholding............................................................................... 33

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLERS................... 34

Section 3.01.    Organization and Qualification .................................................. 34
Section 3.02.    Authorization; Execution and Delivery; Enforceability................ 34
Section 3.03.    Noncontravention; Consents and Approvals................................ 35
Section 3.04.    Purchased Entities ..................................................................... 35
Section 3.05.    Title to and Sufficiency of Purchased Assets .............................. 36
Section 3.06.    Litigation ................................................................................... 37
Section 3.07.    Permits; Compliance with Laws ................................................ 37
Section 3.08.    Material Contracts ..................................................................... 37
Section 3.09.    Anti-Corruption, Anti-Money Laundering, and International Trade
                 Compliance................................................................................ 39
Section 3.10.    Intellectual Property .................................................................. 40
Section 3.11.    Data Privacy and Information Security ....................................... 42
Section 3.12.    Leased Real Property ................................................................. 43
Section 3.13.    Environmental, Health and Safety Matters ................................. 44
Section 3.14.    Taxes ......................................................................................... 45
Section 3.15.    Employee Benefits ..................................................................... 47
Section 3.16.    Labor Matters ............................................................................ 48
Section 3.17.    Insurance Policies ...................................................................... 49
Section 3.18.    Affiliate Transactions ................................................................ 50
Section 3.19.    Material Suppliers ..................................................................... 50
Section 3.20.    Financial Statements; Internal Controls ..................................... 50
Section 3.21.    Undisclosed Liabilities .............................................................. 51
Section 3.22.    Absence of Certain Changes ...................................................... 51
Section 3.23.    Brokers ...................................................................................... 51

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 51

Section 4.01.   Corporate Existence and Power ...................................... 51
Section 4.02.   Authorization; Execution and Delivery; Enforceability.............. 52
Section 4.03.   Noncontravention; Consents and Approvals........................... 52
Section 4.04.   Availability of Funds; Solvency.................................... 52
Section 4.05.   Litigation ........................................................ 53
Section 4.06.   Brokers ........................................................... 53
Section 4.07.   Buyer Information ................................................. 53
Section 4.08.   [Intentionally Omitted]............................................ 53
Section 4.09.   Buyer's Investigation and Reliance................................. 53

ARTICLE 5 COVENANTS OF SELLERS ............................................... 54

Section 5.01.   Conduct of the Business ........................................... 54
Section 5.02.   Alternative Transaction ........................................... 57
Section 5.03.   Access to Information; Notice of Change ............................ 57
Section 5.04.   Name Change ....................................................... 58
Section 5.05.   Certain Consents .................................................. 58
Section 5.06.   Disclosure Schedules .............................................. 58

ARTICLE 6 COVENANTS OF BUYER ................................................. 59

Section 6.01.   Preservation of Books and Records ................................. 59
Section 6.02.   Insurance Matters ................................................. 59

ARTICLE 7 COVENANTS OF BUYER AND SELLERS ..................................... 60

Section 7.01.   Confidentiality.................................................... 60
Section 7.02.   Further Assurances ................................................ 60
Section 7.03.   Certain Filings.................................................... 61
Section 7.04.   Public Announcements............................................... 62
Section 7.05.   Employee Matters .................................................. 62
Section 7.06.   Tax Matters ....................................................... 64
Section 7.07.   Misallocated Assets ............................................... 65
Section 7.08.   Payments from Third Parties after Closing ......................... 65
Section 7.09.   Bulk Transfer Laws ................................................ 66
Section 7.10.   Bankruptcy Court Approval. ........................................ 66
Section 7.11.   No Successor Liability ............................................ 68
Section 7.12.   Communications with Customers and Suppliers ....................... 69
Section 7.13.   Efforts to Consummate.............................................. 69
Section 7.14.   Transition Services Agreement ..................................... 69
Section 7.15.   Agreement with C&B NewCo, LLC ..................................... 69
Section 7.16.   Access to Books & Records ......................................... 69

ARTICLE 8 CONDITIONS TO CLOSING.............................................. 70

Section 8.01.   Conditions to Obligations of Buyer and Sellers..................... 70
Section 8.02.   Conditions to Obligations of Buyer ................................ 71
Section 8.03.   Conditions to Obligations of Sellers .............................. 72

Section 8.04.     Waiver of Conditions ..................................................................... 72

ARTICLE 9 SURVIVAL ............................................................................................ 73

Section 9.01.     Survival .......................................................................................... 73

ARTICLE 10 TERMINATION .................................................................................. 73

Section 10.01.    Grounds for Termination ................................................................ 73
Section 10.02.    Effect of Termination ..................................................................... 75
Section 10.03.    Costs and Expenses ........................................................................ 76

ARTICLE 11 MISCELLANEOUS ............................................................................ 76

Section 11.01.    Notices............................................................................................ 76
Section 11.02.    Amendments and Waivers .............................................................. 78
Section 11.03.    Successors and Assigns ................................................................... 78
Section 11.04.    Governing Law................................................................................ 78
Section 11.05.    Jurisdiction ..................................................................................... 78
Section 11.06.    WAIVER OF JURY TRIAL ........................................................... 79
Section 11.07.    Counterparts; Third-Party Beneficiaries ........................................ 79
Section 11.08.    Specific Performance ...................................................................... 79
Section 11.09.    Entire Agreement ............................................................................ 80
Section 11.10.    No Strict Construction..................................................................... 80
Section 11.11.    Severability...................................................................................... 80
Section 11.12.    Disclosure Schedules ...................................................................... 80
Section 11.13.    Non-Recourse .................................................................................. 81
Section 11.14.    Buyer Guaranty ............................................................................... 81
Section 11.15.    DISCLAIMER ................................................................................. 83

<u>EXHIBITS</u>

Exhibit A     Form of Assumption and Assignment Agreements
Exhibit B     Form of Bills of Sale
Exhibit C     Form of Assignment of Trademarks
Exhibit D     Form of Assignment of Domain Names
Exhibit E     Form of German Share Transfer Agreement
Exhibit F     Form of Assignment of Patents

<u>SCHEDULES</u>

Disclosure Schedules
Original Contract & Cure Schedule

# ASSET AND EQUITY PURCHASE AGREEMENT

THIS **ASSET AND EQUITY PURCHASE AGREEMENT**, dated as of August 15, 2023 (the "**Agreement**"), is made and entered into by and among IV Media, LLC, a Michigan limited liability company ("**Buyer**"), iMedia Brands, Inc., a Minnesota corporation (the "**Company**"), those certain Subsidiaries of the Company signatory hereto (collectively with the Company, "**Sellers**" and each entity individually, a "**Seller**"), and Innovation Ventures, LLC, a Michigan limited liability company ("**Buyer Guarantor**"), solely for the purposes of <u>Section 11.14</u>. Sellers and Buyer are sometimes referred to collectively herein as the "**Parties**" and individually as a "**Party.**" Capitalized terms used herein and not otherwise defined herein have the meanings set forth in <u>Article 1</u>.

## W I T N E S E T H:

**WHEREAS**, on June 28, 2023 (the "**Petition Date**"), the Company and its affiliated debtors and debtors in possession (the "**Debtors**") sought relief under Chapter 11 of Title 11, §§ 101-1330 of the United States Code (as amended, the "**Bankruptcy Code**") by filing cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS**, subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, the Parties desire to enter into this Agreement, pursuant to which Sellers shall sell, assign, transfer, and convey to Buyer, and Buyer shall purchase and acquire from Sellers, all of Sellers' right, title and interest in and to the Purchased Assets, and Buyer shall assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement, upon the terms and conditions hereinafter set forth in a sale authorized by the Bankruptcy Court pursuant to, inter alia, Sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court; and

**WHEREAS**, Buyer's and Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

ARTICLE 1

DEFINITIONS

Section 1.01.        *Definitions*.

(a)        The following terms, as used herein, have the following meanings:

"**Affiliate**" means, with respect to any Person, another Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with,

such Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise. For the avoidance of doubt, ownership of more than fifty percent (50%) of the voting securities shall be deemed to be "**control**" for purposes of this definition.

"**Alternative Transaction**" means (a) any investment in, financing of, capital contribution or loan to or restructuring or recapitalization of Sellers or any of their respective direct or indirect Subsidiaries (including any exchange of all or a substantial portion of Sellers' or any of their respective Affiliates' outstanding debt obligations for equity securities of Sellers or any of their respective Affiliates), (b) any merger, consolidation, share exchange or other similar transaction to which Sellers or any of their respective Affiliates is a party that has the effect of transferring, directly or indirectly, any portion of the assets of, or any issuance, sale or transfer of equity interests in, Sellers, the Purchased Assets or the Business, (c) any direct or indirect sale of any portion of the assets of, or any issuance, sale or transfer of equity interests in, Sellers, the Purchased Assets or the Business (excluding, for the avoidance of doubt, any products or services sold in the Ordinary Course), or (d) any other transaction, including a plan of liquidation or agreement with a liquidation firm (or consortium) for the orderly liquidation of the Sellers, all or any portion of the Purchased Assets, or the Business (other than any wind-down or similar plan or transaction or dismissal with respect to the sale of Excluded Assets) or reorganization (in any jurisdiction, whether domestic, foreign, international or otherwise), in each instance that transfers or vests ownership of, economic rights to, or benefits in any portion of the assets of Sellers, the Purchased Assets or the Business to any party other than Buyer.

"**Anti-Corruption Laws**" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, the Anti-Kickback Act of 1986, the UK Bribery Act of 2010, and any similar Laws in any other jurisdiction in which the Company or any of its Subsidiaries, or their respective agents and representatives, conduct business.

"**Anti-Money Laundering Laws**" means all anti-money laundering Laws applicable to the Company, including 18 U.S.C. §§ 1956 and 1957 and the Bank Secrecy Act, as amended by the USA PATRIOT Act, 31 U.S.C. §§ 5311 et seq., and its implementing regulations, 31 C.F.R. Chapter X.

"**Antitrust Laws**" means the Sherman Antitrust Act, as amended, the Clayton Antitrust Act, as amended, the Federal Trade Commission Act, as amended, and all other applicable federal, state, or foreign statutes, rules, regulations, orders, decrees, administrative and judicial doctrines, and all other applicable Laws that are designed or intended to prohibit, restrict or regulate (a) foreign investment or (b) actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger and acquisition.

"**Bankruptcy Law**" means any Laws relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Laws relating to or affecting creditors' rights generally and subject, as to enforceability, to the effect of general principles of equity (regardless of whether such enforceability is considered in any Proceeding in equity or at Law).

2

"**Business**" means the business of purchasing, creating, producing (including post-production), filming, managing, delivering, designing, manufacturing, producing, selling and distributing wholly owned and licensed media content, channels, brands, products, programming, advertising and applications in the digital, television, audio, creative agency, consumer, apparel, jewelry, kitchen products, news and studio spaces, amongst other media platforms, in various formats, including but not limited to: editorial, branded content, digital video, stories, music videos, commercials, podcasts, documentaries and docuseries, scripted and unscripted television, film, experiential, and commerce produced by the Company and its Subsidiaries and joint ventures and any other business described in the most recent Business Plan, in each case, as conducted by the Company and its Subsidiaries immediately prior to the Closing.

"**Business Day**" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"**Business Employee**" means each Service Provider who is employed by the Group Companies.

"**Business Plan**" means the Business Plan delivered by the Sellers to Buyer on May 26, 2023.

"**CARES Act**" means the CARES Act (Pub. L. 116-136 (2020)) and any similar Law providing for the deferral of Taxes, the conditional deferral, reduction, or forgiveness of Taxes, the increase in the utility of Tax attributes, or other Tax-related measures intended to benefit taxpayers in response to the COVID-19 pandemic and associated economic downturn.

"**Cash and Cash Equivalents**" means all of the Company's and its Subsidiaries' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

"**Claim**" means a "claim" as defined in Section 101 of the Bankruptcy Code, including any Indebtedness or Liability.

"**Closing Date**" means the date of the Closing.

"**COBRA**" means the health care continuation coverage requirements of the Consolidated Omnibus Reconciliation Act of 1985, as codified in Section 4980B of the Code and Section 601 et seq. of ERISA, as amended from time to time, and the regulations and other guidance promulgated thereunder and any other similar provisions of state or local Law.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collective Bargaining Agreement**" means any Contract that any Group Company or any of its Affiliates has entered into with any Union with respect to terms and conditions of employment of its employees.

3

"**Consigned Inventory**" means those goods consigned by C&B Newco, LLC to the Company pursuant to (i) that certain Consignment Agreement, dated as of March 1, 2021, between C&B Newco, LLC and the Company and (ii) that certain Amended and Restated Consignment Agreement effective as of November 23, 2022, between C&B Newco LLC and the Company.

"**Contract**" means any written contract, agreement, license, sublicense, Lease, sales order, purchase order, instrument, undertaking or commitment that is legally binding.

"**Company IT Asset**s" mean all IT Assets used or held for use by the Purchased Entities or Sellers in the operation of the Business, including pursuant to outsourced or cloud computing arrangements.

"**Cure Costs**" means, with respect to any Purchased Contract, the Liabilities that must be paid or otherwise satisfied to cure all monetary defaults under such Purchased Contract to the extent required by Section 365(b) of the Bankruptcy Code in connection with the assumption and assignment of such Purchased Contract.

"**Deposit Escrow Account**" shall mean the account established by the Escrow Agent to hold the Deposit.

"**DIP Budget**" means the Initial Budget or any Approved Budget (each as defined in the DIP Credit Agreement), as applicable, as set forth and agreed to in accordance with the terms of the DIP Credit Agreement.

"**DIP Credit Agreement**" means that certain superpriority senior secured debtor-in-possession loan and security agreement dated as of July 3, 2023, and as agreed to by and among the Debtors, the Agent (as defined therein), and the lenders party thereto from time to time (the "**DIP Lenders**"), and the guarantors party thereto from time to time.

"**DIP Facility**" means a superpriority senior secured debtor-in-possession financing facility as further described in the DIP Credit Agreement, as approved by the Bankruptcy Court.

"**DIP Order**" means the order of the Bankruptcy Court approving the Debtors' entry into the DIP Facility.

"**DIP Payoff Amount**" means an amount as of the Closing Date equal to the aggregate amount of all obligations (other than the ETF (as defined in the DIP Credit Agreement)) under the DIP Credit Agreement and the DIP Order.

"**DIP Reserve Amount**" means the *lesser* of (i) $3,000,000 (which is the maximum reserve established under the DIP Facility) and (ii) the positive difference between $19,947,305.40 (which is the amount set forth in clause (ii) of the definition of Maximum Revolving Facility Amount (as defined in the DIP Credit Agreement)) and the principal amount of Revolving Loans (as defined in the DIP Credit Agreement) outstanding under the DIP Facility as of the Closing Date; provided that, for the avoidance of doubt, in no instance shall the DIP Reserve Amount be less than zero.

"**Distribution Contract**" means each of those Contracts set forth on Section 1.01(a) of the Disclosure Schedules.

Case 25-90043 Document 1356 Filed 05/02/25 in TXSB Page 201 of 327
Case 25-90043 Doc 1143-1 Filed 05/02/25 Entered 05/02/25 15:22:10 Desc
Exhibit(s) A-1 court pleadings   Page 201 of 327

"**Designation Rights Period**" means, with respect to any Contracts or Leases to be assumed and assigned or rejected pursuant to <u>Section 2.05</u>, the period from the Closing Date through the earlier of (i) the date on which the Bankruptcy Court enters an order confirming a plan of reorganization or liquidation concerning Sellers in the Chapter 11 Cases, and (ii) January 24, 2024; <u>provided</u> that such date may be extended with respect to any Designated Contract for up to an additional 180 days beyond January 24, 2024 with the consent of Buyer and the applicable counterparty to such Designation Contract; <u>provided</u> <u>further</u>, however, that, notwithstanding the forgoing proviso, Buyer and Sellers shall work in good faith to ensure that the Designation Rights Period is extended in a manner that does not delay Sellers' intended conclusion of the Chapter 11 Cases and require the Seller's estate to incur incremental costs (<u>provided</u> that any incremental costs or expenses (i) that arise out of the Sellers' extension and continuation of the Chapter 11 Cases that is directly attributable to the Buyer's extension of the Designation Rights Period and (ii) are incurred as a result of the Sellers' performance of their obligations under this Agreement, in each of the foregoing (i) and (ii) shall be payable by Buyer).

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Sellers to Buyer on the date hereof and updated pursuant to <u>Section 5.06</u>.

"**Encumbrance**" means any mortgage, lien, pledge, security interest, charge, easement, purchase option, interest, right of first refusal or offer, covenant, right of way, option, claim, license, restriction, title defect, or other survey defect of any kind, including any restriction on or transfer or other assignment, as security or otherwise, of or relating to use, quiet enjoyment, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental, Health and Safety Requirements**" means all applicable Laws concerning or relating to worker/occupational health and safety, or pollution or protection of the environment, including those relating to the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, transfer, storage, disposal, distribution, importing, labeling, testing, processing, discharge, release, threatened release, control or other action or failure to act involving cleanup of any Hazardous Materials.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any Person under common control with the Company or any of its Subsidiaries or that, together with the Company, could be deemed a "single employer" within the meaning of Sections 414(b), (c), (m) or (o) of the Code.

"**Escrow Agent**" shall mean an escrow agent mutually agreed to by Buyer and Sellers.

"**Escrow Agreement**" shall mean the escrow agreement by and among Escrow Agent, Buyer and Sellers.

"**Excluded Actions**" shall mean all Actions other than Purchased Actions.

"**Excluded Individuals**" shall mean the individuals identified by Greenberg Traurig, LLP to Ropes & Gray LLP in writing, which shall occur prior to the Closing.

"**Final Order**" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Chapter 11 Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented in writing to by Buyer) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such judgment or Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such judgment or Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such judgment or Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; <u>provided</u> that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such judgment or Order, shall not cause such judgment or Order not to be a Final Order.

"**Fraud**" means an intentional fraud by any Person with respect to the making of a representation or warranty expressly stated in <u>Article 3</u> or <u>Article 4</u> or <u>Section 11.14(d)</u> of this Agreement that constitutes actual common law fraud under the Laws of the State of Delaware and not with respect to any other matters; <u>provided</u> that such intentional fraud specifically excludes any statement, representation or omission made negligently or recklessly and shall only be deemed to exist if (a) such Person had actual knowledge that the representations and warranties were inaccurate when made, (b) such representations and warranties were made with the express intent to induce a Party hereto to rely thereon, (c) such reliance and subsequent action or inaction by such Party was justifiable and (d) such action or inaction resulted in actual damages to such Party. For the avoidance of doubt, (i) the term "Fraud" does not include any claim for constructive fraud or any torts (including a claim for fraud) based on negligence or recklessness and (ii) only the Person or Persons who committed a Fraud shall be responsible for such Fraud and only to the Party hereto alleged to have suffered from such Fraud.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governmental Authority**" means any (a) multinational, federal, state, municipal, local or other governmental or public department, central bank, court, commission, commissioner, tribunal, board, bureau, agency or instrumentality, domestic or foreign, (b) subdivision or authority of any of the foregoing or (c) regulatory or administrative authority.

"**Group Companies**" means the Sellers and the Purchased Entities.

"**Hazardous Materials**" means any material, substance or waste defined, listed, regulated, or characterized as "hazardous" or "toxic" or a "contaminant" (or words of similar intent or meaning) pursuant to Environmental, Health and Safety Requirements, including but not be limited to petroleum and petroleum products, polychlorinated biphenyls, per-and polyfluoroalkyl substances, radioactive materials and friable asbestos.

6

"**Income Tax**" means any Tax measured by or imposed on overall gross or net income or net profits (however denominated), or any franchise Tax imposed in lieu thereof, including any interest, penalty or addition thereto.

"**Indebtedness**" of any Person means, without duplication, (a) the principal of and premium (if any) in respect of (i) indebtedness of such Person for money borrowed, and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (b) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable for goods and services and other accrued current liabilities arising in the Ordinary Course), (c) all obligations of such Person under leases required to be capitalized in accordance with GAAP, (d) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction and (e) all obligations of the type referred to in clauses (a) through (d) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guaranties of such obligations, and (h) all obligations of the type referred to in clauses (a) through (g) of other Persons secured by any Encumbrance (other than Permitted Encumbrances) on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Intellectual Property**" means all of the following in any jurisdiction throughout the world: (a) patents, patent applications, utility models, inventor's certificates and applications for inventor's certificates, and invention disclosure statements, together with all reissuances, continuations, continuations-in-part, divisionals, revisions, extensions, and reexaminations thereof (collectively, "**Patents**"); (b) trademarks, service marks, trade names, logos, slogans, trade dress and other source indicators and registrations and applications to register any of the foregoing, including intent-to-use registrations or similar pending reservations (as well as all goodwill associated with each of the foregoing) (collectively, "**Trademarks**"); (c) works of authorship and copyrights (whether registered or unregistered), applications for copyright registration, and all translations, adaptations, derivations and combinations of the foregoing (collectively, "**Copyrights**"); (d) Internet domain names, URLs, and social media accounts, identifiers and handles (collectively, "**Domain Names**"); (e) rights in software (including object code, source code, or other form), data, data sets, databases, and collections of data; (f) trade secrets, including, to the extent the following constitute trade secrets under applicable Law, confidential information, knowhow, ideas, methods, formulae, methodologies, processes, technology, customer lists and inventions; (g) moral rights and publicity rights; and (h) any other intellectual property rights of any kind or nature, including the right to bring suit and pursue past, current and future violations, infringements or misappropriations of any of the foregoing. "**Internet**" means the publicly accessible worldwide system of interconnected computer networks that transmit data by packet switching using a standardized Internet protocol (e.g., TCP/IP) or any successor thereto.

"**International Trade Laws**" means all applicable United States Laws pertaining to trade and economic sanctions, export controls, and imports, including such Laws, regulations, and orders administered and enforced by the U.S. Department of the Treasury, the U.S. Department of Commerce, the U.S. Department of State, and the U.S. Customs and Border Protection agency, including the sanctions and export controls administered and enforced by the Office of Foreign Assets Control ("**OFAC**"); the United States Export Administration Act of 1979, as amended, the

Export Control Reform Act of 2018, and implementing Export Administration Regulations; the Arms Export Control Act and implementing International Traffic in Arms Regulations; the anti-boycott regulations, guidelines and reporting requirements under the Export Administration Regulations and Section 999 of the Code; and any similar Laws in any other jurisdiction in which the Company or any of its Subsidiaries, or their respective agents and representatives, conduct business.

"**IRS**" means the Internal Revenue Service.

"**IT Assets**" means all software, systems, servers, websites, computers, hardware, firmware, middleware, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation.

"**Knowledge of Sellers**" means the actual knowledge (based on reasonable inquiry of their direct reports) of the individuals set forth on Section 1.01(a) of the Disclosure Schedules.

"**Law**" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority anywhere in the world.

"**Lease**" means all leases, subleases, licenses, concessions and other agreements (including, without limitation, the Master Lease) pursuant to which any Group Company holds any Leased Real Property, including the right to all security deposits and other amounts and instruments deposited by or on behalf of the applicable Group Company thereunder.

"**Leased Real Property**" any real property leased, subleased or otherwise used or occupied by a Group Company, or which Group Company has the right to use or occupy, pursuant to a Lease.

"**Liability**" means any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required to be reflected in financial statements or disclosed in the notes thereto.

"**Malicious Code**" means (a) any virus, malware, trackware, ransomware, Trojan horse, worm, back door, time bomb, drop dead device, spyware or adware, and (b) any similar program, routine, instruction, device, code, contaminant, logic or effect designed or intended to disable, disrupt, erase, harm, or otherwise impede the operation of, or enable any Person to access without authorization, or otherwise materially and adversely affect the functionality of, any IT Asset (or portion thereof).

"**Master Lease**" means that certain Master Lease Agreement dated April 7, 2023, between Pontus IMB Portfolio, LLC, as landlord, and the Company, as tenant.

"**Material Adverse Effect**" means any change, effect, event, circumstance, occurrence or state of facts that, individually or in the aggregate, (a) has, or would reasonably be expected to have, a material adverse effect on the Business, the Purchased Entities, the Purchased Assets or the Assumed Liabilities, taken as a whole, or (b) would reasonably be expected to prevent Sellers from consummating the transactions contemplated by this Agreement and the other Transaction Documents; provided, however, that in the case of clause (a), in no event shall any change, effect, event, circumstance, occurrence or state of facts that results from or arises out of the following be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect: (i) general changes or developments in global or national political, economic, business, monetary, banking, financial or capital or credit market conditions or trends; (ii) general political, economic, business, regulatory, monetary, financial or capital or credit market conditions or trends (including interest rates); (iii) geopolitical conditions or any outbreak or escalation of hostilities, acts of terrorism or war, civil unrest, epidemic, pandemic, disease outbreak or other health crisis or public health event, regional, national or international emergency, or any fire, flood, hurricane, earthquake, tornado, windstorm or other similar calamity or acts of God or any other force majeure events; (iv) the failure of the financial or operating performance of any Seller or any of their respective businesses to meet any projections, forecasts, budgets estimates or predictions for any period (it being understood that the underlying cause of such failure to meet such projections, forecasts, budgets, estimates or predictions may be taken into account in determining whether a Material Adverse Effect has occurred); (v) changes in Laws first proposed after the date hereof; (vi) changes in GAAP or other accounting regulations or principles first proposed after the date hereof; (vii) the Chapter 11 Cases, including, without limitation, any announced liquidation of Sellers or any of their respective assets; (viii) the negotiation, execution, public announcement or performance of this Agreement, provided that the exception in this clause (viii) shall not apply to that portion of any representation or warranty contained in this Agreement to the extent that the purpose of such portion of such representation or warranty is to address the consequences resulting from the negotiation, execution, public announcement or performance of this Agreement; (ix) any actions taken by Sellers as expressly required by this Agreement or taken with Buyer's prior written consent; or (x) any Law issued by a Governmental Authority requiring business closures, quarantine or sheltering-in-place or similar restrictions in connection with the COVID-19 pandemic; (xi) any change in the listing price of the Company's securities, any change in the volume of trading in the Company's securities, any down-grading or other reduction in the Company's credit ratings, any request, demand or any action taken pursuant a requirement that one or more of the class of securities listed for trading on any securities exchange be delisted, any change in the number of securities subject to short-sale, or any other change relating to the number or type of the securities of the Company (it being understood that the underlying cause of any of the foregoing may be taken into account in determining whether a Material Adverse Effect has occurred); provided, further, that in the case of clause (i), (ii), (iii), (v), (vi) or (xi), to the extent that the effects of any such change, effect, event, circumstance, occurrence or state of facts is disproportionately adverse to Sellers, the Purchased Entities, their respective businesses, the Purchased Assets or the Assumed Liabilities, taken as a whole, relative to other businesses in the industries in which Sellers and the Purchased Entities operate, then such matter, event, change, development, occurrence, circumstance or effect may be taken into account in determining whether there has been or will be, a Material Adverse Effect.

"**Minimum Cash Amount**" means $3,000,000.

"**Order**" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, precept, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority.

"**Ordinary Course**" means the ordinary course of business consistent with past practice.

"**Permits**" means any franchises, permits, licenses, consents, certificates, clearances, approvals, exceptions, variances, permissions, filings, publications, declarations, notices, waivers, and authorizations, including environmental permits, of or with any Governmental Authority held, used or made by any (a) Seller in connection with the Purchased Assets or the Assumed Liabilities or (b) any Purchased Entity.

"**Permitted Encumbrances**" means the following Encumbrances: (a) statutory liens for current Taxes that are not yet due or payable or that are being contested in good faith by appropriate Proceedings and for which adequate reserves have been established in accordance with GAAP; (b) mechanics', materialmen's, repairmen's and other statutory Encumbrances incurred in the Ordinary Course and for adequate reserves have been established in accordance with GAAP and which would not, individually or in the aggregate, have a material impact on the Business or materially impair the ability of the Purchased Entities to use or operate the property to which they relate; (c) Encumbrances incurred or deposits made in the Ordinary Course and on a basis consistent with past practice in connection with workers' compensation, unemployment insurance or other types of social security; (d) with respect to Leased Real Property, easements, declarations, covenants or rights-of-way, restrictions and similar non-monetary Encumbrances (that would be disclosed by an accurate survey of real property) which do not, individually or in the aggregate, materially adversely affect the use or occupancy of the Leased Real Property to which they relate; (e) zoning ordinances, variances, conditional use permits and similar regulations, permits, approvals and conditions that are not materially violated by and do not materially interfere with the business as currently conducted at the applicable Leased Real Property, or the improvements located thereon; (f) Encumbrances that will be released at the Closing with no Liability to the Purchased Entities, Buyer or its Affiliates; (g) any Encumbrance granted or incurred pursuant to an Order of the Bankruptcy Court and consented to in writing by the Buyer; (h) outbound Intellectual Property licenses that are subject to Section 365(n) of the Bankruptcy Code; (i) non-exclusive licenses of Intellectual Property granted in the Ordinary Course; (j) Encumbrances consented to in writing by Buyer; and (k) any Encumbrance set forth on Section 1.01(a) of the Disclosure Schedules.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group or Governmental Authority.

"**Personal Information**" means any information that either directly or indirectly identifies or, alone or in combination with any other information, could reasonably be used to identify a natural Person, or any other information that is considered "personally identifiable information," "nonpublic personal information," "protected health information," "personal information," or "personal data" under applicable Law, and all data associated with any of the foregoing that are or could reasonably be used to develop a profile or record of the activities of a natural Person across multiple websites or online services, to predict or infer the preferences, interests, or other

10

characteristics of a natural Person, or to target advertisements or other content or products or services to a natural Person.

"**Post-Closing Tax Period**" means any Tax period beginning after the Closing Date and, with respect to any Straddle Period, the portion thereof beginning after the Closing Date.

"**Pre-Closing Tax Period**" means any Tax period ending on or before the Closing Date and, with respect to any Straddle Period, the portion thereof ending on the Closing Date.

"**Privacy Laws**" means all applicable Laws, Orders, and guidance issued by any Governmental Authority concerning the privacy, security, or Processing of Personal Information (including Laws of jurisdictions where Personal Information was collected), including, as applicable, data breach notification Laws, consumer protection Laws, Laws concerning requirements for website and mobile application privacy policies and practices, Social Security number protection Laws, data security Laws, and Laws concerning email, text message, or telephone communications.

"**Proceeding**" means any claim, demand, action, suit, inquiry, examination, audit, investigation (including subpoenas and other requests for documents and information from Governmental Authorities), arbitration, mediation or proceeding by or before any Governmental Authority or any other arbitration mediation or similar proceeding by or before an arbitral body, including any related to Claims, Liabilities, preference actions and preferential transfers, Contracts, debts, breaches of fiduciary duties, accounts, bills, covenants, agreements, damages, judgments, third- party Claims, counterclaims, and cross-claims, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereinafter arising, in Law or equity or otherwise.

"**Processing**" means any operation or set of operations performed on Personal Information, whether or not by automated means, including the collection, creation, receipt, acquisition, recording, organization, structuring, adaptation or alteration, retrieval, consultation, de-identification, re-identification, sale, sharing, alignment or combination, access, use, handling, compilation, analysis, monitoring, maintenance, retention, storage, transmission, transfer, protection, disclosure, distribution, destruction, erasure or disposal of Personal Information.

"**Purchased Entity Employee**" means each Service Provider who is an employee of a Purchased Entity.

"**Purchased Intellectual Property**" means all (a) Seller Intellectual Property and (a) Intellectual Property owned or purported to be owned by the Purchased Entities.

"**Purchase Price Reserve**" means $5,000,000 of the Purchase Price plus the DIP Reserve Amount.

"**Release**" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the indoor or outdoor environment.

"**Sale Hearing**" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement pursuant to the Sale Order.

"**Sale Motion**" means the motion seeking entry of the Sale Order, which shall be in form and substance consistent with this Agreement and otherwise reasonably satisfactory to Buyer and Seller.

"**Sale Order**" means an Order by the Bankruptcy Court, in form and substance acceptable to Buyer and Sellers, among other things, (a) approving this Agreement, (b) authorizing the sale of the Purchased Assets to Buyer pursuant to Section 363 of the Bankruptcy Code, pursuant to the terms and conditions set forth herein, free and clear of any Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), (c) authorizing the assumption by Sellers and assignment to Buyer of the Purchased Contracts and the Assumed Liabilities pursuant to Section 365 of the Bankruptcy Code and (d) authorizing the other transactions contemplated by this Agreement.

"**Seller Plan**" means each "employee benefit plan" (as defined in Section 3.3 of ERISA, whether or not subject to ERISA), and any other employee benefit, fringe benefit, supplemental unemployment benefit, bonus, incentive, profit sharing, termination, change of control, pension, retirement, stock option, stock purchase, stock appreciation, or other equity or equity-based interest, health, severance, welfare, medical, dental, disability, life insurance and similar plans, programs, arrangements or practices relating to the current or former directors, officers or employees of the Group Companies (including, for avoidance of doubt, each Purchased Entity), in each case, currently maintained, sponsored or funded by Sellers or their Affiliates, whether written or oral, funded or unfunded, insured or self-insured, registered or unregistered.

"**Sanctioned Jurisdiction**" means a country or territory which is, or during the past five (5) years has been, the subject or target of comprehensive U.S. sanctions (as of the date of this Agreement, such jurisdictions include Cuba, Iran, North Korea, Syria, the Crimea region of Ukraine, and the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine).

"**Sanctioned Person**" means any Person that is the subject or target of sanctions or restrictions under International Trade Laws, including: (a) any Person identified on any applicable U.S. or non-U.S. sanctions- or export-related restricted party list, including but not limited to OFAC's Specially Designated Nationals and Blocked Persons List, List of Persons Identified as Blocked Solely Pursuant to Executive Order 13599, and Sectoral Sanctions Identifications List; the Denied Persons, Unverified, or Entity Lists, maintained by the U.S. Department of Commerce; the Debarred List or non-proliferation sanctions lists maintained by the U.S. State Department; the Consolidated List of Persons, Groups and Entities Subject to Financial Sanctions, maintained by the European Union; the Consolidated List of Assets Freeze Targets, maintained by HM Treasury (U.K.); or the UN Consolidated List, maintained by the UN Security Council Committee; or any other similar list maintained by any other Governmental Authority having jurisdiction over the Agreement; (b) any Person that is, in the aggregate, fifty percent (50%) or greater owned, directly or indirectly, or otherwise controlled by a Person or Persons described in clause (a) so as to subject the Person to sanctions; or (c) any Person that is organized, resident, or located in a Sanctioned Jurisdiction.

"**Service Provider**" means any officer, employee, individual independent contractor or non-employee director who provides, or has provided, services to any Group Company.

"**Service Provider Agreement**" means each written employment, severance, consulting, or other similar Contract providing for compensation or benefits between any Group Company, on the one hand, and any individual Service Provider, on the other hand, under which any Group Company has any obligation.

"**Specified Sales Taxes**" means sales Taxes of the Business arising after the Petition Date to the extent not paid under the DIP Facility.

"**Subsidiary**" means, with respect to any Person, another Person in which such Person beneficially owns, directly or indirectly, capital stock or other equity securities representing more than fifty percent (50%) of the outstanding voting stock or other equity interests.

"**Tax**" or "**Taxes**" means (i) all federal, state, local or non-U.S. income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, special assessment, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding tax, profits, lease, service, recording, documentary, filing, permit or authorization, gains, escheat, unclaimed property, import, export, intangibles, or any other taxes, fees, levies, assessments or charges in the nature of a tax (however denominated), including any interest, penalties or additions to tax or additional amounts in respect of the foregoing, and (ii) any liability for the payment of amounts determined by reference to amounts described in clause (i) as a result of being or having been a member of any group of corporations that files, will file, or has filed Tax Returns on a combined, consolidated, unitary or similar basis or as a result of being a transferee or successor.

"**Tax Return**" means any report, return, election, extension or similar document (including declarations, disclaimers, notices, disclosures, estimates, claims (including claims for refunds), real property transfer tax returns, information returns, schedules or any related or supporting information) filed or required to be filed or submitted with respect to Taxes with any Governmental Authority in connection with the determination, assessment or collection of any Tax or the administration of any Laws or administrative requirements relating to any Tax, including any information return, claim for refund, amended return or declaration of estimated Taxes.

"**Terminated APA**" means that Asset and Equity Purchase Agreement, dated as of July 3, 2023, by and among RNN-TV Licensing Co. LLC, the Company and the other Sellers named therein.

"**Transaction Document**" means this Agreement, the Assumption and Assignment Agreements, the Bills of Sale, the Assignment of Trademarks, the Assignment of Domain Names, the STA Germany, the Assignment of Patents and any other agreements, instruments or documents entered into pursuant to, or as contemplated by, this Agreement.

"**Transfer Taxes**" means any transfer (including a direct or indirect real property transfer tax), conveyance, sales, use, value added, goods and services, filing, documentary, stamp,

13

registration, recording, transfer or similar Taxes payable in connection with the sale or transfer of the Purchased Assets contemplated by this Agreement, including any interest, penalty or addition thereto. For the avoidance of doubt and notwithstanding anything to the contrary, Transfer Taxes shall not include any Income Taxes of the Sellers or the Group Companies arising from the transactions contemplated by this Agreement.

"**Transferred Employees**" means, collectively, (a) all Business Employees who accept offers of employment with Buyer or its Affiliates and commence such employment immediately after the Closing with Buyer or its Affiliates, (b) Business Employees who are absent due to vacation, family leave, short-term disability, long-term disability, or other authorized leave of absence on the Closing Date but who accept such offer of employment and indicate an intention to commence such employment with Buyer or its Affiliates as of such employee's return from vacation, family leave, short-term disability, long-term disability or other authorized leave, provided, that (i) such return must occur within six (6) months after the Closing Date and (ii) any such Business Employee shall be deemed to be a "Transferred Employee" for purposes of this Agreement as of the Closing Date, and (c) all Purchased Entity Employees as of the Closing Date.

"**Union**" means any labor union, works council, trade union or other employee representative body.

"**Utility Deposits**" means (a) all deposits (whether maintained in escrow or otherwise) or other security provided in favor of a utility as adequate assurance of payment pursuant to section 366 of the United States Bankruptcy Code and (b) any other deposits made by or on behalf of seller with persons providing water, sewer, gas, electricity, telephone, and other utilities.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988 and all similar state and local Laws.

(b)     Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Accrued Liabilities Cap | Section 2.02 |
| Actions | Section 2.01(n) |
| Agreement | Preamble |
| Allocation Schedule | Section 2.08 |
| Annual Financial Statements | Section 3.20 |
| Assumed Liabilities | Section 2.02 |
| Assumed Plans and Agreement | Section 2.01(g) |
| Assignment of Trademarks | Section 2.09(a)(iii) |
| Assignment of Domain Names | Section 2.09(a)(iv) |
| Assignment of Patents | Section 2.09(a)(xi) |
| Assumption and Assignment Agreements | Section 2.09(a)(i) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Court Milestones | Section 7.10(a) |
| Bankruptcy Period | Section 11.05 |

14

| **Term** | **Section** |
|---|---|
| Board Determination Notice | Section 5.02 |
| Bills of Sale | Section 2.09(a)(ii) |
| Business Name | Section 5.04 |
| Buyer | Preamble |
| Buyer Designee | Section 2.01 |
| Buyer Plans | Section 7.05(b) |
| Capped Assumed Liabilities | Section 2.02 |
| Cash Balance | Section 2.06 |
| Chapter 11 Cases | Recitals |
| Closing | Section 2.09 |
| Confidentiality Agreement | Section 7.01(a) |
| Company | Preamble |
| Company SEC Documents | Article 3 |
| Contract & Cure Update Schedule | Section 2.05(a) |
| Credit | Section 2.06 |
| Cure Notice | Section 7.10(b) |
| Cure Payment | Section 2.05(b) |
| Data Privacy/Security Requirements | Section 3.11(b) |
| Debtors | Recitals |
| Deposit | Section 2.07 |
| Designated Contract | Section 2.05(g) |
| Disputed Amount Contract | Section 2.05(f) |
| Excluded Accounts | Section 2.03(e) |
| Excluded Assets | Section 2.03 |
| Excluded Contracts | Section 2.03(b) |
| Excluded Contract Notice | Section 2.05(g) |
| Excluded Liabilities | Section 2.04 |
| Express Representations | Section 4.09 |
| Financial Statements | Section 3.20(a) |
| IBNR Claims | Section 2.02(f) |
| Interim Balance Sheet | Section 3.20(a) |
| Material Suppliers | Section 3.19 |
| Outside Date | Section 10.01(d) |
| Original Contract & Cure Schedule | Section 2.05(a) |
| Party or Parties | Preamble |
| Petition Date | Recitals |
| Post-Closing COBRA Liability | Section 7.05(e) |
| Post-Petition Wages | Section 2.02(m) |
| Purchased Actions | Section 2.01(n) |
| Purchased Assets | Section 2.01 |
| Purchased Contracts | Section 2.01(a) |
| Purchased Entity or Purchased Entities | Section 2.01(f) |
| Purchased Entities' Plans | Section 2.01(g) |
| Purchased Shares | Section 2.01(f) |
| Purchased Intellectual Property | Section 2.01(e) |

15

| Term | Section |
|------|---------|
| Purchased Third Party Claims | Section 2.01(k) |
| Purchased Trademarks | Section 5.04 |
| Purchase Price | Section 2.06 |
| Records | Section 2.01(r) |
| Registered IP | Section 3.10(a) |
| SEC | Article 3 |
| Security Plan | Section 3.11(d) |
| Seller or Sellers | Preamble |
| Seller Intellectual Property | Section 2.01(e) |
| Social Media Accounts | Section 3.10(a) |
| STA Germany | Section 2.09(c) |
| Straddle Period | Section 7.06(c) |
| Surviving Post-Closing Covenants | Section 9.01 |
| Tax Proceedings | Section 3.14(c) |
| Title IV Plans | Section 3.15(d) |
| Transfer Consent | Section 2.05(d) |
| US Person | Section 2.09(a)(viii) |
| Vendor Loan Agreement | Section 8.02(e) |

Section 1.02. *Construction*. In construing this Agreement, including the Exhibits and Schedules hereto, the following principles shall be followed: (a) the terms "herein," "hereof," "hereby," "hereunder" and other similar terms refer to this Agreement as a whole and not only to the particular Article, Section or other subdivision in which any such terms may be employed unless otherwise specified; (b) except as otherwise set forth herein, references to Articles, Sections, Disclosure Schedules, Schedules and Exhibits refer to the Articles, Sections, Disclosure Schedules, Schedules and Exhibits of this Agreement, which are incorporated in and made a part of this Agreement; (c) a reference to any Person shall include such Person's successors and assigns; (d) the word "includes" and "including" and their syntactical variants mean "includes, but is not limited to" and "including, without limitation," and corresponding syntactical variant expressions; (e) a defined term has its defined meaning throughout this Agreement, regardless of whether it appears before or after the place in this Agreement where it is defined, including in any Schedule; (f) the word "dollar" and the symbol "$" refer to the lawful currency of the United States of America; (g) unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa; (h) the words "to the extent" shall mean "the degree by which" and not "if"; (i) the word "will" will be construed to have the same meaning and effect as the word "shall," and the words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive; (j) where a word is defined herein, references to the singular will include references to the plural and vice versa; (k) all references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless Business Days are expressly specified; (l) any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived; (m) any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at

16

the time of such violation or non-compliance or alleged violation or non-compliance; (n) references to "written" or "in writing" include in electronic form (including email) and any notice or consent that is required to be written or delivered to a Party in writing may be written or delivered via e-mail in accordance with Section 11.01); (o) the headings contained in this Agreement and the other Transaction Documents are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement and the other Transaction Documents; (p) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day; and (q) the word "or" shall not be exclusive.

## ARTICLE 2

## PURCHASE AND SALE

Section 2.01.    *Purchase and Sale*. Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement and the Sale Order, on the Closing Date, Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, free and clear of all Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), to Buyer and/or one or more other Affiliates of Buyer as designated by Buyer (subject to Section 11.03) (a "**Buyer Designee**"), and Buyer shall, and shall cause its Buyer Designees (if any) to, purchase, acquire and accept from Sellers, all of Sellers' right, title and interest in the assets, properties, interests, rights and other assets of Sellers as of the Closing of every kind and nature, whether tangible or intangible (including goodwill), real, personal or mixed, known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP or specifically referred to in this Agreement, including any such properties, rights, interests, and other assets acquired by Sellers after the date hereof and prior to the Closing in accordance with Section 5.01, including the following assets, properties, rights, interests and other assets of Sellers, but excluding, in all circumstances, any Excluded Assets which, notwithstanding the foregoing provisions of this Section 2.01 or anything in this Agreement to the contrary, will remain, as applicable, the assets, properties, interests and rights of Sellers and their Affiliates (collectively, the "**Purchased Assets**")):

(a)    subject to Section 2.05, the Contracts (including Leases with respect to Leased Real Property) set forth on Section 2.01(a) of the Disclosure Schedules (collectively, the "**Purchased Contracts**");

(b)    the Leased Real Property set forth on Section 2.01(b) of the Disclosure Schedules, together with any buildings, fixtures and improvements located on or attached to such real property, and all rights arising therefrom (including, without limitation, any purchase options, repurchase option, rights of first offer and rights of first refusal with respect to the Leased Real Property), and all tenements, hereditaments, appurtenances and other real property rights appertaining thereto;

(c)     all tangible assets, including machinery, equipment, computers, telephone, supplies and other tangible personal property owned by any Seller, including any such personal property located at any Leased Real Property and any such tangible property on order to be delivered to any Seller;

(d)     all warranties, indemnities or guaranties from any Person with respect to any Purchased Asset, including any item of real property, personal property or equipment;

(e)     all Intellectual Property owned by any Seller, including the Intellectual Property set forth on <u>Section 2.01(e)</u> of the Disclosure Schedules (the "**Seller Intellectual Property**");

(f)     all of Sellers' direct or indirect interests (the "**Purchased Shares**") in the Persons listed in <u>Section 2.01(f)</u> of the Disclosure Schedules (each, a "**Purchased Entity,**" and collectively, the "**Purchased Entities**") (it being understood, for the avoidance of doubt, that the purchase of the Purchased Shares of iMedia & 123tv Holding GmbH, a German *Gesellschaft mit beschränkter* Haftung, and its Subsidiaries will be completed by Sellers' transferring their direct equity interests in iMedia & 123tv Holding GmbH);

(g)     the Service Provider Agreements and Seller Plans, each as set forth on <u>Section 2.01(g)</u> of the Disclosure Schedules that Buyer elects to assume (which, for the avoidance of doubt, will include Sellers' self-insured medical plan), if any, in accordance with <u>Section 7.05(c)</u> (collectively, the "**Assumed Plans and Agreements**") and the Seller Plans of the Purchased Entities (the "**Purchased Entities' Plans**"), all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder, in each case, to the extent transferable in accordance with the existing terms and conditions of the applicable Contract(s);

(h)     all deposits (excluding Utility Deposits), credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items and duties related to the Purchased Assets (including Purchased Contracts);

(i)     all accounts receivable, notes, negotiable instruments and chattel paper owned or held, together with any unpaid interest or fees accrued thereon or other amounts due with respect thereto, and other amounts receivable from any Person before the Closing, whether or not in the Ordinary Course;

(j)     all confidentiality, non-competition, non-solicitation or similar agreements entered into by any Seller or any of their respective representatives in connection with a sale of any Seller, any Purchased Asset, any Purchased Entity or any Assumed Liabilities;

(k)     all rights, privileges, claims and causes of action against customers, suppliers, vendors, lessors, lessees, licensees or licensors of any Seller (solely to the extent against such Persons in their capacity as such), arising in the ordinary course of business under or related to any Purchased Contract, other Purchased Asset (including any use, ownership, possession, operation, sale or lease of such other Purchased Asset) or Assumed Liability, including Proceedings, Claims, counterclaims, defenses, credits, rebates, Tax refunds (other than any Tax Refunds described in <u>Section 2.03(j)</u>), rights of set off, rights of recovery (including rights to

18

insurance proceeds), rights of subrogation, rights of recoupment, rights under or with respect to express or implied guarantees, warranties, representations, covenants, indemnities, exculpation, advancement, reimbursement of expenses or contract renewal rights and other similar rights, in each case, whether direct or derivative, known or unknown, liquidated or unliquidated, contingent or otherwise ("**Purchased Third Party Claims**");

(l)     all Cash and Cash Equivalents (other than any Excluded Cash, the Deposit or the Purchase Price Reserve);

(m)     all bank accounts of Sellers, other than Excluded Accounts;

(n)     all of Sellers' and the Purchased Entities' (i) avoidance claims or causes of action arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code and any similar state Law,  (ii) other claims, causes of action, lawsuits, judgements, privileges, counterclaims, defenses, rights of recovery, rights of set-off, rights of subrogation and (iii) all other rights of any kind under any other provision of applicable Laws (collectively, "**Actions**"), but only to the extent that such Actions are against any of the Sellers' or the Purchased Entities' vendors, suppliers, contract counterparties, customers, employees, directors, officers, insiders (and any other Person doing business with, employed by or directors of the Buyer on and after Closing) (collectively, and including Purchased Third Party Claims, "**Purchased Actions**"); provided, that notwithstanding anything to the contrary herein, Purchased Actions shall not include any claims or causes of action (whether characterized as an Action or otherwise) solely (x) against shareholders of the Company, in each case solely in that capacity, (y) against current or former directors or officers of Sellers, in each case solely in that capacity, to the extent coverage for any such claim or cause of action is available under any and all of Sellers' current and prior director and officer (or similar) insurance policies and all rights of any nature with respect thereto, but limited to the proceeds and recoveries from such insurance policies, provided, further, that such claims or causes of action are not against Transferred Employees under the terms of this Agreement, in which case those claims or causes of actions shall be considered Purchased Actions; *provided*, *further*, that the Excluded Individuals shall not be Transferred Employees.

(o)     all goodwill related to the Purchased Assets;

(p)     all rights of Sellers under non-disclosure or confidentiality, invention assignment, work made for hire, non-compete, or non-solicitation agreements with current or former Service Providers, in each case, which relate to the Business or any of the Purchased Assets or Assumed Liabilities;

(q)     subject to Section 7.15, all inventory owned by Sellers, including finished products and goods, raw materials, work in process, replacement and component parts, including inventory of Sellers held at any third-party location and inventory previously purchased and in transit to Sellers; and

(r)     all of the current or historical written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, Tax Returns related to Taxes imposed with respect to any Purchased Entity or Purchased Assets (provided that the Sellers shall be entitled

19

to retain and use copies of any Tax Returns that are necessary for the Sellers' and their Affiliates' Tax, accounting or legal purposes), ledgers, journals, title policies, customer lists, supplier lists, vendor lists, price lists, mailing lists, invoices, shipping records, standard forms of documents, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, *etc.*), user documentation (installation guides, user manuals, training materials, release notes, working papers, *etc.*), marketing documentation (catalogs, sales brochures, flyers, pamphlets, web pages, *etc.*), consulting materials, opinions and other documents owned by the Sellers, development, quality control, quality assurance, regulatory documents, all personnel and employment records for the Transferred Employees or any individual independent contractors of the Sellers or the Purchased Entities (excluding performance assessments), unless prohibited by applicable Law, and other books and records owned by the Sellers, in each case whether stored in hard copy form or on electronic, magnetic, optical or other media and excluding any such items relating to Excluded Assets (collectively, the "**Records**").

For the avoidance of doubt and notwithstanding anything to the contrary set forth herein, Sellers shall not sell, assign, transfer or deliver, and Buyer shall not purchase any Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, (A) at any time (but in any event no later than 11:59 p.m. New York Time on the date that is two (2) Business Days prior to the Closing) Buyer may, in its sole discretion and by written notice to the Company, designate any of the Purchased Assets (including, for the avoidance of doubt, the Purchased Entities) as additional Excluded Assets, which notice shall set forth in reasonable detail the Purchased Assets so designated; and (B) the Liabilities of Sellers under or related to any Purchased Asset designated as an Excluded Asset pursuant to this paragraph will constitute Excluded Liabilities; provided, that Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to designate any Purchased Asset as an Excluded Asset.

Pursuant to Section 2.05(b), from and after the date hereof until seven (7) days prior to the Closing (and with the consent of the counterparty until one (1) day prior to Closing), Buyer may, in its sole discretion, designate any Contract or Lease not already included as a Purchased Contract to be a Purchased Contract, effective on and as of the Closing; provided, that Sellers acknowledge and agree that there shall be no increase to the Cash Balance portion of the Purchase Price if Buyer makes any such designation.

Section 2.02.     *Assumed Liabilities*. Upon the terms and subject to the conditions of this Agreement, Buyer agrees, effective at the time of the Closing, to assume only the following Liabilities of Sellers (and no other Liabilities of Sellers, which other Liabilities of Sellers shall be retained by Sellers) (the "**Assumed Liabilities**"):

(a)     all Liabilities relating to or arising out of the ownership or operation of the Purchased Assets (including, for the avoidance of doubt, any Liabilities for Taxes arising from the ownership or operation of the Purchased Assets in a Post-Closing Tax Period (including, with respect to any Taxes arising in a Straddle Period, the portion of such Taxes that are allocable to Buyer under Section 7.06(c))) by Buyer solely for and in respect of periods following the Closing and excluding any Excluded Liabilities; for the avoidance of doubt any Liabilities relating to or

arising out of facts, events or circumstances occurring prior to the Closing, regardless of whether such Liabilities arise or are asserted prior to or after the Closing, shall be Excluded Liabilities (except to the extent such Liability is otherwise expressly set forth as an Assumed Liability in another section of this Agreement);

(b)    payment of all Liabilities, to the extent not paid in connection with the DIP Facility, arising under and with respect to the Assumed Plans and Agreements and the Purchased Entities' Plans, if any (including, for the avoidance of doubt, with respect to any Purchased Entity Employee**,** and the Sellers have advised that, to their Knowledge, any such Liabilities that are due and payable are expected to total $0.00 on the Closing Date assuming the Closing occurs on August 15, 2023 (for avoidance of doubt, not including Liabilities expressly covered by the other specific clauses in this Section 2.02);

(c)    other than in respect of PTO Liabilities, all Liabilities associated with Transferred Employees arising and accruing on or after (i) the Closing Date or (ii) in the case of Business Employees who become Transferred Employees after the Closing Date, the date such Business Employees become Transferred Employees;

(d)    payment of all Liabilities arising out of, relating to, or with respect to any notice pay or benefits and claims under the WARN Act with respect to any Transferred Employee arising on or following the Closing Date;

(e)    payment of Post-Closing COBRA Liabilities;

(f)    all Liabilities related to the claims incurred as of the Closing Date but not reported in respect of Seller's self-insured medical plan ("**IBNR Claims**");

(g)    all Liabilities of each Seller relating to or arising out of the Purchased Contracts solely in respect of periods following the Closing and not to the extent relating to or arising out of any breach or default thereof or other activities on or prior to the Closing and excluding any Excluded Liabilities;

(h)    all Liabilities outstanding as of and after the Closing with respect to (i) returns of goods or merchandise sold by any Seller, in compliance with the return policy in effect as of such sale, (ii) gift cards and certificates, validly issued by Sellers and outstanding as of the Closing, (iii) customer prepayments to the extent related to a Purchased Asset, and (iv) customer loyalty obligations or programs;

(i)    any and all Liabilities for Transfer Taxes for which Buyer is liable pursuant to Section 7.06(a);

(j)    certain accounts payables related to the Purchased Assets and specified by Buyer in its sole and absolute discretion, as set forth on Section 2.02(j) of the Disclosure Schedules;

(k)    Cure Costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Purchased Contracts;

(l)      during the Designation Rights Period, all administrative expenses arising under Designated Contracts until such time as they become an Excluded Asset or a Purchased Contract and any incremental costs or expenses (i) that arise out of the Sellers' extension and continuation of the Chapter 11 Cases that is directly attributable to the Buyer's extension of the Designation Rights Period and (ii) are incurred as a result of the Sellers' performance of their obligations under this Agreement;

(m)      subject to the Accrued Liabilities Cap, payment of Liabilities, to the extent not paid in connection with the DIP Facility, for payroll incurred in the Ordinary Course of Business arising after the Petition Date through the Closing Date (including, for the avoidance of doubt, the employer portion of Taxes payable in respect thereof, and excluding any Liabilities related to equity or equity-based incentive awards, cash bonuses, accrued paid time off, or any similar obligations arising under any Service Provider Agreement or Seller Plan) and remaining unpaid as of the Closing Date ("**Post-Petition Wages**");

(n)      subject to the Accrued Liabilities Cap, payment of Liabilities for Specified Sales Taxes remaining unpaid as of the Closing Date;

(o)      subject to the Accrued Liabilities Cap, payment of Liabilities of the Company's iMedia Digital Services business unit incurred in the Ordinary Course of Business arising after the Petition Date through the Closing Date and remaining unpaid as of the Closing Date;

(p)      subject to the Accrued Liabilities Cap, with respect to each Distribution Contract that (i) as of the date hereof, is a Purchased Contract or Designated Contract and (ii) after the date hereof but prior to Closing, becomes an Excluded Contract due to Buyer's actions, payment of Liabilities arising under any such Distribution Contracts, to the extent relating to periods from and after the Petition Date through the Closing Date;

(q)      subject to the Accrued Liabilities Cap, payment of Liabilities for general and administrative expenses incurred in the Ordinary Course of Business arising after the Petition Date through the Closing Date and remaining unpaid as of the Closing Date; and

(r)      any other Liability expressly to be assumed by Buyer pursuant to the Sale Order.

Notwithstanding anything to the contrary in this Agreement, (1) the sum of the aggregate maximum amounts of Buyer's payment obligations in respect of Assumed Liabilities in the foregoing Section 2.02(m), Section 2.02(n), Section 2.02(o), Section 2.02(p), and Section 2.02(q) (together, the "**Capped Assumed Liabilities**") shall not exceed $8,000,000 (eight million United States Dollars) (the "**Accrued Liabilities Cap**"), (2) Buyer's sole obligation in respect of the Capped Assumed Liabilities shall be payment thereof up to the Accrued Liabilities Cap, and (3) Buyer shall have no other obligation or liability in respect of the Capped Assumed Liabilities.

Notwithstanding anything to the contrary in this Agreement, at any time (but in any event no later than 11:59 p.m. New York Time on the date that is two (2) Business Days prior to the deadline to the Closing) Buyer may, in its sole discretion and by written notice to the Company, designate any of the Excluded Liabilities as additional Assumed Liabilities, which notice shall set forth in

reasonable detail the Excluded Liabilities so designated; provided, that Buyer acknowledges and agrees that there shall be no reduction in the Cash Balance portion of the Purchase Price if it elects to designate any Excluded Liabilities as additional Assumed Liabilities; provided, further, that Buyer acknowledges and agrees that Sellers' self-insured medical plan shall be listed as an Assumed Plan and Agreement.

Section 2.03.    *Excluded Assets.* Notwithstanding any provision in this Agreement to the contrary, Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and Sellers will retain all right, title and interest to, in and under the following assets, properties, interests and rights of Sellers (whether owned, licensed, leased or otherwise) (the "**Excluded Assets**"):

(a)    the organizational documents, corporate records and minute books, in each case, to the extent solely pertaining to the organization, existence or capitalization of Sellers (and not used in the operation of the Business or the Purchased Assets);

(b)    subject to Section 2.05 any Contract that is not a Purchased Contract or a Designated Contract, including for the avoidance of doubt the Contracts (including Leases with respect to Leased Real Property) set forth on Section 2.03(b) of the Disclosure Schedules (collectively, the "**Excluded Contracts**");

(c)    an amount of Cash and Cash Equivalents equal to the Minimum Cash Amount (the "**Excluded Cash**"), plus the Deposit and the Purchase Price Reserve;

(d)    the Utility Deposits;

(e)    the Carve-Out Reserve Account (as defined in the DIP Credit Agreement) and one other bank account of Sellers designated by the Company as an excluded bank account for purposes of winding down the Business (for avoidance of doubt, without duplication of any Cash and Cash Equivalents covered in Section 2.03(c)) (collectively, the "**Excluded Accounts**");

(f)    all rights that accrue or will accrue to any Seller or any of their Subsidiaries (other than the Purchased Entities) pursuant to this Agreement or any of the other Transaction Documents;

(g)    other than the Purchased Shares (or any equity interests owned by Purchased Entities), all shares of capital stock or other equity interests of any Seller or any Subsidiary of any Seller;

(h)    other than the Assumed Plans and Agreements and the Purchased Entities' Plans, all Seller Plans, together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder;

(i)    all current and prior director and officer (or similar) insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance proceeds or recoveries thereunder and rights to assert claims with respect to any such insurance proceeds or recoveries;

23

(j)      all attorney-client privilege and attorney work-product protection of Sellers or associated with their businesses solely to the extent arising with respect to legal counsel representation of Sellers or their Affiliates or their businesses in connection with the transactions contemplated by this Agreement or any of the Transaction Documents; for the avoidance of doubt, all attorney-client privilege and attorney work-product relating to the Purchased Assets and the Assumed Liabilities shall be Purchased Assets;

(k)      all personnel and employment records for the Transferred Employees or any individual independent contractors of the Sellers that cannot be provided under applicable Law;

(l)      all rights to any Tax refunds, or credits (in lieu of refunds) against Tax liabilities, of Sellers that relate to Taxes that are Excluded Liabilities or that are paid by Sellers after the Closing, but solely to the extent that such Tax refunds are not attributable to a loss, credit or other tax attribute of Buyer or any of its Affiliates including, without limitation, any tax attributes of any Seller or Group Company that would otherwise be transferred to Buyer or any of its Affiliates (including any Purchased Entity) pursuant to the transactions contemplated by this Agreement; provided, that if Buyer or any of its Affiliates incurs any reasonable, out-of-pocket costs or expenses (including Taxes) as a direct result of the receipt any such Tax refund or credit (in lieu of a refund), Buyer shall be entitled to retain the portion of such Tax refund or credit (in lieu of a refund) equal to the amount of such reasonable, out-of-pocket costs or expenses;

(m)      all Intellectual Property owned by a Person other than a Seller (other than rights to Intellectual Property granted to a Seller pursuant to a Purchased Contract);

(n)      all Service Provider Agreements other than those that are Assumed Plans and Agreements;

(o)      all claims that Sellers or their Affiliates may have against any Person with respect to Excluded Assets or Excluded Liabilities;

(p)      all rights, claims and causes of action of Sellers under this Agreement and any other Transaction Document or any agreement, certificate, instrument, or other document executed and delivered between Sellers and Buyer or their respective Affiliates in connection with the transactions contemplated by this Agreement, or any other agreement between Sellers and Buyer or their respective Affiliates entered into on or after the date hereof relating to the foregoing;

(q)      all of Sellers' direct or indirect interests in the Persons listed in Section 2.03(q) of the Disclosure Schedules;

(r)      all Excluded Actions;

(s)      any funds collected on behalf of another person or held (whether in trust or otherwise) pursuant to applicable Law for the benefit of a U.S. federal, state, county or city taxing or licensing authority with respect to an unpaid Tax obligation, solely to the extent such funds are funded in accordance with the DIP Budget; and

(t)      Consigned Inventory unless an election is made by Buyer pursuant to Section 7.15.

Section 2.04.    *Excluded Liabilities*. Notwithstanding any provision in this Agreement to the contrary, except solely for the Assumed Liabilities, Buyer shall not assume, be required to pay, perform or discharge, or be liable for any Liabilities of any Seller, of whatever nature, whether presently in existence or arising hereafter, whether or not related to the Business or the Purchased Assets, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, and Sellers shall retain and be responsible for all Liabilities of a Seller other than solely the Assumed Liabilities, including the following (the Liabilities described in this <u>Section 2.04</u> collectively, the "**Excluded Liabilities**"):

(a)    all Liabilities for any Taxes (in each case, other than (x) Liabilities for Taxes of any Purchased Entity, or (y) Transfer Taxes for which Buyer is liable pursuant to <u>Section 7.06(a)</u> of this Agreement, or (z) Specified Sales Taxes, (i) arising from or with respect to the Purchased Assets, the Assumed Liabilities or the operation of the Business that are attributable to any Pre-Closing Tax Period (including, with respect to any Taxes arising in a Straddle Period, the portion of such Taxes that are allocable to the Seller under <u>Section 7.06(c)</u>, (ii) imposed on or with respect to the Excluded Assets or Excluded Liabilities, (iii) of any Seller or any Affiliate (other than a Purchased Entity) or predecessor of Seller for any period, including Taxes of Seller or any Affiliate (other than a Purchased Entity) or predecessor of Seller that could become a liability of, or be assessed or collected against, Buyer or any of its Affiliates (including the Purchased Entities), or that could become an Encumbrance on the Purchased Assets, (iv) for which Seller or any of its Affiliates (other than a Purchased Entity) would be liable as a result of being a member of an affiliated, consolidated, combined or unitary group on or prior to the Closing Date, pursuant to Treasury Regulations Section 1.1502-6 or any analogous or similar Law, and (v) arising in connection with the transactions contemplated by this Agreement (other than Transfer Taxes for which Buyer is liable pursuant to <u>Section 7.06(a)</u> of this Agreement);

(b)    Reserved;

(c)    all Liabilities arising under any Excluded Contract, other than those described in <u>Section 2.02(l)</u>;

(d)    all Liabilities of Sellers for Indebtedness, including any intercompany Indebtedness among Sellers or due from a Purchased Entity to a Seller;

(e)    all Liabilities relating to any accounts payable other than those specifically identified by Buyer as an Assumed Liability;

(f)    all Liabilities and other obligations of Sellers relating to or arising from any Collective Bargaining Agreement (except as required by applicable Law);

(g)    all Liabilities associated with Service Providers who do not become Transferred Employees, other than, with respect to any such Service Providers, (i) IBNR Claims, (ii) Post-Closing COBRA Liabilities and (iii) Post-Petition Wages;

(h)     all Liabilities arising out of, relating to, or with respect to any notice pay or benefits and claims under the WARN Act with respect to any current or former Service Provider arising on or prior to the Closing Date;

(i)     all Service Provider Agreements and Seller Plans (other than the Assumed Plans and Agreements and the Purchased Entities' Plans), and Liabilities arising out of, relating to or with respect to any Service Provider Agreement or any Seller Plan (other than the Assumed Plans and Agreements and the Purchased Entities' Plans);

(j)     all Liabilities arising out of, relating to, or with respect to any bonus or other incentive compensation arrangement of Sellers, including, without limitation, the accrued, but un-paid, 2022 annual incentive bonuses;

(k)     all Liabilities arising out of, relating to, or with respect to any Service Provider's accrued paid time off under any vacation or other paid time off policy or similar arrangement of Sellers (the "**PTO Liabilities**");

(l)     all Ordinary Course current Liabilities of the Sellers attributable to the ownership or operation of the Purchased Assets in respect of the period following the Petition Date and prior to the Closing other than those set forth in <u>Section 2.02(m)</u>, Section 2.02(n), <u>2.02(o)</u>, <u>2.02(p)</u>, and <u>2.02(q)</u>;

(m)     all Liabilities arising in connection with any violation of any applicable Law relating to the period prior to the Closing;

(n)     all Liabilities of Sellers to their equity holders;

(o)     all Liabilities arising out of relating to any business or property formerly owned or operated by any of the Sellers, any affiliate or predecessor thereof, but not presently owned and operated by the Sellers;

(p)     all Liabilities of Sellers arising under or pursuant to any Environmental Health and Safety Requirements, including with respect to any real property owned, operated, leased or otherwise used by Sellers, whether or not used in the Ordinary Course, including any Liabilities for noncompliance with any Environmental Health and Safety Requirements (including the Release of Hazardous Materials), in each case to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Closing, whether known or unknown as of the Closing;

(q)     all Liabilities arising out of, relating to or with respect to any Order or Proceeding involving, against or affecting, any Purchased Asset (i) commenced, filed, initiated or threatened as of the Closing or (ii) relating to facts, events or circumstances arising or occurring prior to the Closing;

(r)     any obligation of any Seller to indemnify any Person by reason of, or in connection with, the fact that such Person was a director, officer, manager, employee or agent of such Seller or any Purchased Entity or any other Person;

26

(s)     all Liabilities for: (i) costs and expenses incurred or owed in connection with the administration of the Chapter 11 Cases by Sellers; and (ii) all costs and expenses incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement by Sellers;

(t)     all Liabilities arising out of, relating to or with respect to any Proceedings whether in existence prior to, at the Closing Date or arising thereafter relating to Sellers or the Excluded Assets;

(u)     all Capped Assumed Liabilities, other than Buyer's payment obligation in respect of Capped Assumed Liabilities up to the Accrued Liabilities Cap; and

(v)     all other Liabilities of Sellers that are not expressly included as Assumed Liabilities or that relate to any Excluded Asset, whether arising prior to or after the Closing.

Section 2.05.     *Assignment of Contracts and Rights.*

(a)     On or before the date of this Agreement, Sellers have delivered to Buyer a schedule that contains a substantially complete list of each material Contract to which a Seller is a party or by which a Seller is bound, of Sellers and Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (the "**Original Contract & Cure Schedule**"). On or before the date of this Agreement, Sellers shall deliver to Buyer an updated Original Contract & Cure Schedule that includes a substantially complete list of each Contract to which a Seller is a party or by which a Seller is bound, of Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract and, subject to Buyer's consent (which consent shall not be unreasonably withheld, conditioned or delayed), such updated schedule shall hereinafter be deemed to be the "Original Contract & Cure Schedule". From the date on which such Original Contract & Cure Schedule is provided to Buyer through (and including) the date which is three (3) days prior to the Closing Date, promptly following any changes to the information set forth on the Original Contract & Cure Schedule (including any new Contracts to which any Seller becomes a party and any change in the Cure Cost of any Contract), or as reasonably requested by Buyer, Sellers shall provide Buyer with a schedule that updates and corrects such information (as such schedule may be amended, supplemented or otherwise modified from time to time prior to the Closing Date in accordance with the terms of this Agreement, the "**Contract & Cure Update Schedule**"). Sellers shall be responsible for the verification of all Cure Costs for each Contract and shall, in consultation with and subject to the consent of Buyer, use their reasonable best efforts to establish Cure Costs for each Contract prior to the Closing Date.

(b)     At any time, but in no event later than one (1) Business Day prior to the Closing Date, Buyer may, by written notice to the Company eliminate any Contract (including any Lease) from Section 2.01(a) of the Disclosure Schedules as a Purchased Contract. At any time, but in no event later than the date hereof, Buyer may, by written notice to the Company add any Contracts (including any Lease) to Section 2.01(a) of the Disclosure Schedules as a Purchased Contract; provided, Sellers shall promptly give notice to the other parties to such Contract informing them of the assumption of such Contract, including by providing them with the Cure Costs and the amount that Buyer proposes to pay in satisfaction of such Cure Costs ("**Cure Payment**"), and an opportunity to object to such Cure Costs. The procedures for establishing Cure

27

Costs, Cure Payment, and any other procedures relating to the negotiation and payment of Cure Costs shall be set forth in the Sale Motion. Automatically upon the elimination of any Contract as a Purchased Contract in accordance with the first sentence of this Section 2.05(b), such Contract will constitute an Excluded Contract and will not be assigned to Buyer, and no Liabilities arising thereunder or relating thereto shall be assumed by Buyer. The Parties acknowledge and agree that there will be no reduction in, or increase to, the Purchase Price as a result of any addition or elimination of any Contract as a Purchased Contract; provided, however, that any such addition or elimination may increase or decrease (as applicable) the extent of the Assumed Liabilities, Purchased Assets and/or Excluded Contracts.

(c)     Sellers shall use their reasonable best efforts to assign the Purchased Contracts to Buyer, including using their reasonable best efforts to take all actions required to facilitate any negotiations with the counterparties to such Purchased Contracts and to obtain an Order containing a finding that the proposed assumption and assignment of the Purchased Contracts to Buyer satisfies all requirements of Section 365 of the Bankruptcy Code; provided that, for the avoidance of doubt, any Cure Cost with respect to such Purchased Contract shall constitute an Assumed Liability.

(d)     Except as to Purchased Contracts, this Agreement shall not constitute an agreement to contribute, transfer, assign or deliver any Purchased Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted contribution, transfer, assignment, or delivery thereof without the consent of a third party or Governmental Authority (each, a "**Transfer Consent**"), would conflict with, violate, constitute a breach or default under any related Contract or violate any applicable Law or in any way otherwise adversely affect the rights of Buyer or Sellers thereunder. If such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, Sellers and Buyer will reasonably cooperate in a mutually agreeable arrangement (at Sellers' cost and expense) under which Buyer would obtain the claims, rights or benefits and assume the obligations thereunder in accordance with this Agreement without any further additional consideration. For the avoidance of doubt, the failure to obtain any Transfer Consent with respect to any Purchased Asset shall not delay the Closing; provided that, from and after the Closing, Sellers shall use their reasonable best efforts to obtain such Transfer Consent for Buyer with respect to such Purchased Asset. Upon obtaining any such Transfer Consent with respect to the applicable Purchased Asset after the Closing, such Purchased Asset shall promptly be transferred and assigned to Buyer or a Buyer Designee in accordance with the terms of this Agreement, the Sale Order, and the Bankruptcy Code without any further additional consideration. Buyer may request, in its reasonable business judgment, certain modifications and amendments to any Contract as a condition to such Contract being designated as a Purchased Contract, and Sellers shall use their reasonable best efforts to obtain such modifications or amendments.

(e)     At Closing, pursuant to the Sale Order and the Assumption and Assignment Agreements, Sellers shall assign or cause to be assigned to Buyer (the consideration for which is included in the Purchase Price) each of the Purchased Contracts that is capable of being assigned.

(f)     If any Contract requires the payment of Cure Costs in order to be assumed and assigned pursuant to Section 365 of the Bankruptcy Code, and such Cure Costs are or will be

undetermined on the Closing Date because a non-Seller counterparty to such Contract proposed Cure Costs in an amount that is different than the amount of Cure Costs proposed by Sellers and has not consented to the Cure Payment and such disagreement will not be resolved prior to the Sale Hearing (each such Contract, a "**Disputed Amount Contract**"), then Sellers shall provide Buyer, not less than three (3) days prior to the Sale Hearing, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Costs that has been proposed by each such non-Seller counterparty. If Sellers, with the consent of Buyer, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Costs for such Disputed Amount Contract prior to the Sale Hearing, solely upon Buyer's written request, Sellers shall seek to have the amount of Cure Costs related to such Disputed Amount Contract determined by the Bankruptcy Court at the Sale Hearing. Upon final determination of such Cure Costs, Buyer may elect, at its sole cost and expense, to re-designate such Purchased Contract as an Excluded Contract or Designated Contract. If such Purchased Contract is not so re-designated, (x) the applicable Sellers shall promptly take such steps as are reasonably necessary, including, if applicable and reasonably practicable, promptly on delivery of no less than five (5) Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller and assigned to Buyer, including by executing and delivering to Buyer an Assumption and Assignment Agreement with respect to such Purchased Contract, and (y) Buyer shall pay the Cure Costs with respect to such Purchased Contract either (i) concurrently with their assumption and assignment thereof to Buyer or (ii) as agreed in writing by Buyer and the applicable counterparty to such Purchased Contract, and Buyer shall execute and deliver to the applicable Sellers an Assumption and Assignment Agreement with respect to such Purchased Contract; <u>provided</u> that all undisputed Cure Costs for Purchased Contracts shall be paid by Buyer as soon as reasonably practicable after Closing, unless a later term is provided for in the Ordinary Course with respect to a Purchased Contract, or as otherwise agreed with any counterparty to a Purchased Contract. Notwithstanding the foregoing, if, following the Closing, it is discovered that a Contract that should have been listed on the Original Contract & Cure Schedule or any Contract & Cure Update Schedule was not so listed, Sellers shall, to the extent Sellers are still debtors-in-possession in the Chapter 11 Cases, promptly following the discovery thereof, notify Buyer in writing of any such Contract and the Seller's good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any such Contract, the amount of such Cure Cost shall be designated for such Contract as "$0.00"), and upon Buyer's request, take all actions reasonably required to assume and assign to Buyer such Contract.

(g)     At any time prior to Closing, by written notice to Sellers, Buyer may, in its sole discretion, designate any Contract or Lease (a "**Designated Contract**") to be listed on <u>Section 2.05(g)</u> of the Disclosure Schedules. At any time that is at least ten (10) days prior to the end of the Designation Rights Period, by written notice to Sellers, Buyer may (i) designate any Designated Contract for assumption and assignment to Buyer or its designee by paying the Cure Costs determined pursuant to <u>Section 2.05(f)</u> of this Agreement or (ii) designate any Designated Contract to be an Excluded Contract (an "**Excluded Contract Notice**"). Two (2) Business Days after delivery of an Excluded Contract Notice to Sellers, any Designated Contract listed in such Excluded Contract Notice shall be deemed to be an Excluded Contract. Any Contract or Lease that is not assumed and assigned before the expiration of the Designation Rights Period shall be deemed an Excluded Contract effective as of the date on which the Designation Rights Period expires. For the avoidance of doubt, all Contracts and Leases that are not designated by Buyer to be Purchased Contracts or Designated Contracts immediately prior to the Closing shall be deemed

29

to be an Excluded Contract, and all Designated Contracts assumed and assigned to Buyer or its designee pursuant to this <u>Section 2.05</u> shall be Purchased Contracts.

(h)     Notwithstanding <u>Section 2.05(g)</u> above, during the Designation Rights Period, Buyer may enter into an agreement with the counterparty to any Designated Contract pursuant to which such counterparty consents to the assumption and assignment to Buyer or its designee of such Designated Contract on the terms set forth in such agreement, and such agreement shall be effective without further order of the Bankruptcy Court.

(i)     During the Designation Rights Period, the Sellers shall not reject, terminate, amend, supplement, modify, waive any rights under, or create any adverse interest with respect to any Designated Contract or take any affirmative action not required thereby, without the prior written consent of Buyer unless Buyer has provided written notice to the Sellers designating such Contract or Lease for rejection pursuant to this <u>Section 2.05(i)</u>.

(j)     At the Closing, Buyer shall deliver to the Company updated versions of <u>Section 2.01(a)</u> of the Disclosure Schedules, <u>Section 2.03(b)</u> of the Disclosure Schedules, and <u>Section 2.05(g)</u> of the Disclosure Schedules, each updated in accordance with this <u>Section 2.05</u>.

Section 2.06.     *Purchase Price*. On the terms and subject to the conditions contained herein, the aggregate consideration for the Purchased Assets (the "**Purchase Price**") shall consist of (i) cash in an amount equal to $39,947,305.40 (the "**Cash Balance**"), which shall be paid at Closing pursuant to <u>Section 2.07</u> and <u>Section Section 2.09(b)(i)</u>, (ii) if the amount of Cash and Cash Equivalents held by Sellers at Closing (excluding any amounts in Excluded Accounts) (such amount, the "**Closing Cash**") is less than the Minimum Cash Amount, cash in an amount equal to the difference between the Minimum Cash Amount and the Closing Cash (the "**Minimum Cash Shortfall**"),, and (iii) the assumption of the Assumed Liabilities, including the payment of the Cure Costs for the Purchased Contracts, which shall be paid to the applicable obligees identified on the Contract & Cure Update Schedule pursuant to <u>Section 2.09(b)(ii)</u>; <u>provided</u>, <u>however</u>, that Buyer reserves the right, in its sole discretion, to increase the Purchase Price (including any component thereof), subject to applicable Law.

Section 2.07.     *Deposit*. Promptly following the execution of this Agreement, Buyer (or Guarantor on its behalf) shall immediately deposit an aggregate equal to $3,994,730.00 in cash into the Deposit Escrow Account (the "**Deposit**"). The Deposit shall be released and delivered by the Escrow Agent to either Buyer or Sellers, as applicable, as follows, in each case in accordance with the Escrow Agreement:

(a)     if the Closing occurs, the Deposit shall be released to the Sellers and applied against the Cash Balance.

(b)     if this Agreement is terminated by Sellers pursuant to <u>Section 10.01(n)</u>, the Deposit shall be released to Sellers within five (5) Business Days after such termination; or

(c)     if this Agreement is terminated for any reason (other than a termination pursuant to <u>Section 10.01(n)</u>) shall be returned to Buyer within five (5) Business Days after such termination.

Section 2.08.    *Purchase Price Allocation.* No later than one hundred twenty (120) days after the Closing Date, Buyer shall deliver to the Company a schedule (i) allocating the Purchase Price (and any adjustments thereto as determined for U.S. federal income tax purposes) between each Seller (or, in the case of a Seller that is an entity that is treated as disregarded for U.S. federal income tax purposes, such Seller's regarded owner for U.S. federal income tax purposes), and (ii) allocating the Purchase Price (and any adjustments thereto as determined for U.S. federal income tax purposes) among the Purchased Assets (and if a Purchased Asset is an equity interest in a Purchased Entity that is classified as a disregarded entity for U.S. federal income tax purposes, the assets of such Purchased Entity) and Assumed Liabilities of such Seller (or such Seller's regarded owner for U.S. federal income tax purposes), (such schedule, the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Code, the regulations promulgated thereunder, and any similar provision of applicable Law. The Parties shall (and shall cause their respective Affiliates to) file all Tax Returns, including Form 8594 (Asset Acquisition Statement under Section 1060 of the Code), in a manner consistent with the Allocation Schedule and shall not take (or permit any of their respective Affiliates to take) any position inconsistent therewith upon examination of any Tax Return, in any Tax refund claim, in any Proceeding related to Taxes, or otherwise unless otherwise required by determination within the meaning of Section 1313(a) of the Code (and comparable provision of state, local, or non-U.S. Laws) or other binding settlement on audit. If any taxing authority disputes the final Allocation Schedule, the Party receiving notice of the dispute shall promptly notify the other Party hereto of such dispute and the Parties shall cooperate in good faith in responding to such dispute in order to preserve the effectiveness of the Allocation Schedule; provided that, subject to the immediately succeeding proviso, nothing in this Section 2.08 shall impede the ability of any of the Parties or any of their respective Affiliates to compromise and/or settle any Proceeding relating to the Allocation Schedule.

Section 2.09.    *Closing.* The closing (the "**Closing**") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder shall take place via the exchange of documents by mail or electronic delivery services, as soon as possible following entry of the Sale Order, but in no event later than three (3) Business Days, after satisfaction of the conditions set forth in Article 8, or at such other time or place as Buyer and the Company may agree in writing. At the Closing:

(a)    Sellers shall deliver, or cause to be delivered, to Buyer:

(i)    one or more assumption and assignment agreements, in the form attached hereto as Exhibit A (the "**Assumption and Assignment Agreements**"), duly executed by each applicable Seller;

(ii)    one or more bills of sale, in the form attached hereto as Exhibit B (the "**Bills of Sale**"), duly executed by each applicable Seller;

(iii)    an instrument evidencing the assignment of all Trademarks included in the Purchased Assets, in the form attached hereto as Exhibit C (the "**Assignment of Trademarks**") duly executed by each applicable Seller;

31

(iv)    an instrument evidencing the assignment of all Domain Names included in the Purchased Assets, in the form attached hereto as <u>Exhibit D</u> (the "**Assignment of Domain Names**") duly executed by each applicable Seller;

(v)    original stock, unit or interest certificates evidencing the Purchased Shares (if any) duly endorsed in blank or accompanied by stock powers or other instruments of transfer duly executed in blank, with any required stock transfer tax stamps affixed thereto;

(vi)    a certificate, dated as of the Closing Date, executed by a duly authorized officer of the Company certifying that the conditions set forth in <u>Section 8.02(a)</u> and <u>Section 8.02(b)</u> have been satisfied;

(vii)    copies of all Records in the possession or control of any Seller;

(viii)    with respect to any Seller that is a "United States person" within the meaning of Section 7701(a)(30) of the Code (a "**US Person**"), and any Seller that is disregarded as a separate entity from a US Person for income tax purposes, a properly completed and executed valid IRS Form W-9 of such Seller or such Seller's regarded owner that is a US Person, as applicable;

(ix)    each third-party consent, waiver, authorization, or approval set forth on <u>Section Section 2.09(a)(ix)</u> of the Disclosure Schedules, each in form and substance reasonably acceptable to Buyer;

(x)    in connection with the Vendor Loan Agreement, an irrevocable payoff letter signed by all lenders which (x) establishes the overall amount of indebtedness to be paid by Seller and (y) provides further that, upon payment of an amount equal to €5,975,000, all outstanding amounts due under the Vendor Loan Agreement have been satisfied in full;

(xi)    an instrument evidencing the assignment of all Patents included in the Purchased Assets, in the form attached hereto as <u>Exhibit F</u> (the "**Assignment of Patents**") duly executed by each applicable Seller; and

(xii)    such other deeds, bills of sale, assignments, memoranda of assignment, share transfer forms and other good and sufficient instruments of conveyance and assignment as Buyer deems reasonably necessary to vest in, and transfer to, Buyer all right, title and interest in, to and under the Purchased Assets (including the Purchased Shares), each in form and substance reasonably acceptable to Buyer.

(b)    Buyer shall deliver, or cause to be delivered, to the Company or to such other Person(s) as may be entitled to payment therefrom, as applicable:

(i)    unless otherwise ordered by the Bankruptcy Court, the DIP Payoff Amount, by wire transfer of immediately available funds, to the bank account(s) designated in writing by the Agent (as defined in the DIP Credit Agreement) at least two (2) Business Days prior to the Closing Date; <u>provided</u> that the Parties agree that (x) the DIP Payoff Amount is being wired by or on behalf of Buyer directly to the Agent (as defined in the DIP Credit Agreement) solely for administrative convenience and (y) the DIP Payoff Amount shall be treated as paid by Buyer to

32

Sellers, and then, upon application against the Obligations (as defined in the DIP Credit Agreement) pursuant to the terms and conditions of the DIP Credit Agreement, by Seller to the Agent, for all purposes;

(ii)  the Cash Balance *minus* the Deposit *minus* the DIP Payoff Amount, by wire transfer of immediately available funds, to the bank account(s) designated in writing by the Sellers at least two (2) Business Days prior to the Closing;

(iii)  the Cure Costs on account of the Purchased Contracts, to the obligees identified on the Contract & Cure Update Schedule;

(iv)  the Assumption and Assignment Agreements, duly executed by Buyer or the applicable Buyer Designee;

(v)  the Bills of Sale, duly executed by Buyer or the applicable Buyer Designee;

(vi)  the Assignment of Trademarks, the Assignment of Domain Names and the Assignment of Patents, in each case, duly executed by Buyer or the applicable Buyer Designee;

(vii)  a certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer certifying that the conditions set forth in Section 8.03(a) and Section 8.03(b) have been satisfied;

(viii)  the Minimum Cash Shortfall, if any, by wire transfer of immediately available funds, to the bank account designated in writing by Sellers;

(ix)  in connection with the Vendor Loan Agreement, cash in an amount equal to €5,975,000, by wire transfer of immediately available funds, to the bank account designated in writing by Sellers; and

(x)  such other assignments and other good and sufficient instruments of assumption and transfer, in form satisfactory to Buyer and Sellers, as Sellers may reasonably request to transfer and assign the Purchased Assets and Assumed Liabilities to Buyer.

(c)  Company and Buyer or a Buyer Designee shall enter into a German law governed notarial share transfer agreement in order to effect the assignment of the shares (*Geschäftsanteile*) in the German limited liability company (*GmbH*) iMedia & 123tv Holding GmbH with its seat in Grünwald, registered in the commercial register (*Handelsregister*) of the local court (*Amtsgericht*) of Munich under HRB 267579 from the Company to the Buyer or the Buyer Designee, substantially in the form attached hereto as Exhibit E (the "**STA Germany**").

Section 2.10.    *Withholding*. Buyer shall be entitled to deduct and withhold (or cause to be deducted and withheld) from the consideration otherwise payable pursuant to this Agreement to any Person such amounts as Buyer (or any agent thereof) is required to deduct and withhold under the Code, or any Tax Law, with respect to the making of such payment; provided that Buyer shall use commercially reasonable efforts to promptly notify the applicable Seller of its intention

33

to deduct or withhold in respect of any consideration otherwise payable to Sellers. To the extent that amounts are withheld and paid to the appropriate Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction and withholding was made, and in no event shall the withholding reduce the Cash Balance.  As of the date hereof, the Buyer and the Sellers each acknowledge that it is not aware of any obligation to deduct or withhold any amount from the consideration payable pursuant to this Agreement under the Code or any other Tax Law, provided each of the Sellers satisfies the requirements of Section 2.09(a)(viii).

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF SELLERS

Except (a) as set forth in the Disclosure Schedules, but subject to Section 11.12, or (b) as disclosed in any form, document or report publicly filed with or publicly furnished to the U.S. Securities and Exchange Commission (the "**SEC**") by any Seller in the three (3) years prior to the date hereof (the "**Company SEC Documents**") (so long as such documents are publicly available via the Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system or have been provided to Buyer at least 24 hours prior to the date of this Agreement and excluding any statements in any "Forward-Looking Statements "or "Risk Factors" sections or any other disclosures contained therein to the extent that such statements are cautionary, predictive or forward-looking in nature but, for the purpose of clarification, including and giving effect to any factual or historical statements included in any such statement), it being understood that any matter disclosed in such filings shall not be deemed disclosed for purposes of the Seller Fundamental Representations, each Seller hereby jointly and severally represents and warrants to Buyer as follows:

Section 3.01.      *Organization and Qualification*. Except as set forth on Section 3.01 of the Disclosure Schedules, each Group Company is duly organized, validly existing and in good standing (where applicable) under the Laws of its respective jurisdiction of formation or organization and, subject to the provisions of the Bankruptcy Code, has requisite power and authority to own, lease and operate its properties, where such properties are now owned, leased or operated, and conduct its business (including the Business) as currently conducted. Except as set forth on Section 3.01 of the Disclosure Schedules, each Group Company is duly qualified or licensed to do business and is in good standing as a foreign corporation in each jurisdiction where such qualification is required for the ownership or operation of the Purchased Assets, except for failures to be so qualified or to be in such good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

Section 3.02.      *Authorization; Execution and Delivery; Enforceability*.  Subject to entry of the Sale Order and any other applicable Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents: (a) the execution, delivery and performance of this Agreement and each Transaction Document to which a Group Company is a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of such Group Company, (b) each Group Company has all necessary power and authority to execute and deliver this Agreement and each other Transaction Document to which such Group

34

Company is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder, (c) this Agreement has been, and at or prior to the Closing, each Transaction Document to which each Group Company is a party will be, duly and validly executed and delivered by such Group Company and, assuming due authorization, execution and delivery by the other Parties, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of such Group Company, enforceable against such Group Company in accordance with its terms, subject to Bankruptcy Law.

Section 3.03.        *Noncontravention; Consents and Approvals*.

(a)        Neither the execution and delivery by any Group Company of this Agreement and each other Transaction Document to which a Group Company is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order and any other applicable Order of the Bankruptcy Court, (i) conflict with or result in a breach of the organizational documents of any Group Company, (ii) violate any Law or Order to which any Group Company, or its assets or properties, or any of the Purchased Assets may be subject, or (iii) except as set forth on Section 3.03(a) of the Disclosure Schedules, conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on, any Contract to which any Group Company is a party or by which any Group Company, or its assets or properties, is bound or to which any of the Purchased Assets is subject, after giving effect to the Sale Order and any applicable Order of the Bankruptcy Court authorizing the assumption and assignment of any such Contract that is a Purchased Contract hereunder, except, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Entities, the Purchased Assets or the Assumed Liabilities, taken as a whole.

(b)        Other than (i) the entry of the Sale Order or any other applicable Order of the Bankruptcy Court, and (ii) as set forth on Section 3.03(b) of the Disclosure Schedules, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Group Company in connection with the execution and delivery of this Agreement or any other Transaction Document which any Group Company is a party, the compliance by Group Companies with any of the provisions hereof or thereof, the consummation of transactions contemplated hereby or thereby or any other action by any Group Companies contemplated hereby or thereby (with or without notice or lapse of time, or both), except for such consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Entities, the Purchased Assets or the Assumed Liabilities, taken as a whole.

Section 3.04.        *Purchased Entities*.

(a)        Section 3.04(a) of the Disclosure Schedules sets forth, with respect to each Purchased Entity, (i) the name, (ii) the jurisdiction of formation or organization, (iii) the

137451785_15

authorized, issued and outstanding equity interests, and (iv) each owner of record of the Purchased Shares of such Purchased Entity (including the Purchased Shares). The Purchased Shares have been duly authorized and validly issued, are fully paid and non-assessable (where applicable) and have not been issued in violation of any preemptive rights, rights of first offer, rights of first refusal or similar rights, and are owned beneficially, of record and with good and valid title by the applicable Group Company set forth on Section 3.04(a) of the Disclosure Schedules, free and clear of any Encumbrances (other than Permitted Encumbrances). The Purchased Shares constitute all of the outstanding equity interests of the Purchased Entities.

(b)    Section 3.04(b) of the Disclosure Schedules sets forth, with respect to each Purchased Entity, any Subsidiary or any other Person in which such Purchased Entity owns, of record or beneficially, any direct or indirect equity or similar interests or any right (contingent or otherwise) to acquire any direct or indirect equity or similar interests.

(c)    No Purchased Entity is under any obligation, or is bound by any Contract pursuant to which such Purchased Entity may become obligated to, following entry of the Sale Order, (i) declare, make or pay any dividends or distributions, whether current or accumulated or due or payable or (ii) make any loan to, investment in, or capital contribution to, any Person. There are no outstanding options, warrants, calls, rights, subscriptions, arrangements, claims, commitments (contingent or otherwise) or any other agreement or Contract to which any Purchased Entity is a party, or is otherwise subject, that requires the issuance, sale or transfer of any additional shares of capital stock or other equity securities of any Purchased Entity convertible into, exchangeable for or evidencing the right to subscribe for or purchase capital stock or other equity securities of any Purchased Entity. No Seller or any Purchased Entity is a party, or is otherwise subject, to any voting trust or other voting agreement with respect to the Purchased Shares or to any agreement or Contract relating to the issuance, sale, redemption, transfer, acquisition, disposition or registration of the Purchased Shares.

(d)    Except as set forth on Section 3.04(d) of the Disclosure Schedules, there are no other limited liability companies, partnerships, joint ventures, associations or other entities or Persons in which any Seller or Purchased Entity holds any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

Section 3.05.    *Title to and Sufficiency of Purchased Assets.* Sellers have good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and, at the Closing, subject to the Sale Order and any other applicable Order of the Bankruptcy Court, and subject to Section 2.05, Sellers will transfer, convey and assign good and valid title to, or valid leasehold interests in, the Purchased Assets (including record and beneficial ownership of the Purchased Shares) free and clear of all Encumbrances (other than Permitted Encumbrances). Except (a) as set forth on Section 3.05 of the Disclosure Schedules and (b) for the exclusion of the Excluded Assets, and subject to entry of the Sale Order and any other applicable Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents and the assumption by Buyer of all Purchased Contracts in accordance with applicable Law (including satisfaction of all applicable Cure Costs), the Purchased Assets, together with the assets of the Purchased Entities, constitute all of the material assets, properties and rights held for use or necessary to operate and conduct the Business in all material respects in the Ordinary Course. Except as set forth on Section 3.05 of the

36

Disclosure Schedules, neither Portal Acquisition Company nor 317047 B.C. Ltd, each as Subsidiary of the Company, hold any assets, properties or rights, either individually or in the aggregate, that are material to the operation of the Business.

Section 3.06.        *Litigation*. Except as set forth on <u>Section 3.06</u> of the Disclosure Schedules: (a) there are no Proceedings pending, or, to the Knowledge of Sellers, threatened against any Seller (with respect to the Purchased Assets or the Assumed Liabilities) or against any Purchased Entity, which, in each case, would reasonably be expected to affect in any material respect Sellers' ability to perform their obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby, result in losses in excess of $250,000 individually or $2,000,000 in the aggregate or the imposition of material non-monetary relief; (b) there are no Orders outstanding (including any settlement with any Governmental Authority or other Person, administrative order, decree, or agreement) with respect to which any Seller (with respect to the Purchased Assets or Assumed Liabilities) or Purchased Entity have any continuing or outstanding obligations; and (c) for the past three (3) years, the Sellers have not received written notice from any Governmental Authority of any criminal or civil regulatory Proceedings pending or, to the Knowledge of Sellers, threatened in writing against any Seller (with respect to the Purchased Assets or the Assumed Liabilities) or Purchased Entity.

Section 3.07.        *Permits; Compliance with Laws*.

(a)        Sellers (with respect to the Purchased Assets and the Assumed Liabilities) and the Purchased Entities are in possession of all material Permits necessary to carry on and operate as currently conducted, except as would not reasonably be expected to be material to the Purchased Assets, the Assumed Liabilities, and the Purchased Entities, taken as a whole.

(b)        For the past three (3) years, Sellers (with respect to the Purchased Assets and the Assumed Liabilities) and the Purchased Entities have been in compliance in all material respects with applicable Laws.

Section 3.08.        *Material Contracts*.

(a)        <u>Section 3.08(a)</u> of the Disclosure Schedules sets forth a true, correct and complete list of the following Contracts to which any Group Company is a party as of the date hereof (and Sellers have made available to Buyer true, correct and complete copies of all such Contracts, together with all amendments, modifications or supplements thereto):

(i)        any Contract relating to the formation, creation, governance, economics or control of any partnership, joint venture, strategic alliance or similar arrangement with any Person that is not a Group Company;

(ii)        any Contract relating to any options, rights (preemptive or otherwise), warrants, calls or convertible securities of the Purchased Entities;

(iii)        any Contract relating to (A) the Indebtedness of any Group Company in excess of $100,000 or (B) the mortgage or pledge of, or otherwise creating an Encumbrance (other than a Permitted Encumbrance) on, any of the Purchased Assets in excess of $100,000 (in each case, other than intercompany Indebtedness amongst the Group Companies);

(iv)    any Contract relating to the acquisition or disposition of any business, assets or properties for consideration in excess of $100,000 (whether by merger, sale of stock, sale of assets or otherwise) as to which any material earn-out, indemnification or deferred or contingent payment obligations remain outstanding (in each case, excluding for the avoidance of doubt, purchase of inventory in the Ordinary Course);

(v)    any Lease with respect to the Leased Real Property;

(vi)    any Contract for the lease of tangible personal property to or from any Person providing for lease payments in excess of $50,000 per annum;

(vii)    any Contract with any Material Supplier;

(viii)    any Contract with any Governmental Authority;

(ix)    any Contract that (A) prohibits or limits the freedom of any Group Company to compete in any line of business with any Person or in any geographic area or (B) contains exclusivity obligations or restrictions binding on any Group Company or (C) grants any right of first refusal or right of first offer obligations or restrictions to any Person;

(x)    any material Contract under which any Group Company (A) has licensed any Intellectual Property from a third party (other than non-exclusive licenses for commercially available or off-the-shelf software or software that is subject to click through or shrink wrap agreements), or (B) grants to any third party any right to use or exploit any Purchased Intellectual Property (other than non-exclusive licenses of any Purchased Intellectual Property granted in the Ordinary Course);

(xi)    any Service Provider Agreement that (i) provides for annual base compensation in excess of $150,000 or (ii) is not terminable at-will, has more than a sixty (60) day contractual termination notice period or provides for contractual severance or change of control benefits; and

(xii)    any Contract that is a Collective Bargaining Agreement.

(b)    With respect to each Contract set forth on Section 3.08(a) of the Disclosure Schedules, and subject to entry of the Sale Order and any other applicable Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents and the assumption by Buyer of the applicable Contract in accordance with applicable Law (including satisfaction of all applicable Cure Costs), and except (x) as a result of the commencement of the Chapter 11 Cases or (y) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced, (i) such Contract is in full force and effect and constitutes the legal, valid and binding obligation of the Group Company party thereto and, to the Knowledge of Sellers, the counterparty thereto, enforceable against such Group Company and, to the Knowledge of Sellers, the counterparty thereto in accordance with its terms and conditions, subject to the Bankruptcy Law; (ii) the Cure Costs set forth in the Original Contract & Cure Schedule are true and correct; (iii) except as set forth on Section 3.08(b)(iii) of the Disclosure Schedules, neither the Group Company party thereto nor, to the Knowledge of Sellers, the counterparty thereto is in material breach or material default thereof that would permit

or give rise to a right of termination, modification or acceleration thereunder; and (iv) except as set forth on Section 3.08(b)(iv) of the Disclosure Schedules, no Group Company and, to the Knowledge of Sellers, no counterparty thereto, has commenced any Proceeding against any other party to such Contract or given or received any written notice of any breach or default under such Contract that has not been withdrawn or dismissed, except, in the cases of clauses (iii) and (iv), for breaches or defaults caused by or resulting from, or filings or objections made in, the Chapter 11 Cases or which would not, individually or in the aggregate, reasonably be expected to be material and adverse to the Business, the Purchased Assets, the Purchased Entities or the Assumed Liabilities, taken as a whole.

Section 3.09.    *Anti-Corruption, Anti-Money Laundering, and International Trade Compliance.*

(a)    Sellers and the Purchased Entities, and, to the Knowledge of Sellers, any directors, officers, employees, or representatives of Sellers or the Purchased Entities (but only their capacity as such) are and have been for the past five (5) years in compliance with all International Trade Laws. Sellers and the Purchased Entities, and, to the Knowledge of Sellers, any directors, officers, employees, or representatives of Sellers or the Purchased Entities, currently or during the past five (5) years: (i) is or has been a Sanctioned Person or has acted, directly or indirectly, on behalf of a Sanctioned Person; (ii) is unlawfully conducting or has unlawfully conducted any business or engaged in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person; or (iii) is unlawfully dealing in or has unlawfully dealt in, or otherwise engaged in, any transaction relating to, any property or interests in property of any Sanctioned Person.

(b)    None of Sellers or the Purchased Entities, and, to the Knowledge of Sellers, any directors, officers, employees, or representatives of Sellers or the Purchased Entities have received written or, to the Knowledge of Sellers, oral, notice of any current or threatened investigation, inquiry, complaint, lawsuit, voluntary or involuntary disclosure, warning letter, penalty notice, or other regulatory action or Proceeding, whether internal, by a government regulator or agency, or a private party, relating to any alleged violation of International Trade Laws, Anti-Corruption Laws or Anti-Money Laundering Laws, nor have Sellers  or the Purchased Entities, and, to the Knowledge of Sellers, any directors, officers, employees, or representatives of Sellers or the Purchased Entities (but only their capacity as such), been charged with or convicted of violating any International Trade Laws, Anti-Corruption Laws or Anti-Money Laundering Laws.

(c)    The Sellers and the Purchased Entities have adopted and implemented policies and procedures reasonably designed to prevent, detect and deter violations of applicable International Trade Laws, Anti-Corruption Laws or Anti-Money Laundering Laws.

(d)    None of Sellers or the Purchased Entities, and, to the Knowledge of Sellers, any directors, officers, employees, or representatives of Sellers or the Purchased Entities (but only their capacity as such) during the past five (5) years, (i) has made, offered, authorized or promised any illegal contributions, gifts, entertainment or other unlawful expenses relating to political activity, (ii) has violated or is violating any provision of applicable Anti-Corruption Laws or Anti-Money Laundering Laws, (iii) has made, offered, authorized or promised any payment, rebate, payoff,

influence payment, contribution, gift, bribe, rebate, kickback, or any other thing of value to any government official or employee, political party or official, campaign or candidate, or official, employee or representative of any public international organization or state-owned enterprise, regardless of form, to obtain favorable treatment in obtaining or retaining business or to pay for favorable treatment already secured in violation of any provision of applicable Anti-Corruption Laws or Anti-Money Laundering Laws, (iv) has made any bribe, unlawful rebate, payoff, influence payment, kickback or other similar payment of any nature or (v) has violated or is violating any Law that prohibits commercial bribery, domestic corruption or money laundering.

Section 3.10.    *Intellectual Property.*

(a)    Section 3.10(a) of the Disclosure Schedule sets forth a true and complete list of all of the following owned or purported to be owned by the Group Companies: (i) registered Trademarks and Trademark applications, Internet domain names, Patents and Patent applications, registered Copyrights and Copyright applications ("**Registered IP**"), and (ii) all social media accounts and handles ("**Social Media Accounts**").

(b)    The Trademarks which are registered or pending registration with a Governmental Authority (i) are all duly registered or filed in the name of one of the Group Companies, and (ii) are all in good standing with the Governmental Authority before which such Trademark is registered or pending.

(c)    the Group Companies have (i) used commercially reasonable efforts to enforce quality control measures adequate to maintain the validity and enforceability of any and all Trademarks that it has licensed any other Person to use, and (ii) complied with its duty of candor and disclosure to the United States Patent and Trademark Office and any other applicable Governmental Authority with respect to all applications for registration included in the Registered IP and have made no material misrepresentations in any such applications. Without limiting the foregoing, the Group Companies have not taken any action or failed to take any action that could reasonably be expected to result in the abandonment, cancellation, invalidation or unenforceability of any of registered or applied for Trademarks included in the Registered IP (other than non-use of Trademarks in the Ordinary Course).

(d)    The Group Companies (i) have paid all fees due as of the date hereof that are associated with maintaining and advertising on the Social Media Accounts, (ii) have not deactivated or deleted any material Social Media Accounts in the last six (6) months, and (iii) are in material compliance with all applicable Laws and terms concerning the use of the Social Media Accounts. Except as would not reasonably be expected to be material to the Purchased Assets and the Business, no Person has made any claims or allegations against the Group Companies concerning any violation of Law or any Person's rights in connection with the use of the Social Media Accounts.

(e)    The Group Companies have sufficient rights to use the Purchased Intellectual Property in connection with the operation of the Business, all of which rights shall survive unchanged following the consummation of the transactions contemplated by the performance of this Agreement and each Transaction Document. Other than rights licensed from (or otherwise used with permission from) third parties, (i) the Purchased Intellectual Property

40

includes all Intellectual Property used or held for use in connection with the operation of the Business, and (ii) there are no other items of Intellectual Property that are material to or necessary for the operation of the Business or for the continued operation of the Business immediately after the Closing in substantially the same manner as operated prior to the Closing. A Group Company is the exclusive owner of all right, title and interest in and to each item of Purchased Intellectual Property, free and clear of all Encumbrances, other than Permitted Encumbrances.

(f)     The Registered IP is (i) to the Knowledge of Sellers, valid, subsisting and enforceable, (ii) currently in compliance with any and all formal legal requirements necessary to maintain the validity and enforceability thereof, and (iii) not subject to any outstanding order, judgment, injunction, decree, ruling or agreement adversely affecting the Business's use thereof or rights thereto, or that would impair the validity or enforceability thereof. The Registered IP is currently in compliance with any and all formal legal requirements necessary to record and perfect the Group Companies' interest therein and the chain of title thereof. As of the date hereof there is no action or claim pending, asserted or threatened in writing against any Group Company contesting or challenging the ownership, validity, registerability or enforceability of, or the Group Companies' or any of their licensees' right to use, any Purchased Intellectual Property.

(g)     The Group Companies, the operation of the Business and the use of the Purchased Intellectual Property, and to the Knowledge of Sellers, the Company IT Assets in connection therewith, do not infringe, misappropriate or otherwise violate or conflict with the Intellectual Property rights of any other Person, and have not done so in the last three (3) years. There is no action or claim pending, asserted or threatened in writing against the Group Companies concerning any of the foregoing. To the Knowledge of Sellers, no Person is engaging, or has engaged in the last three (3) years, in any activity that infringes, misappropriates or otherwise violates or conflicts with any Purchased Intellectual Property, and there is no action or claim pending, asserted or threatened in writing by the Group Companies against any other Person concerning any of the foregoing.

(h)     The Group Companies have taken all reasonable measures consistent with industry best practices to maintain the confidentiality and value of all confidential information used or held for use in the operation of the Business. To the Knowledge of Sellers, no material confidential information, trade secrets or other confidential Purchased Intellectual Property have been disclosed by Sellers to or discovered by any Person except pursuant to appropriate non-disclosure and/or license agreements that (i) obligate such Person to keep such confidential information, trade secrets or other confidential Purchased Intellectual Property confidential, and (ii) are valid, subsisting, in full force and effect and binding on the parties thereto, and with respect to which no party thereto is in material default thereunder and no condition exists that with notice or the lapse of time or both could constitute a material default thereunder.

(i)     No present or former employee, officer, or director of the Group Companies, or agent or outside contractor or consultant of the Group Companies, holds any right, title or interest, directly or indirectly, in whole or in part, in or to any Purchased Intellectual Property. Except as would not reasonably be expected to be material to the Purchased Assets and the Business, no employee, contractor or agent of the Business is in material default or breach of any term of any employment agreement, non-disclosure agreement, assignment of invention agreement or similar agreement relating to the protection, ownership, development, use or transfer

41

of Purchased Intellectual Property. To the extent that any Purchased Intellectual Property has been conceived, developed, acquired or created for the Business by any other Person, the Group Companies, as applicable, have executed valid and enforceable written agreements with such Person with respect thereto transferring to the Business the entire and unencumbered right, title and interest therein and thereto by valid written assignment except where such right, title and interest is validly transferred to the Business by operation of law.

Section 3.11.    *Data Privacy and Information Security*.

(a)    The Company IT Assets (i) are adequate for, and operate and perform in all material respects in accordance with their documentation and functional specifications and otherwise as required in connection with, the operation of the Business, (ii) are, to the Knowledge of Sellers, free from material bugs, errors or other defects, (iii) except as would not reasonably be expected to be material to the Purchased Assets and the Business, have not materially malfunctioned, crashed, failed, experienced denial of service attacks or continued substandard performance or other adverse events, and (iv) to the Knowledge of Sellers, do not contain any Malicious Code. The Group Companies have implemented reasonable and appropriate anti-malware, anti-virus, backup, security, business continuity, and disaster recovery measures and technology and regularly tests those measures and technology.

(b)    Each Group Company complies, and has in the past three (3) years complied materially, with (i) public-facing privacy and data security policies, (ii) all applicable rules of self-regulatory organizations and codes of conduct, including the Payment Card Industry Data Security Standard (PCI DSS), (iii) applicable industry standards and guidelines concerning the Processing of Personal Information, (iv) all applicable Privacy Laws, and (v) all contractual obligations concerning information security and data privacy (including the Processing of Personal Information) (collectively, the "**Data Privacy/Security Requirements**"). All vendors, processors, subcontractors and other Persons acting for or on behalf of the Group Companies in connection with the Processing of Personal Information or that otherwise have been authorized to have access to the Company IT Assets or the Personal Information in the possession or control of Group Companies are subject to reasonable contractual requirements regarding the Processing of Personal Information, and, to the Knowledge of Sellers, comply, and have in the past three (3) years complied, with the Data Privacy/Security Requirements.  Neither the consummation of the transactions contemplated by the performance of this Agreement and each Transaction Document, nor any disclosure or transfer of information in connection therewith, will breach or otherwise cause any violation of any Data Privacy/Security Requirement or require the consent, waiver or authorization of, or declaration, filing or notification to, any Person under any such Data Privacy/Security Requirement. Except as would not reasonably be expected to be material to the Purchased Assets and the Business, there are not, and have not been in the last three (3) years, any legal actions pending by or threatened against any Group Company concerning any Data Privacy/Security Requirement or compliance therewith or violation thereof. To the Knowledge of Sellers, no disclosure or representation made or contained in any such privacy policy has been inaccurate, misleading, deceptive or in violation of any applicable Laws (including containing any material omission).

(c)    For the last three (3) years, each Group Company has posted a privacy policy that fully and accurately describes its privacy practices, including its collection and use of

42

Personal Information in a clear and conspicuous location on each of the websites and mobile applications owned, operated or hosted by the Group Company or through which the Group Company conducts business in accordance with all applicable Privacy Laws.

(d)    Each Group Company has implemented and maintains a comprehensive information security plan (a "**Security Plan**"), which includes commercially reasonable administrative, technical and physical safeguards reasonably designed to protect the confidentiality, availability, integrity and security of the Company IT Assets and the Personal Information and other sensitive information stored therein. The Security Plan conforms to the Data Privacy/Security Requirements and any public statements made by the Sellers regarding the Security Plan.  To the Knowledge of Sellers, there has been no material (i) loss, damage, misuse or unauthorized use, access, modification, destruction, or disclosure, or other breach of security of the Personal Information maintained by or on behalf of the any Group Company (including, but not limited to, any event that would give rise to a breach or incident for which notification by the Company to individuals and/or Governmental Authorities is required under Data Privacy/Security Requirements), (ii) phishing, social engineering, or business email compromise incident that has resulted in a monetary loss or that has otherwise had or would reasonably be expected to have, individually or in the aggregate, an adverse effect on the Business, or (iii) breaches or unauthorized intrusions of the security of any Company IT Asset.

Section 3.12.    *Leased Real Property*.

(a)    Section 3.12(a) of the Disclosure Schedule sets forth a true, correct and complete list of all Leased Real Properties.  As to each such Leased Real Property, Sellers warrants the following is true and correct: (i) the Group Companies have not leased or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; (ii) each Leased Real Property is in good operating condition and repair in all material respects, subject to ordinary wear and tear, and no Leased Real Property has suffered a fire or other casualty that has not been fully repaired and restored, and (iii) each Leased Real Property (including, without limitation, utilities serving such Leased Real Property) is, in all material respects, adequate for the business operations as currently used.

(b)    Section 3.12(b) of the Disclosure Schedules includes a true, correct and complete list of all Leases to which any Group Company is a party as lessee, together with any amendments, or modifications thereto or guaranties thereof. As to each Leased Real Property, except as disclosed in Section 3.12(b) of the Disclosure Schedules (i) no Group Company has assigned, subleased, transferred, conveyed, mortgaged, or otherwise encumbered in any material respect any interest in such leasehold interest, and there are no options or rights of first offer or refusal to acquire any such rights; (ii) except for matters addressed by the payment of Cure Costs or as would not reasonably be expected to be material to the Leased Real Property subject to the applicable Lease, there is no existing monetary default or material non-monetary default (beyond applicable notice and cure periods) on the part of any Group Company under any Leases, or on the part of any landlord thereunder, and no Group Company has received written notice from any landlord thereunder of any default that remains uncured or any event or circumstance that with the passage of time would become a default that remains uncured; and (iii) a true and correct copy of each Lease has been provided to Buyer; and (iv) subject to entry of the Sale Order and any other applicable Order necessary to consummate the transactions contemplated by this Agreement and

43

the other Transaction Documents and the assumption by Buyer of the applicable Contract in accordance with applicable Law (including satisfaction of all applicable Cure Costs), and except as a result of the commencement of the Chapter 11 Cases, the Leases are in full force and effect.

(c)     As to each Leased Real Property: (i) Group Company has received written notice of any eminent domain, condemnation, or similar taking proceedings, and no such proceedings are threatened in writing; and (ii) no Group Company has received written notice that the Leased Real Property is not in compliance with applicable building, zoning, subdivision, health and safety and other land use laws, including The Americans with Disabilities Act of 1990, as amended, and all insurance requirements affecting such Leased Real Property, other than violations that have been cured, except in each case as would not reasonably be expected to adversely affect in any material respect the use or occupancy of such Leased Real Property or the operations of the Business thereon.

(d)     No Group Company has given or received any written default notice (excluding any default notices as to which the default referenced therein has been cured or that would not reasonably be expected to adversely affect in any material respect the use or occupancy of such Leased Real Property or the operations of the Business thereon) under any declaration of covenants, conditions and restrictions, reciprocal easement agreements, party wall agreements or similar instruments governing or affecting the use, operation, maintenance, management or improvement of the applicable Leased Real Property.

(e)     With respect to the "Tenant Retained Parcel" (as defined in the Master Lease): (i) the Company has not completed the Subdivision or delivered a Subdivision Completion Notice, (ii) the Company's Repurchase Right and Tenant ROFO (each as defined in the Master Lease) remains in full force and effect, (iii) as of the date hereof, except as set forth on Section 3.12(e) of the Disclosure Schedule, there is no TRP Sublease (as defined in the Master Lease); (iv) the Landlord Purchase (as defined in the Master Lease) has not occurred.

(f)     Neither Sellers nor the Purchased Entities own any real property.

Section 3.13.     *Environmental, Health and Safety Matters.*

(a)     The Group Companies are, and have been since January 1, 2020, in compliance with all applicable Environmental, Health and Safety Requirements with respect to the Purchased Assets and the Leased Real Property, except in any such case where the failure to be in compliance would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Group Companies possess all material Permits issued pursuant to any Environmental, Health and Safety Requirements necessary for operation of the Business or the Purchased Assets, the absence of which would not reasonably be expected to have a Material Adverse Effect. To the Knowledge of Sellers, no Group Company has received any written notice or report regarding any material violation of Environmental, Health and Safety Requirements or any material Liabilities relating to the Purchased Assets or any Leased Real Property arising under Environmental, Health and Safety Requirements. There are no material Orders outstanding, or any Proceedings pending or, to the Knowledge of Sellers, threatened, relating to compliance with or Liability under any Environmental, Health and Safety Requirements affecting the Purchased

137451785_15

Assets or any Leased Real Property, which would reasonably be expected to have a Material Adverse Effect.

(b)     To the Knowledge of Sellers, there are no Hazardous Materials present at any Leased Real Property and there has been no Release of Hazardous Materials on, in, or at the Leased Real Property, that would reasonably be expected to result in material Liability to any Group Company under Environmental, Health and Safety Requirements or in a manner that would reasonably be expected to result in a Material Adverse Effect.

Section 3.14.     *Taxes*.

(a)     All income and other material Tax Returns required to be filed by or on behalf of the Purchased Entities, Sellers or relating to the Purchased Assets, the Business or the Assumed Liabilities have been timely and properly filed (taking into account any extensions of time for filing such Tax Returns that have been properly obtained) with the appropriate Governmental Authority. Such Tax Returns are true, correct, and complete in all material respects. All income and other material Taxes (whether or not reflected on such Tax Returns) required to be paid by or on behalf of any Purchased Entity or Seller or relating to the Purchased Assets, the Business or the Assumed Liabilities have been timely paid to the appropriate Governmental Authority in full.

(b)     The Taxes of the Company and its Subsidiaries accrued as of the Interim Balance Sheet Date do not exceed the accruals for current Taxes set forth on the balance sheet included in the Interim Balance Sheet, and no Taxes of any Seller or Purchased Entity have been incurred since the Interim Balance Sheet Date other than in the Ordinary Course of the Sellers and the Purchased Entities consistent with amounts previously paid with respect to such Taxes for similar periods in prior years, adjusted for changes in Ordinary Course operating results. The Purchased Entities currently use the accrual method of accounting for income Tax purposes.

(c)     None of the Sellers or Purchased Entities is a party to or the subject of any Proceedings relating to any income or other material Taxes ("**Tax Proceedings**"); (ii) to the Knowledge of Sellers, there are no proposed, threatened (in writing) or pending Tax Proceedings currently under discussion with any Governmental Authority against any Seller or Purchased Entity or relating to the Purchased Assets, the Business or the Assumed Liabilities; (iii) all deficiencies asserted or assessments made or proposed against any Seller or Purchased Entity, or relating to the Purchased Assets, the Business or the Assumed Liabilities, in writing with respect to any income or other material Taxes have been fully satisfied or finally withdrawn; and (iv) no Tax rulings with respect to any income or other material Taxes have been applied for or received by any Seller or Purchased Entity that would be binding on Buyer or any of its Affiliates following the Closing.

(d)     No written claim has ever been made by a Governmental Authority that Tax Returns are required to be filed by a Purchased Entity, or otherwise relating to the Purchased Assets, the Business or the Assumed Liabilities, in a jurisdiction where no such Tax Returns are currently filed, which claim has not been resolved in full or settled, and (ii) no Purchased Entity is or has been a resident of any country for Tax purposes, or is or has had, any branch, agency,

permanent establishment or other taxable presence, in any jurisdiction other than the jurisdiction in which it was organized.

(e)    No Purchased Entity, and no Seller with respect to the Purchased Assets, the Business or the Assumed Liabilities, has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to an assessment or deficiency for Taxes (other than any such extension arising as a result of obtaining an extension of time to file a Tax Return in the Ordinary Course).

(f)    No Encumbrances for Taxes (other than Permitted Encumbrances) exist with respect to any of the Purchased Assets or assets of any Purchased Entity.

(g)    No Purchased Entity is a party to or bound by or has any liability for (i) any obligation to any Person under any Tax allocation, sharing, indemnity obligation, or similar agreement, arrangement, understanding, or practice with respect to Taxes (other than any commercial agreement entered into in the Ordinary Course, the principal purpose of which is not related to Taxes), (ii) an obligation under any transfer pricing, closing, gain recognition or other agreement or arrangement or offer in compromise with any Governmental Authority that will impose any Liability on Buyer or any Purchased Entity (or any of their respective Affiliates) after the Closing or (iii) any obligation to pay the Taxes of any Person (including any predecessor) other than a Purchased Entity as a transferee or successor, by operation of Law or under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law) or by Contract (other than any commercial agreement entered into in the Ordinary Course, the principal purpose of which is not related to Taxes).

(h)    No Purchased Entity has ever been a member of an affiliated group of corporations within the meaning of Section 1504 of the Code, or a member of a combined, consolidated, unitary or other group for state, local or foreign Tax purposes (other than a group of which the Company or any of its Affiliates is the common parent).

(i)    To the Knowledge of Sellers, no Purchased Entity has been a party to a "reportable transaction" as such term is defined in Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).

(j)    Each Seller and Purchased Entity has complied in all material respects with (i) all applicable Laws relating to the withholding of Taxes and the remittance of withheld Taxes and (ii) all applicable Laws relating to information reporting and record retention (including to the extent necessary to claim any exemption from sales Tax collection and maintaining adequate and current resale certificates to support any such claimed exemptions).

(k)    No Purchased Entity has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or 361 of the Code.

(l)    None of the Purchased Entities has (i) deferred any payment of Taxes otherwise due (including through any automatic extension or other grant of relief provided by a Pandemic Response Law) or (ii) sought any other benefit from any applicable Governmental

Authority related to any governmental response to the COVID-19 pandemic (including any benefit provided or authorized by a Pandemic Response Law).

Section 3.15.    *Employee Benefits*.

(a)    Section 3.15(a) of the Disclosure Schedules contains a true, correct and complete list of all (i) material Seller Plans, with each Seller Plan that is a Purchased Entities' Plan separately identified as such, and (ii) material Service Provider Agreements (or templates or forms of Service Provider Agreements, to the extent Service Providers are party to a Service Provider Agreement on substantially the same template or form). With respect to each material Service Provider Agreement and Seller Plan, Sellers have made available to Buyer true, correct and complete copies (or, with respect to Service Provider Agreements, templates or forms thereof, to the extent Service Providers are party to a Service Provider Agreement on substantially the same template or form) of, to the extent applicable, (i) the current agreement or plan document, including any amendments thereto, and all related administrative service Contracts, trust documents, insurance policies or other funding arrangements, (ii) the most recent summary plan description and all summaries of material modification thereto, (iii) any material written communication to or from any Governmental Authority within the last three years, other than routine reports, returns or other filings, (iv) the most recently filed IRS Form 5500 (including all schedules and attachments thereto), (v) the most recent actuarial report, financial statement and trustee report, (vi) the most recent determination or opinion letter from the IRS with respect to any Seller Plan intended to qualify under Section 401(a) of the Code, and (vii) a written summary of any unwritten Seller Plan.

(b)    (i) Each Seller Plan has been and is being administered, maintained and operated in all material respects in compliance with all applicable Laws and in accordance with its terms, (ii) each Seller Plan that is intended to be "qualified" within the meaning of Section 401(a) of the Code has received or is the subject of a currently applicable favorable determination letter, opinion letter or advisory letter from the IRS, stating that its related trust is exempt from taxation under Section 501(a) of the Code, and no event or circumstance exists that has affected or is likely to adversely affect the qualified status of any such Seller Plan, (iii) no Seller Plan is subject to Title IV of ERISA or Part 3 of Subtitle B of Title I of ERISA, (iv) there are no Proceedings (other than routine claims for benefits) relating to any Seller Plan or the assets, fiduciaries or administrators thereof and no audit by a Governmental Authority or other Proceeding pending or, to the Knowledge of Sellers, anticipated or threatened, (v) all contributions (including all employer contributions and employee salary reduction contributions) or premium payments required to have been made to or in respect of any Seller Plan under the terms of such Seller Plan or in accordance with Law have been, in all material respects, timely made or reflected on the applicable financial statements, and (vi) Sellers and their Affiliates (including, for the avoidance of doubt, each Purchased Entity) have complied in all material respects with the requirements of COBRA and the Patient Protection and Affordable Care Act.

(c)    No Seller or any of its Affiliates (including, for the avoidance of doubt, each Purchased Entity) has any obligation to provide or make available postemployment benefits under any Seller Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA), except as may be required under COBRA or similar Law, and at the sole expense of such individual, except as set forth on Section 3.15(c).

47

(d)     Except as would not result in any material Liability to Buyer, (i) none of the Sellers, any Purchased Entity, or any of their respective ERISA Affiliates maintains or contributes to, or has any Liability in respect of any plan that is subject to Section 412 or 430 of the Code, Section 302 or 303 of ERISA or Title IV of ERISA or that is subject to Section 4063, 4064 or 4069 of ERISA ("**Title IV Plans**"), (ii) no Title IV Plan has failed to meet the minimum funding standard (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA, (iii) no Liability under Title IV or Section 302 of ERISA has been incurred by any Seller, any Purchased Entity, or any ERISA Affiliate that has not been satisfied in full, (iv) all contributions required to be made by Sellers or the Purchased Entities or any of their respective ERISA Affiliates with respect to any Title IV Plan prior to the Closing Date have been timely made and (v) no Seller, Purchased Entity, nor any ERISA Affiliate has now or in the past six (6) years contributed to, sponsored, or maintained a "multiemployer plan" (as defined in Section 3(37) of ERISA).

(e)     The consummation of the transactions contemplated by this Agreement will not, either alone or in combination with another event, (i) increase any benefits or result in the acceleration of the timing of payment, vesting or funding of any benefits under any Seller Plan or any Service Provider Agreement, (ii) entitle any Service Provider to, or accelerate the time of payment or vesting, or increase the amount of, any compensation or benefit due to any Service Provider, (iii) result in the triggering or imposition of any restrictions or limitations on the rights of any Seller or Purchased Entity to amend or terminate any Seller Plan or Service Provider Agreement or (iv) result in any payment that would, individually or in combination with any other such payment, be nondeductible pursuant to Section 280G of the Code.

(f)     Sellers, the Purchased Entities and their Affiliates have no obligation to indemnify any Service Provider for any Tax, including, without limitation, any Tax imposed pursuant to Sections 409A or 4999 of the Code.

(g)     Each Service Provider Agreement and Seller Plan that constitutes in any part a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) subject to Section 409A of the Code has been operated and administered in compliance with Section 409A of the Code.

Section 3.16.    *Labor Matters.*

(a)     Section 3.16(a) of the Disclosure Schedules is a true, complete and correct list of Business Employees, specifying each individual's (i) name or employee identification number; (ii) employing entity; (iii) title or position; (iv) base salary or base wage; (v) short-term cash incentive or other bonus opportunity; (vi) date of hire; (vii) years of credited service; (viii) Fair Labor Standards Act classification; (ix) leave status and, if on leave, the terms thereof; (x) accrued and unused vacation days, sick days and personal days; (xi) full-time or part-time status; and (xii) primary work location (country and state or province).

(b)     Except as set forth on Section 3.16(b) of the Disclosure Schedules, (i) no Seller or any Purchased Entity is a party to any Collective Bargaining Agreement with respect to any Business Employees, (ii) no Business Employee is represented by any Union with respect to their employment with any Seller of any Purchased Entity, (iii) no Union or group of Business Employees has made a demand for recognition or request for certification that is pending as of the

date hereof, nor have there been any such demands or requests in the last three (3) years and (iv) there are no representation or certification Proceedings or petitions seeking a representation election presently pending or, to the Knowledge of Sellers, threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller or any Purchased Entity, nor have there been any such Proceedings in the last three (3) years. There are no strikes, lockouts, work stoppages or slowdowns pending or, to the Knowledge of Sellers, threatened against or involving any Seller or any Purchased Entity and there has been no such event in the last three (3) years. No Seller or Purchased Entity has notice or consultation obligations to any Union in connection with the execution of this Agreement or consummation of the transactions contemplated hereby.

(c)       Except as set forth on Section 3.16(c) of the Disclosure Schedules, there are no charges, arbitrations, grievances, complaints or Proceedings pending or, to the Knowledge of Sellers, threatened against any Seller or any Purchased Entity relating to the employment or termination of employment of any individual or group of individuals by any Seller or any of its Affiliates (including, for avoidance of doubt, each Purchased Entity).

(d)       Except as set forth on Section 3.16(d) of the Disclosure Schedules, in the last three (3) years, each Group Company has complied in all material respects with all applicable Laws respecting employment and employment practices (including applicable Laws and Orders regarding terms and conditions of employment, wages and hours of work, minimum wage and overtime compensation, meal and break periods, employee and independent contractor classification, immigration and employment authorization, hiring, equal employment opportunity, discrimination, harassment, retaliation, employee health and safety, collective bargaining, whistleblowing, disability rights or benefits, layoffs (including the WARN Act), employee trainings and notices, workers' compensation, leaves of absence, affirmative action and unemployment insurance). For the past three (3) years, there have been no pending, or, to the Knowledge of Sellers, threatened complaints, reports, or Proceedings against any Group Companies or any of their directors, officers, or executives with the title of Vice President or more senior based on sexual or gender discrimination or harassment.

(e)       No Seller or any Purchased Entity has experienced a "plant closing" or "mass layoff" or similar group employment loss (as defined in the WARN Act) with respect to which there is any unsatisfied Liability.

Section 3.17.       *Insurance Policies*. Section 3.17 of the Disclosure Schedules sets forth each material insurance policy (other than any insurance policy that funds or relates to any Seller Plans and excluding self-insurance programs or policies) held by any Purchased Entities or any Seller (relating to the Purchased Assets or the Assumed Liabilities). With respect to each such material insurance policy, (a) such policy is in full force and effect, and constitutes the legal, valid and binding obligation of the Group Company party thereto and, to the Knowledge of Sellers, the counterparty thereto, enforceable against such Group Company and, to the Knowledge of Sellers, the counterparty thereto in accordance with its terms and conditions, subject to the Bankruptcy Law, (b) no Group Company has received any written notice of cancellation or termination with respect to such policy, (c) premiums due and payable by the Group Companies or their Affiliates under such policy prior to the date hereof have been duly paid (or if installment payments are due, will be paid by the Group Companies if incurred prior to the Closing Date), and (d) as of the date

49

hereof, there is no claim pending under such policy which such insurer has disclaimed coverage or is defending subject to a reservation of rights.

Section 3.18.    *Affiliate Transactions*. Except as set forth in <u>Section 3.18</u> of the Disclosure Schedules, no Affiliate of any Group Company (other than any other Group Company) or any officer, director or employee of any Group Company (a) is a party to any material Contract or arrangement with any Group Company, other than (i) employment arrangements in the Ordinary Course and (ii) the Seller Plans, (b) has any material interest in any tangible property used by any Group Company or (c) owns any material interest in, or is an officer, director or employee of, any Person which is a Material Supplier.

Section 3.19.    *Material Suppliers*. <u>Section 3.19</u> of the Disclosure Schedules sets forth a true, correct and complete list of the ten (10) largest suppliers of the Business during the twelve (12)-month period ending on May 30, 2023 (collectively, the "**Material Suppliers**"), as measured by the dollar amount of purchases therefrom during such period, including the approximate total purchases by the Business from each such supplier during such period.

Section 3.20.    *Financial Statements; Internal Controls*.

(a)    Sellers have delivered to Buyer the audited financial statements of the Company and its Subsidiaries as of January 29, 2022 (collectively, the "**Annual Financial Statements**"). The Annual Financial Statements have been prepared in accordance GAAP consistently applied in accordance with Sellers' and the Company's past practice throughout the periods indicated. Sellers have also delivered to Buyer the unaudited consolidated balance sheet of the Company and its Subsidiaries as of April 23, 2023 (such date, the "**Interim Balance Sheet Date**", and such balance sheet, the "**Interim Balance Sheet**") and the unaudited consolidated statements of income, stockholder's equity and cash flows for the period then ending (collectively, the "**Interim Financial Statements**"). The Interim Financial Statements are also set forth on <u>Section 3.20</u> of the Disclosure Schedules.  The Interim Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with Sellers' and the Company's past practice except for the absence of footnotes and customary year-end adjustments. The Annual Financial Statements and the Interim Financial Statements (together, the "**Financial Statements**") (i) are true, correct and complete in all material respects, (ii) are in accordance in all material respects with the books and records of the Group Companies, (iii) have been prepared on a consistent basis with respect to each period covered thereunder and (iv) fairly present in all material respects the financial position of the Group Companies at the dates specified and the results of their operations for the period covered. The copies of the Financial Statements delivered to Buyer are true, correct and complete.

(b)    With respect to the periods addressed in the Financial Statements, the Business has maintained a system of internal controls over financial reporting designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Financial Statements. To the Knowledge of Sellers, such internal controls over financial reporting are effective in (i) ensuring that material information relating to the Business is made known to the chief executive officer and the chief financial officer and (ii) providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP in all material respects. The Business has no

significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect in any material respect the Business's ability to record, process, summarize and report financial information. For the last five (5) years, there has been no fraud in connection with the Business or its respective financial condition or results of operations that involved management or other employees of the Business who have a significant role in the Business's internal control over financial reporting.

Section 3.21.    *Undisclosed Liabilities*. The Group Companies have no Liabilities, whether or not required by GAAP to be reflected in a consolidated balance sheet of the Company and its Subsidiaries or disclosed in the notes thereto, other than Liabilities (a) reflected in, reserved against or otherwise described in the Interim Balance Sheet, (b) that have arisen since the Interim Balance Sheet Date in the Ordinary Course and are similar in character and amount to the Liabilities set forth in the Interim Balance Sheet, none of which would, individually or in the aggregate, reasonably be expected to be material to the Business, the Purchased Assets, the Purchased Entities or the Assumed Liabilities, taken as a whole, (c) that are executory performance obligations arising under Contracts to which a Group Company is a party or otherwise bound (that are not arising from a breach thereof), or (d) that are for third-party expenses incurred in connection with the transactions contemplated by this Agreement.

Section 3.22.    *Absence of Certain Changes*. Except as set forth in <u>Section 3.22</u> of the Disclosure Schedules, since the Interim Balance Sheet Date, other than as a result of the commencement of the Chapter 11 Cases, (a) there has not been or occurred any Material Adverse Effect and (b) there has not been, occurred or arisen any agreement, condition, action, omission or event which, if occurred or existed after the date hereof, would be prohibited (or require consent from Buyer) under <u>Section 5.01</u> with respect to the Business, the Purchased Assets, the Purchased Entities or the Assumed Liabilities.

Section 3.23.    *Brokers*. Except for Lincoln International LLC, the fees and expenses of which will be paid by the Company on or prior to the Closing Date, no broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller as follows:

Section 4.01.    *Corporate Existence and Power*. Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Michigan and has all power and authority to carry on its business as presently conducted. Buyer is duly licensed or qualified to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets leased by it, if any, makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing

would not, individually or in the aggregate, reasonably be expected to prevent or materially delay Buyer's ability to consummate the transactions contemplated by this Agreement.

Section 4.02.    *Authorization; Execution and Delivery; Enforceability*. The execution, delivery and performance of this Agreement and each Transaction Document to which Buyer is a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the Closing will be, duly authorized by all necessary corporate or other action on the part of Buyer. Buyer has all necessary power and authority to execute and deliver this Agreement and each other Transaction Documents to which Buyer is a party and to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. Subject to entry of the Sale Order and any other Order necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, this Agreement has been, and at or prior to the Closing, each Transaction Document to which each Group Company is a party will be, duly and validly executed and delivered by Buyer and, assuming due authorization, execution and delivery by the other Parties and the entry of the Sale Order, this Agreement constitutes, and each other Transaction Document (when duly and validly executed and delivered) will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to Bankruptcy Law.

Section 4.03.    *Noncontravention; Consents and Approvals*.

(a)    Neither the execution and delivery by Buyer of this Agreement and each other Transaction Document to which Buyer is a party, nor the consummation of the transactions contemplated hereunder or thereunder, will, subject to entry of the Sale Order, (i) conflict with or result in a breach of the organizational documents of Buyer, (ii) violate any Law or Order to which Buyer or its assets and properties may be subject, (iii) conflict with, result in a breach of, constitute a default (with or without notice or lapse of time, or both) under, result in the acceleration of, create in any Person the right to accelerate, terminate, modify or cancel or require any notice under, or result in the creation of any Encumbrance (other than Permitted Encumbrances) on, any Contract to which Buyer is a party or by which Buyer or its assets and properties is bound, except, in the case of clause (ii) or (iii), for such conflicts, breaches, defaults, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

(b)    Other than the entry of the Sale Order, no consent, waiver, approval, Order or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of any Buyer in connection with the execution and delivery of this Agreement or any other Transaction Document which Buyer is a party, the compliance by Buyer with any of the provisions hereof or thereof, the consummation of transactions contemplated hereby or thereby or any other action by Buyer contemplated hereby or thereby (with or without notice or lapse of time, or both), except for such consents, waivers, approvals, Orders, authorizations, declarations, filings or notifications, the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on Buyer's ability to consummate the transactions contemplated by this Agreement.

Section 4.04.    *Availability of Funds; Solvency*. Buyer has, or will have, sufficient funds at the Closing to pay the Purchase Price (less the Deposit) and any other amounts, costs, fees

and expenses which may be required to be paid by or on behalf of Buyer under this Agreement and the other Transaction Documents. Upon consummation of the transactions contemplated by this Agreement, (a) Buyer will not be insolvent as defined in Section 101 of the Bankruptcy Code, (b) Buyer will not be left with unreasonably small capital, and (c) Buyer will not have incurred debts beyond its ability to pay such debts as they mature.

Section 4.05.    *Litigation*. There are no Proceedings to which Buyer is a party pending, or, to the actual knowledge of Buyer, threatened against Buyer that would affect in any material respect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

Section 4.06.    *Brokers*. No broker, finder, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses in connection therewith, in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer.

Section 4.07.    *Buyer Information*. None of the information supplied by Buyer to Sellers in writing for inclusion or incorporation by reference in any filings required under the applicable U.S. federal securities Laws, including the rules and regulations of the SEC thereunder, relating to the transactions contemplated by this Agreement will, at the time such documents are filed with the SEC or at any time such documents are amended or supplemented, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.  The representations and warranties contained in this <u>Section 4.07</u> will not apply to statements or omissions included or incorporated by reference in such documents based upon information supplied by the Company or any of its representatives or advisors (in their capacities as such) specifically for use or incorporation by reference therein.

Section 4.08.    *[Intentionally Omitted]*.

Section 4.09.    *Buyer's Investigation and Reliance*. Buyer is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Business, the Purchased Assets, the Assumed Liabilities and the transactions contemplated hereby, which investigation, review and analysis was conducted by Buyer together with expert advisors, including legal counsel, that it has engaged for such purpose. Buyer and its representatives have been provided with access to the representatives, properties, premises and records of the Group Companies relating to the Business and other information requested in connection with their investigation of the Business, the Purchased Assets, the Assumed Liabilities and the transactions contemplated hereby. In entering into this Agreement, Buyer acknowledges that it has relied solely upon (i) its own investigation, review and analysis, (ii) the covenants and agreements set forth in this Agreement (iii) the express representations and warranties set forth in this Agreement, the certificate contemplated by Section 2.09(a)(vi) and any other Transaction Documents executed by the Group Companies (such representations in clause (iii), the "**Express Representations**") (and is not relying on any other factual representations or opinions of the Group Companies or its representatives). Buyer acknowledges that, should the Closing occur, Buyer shall acquire the Purchased Assets without any surviving representations or warranties, on an "as is" and "where is" basis, and other than the Express Representations, none of the Group Companies, any of their

Affiliates, or any of their respective officers, directors, employees, agents, representatives or direct or indirect equityholders make or have made, and Buyer has not relied on and is not relying on any representation or warranty, express or implied, at law or in equity, as to any matter whatsoever relating to the Business, the Purchased Assets, the Assumed Liabilities or any other matter relating to the transactions contemplated by this Agreement including as to: (a) merchantability or fitness for any particular use or purpose; (b) the operation or ownership of the Purchased Assets or the Business by Buyer after the Closing in any manner; or (c) the probable success or profitability of the Business after the Closing. None of the Group Companies, any of their Affiliates or any their respective officers, directors, employees, agents, representatives or stockholders will, except in the case of Fraud, have or be subject to any Liability or indemnification obligation to Buyer or any other Person resulting from the distribution to Buyer or its Affiliates or representatives of, or Buyer's use of or reliance on, any information relating to the Business or any other matter relating to the transactions contemplated by this Agreement, including any descriptive memoranda, summary business descriptions or any information, documents or material made available to Buyer or its Affiliates or representatives, whether orally or in writing, in certain "data rooms," management presentations, functional "break-out" discussions, responses to questions submitted on behalf of Buyer or in any other form in expectation of the transactions contemplated by this Agreement or any discussions with respect to the foregoing information.

ARTICLE 5

COVENANTS OF SELLERS

Section 5.01.        *Conduct of the Business*.

(a)        Except (i) as consented to in writing by Buyer, which consent shall not be unreasonably withheld, conditioned or delayed, (ii) as required by the Bankruptcy Code or any Orders entered by the Bankruptcy Court in the Chapter 11 Cases, (iii) to the extent related to an Excluded Asset or an Excluded Liability and not related to a Purchased Entity, Purchased Asset or Assumed Liability, (iv) as otherwise necessary to comply with this Agreement or applicable Law, or (v) as set forth on Section 5.01(a) of the Disclosure Schedules, from the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10, (A) Sellers shall use reasonable best efforts (and shall cause each of their Subsidiaries (including the Purchased Entities) to use reasonable best efforts) (A) to conduct the Business in the Ordinary Course taking into account the terms of the DIP Facility (with respect to Sellers) and maintain in all material respects the goodwill associated with the Purchased Assets and the Purchased Entities and the Group Companies' business relationships with employees, customers, suppliers, vendors, clients, contractors and other Persons in connection with the Business, and (B) not to:

(i)        amend or waive any provision of their organizational documents in a manner that could be expected to delay or otherwise interfere with the consummation of the transactions contemplated by this Agreement;

(ii)        declare, set aside or pay any dividend or other distribution in respect of its membership interests or capital stock;

54

(iii)     sell, lease, license on an exclusive basis or otherwise encumber or dispose of any assets of the Purchased Entities or any Purchased Assets with respect to Sellers, other than in the Ordinary Course;

(iv)     renew, materially amend, modify, terminate, cancel, let lapse or waive any rights under, or create any Encumbrance on, any Contracts to which a Purchased Entity is party, any of the Purchased Contracts or any Permits, other than in the Ordinary Course;

(v)     enter into any material contract relating to the Purchased Assets, the Assumed Liabilities, the Purchased Entities or the Business;

(vi)     change in any material respect their policies or practices regarding accounts receivable or accounts payable, except as required by Law, a change in GAAP (or authoritative interpretation thereof) or by a Governmental Authority;

(vii)     make any capital expenditures in excess of $100,000;

(viii)     acquire any Person or all or substantially all of the assets of any Person or make any other investment outside the Ordinary Course;

(ix)     incur, assume or guarantee any Indebtedness or Liability of any other Person, in an amount not to exceed $50,000 outstanding at any time, other than as permitted under the DIP Facility or as would constitute an Excluded Liability;

(x)     with respect to any Purchased Asset, Assumed Liability, or Purchased Entity, (i) initiate any Proceedings outside of the ordinary course of business, or (ii) concede, settle, pay, discharge or satisfy any actual or threatened Proceedings that would reasonably be expected to result in Losses in excess of $50,000 individually or $250,000 in the aggregate or the imposition of any material non-monetary relief;

(xi)     terminate, let lapse or materially amend or modify any material insurance policy maintained by any Group Company with respect to any Purchased Assets or any Assumed Liability or any Purchased Entity;

(xii)     purchase inventory in an amount in excess of the amount set forth in the DIP Budget;

(xiii)     (A) sell, transfer, assign, subject to an Encumbrance (other than Permitted Encumbrances) or otherwise dispose of any Purchased Intellectual Property or material Company IT Asset, other than entering into non-exclusive license agreements in the Ordinary Course, (B) abandon, disclaim, dedicate to the public, cancel, let lapse, or fail to renew, continue to prosecute, protect or defend any material Registered IP, other than non-use of Registered IP in the Ordinary Course or (C) grant to any Person any license, or enter into any covenant not to sue, with respect to any Purchased Intellectual Property, except in the Ordinary Course;

(xiv)     change or amend any data privacy or information security practices, except as required by applicable law;

(xv)    (A) fail to exercise any rights of renewal with respect to any Leased Real Property that by its terms would otherwise expire or (B) enter into any Contract for the sublease of Leased Real Property;

(xvi)    (A) grant or announce any increase in the compensation, perquisites or benefits (whether through the payment of, agreement to pay or otherwise) of any Service Provider, other than increases (1) required by applicable Law or required by the terms of Seller Plans or a Service Provider Agreement in effect as of the date hereof or (2) in connection with annual reviews in the Ordinary Course, (B) grant or provide, or promise to grant or provide any special bonus or special remuneration, severance, retention, change of control or termination or similar payments to any Service Provider, other than as required by applicable Law or required by the terms of Seller Plans or a Service Provider Agreement in effect as of the date hereof, or (C) accelerate or agree to accelerate the time of payment or vesting of, or the lapsing of restrictions with respect to, or fund or otherwise secure the payment of, any compensation or benefits under any Seller Plans, Purchased Entity Plans or Service Provider Agreements;

(xvii)    make any changes in any accounting methods, principles or practices except as required by a change in GAAP (or authoritative interpretation thereof);

(xviii) (A) make, change, or rescind any material election or material method of accounting relating to Taxes, (B) file any income or other material Tax Return (other than in the Ordinary Course and pursuant to applicable Law) or amend any income or other material Tax Return, (C) enter into any closing agreement or any other agreement in respect of Taxes with any Governmental Authority, (D) surrender any right or claim to a refund of material Taxes or commence, settle or compromise any Tax Proceeding in respect of material Taxes, (E) consent to any extension or waiver of the statute of limitations period relating to any Taxes or Tax Returns other than obtaining an extension of time to file a Tax Return in the Ordinary Course, or (F) enter into any Tax allocation, sharing, indemnity or similar agreement or arrangement (other than any commercial agreement to be entered into in the Ordinary Course, the principal purpose of which is not related to Taxes);

(xix)    enter into, amend, terminate or renew any Contracts with any Service Providers, except with respect to current employees with base annual compensation of less than $100,000 and in a manner consistent with the Ordinary Course;

(xx)    transfer the employment or engagement of any Service Provider;

(xxi)    terminate the employment of any Business Employee with base annual compensation in excess of $100,000 or other key employee of the Group Companies other than for cause;

(xxii)   hire any Service Provider with base annual compensation or service fees, as applicable, in excess of $100,000 per annum;

(xxiii)  enter into, amend, terminate or negotiate to enter into any Collective Bargaining Agreement; or

(xxiv)  agree or commit to do any of the foregoing.

(b)    Without limiting the rights otherwise granted in this <u>Article 5</u>, nothing in this Agreement is intended to give Buyer, directly or indirectly, the right to control or direct the business or operations of the Company at any time prior to the Closing.

(c)    Except as consented to in writing by Buyer, from the date hereof until the Closing Date, Sellers shall not, and shall cause the Group Companies not to, (i) transfer, convey or assign any assets to Portal Acquisition Company or 1317047 B.C. Ltd, or (ii) assume any Liability of Portal Acquisition Company or 1317047 B.C. Ltd.

(d)    Seller shall reserve an amount equal to the Purchase Price Reserve to fund, together with the Minimum Cash Amount, the costs of administering the Sellers' chapter 11 estates and, thereafter, to make one or more distributions on account of prepetition claims allowed against the Sellers' estates in order of priority fixed by the Bankruptcy Code.

Section 5.02.    *Alternative Transaction*. Subject to Buyer's rights set forth in <u>Section 10.01(c)</u> hereof, nothing in this Agreement shall require Sellers or the board of directors or other governing body of Sellers to take any action or to refrain from taking any action to the extent the board of directors or other governing body of any such Seller determines in good faith after consultation with outside legal counsel that continued performance under this Agreement (including taking any action or refraining from taking any action) would be inconsistent with the exercise of its fiduciary duties under applicable Law; <u>provided</u> that if such Seller or the board of directors or other governing body of such Seller makes any such determination under this <u>Section 5.02</u>, Sellers shall notify Buyer of such determination within one (1) day of such determination ("**Board Determination Notice**"); <u>provided, further</u>, that Sellers shall provide Buyer written notice of any decision by Sellers, or the board of directors or other governing body of Sellers, within two (2) Business Days of such decision, to enter into any agreement with respect to an Alternative Transaction, including without limitation any term sheet, letter of intent, support agreement, or definitive agreement. For the avoidance of doubt, nothing in this Agreement shall prohibit Sellers from continuing a marketing process of the Company after the Petition Date and prior to entry of the Sale Order.

Section 5.03.    *Access to Information; Notice of Change*. From the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to <u>Article 10</u>), Buyer shall be entitled, through its Affiliates and representatives, to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, assets, operations and personnel of the Group Companies relating (and solely to the extent relating) to the Purchased Entities, the Purchased Assets and the Assumed Liabilities as Buyer may reasonable request. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and in a manner that does not materially interfere with the normal operations of the Group Companies and the Business. Each Seller shall, and shall cause its Subsidiaries to, use its reasonable best efforts to cause its representatives to cooperate with Buyer and its Affiliates and representatives in connection with such investigations and examinations. No Group Company shall be required to afford such access to the extent that such Group Company reasonably believes (based on the advice of outside legal counsel) that doing so would: (A) result in the loss of attorney-client privilege or (B) violate any applicable Law, provided that in the case of each of subclauses (A) and (B), such Group Company shall use its reasonable best efforts to allow for such access or disclosure in a manner that would not reasonably be expected to result in

57

a loss of attorney-client privilege or a violation of applicable Law.  From the date hereof until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10), Sellers shall (i) use their reasonable best efforts to provide Buyer with any additional diligence information reasonably requested by Buyer in respect of any information set forth in the Disclosure Schedules, (ii) promptly notify Buyer if Sellers receive any notice (written or oral) from any Material Supplier regarding or contemplating any adverse change in such Material Supplier's relationship with the Business, whether before or after the Closing Date, and deliver copies of any such notices to Buyer; (iii) promptly notify Buyer if Sellers receive any written notice with respect to the Leases or Leased Real Property and deliver copies of any such written notices to Buyer; and (iv) promptly notify Buyer if Sellers receive any notice that any individual employee or number of employees in the aggregate, in each case material to the operation of the Business, is or has resigned as an employee of a Seller or Purchased Entity.

Section 5.04.    *Name Change*. Sellers hereby acknowledge that any and all business names which contain any Trademarks comprising the Purchased Intellectual Property ("**Purchased Trademarks**") shall be solely owned by Buyer as of the Closing and the Sellers shall not use or have any rights in or to any Purchased Trademark (or any Business Name confusingly similar thereto) nor contest the ownership or validity of any rights of Buyer in or to any Purchased Trademarks. Notwithstanding the foregoing, as reasonably promptly as possible following the Closing, but in no event more than thirty (30) days following the Closing, each Seller shall file documents with the appropriate Governmental Authorities necessary to change its corporate name, "doing business as" name, trade name and any other similar corporate identifier (each, a "**Business Name**") that contains any Purchased Trademarks (or any Business Name confusingly similar thereto) to a Business Name that does not contain any Purchased Trademarks (or any Business Name confusingly similar thereto), and to supply additional information, documents and materials that may be reasonably requested by Buyer with respect to such filings. Each Seller shall also cause the names of Sellers in the caption of the Chapter 11 Cases to be changed to the new names of each Seller. Notwithstanding anything in this Agreement to the contrary, and without limiting the rights otherwise granted in this Section 5.04, the Sellers and their Affiliates shall have the right, at all times after the Closing, to (i) keep records and other historical or archived documents containing or referencing the Purchased Trademarks, (ii) use the Purchased Trademarks to the extent required by or as permitted as a fair use under applicable Law, and (iii) refer to the historical fact that the Sellers and their Affiliates previously conducted their respective businesses under the Purchased Trademarks.

Section 5.05.    *Certain Consents*. Sellers will use commercially reasonable efforts to obtain each third-party consent, waiver, authorization, or approval set forth on Section 5.05 of the Disclosure Schedules, including on or after Closing; provided that the foregoing will not require Sellers to expend any money or to incur any Liability (other than professionals fees and expenses) to obtain any such consent, waiver, authorization or approval.

Section 5.06.    *Disclosure Schedules*. Sellers shall disclose to Buyer in writing (in the form of updated Schedules) any updates and/or modifications to the Disclosure Schedules promptly upon discovery by Sellers of any item or information that should have been reflected in the Disclosure Schedules as of the date hereof pursuant to this Agreement. No update or modification delivered pursuant to this Section 5.06 shall be effective, unless such update or modification shall have been approved by Buyer, such approval not to be unreasonably withheld

58

with respect to any update or modification for any section of the Disclosure Schedules under Article 3 (other than Section 3.22(b)(viii)(D) of the Disclosure Schedules); provided, that, for the avoidance of doubt, such approval may be withheld in Buyer's sole discretion with respect to any update or modification of Section 3.22(b)(viii)(D) of the Disclosure Schedules or any section of the Disclosure Schedules under any article other than Article 3.

ARTICLE 6

COVENANTS OF BUYER

Section 6.01.    *Preservation of Books and Records*. For a period of three (3) years following the Closing Date, Buyer shall provide to Sellers and their respective Affiliates and representatives (after reasonable advance notice and during regular business hours and in a manner that does not materially interfere with the normal operations of Buyer or the Business) reasonable access to, including the right to make copies of, all books and records included in and otherwise related to the Purchased Assets, to the extent necessary to permit Sellers to determine any matter relating to their respective rights and obligations hereunder or to any Pre-Closing Tax Period (for example, for purposes of preparing any Tax Return or conducting a Tax or accounting audit or any claim or litigation matter) or otherwise related to the Excluded Assets, for periods prior to the Closing and shall preserve such books and records until the latest of (a) the retention period required by applicable Law, (b) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases and (c) in the case of books and records relating to Taxes, three (3) years following the Closing Date. Such access shall include access to any information in electronic form to the extent reasonably available. Unless otherwise consented to in writing by Sellers (such consent not to be unreasonably withheld, conditioned or delayed), Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any such books and records, without first offering to surrender to Sellers such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of; provided that nothing in this Agreement shall require Buyer to suspend any document preservation policies relating to the retention of electronic data maintained in the ordinary course of business.

Section 6.02.    *Insurance Matters*. From and after the Closing, the Purchased Assets, the Assumed Liabilities and the operations and assets and Liabilities in respect thereof, shall cease to be insured by any insurance policies maintained by Sellers or any of their respective Affiliates (excluding the Purchased Entities), and neither Buyer nor its Affiliates (including the Purchased Entities) shall have any access, right, title or interest to or in any such insurance policies (including to all claims and rights to make claims and all rights to proceeds) to cover the Purchased Assets, the Assumed Liabilities or the operations or assets or Liabilities in respect thereof; provided, however, that Buyer shall have the right to make claims and shall have the right to any proceeds with respect to the Purchased Assets or the Assumed Liabilities under any insurance policy for occurrence-based claims pertaining to, arising out of and inuring to the benefit of any Seller for all periods prior to the Closing, and such Seller shall use its reasonable best efforts to seek the maximum recovery or allow Buyer to seek recovery (including by executing or delivering any document, agreement, instrument or other information as Buyer may reasonably request to seek such recovery) under such insurance policy, in each case, at Buyer's sole cost and expense (including, if and to the extent unpaid and otherwise payable as a result of such recovery, any deductibles or other out-of-pocket expenses required to be paid by Buyer or to the insurer in

59

connection therewith), and such Seller shall cooperate with Buyer's reasonable requests if Buyer seeks recovery, with respect to such matters and shall remit (or, at Buyer's request, direct any such insurer to pay directly to Buyer) any insurance proceeds actually obtained therefrom (net of such Seller's reasonable and documented out-of-pocket costs and expenses of seeking such recovery, to the extent not otherwise paid or reimbursed by Buyer) to Buyer or a Buyer Designee. For the avoidance of doubt, this covenant shall not apply to any self-insurance programs or policies, and Sellers shall have no obligations with respect thereto from and after the Closing.

ARTICLE 7

COVENANTS OF BUYER AND SELLERS

Section 7.01.    *Confidentiality.*

(a)    Buyer acknowledges that the confidential information provided to Buyer in connection with this Agreement, including under Section 5.03, is subject to the Confidentiality Agreement, dated as of July 12, 2023 between SI Capital LLC and the Company (the "**Confidentiality Agreement**").

(b)    Sellers acknowledge that from and after the Closing, all non-public information relating to the Purchased Entities, Purchased Assets and the Assumed Liabilities will be valuable and proprietary to Buyer and its Affiliates. Sellers agree that, from and after the Closing, unless disclosure is required under the Bankruptcy Code or other applicable Law, no Seller will, and Sellers will cause their Affiliates not to, disclose to any Person any confidential information regarding Buyer and its Affiliates, the Purchased Entities, the Purchased Assets or the Assumed Liabilities; provided that (x) confidential information shall not include information that becomes generally available to the public other than through any action by any Seller or any of its Affiliates in violation this Section 7.01(b) and (y) confidential information may be used by Sellers solely to the extent necessary to defend any claims against any Seller; provided that in the case of clause (y), Sellers shall (i) disclose only that portion of such information which such Seller is advised by its outside legal counsel is legally required to be disclosed, (ii) other than in connection with any claims involving Buyer or its Affiliates, cooperate with Buyer (at its expense) to obtain a protective order or other confidential treatment with respect to such information and (iii) other than in connection with any claims involving Buyer or its Affiliates, provide Buyer with a reasonable opportunity to review and comment on such disclosure.

Section 7.02.    *Further Assurances.*

(a)    At and after the Closing, and without further consideration therefor, each of Sellers and Buyer shall execute and deliver such further instruments and certificates (including deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances) and use their reasonable best efforts to take, or cause to be taken, all actions, and do or cause to be done all things as may be reasonably necessary, to effectuate the purposes and intent of and consummate the transactions contemplated by this Agreement and the other Transaction Documents.

60

(b)    The Parties agree to (and shall cause each of their respective Affiliates to) provide each other with such information and assistance as is reasonably necessary for the preparation of any Tax Returns or for the defense of any Tax claim or assessment, whether in connection with an audit or otherwise, relating to the Purchased Assets, the Purchased Entities and the Assumed Liabilities, including the furnishing or making available on a timely basis of records, personnel (as reasonably required), books of account, or other necessary materials.

Section 7.03.    *Certain Filings.*

(a)    Subject to appropriate confidentiality safeguards, each Party shall (i) cooperate with one another to comply with any request from any applicable Governmental Authority related to any Antitrust Laws in accordance with applicable Law, (ii) respond promptly to any request for additional information, documents or other materials in connection therewith, (iii) promptly notify counsel to the other Party of, any communications from or with any Governmental Authority in connection therewith and, to the extent reasonably practicable, enable counsel to the other Party to participate in any such communications, (iv) not participate in any material prescheduled telephonic or in-person meeting in connection therewith unless such Party consults with counsel to the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party a reasonable opportunity to attend, participate and speak thereat, (v) furnish such information and assistance as may be reasonably requested in connection therewith and provide counsel to the other Party the opportunity to review in advance any document, opinion or proposal to be made or submitted to any such Governmental Authority, (vi) use its reasonable best efforts to defend all Proceedings to which it or any of its affiliates is a party challenging or affecting this Agreement or the consummation of the transactions contemplated hereby, in each case until the issuance of a final, non-appealable Order with respect to each such Proceeding, (vii) use its reasonable best efforts to seek to have lifted or rescinded any injunction or restraining order which may adversely affect the ability of the Parties to consummate the transactions contemplated by this Agreement, in each case until the issuance of a final, non-appealable Order with respect thereto and (viii) use reasonable best efforts to resolve any objection or assertion by any Governmental Authority challenging this Agreement or the transactions contemplated hereby. Notwithstanding anything to the contrary herein or otherwise, nothing in this Agreement shall be deemed to require Buyer to commit or agree to (A) sell, hold, divest, discontinue or limit, before or after the Closing Date, any of its or its Affiliates' assets, businesses or interests, (B) any conditions relating to, or changes or restrictions in, the operations of any of its or its Affiliates' respective assets, businesses or interests, and (C) any material restriction on the Business or the business of Buyer or its Affiliates; underlined provided underlined further, that no Group Company nor any Affiliate thereof shall agree to any such actions without the prior written consent of Buyer. Buyer and Sellers shall be jointly responsible for all filing fees relating to this <u>Section 7.03</u> and such filing fees will be equally divided between Buyer, on the one hand, and Sellers, on the other hand.

(b)    Buyer and Seller shall closely cooperate and Buyer shall be entitled to notify the German competent state media authority (*Bayerische Landeszentrale für neue Medien*) of the envisaged change in the shareholding structure in the Purchased entity in the context of the transactions contemplated hereby prior to the Closing Date with a notification to be aligned with Sellers. The Sellers shall procure that the Purchased Entities closely cooperate with the Buyer in this regard.

61

Section 7.04.    *Public Announcements*. On and after the date hereof and through the Closing Date, the Parties shall consult with each other before issuing any press release, and shall use reasonable efforts to consult with each other prior to making any other public statements with respect to this Agreement or the transactions contemplated hereby, and neither Party shall, except as may be required to comply with applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which the Company lists securities, issue any press release or make any public statement prior to obtaining, with respect to Sellers, Buyer's, and with respect to Buyer, the Company's, prior written consent (which consent, in each case, shall not be unreasonably withheld, conditioned or delayed).

Section 7.05.    *Employee Matters*.

(a)    Buyer or its Affiliates intend to extend offers of employment to substantially all of the Business Employees (other than the Purchased Entity Employees) who have not been terminated or otherwise left the employment of Sellers and their Affiliates at the Closing Date. Sellers shall provide Buyer with access to their personnel records and personnel files and such other information with respect to the Business Employees as Buyer may reasonably request, to the extent compliant with applicable Laws.

(b)    Subject to Buyer's right to terminate any Transferred Employees, Buyer shall provide, or shall cause one of its Affiliates (including any Purchased Entity) to provide, for a period of one (1) year from and after the Closing Date, each Transferred Employee with compensation and benefits (excluding, for this purpose, severance, paid time off, equity-based compensation, long-term incentive awards, retention bonuses, change in control-related payments, defined benefit pensions and retiree welfare benefits) that are no less favorable to those provided to such Transferred Employee immediately prior to the Closing. For purposes of eligibility, vesting and participation under any employee benefit plans of Buyer providing benefits to the Transferred Employee after Closing Date (the "**Buyer Plans**"), Buyer shall credit each Transferred Employee with his or her years of service with Sellers, its Affiliates (including the Purchased Entities) and any predecessor entities, to the same extent as such Transferred Employee was entitled immediately prior to the Closing for such service under any similar Seller Plans (including Purchased Entities' Plans) in which such Transferred Employee participated before the Closing, except to the extent such credit would result in a duplication of benefits or the funding thereof. For purposes of each Buyer Plan providing medical, dental, hospital, pharmaceutical or vision benefits to any Transferred Employee, Buyer shall use commercially reasonable efforts to cause to be waived any actively-at-work requirements, limitations on benefits relating to any pre-existing conditions and exclusions and waiting periods for any Transferred Employee and/or his or her covered dependents unless such requirements, limitations, exclusions or waiting periods were applicable under Seller Plans (including the Purchased Entities' Plans). In addition, Buyer shall use commercially reasonable efforts to cause any co-payments, deductible and other eligible expenses incurred by such Transferred Employee and/or his or her covered dependents under any Seller Plan (including any Purchased Entities' Plan) providing, medical, dental, hospital, pharmaceutical or vision benefits during the plan year that includes the Closing Date to be credited for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year of each comparable Buyer Plan in which he or she participates. To the extent Buyer reaches

62

agreement on or otherwise lawfully implements terms or conditions of employment applicable to any Transferred Employee represented by any labor union that differ from the terms of this Section 7.05(b), the former shall control. For any Transferred Employee who are principally based outside the United States, the provisions of this Section 7.05 shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

(c)     To the extent that Post-Petition Wages are payable with respect to any payroll period that remains incomplete as of the Closing Date, Buyer shall, no later than two (2) Business Day following delivery by Sellers of a schedule detailing the amount of Post-Petition Wages owed by Sellers (which schedule shall set forth in reasonable detail all Post-Petition Wages owed by Sellers), pay to the Company or, if applicable, the Company's payroll administrator (by wire transfer of immediately available funds to an account designated by Sellers) an amount equal to such Post-Petition Wages, but in no event exceeding $1,264,725.

(d)     Sellers shall cooperate with Buyer and take, or cause to be taken, any and all necessary steps to assign and transfer sponsorship of the Assumed Plans and Agreements, if any (and including all assets, trusts, insurance policies and administrative service Contracts, as applicable, with respect to such Assumed Plans and Agreements) and, if necessary, the Purchased Entities' Plans, to Buyer or its applicable Affiliate. Prior to the Closing, Sellers shall reasonably cooperate with Buyer and its Affiliates and use their reasonable best efforts to provide assistance as Buyer may reasonably request in order to effectuate the foregoing. Nothing herein shall prohibit Buyer or its Affiliates, as applicable, from terminating, amending, or otherwise affecting any of the Assumed Plans and Agreements or any Purchased Entity Plan, at any time and from time to time following the Closing in accordance with the terms of such Assumed Plans and Agreements or Purchased Entity Plans.

(e)     Effective as of the Closing Date, Buyer or one of its Affiliates shall be responsible for satisfying the continuation coverage requirements of COBRA for all individuals who are M&A qualified beneficiaries (as such term is defined in Treasury Regulation Section 54.4980B-9, Q&A-4(a)) with respect to the transactions contemplated by this Agreement (it being understood that such individuals shall be solely responsible for any payments related to COBRA continuation coverage, including deductibles) (together, the "**Post-Closing COBRA Liability**"); provided that Sellers shall make available to Buyer all applicable personnel records and personnel files and such other information as Buyer may reasonably request in order to satisfy its obligations under this Section 7.05(e), to the extent compliant with applicable Laws.  For purposes of clarification, a Transferred Employee who accepts healthcare coverage with Buyer or its Affiliates shall not be deemed to be an M&A qualified beneficiary.

(f)     Notwithstanding the foregoing, or anything else in this Agreement, if Buyer or one of its Affiliates fails to make offers of employment to, or makes offers of employment that constitute an employment loss to, any number of Business Employees that, if terminated by Sellers upon the Closing, would trigger any obligations or liabilities under the WARN Act, then Buyer shall be solely liable for any such obligations or Liabilities.

(g)     During the period from the date of this Agreement through the Closing Date, Sellers shall use reasonable best efforts to comply with any notice, consultation or consent obligations required by applicable Law or the terms of any Collective Bargaining Agreement in

63

connection with the transactions contemplated hereby or other transactions undertaken by Sellers where such requirements may be implicated.

(h)    No provision in this Section 7.05 or otherwise in this Agreement, whether express or implied, shall (i) create any third-party beneficiary or other rights in any employee or former employee of Sellers or any of their subsidiaries or Affiliates (including any beneficiary or dependent thereof), any other participant in any Seller Plan or any other Person; (ii) create any rights to continued employment with Sellers, Buyer or any of their respective Subsidiaries or Affiliates or in any way limit the ability of Sellers, Buyer or any of their respective Subsidiaries or Affiliates to terminate the employment of any individual at any time and for any reason; or (iii) constitute or be deemed to constitute an amendment to any Seller Plan or any other employee benefit plan, program, policy, agreement or arrangement sponsored or maintained by Sellers, Buyer or any of their subsidiaries or Affiliates.

Section 7.06.    *Tax Matters*.

(a)    Any Transfer Taxes attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order or by Section 1146(a) of the Bankruptcy Code shall be borne by Buyer in the aggregate maximum amount of $10,000, and any remaining Transfer Taxes shall be borne by Sellers. Sellers and Buyer shall reasonably cooperate to (i) mitigate and/or eliminate the amount of any such Transfer Taxes (including by providing any forms, certificates or documents to reduce or eliminate any such Transfer Taxes) and (ii) timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Buyer shall prepare, or cause to be prepared, all necessary Tax Returns or other documents with respect to Transfer Taxes. To the extent any Seller is required by applicable Law to pay Transfer Taxes which Buyer is liable for pursuant to this Section 7.06(a), Buyer shall promptly reimburse in full the applicable Seller the amount of such Transfer Taxes upon written request by such Seller accompanied by a notice setting forth the amount of, and basis, for this Tax and evidence that such Tax was paid by such Seller.

(b)    Sellers shall prepare and timely file (or shall cause to be prepared and timely filed) all Tax Returns that are required to be filed (i) with respect to the Purchased Assets or (ii) by the Purchased Entities, in each case, that are due under applicable Law on or prior to the Closing Date (taking into account any extensions of time to file such Tax Returns), and Sellers shall be liable and responsible for, and timely pay or cause to be paid, in full any Taxes shown as due and owing on such Tax Returns; provided, that Sellers shall provide Buyer with a copy of any such filed Tax Returns.

(c)    For purposes of this Agreement, in order to apportion appropriately any Taxes relating to a taxable period beginning on or before and ending after the Closing Date (a "**Straddle Period**"), the amount of Taxes that are allocable to the portion of the Straddle Period ending on the Closing Date shall be, (i) in the case of Taxes imposed on a periodic basis (such as ad valorem and property Taxes) and exemptions, allowances or deductions that are calculated on an annual basis, such as depreciation, the amount of such Taxes, exemptions, allowances or deductions for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the Straddle Period ending on and including the day immediately prior to the Closing Date, and the denominator of which is the number of calendar

64

days in the entire Straddle Period (provided that any Tax exemption or allowance with respect to an annual period shall be pro-rated on an equal daily basis between the Pre-Closing Tax Period and the remainder of the Straddle Period), and (ii) in the case of all other Taxes, determined on a "closing of the books basis" as if the taxable period ended on the Closing Date.

(d)     Any and all Tax sharing or similar agreements, except for this Agreement, between any Purchased Entity, on the one hand, and any Sellers, any retained Subsidiaries or any of their Affiliates or any direct or indirect owner of the Company (excluding, for the avoidance of doubt, any other Purchased Entity), on the other hand, shall be terminated as of the Closing Date to the extent they relate to the Purchased Entity such that there shall be no liabilities or obligations imposed on any Purchased Entity under any such agreements.

Section 7.07.    *Misallocated Assets*. If, at any time following the Closing, Buyer or its Affiliates discover that any asset owned or held by Buyer or its Affiliates is an Excluded Asset (including by having an Excluded Asset located at any Leased Real Property that is or will be owned or leased by Buyer or any of its Affiliates), Buyer shall transfer, or shall cause its Affiliate to transfer all right, title and interest in such Excluded Asset as soon as practicable to any Sellers designated by the Company, and such Excluded Asset will be deemed the property of such Seller held in trust by Buyer for such Seller until so transferred, and if any such Excluded Asset requires notice or approval in connection with the transfer of such asset, Buyer and its Affiliates shall use commercially reasonable efforts to make or obtain such notice or approvals. If, at any time following the Closing, Sellers or any of their respective Affiliates discover that any asset owned by Sellers or any of their respective Affiliates should have been a Purchased Asset, Sellers shall transfer, or shall cause their respective Affiliates to transfer, all right, title and interest in such Purchased Asset as soon as practicable to Buyer or an Affiliate designated by Buyer, and such Purchased Asset will be deemed the property of Buyer held in trust by such Seller for Buyer until so transferred, and if any such Purchased Asset requires notice or approval in connection with the transfer of such asset, Sellers and their Affiliates shall use commercially reasonable efforts to make or obtain such notice or approvals. Buyer and Sellers shall be responsible for any Transfer Taxes payable as a result of any such transfers in accordance with Section 7.06(a).

Section 7.08.    *Payments from Third Parties after Closing*. In the event that any Seller receives any payment from a third party (other than Buyer or any of its Affiliates) after the Closing Date on account of, or in connection with, any Purchased Asset and to the extent such payment is not made in connection with an Excluded Asset or an Excluded Liability, Sellers shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to Buyer (or other entity nominated by Buyer in writing to Sellers) and notify such third party to remit all future payments (in each case, to the extent such payment is not in respect of an Excluded Asset or an Excluded Liability) on account of or in connection with the Purchased Asset to Buyer (or such other entity designated by Buyer in writing to the Company). Notwithstanding anything to the contrary in this Agreement, in the event that Buyer or any of its Affiliates receives any payment from a third party after the Closing on account of, or in connection with, any Excluded Asset, Buyer shall forward such payment, as promptly as practicable but in any event within thirty (30) days after such receipt, to the Company (or other entity nominated by the Company in writing to Buyer) and notify such third party to remit all future payments on account of or in connection with the Excluded Assets to the Company (or such other entity as the Company may designate). To the extent permitted by applicable Law and unless otherwise required by a determination within

65

the meaning of Section 1313(a) of the Code (or any comparable provision of state, local, or non-U.S. Law), the Parties agree that the Party that is entitled to receive any amounts paid from a third party with respect to a Purchased Asset or Excluded Asset, as the case may be, pursuant to this Section 7.08 shall be treated as the recipient of the applicable payment for all Tax purposes, and the Parties agree not to (and not to permit any of their respective Affiliates to) take a position inconsistent therewith upon examination of any Tax Return, in any Tax refund claim, in any Proceeding related to Taxes, or otherwise.

Section 7.09.    *Bulk Transfer Laws*. The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any Claims (other than the Assumed Liabilities) and Encumbrances (other than the Permitted Encumbrances), including any liens or claims arising out of the bulk transfer Laws, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

Section 7.10.    *Bankruptcy Court Approval.*

(a)    The Parties shall use commercially reasonable efforts to comply with the following timeline (the "**Bankruptcy Court Milestones**"):

(i)    Intentionally Omitted

(ii)    Intentionally Omitted.

(iii)    Intentionally Omitted.

(iv)    Intentionally Omitted.

(v)    No later than August 11, 2023, Sellers shall file with the Bankruptcy Court the schedules of Purchased Contracts and Designated Contracts.

(vi)    No later than August 14, 2023, the Bankruptcy Court shall have held the Sale Hearing, unless such milestone shall have been satisfied prior to termination of this Agreement.

(vii)    No later than August 15, 2023, Sellers shall obtain entry by the Bankruptcy Court of the Sale Order and such order shall be in full force and effect and not reversed, modified or stayed, unless such milestone shall have been satisfied prior to termination of this Agreement.

(viii)    No later than August 16, 2023, the Closing Date shall have occurred, unless such milestone shall have been satisfied prior to termination of this Agreement.

(b)    Sellers shall cooperate with Buyer to prepare a list of Contracts that Buyer may, in its sole discretion, include on the list of Purchased Contracts and such list shall also include the Cure Costs and Cure Payments for each Contract listed thereon ("**Proposed Purchased Contract List**").  Sellers shall serve on all non-Debtor counterparties set forth on the Proposed Purchase Contract List a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such counterparties' Contracts on the terms set forth in the notice,

including listing the applicable Cure Costs and Cure Payments and such notice shall notify such non-Debtor counterparties of the deadline for objecting to the assumption and assignment of such Contract on any basis, including with respect to the amount of Cure Costs and Cure Payment, if any ("**Cure Notice**"). If requested by Buyer, Sellers shall also promptly deliver to each counterparty listed on the Cure Notice a proposed Assumption and Assignment Agreement prepared by Buyer.

(c)      Sellers and Buyer shall cooperate to obtain the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such advisors of Buyer and Sellers and their respective Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of performance by Buyer as required under Section 365 of the Bankruptcy Code, and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(d)      Subject to entry of the Sale Order and consummation of the Closing, Buyer shall pay the Cure Costs, Cure Payment, or other amount agreed between the Buyer and the counterparty to a Purchased Contract in accordance with the provisions of Section 365 of the Bankruptcy Code, this Agreement and the Sale Motion.

(e)      The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Claims (other than Assumed Liabilities or as expressly set forth in this Agreement) and Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances) and (C) the performance by Sellers of their respective obligations under this Agreement, (ii) authorize and empower Sellers to assume and assign to Buyer the Purchased Contracts, (iii) find that Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, find that Buyer is not a successor to any Seller and grant Buyer the protections of Section 363(m) of the Bankruptcy Code, (iv) find that Buyer shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Purchased Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor Law, de facto merger, or substantial continuity, (v) find that Buyer has provided adequate assurance (as that term is used in Section 365 of the Bankruptcy Code) of future performance in connection with the assumption and assignment of the Purchased Contracts and (vi) find that Buyer shall have no Liability for any Excluded Liability. Without limiting Sellers' obligation to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Buyer agrees that it will promptly take reasonable actions to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

67

(f)      Sellers acknowledge and agree, and the Sale Order shall provide that, except as otherwise provided in <u>Section 2.03</u>, and except for the Assumed Liabilities and Permitted Encumbrances, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Purchased Assets. On the Closing Date, the Purchased Assets shall be transferred to Buyer free and clear of all Claims (other than the Assumed Liabilities) and Encumbrances (other than the Permitted Encumbrances) to the fullest extent permitted by Section 363 of the Bankruptcy Code.

(g)      In the event the entry of the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such Order), Sellers shall use their reasonable best efforts to defend such appeal. Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure or (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

(h)      Notwithstanding anything contained herein to the contrary, during the pendency of the Chapter 11 Cases, Sellers shall not reject or transfer any Excluded Contract without first obtaining Buyer's prior written consent (such consent not to be unreasonably withheld, conditioned, or delayed). In the event that any of the Parties to this Agreement discovers a Contract related to the business of the Company and its Subsidiaries, the Purchased Assets or the Assumed Liabilities (whether prior to, on or following the Closing) and such Contract (i) was not set forth on the Original Contract & Cure Schedule, (ii) is a Contract which Buyer wishes to assume the rights and obligations of and (iii) has not been rejected by Sellers (with Buyer's prior written consent in compliance with the immediately preceding sentence), Buyer and Sellers shall execute, acknowledge and deliver such other instruments and take such further actions as are reasonably practicable for Buyer or Buyer Designee to assume the rights and obligations under such Contract as of the Closing (or, if applicable, as soon as reasonably practicable following the Closing), otherwise in accordance with <u>Section 2.05</u>.

Section 7.11.      *No Successor Liability*. The Parties intend that, to the fullest extent permitted by applicable Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Buyer shall not be deemed to: (a) be the successor of any Seller, (b) have, de facto, or otherwise, merged with or into Sellers, (c) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers or (d) be liable or have any Liability for any acts or omissions of Sellers in the conduct of their businesses or arising under or related to the Purchased Assets other than the Assumed Liabilities and Permitted Encumbrances or as expressly set forth and agreed in this Agreement. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, the Parties intend that Buyer shall have no Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Purchased Assets) against Sellers or any of Sellers' predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or in connection with the transactions contemplated to occur on the Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the businesses of

68

Sellers, the Purchased Assets or any Liability of Sellers arising prior to, or relating to any period occurring prior to, the Closing Date. The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this <u>Section 7.11</u>.

Section 7.12.    *Communications with Customers and Suppliers*. Prior to the Closing, the Parties shall reasonably cooperate with each other in coordinating their communications with any key contractual counterparties of Group Companies in relation to this Agreement and the transactions contemplated hereby.

Section 7.13.    *Efforts to Consummate*. From the date of this Agreement until the Closing, subject to the other terms and conditions set forth in this Agreement (including <u>Section 7.03</u>, each Party will use commercially reasonable efforts to take such actions as are necessary to satisfy the closing conditions set forth in <u>Article 8</u>. Notwithstanding anything to the contrary in this Agreement, Buyer shall not be obligated to waive a failure of any of the closing conditions set forth in <u>Section 8.01</u> and <u>Section 8.02</u> and Sellers shall not be obligated to waive a failure of any of the closing conditions set forth in <u>Section 8.01</u> and <u>Section 8.03</u>.

Section 7.14.    *Transition Services Agreement*. From the date of this Agreement until the Closing, the Parties shall, to the extent they together determine it to be necessary, use commercially reasonable efforts to enter into a transition services agreement, in form and substance reasonably acceptable to Buyer and Sellers.

Section 7.15.    *Agreement with C&B NewCo, LLC*. At any time prior to 11:59 p.m. New York Time on the date that is one (1) day prior to the Sale Hearing, Buyer may, in its sole discretion and by written notice to the Company, elect to include the Consigned Inventory as a Purchased Asset, without an attendant increase in the Purchase Price; <u>provided</u>, <u>however</u>, that Buyer may only make such election if Buyer has entered into an agreement with C&B NewCo, LLC regarding the Consigned Inventory that does not require any Seller to make any additional payment to C&B NewCo, LLC on account of the Consigned Inventory prior to or at the Closing. For the avoidance of doubt, if Buyer does not enter into such agreement in connection with the requirements of the foregoing sentence or provides the Company with prior written notice of its intention not to enter into such agreement, the Consigned Inventory shall automatically, without any further action of any Parties hereto, be deemed to be an "Excluded Asset".

Section 7.16.    <u>Access to Books & Records</u>.

(a)    From and after the Closing for a period of three (3) years following the Closing Date (or, if earlier, the closing of the Chapter 11 Cases), Sellers will provide Buyer and its representatives with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents relating to the Company or its Subsidiaries (for the purpose of examining and copying) relating to the Purchased Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities, in each case, in Sellers' possession or control and solely to the extent concerning periods or occurrences prior to the Closing Date as may be reasonably requested by Purchaser (x) to comply with legal, contractual, regulatory, stock exchange and financial reporting requirements, (y) to satisfy any audit, accounting or similar requirement, or (z) to satisfy any other bona fide legal compliance,

137451785_15

accounting or tax purpose; <u>provided</u> that nothing herein will require Sellers to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any applicable Laws, or (C) would violate any fiduciary duty; _provided_ that Sellers will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; _provided further_ that no such access shall be required in connection with a proceeding between Buyer or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand.

(b)     From and after the Closing for a period of three (3) years following the Closing Date (or, if earlier, the closing of the Chapter 11 Cases), Buyer will provide Sellers and their representatives with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents transferred to Buyer pursuant to this Agreement (for the purpose of examining and copying) relating to the Purchased Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities, in each case, in Buyer's possession or control and solely to the extent concerning periods or occurrences prior to the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to personnel, offices and properties of Buyer , as may be reasonably requested by the Sellers in connection with the Chapter 11 Cases, the wind-down and liquidation of Sellers, to comply with legal, regulatory, stock exchange and financial reporting requirements, to satisfy any audit, accounting or similar requirement; provided, in each case, that such access does not unreasonably interfere with the normal operations of Buyer; provided further that nothing herein will require Buyer to provide access to, or to disclose any information to, Sellers if such access or disclosure (A) would result in the waiver of any attorney-client, work-product or other legal privilege or accountant privilege, (B) would reasonably be expected to violate any applicable Laws or (C) would violate any fiduciary duty; provided that Buyer and its Subsidiaries will use commercially reasonable efforts to provide a reasonable alternative means of accessing any such information in a manner that is not inconsistent with the foregoing; provided further that no such access shall be required in connection with a proceeding between Buyer or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand.


ARTICLE 8

CONDITIONS TO CLOSING

Section 8.01.     _Conditions to Obligations of Buyer and Sellers_. The obligations of each of Buyer and Sellers to consummate the Closing are subject to the satisfaction or valid waiver at or prior to the Closing of the following conditions:

(a)     no judgment, injunction or Order shall then be in effect prohibiting or making illegal the consummation of the Closing; and

(b)     the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have not been stayed by the Bankruptcy Court.

70

Section 8.02. *Conditions to Obligations of Buyer*. The obligations of Buyer to consummate the Closing are subject to the satisfaction (or valid waiver) at or prior to the Closing of the following further conditions:

(a)       the representations and warranties of Sellers in this Agreement (other than the Seller Fundamental Representations) shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date, except where the failure of such representations and warranties to be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect," "Material Adverse Effect" or similar qualifiers contained therein) has not had or would not reasonably be expected to have a Material Adverse Effect, and (ii) the representations and warranties of Sellers set forth in underline Section 3.01 (Organization and Qualification), underline Section 3.02 (Authorization; Execution and Delivery; Enforceability), subsections (a), (b) and (d) of underline Section 3.04 (Purchased Entities), the first sentence of underline Section 3.05 (Title to and Sufficiency of Purchased Assets) (solely with respect to the Purchased Shares), and all of underline Section 3.23 (Brokers) (collectively, the "**Seller Fundamental Representations**") shall be true and correct on and as of the Closing in all respects, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct as of such earlier date in all respects;

(b)       the covenants and agreements that Group Companies are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects;

(c)       since the date of this Agreement, there shall not have occurred any event, change, occurrence or effect that, individually or together with all other events, changes, occurrences or effects, has had, or would reasonably be expected to have, a Material Adverse Effect described in clause (a) of the definition thereof;

(d)       Sellers shall have delivered, or cause to be delivered, to Buyer each item set forth in underline Section 2.09(a);

(e)       with respect to the Purchased Entities, (i) none of the Purchased Entities shall have commenced any proceeding relating to bankruptcy, reorganization, insolvency, moratorium, or otherwise affecting creditors' rights generally at any time prior to the Closing, (ii) that certain Amendment Agreement to the Share Purchase Agreement and Sixth Amendment dated July 27, 2023 to the Vendor Loan Agreement Relating to the Impulse Transaction, by and among Emotion Invest GmbH & Co. KG, BE Beteiligungen Fonds GmbH & Co. geschlossene Ivnestmentkommanditgesellschaft, and Iris Capital Fund II, iMedia & 123tv Holding GmbH, and the other parties thereto, in the form delivered to Buyer prior to the date hereof (as may be amended prior to Closing to extend the discounted payoff in the Sixth Amendment through August 21, 2023 in exchange for a €75,000 interest payment), shall be and remain in full force and effect (including the discounted payoff contained therein) (the "**Vendor Loan Agreement**"), and (iii) the DIP Facility shall have been paid in full;

(f)       from the date of this Agreement, no assets that, individually or in the aggregate, are material to the Business or are required by the Purchased Entities to operate in all material respects in the Ordinary Course, has been sold, disposed of, transferred, encumbered,

pledged, or otherwise conveyed by any of the Sellers or otherwise, except as expressly permitted by the terms of this Agreement or as required by Section 5.01(a); and

(g)     at Closing, (i) Sellers shall have paid all outstanding sales Taxes as contemplated by the DIP Budget (other than (A) with respect to penalties and interest not assessed by, and not yet payable to, the relevant Governmental Authority prior to Closing and (B) in respect of outstanding sales Taxes due to Missouri and Oklahoma contemplated by the DIP Budget (and, for the avoidance of doubt, in the case of this clause (B), the amounts allocated therefore which are not paid prior to the Closing shall be segregated and held in trust for the benefit of the Missouri and Oklahoma taxing authorities, respectively, pursuant to that certain Interim Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Relating Relief Docket No. 64)), and if requested by Buyer, Sellers shall provide Buyer with a certification from the Company's outside accounting advisors confirming that such applicable payments have been made in full, (ii) Sellers shall have paid all outstanding amounts owed to the State of California and the State of New York in respect of the matters set forth in Section 3.22(b)(xviii)(D) of the Disclosure Schedules, and shall have, and shall have caused the Company Subsidiaries to have, used reasonable best efforts during the period following the date hereof through the Closing Date to fully resolve the matters set forth in Section 3.22(b)(xviii)(D), including the associated tax liens, and (iii) Sellers shall have, and shall have caused the Company Subsidiaries to have, used reasonable best efforts during the period following the date hereof through the Closing Date to fully pay all outstanding sales Taxes due by the Company and any of its Subsidiaries and fully resolve all outstanding issues related to unpaid or delinquent sales Taxes in all jurisdictions in which the Company and its Subsidiaries conduct business.

Section 8.03.     *Conditions to Obligations of Sellers*. The obligations of Sellers to consummate the Closing are subject to the satisfaction (or valid waiver) at or prior to the Closing of the following further conditions:

(a)     the representations and warranties of Buyer in this Agreement shall be true and correct on and as of the Closing, except to the extent expressly made as of an earlier date, in which case such representations and warranties shall be true and correct in all respects as of such earlier date, except where such failures to be true and correct (without giving effect to any limitation as to "materiality," "material adverse effect" or similar qualifiers contained therein) would not materially impair or prevent Buyer's ability to consummate the transactions contemplated by this Agreement;

(b)     the covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects; and

(c)     Buyer shall have delivered, or cause to be delivered, to the Company each item set forth in Section 2.09(b).

Section 8.04.     *Waiver of Conditions*. Upon the occurrence of the Closing, any condition set forth in this Article 8 that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Buyer or Sellers may rely on the failure of any condition set forth in this Article

8, as applicable, to be satisfied if such failure was primarily caused by such Party's failure to perform any of its obligations under this Agreement, including its obligation to use its reasonable best efforts to consummate the transactions contemplated hereby as required under this Agreement.

ARTICLE 9

SURVIVAL

Section 9.01.     *Survival*. The Parties, intending to modify any applicable statute of limitations, agree that (a)(i) the representations and warranties in this Agreement and in any certificate delivered pursuant hereto and (ii) the covenants in this Agreement only requiring performance prior to the Closing shall, in each case, terminate and be of no further force and effect effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no Liability on the part of, nor shall any claim be made by or on behalf of, any Party or any Party's Affiliates in respect thereof and (b) the covenants in this Agreement that contemplate performance at or after the Closing or expressly by their terms survive the Closing shall survive the Closing in accordance with their respective terms (the "**Surviving Post-Closing Covenants**"). Except with respect to the Surviving Post-Closing Covenants, no other remedy shall be asserted or sought by Buyer, and Buyer shall cause its Affiliates not to assert or seek any other remedy, against Sellers or any of their respective Affiliates under any contract, misrepresentation, tort, strict liability, or statutory or regulatory Law or theory or otherwise, all such remedies being hereby knowingly and expressly waived and relinquished to the fullest extent permitted under applicable Law. Nothing in this Agreement shall limit any party from asserting a claim for Fraud.

ARTICLE 10

TERMINATION

Section 10.01.     *Grounds for Termination*. This Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of the Company and Buyer;

(b)     by Buyer if the Bankruptcy Court Milestones are not (i) met by Sellers or (ii) waived, amended, or extended by Buyer; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.01(b) if it is then in breach of any of its representations, warranties, covenants or agreements contained herein has been the primary cause of the failure of any Bankruptcy Court Milestones (other than those set forth in Section 7.10(a)(vii) and Section 7.10(a)(viii)) to be met;

(c)     by Buyer, if (i) Sellers enter into a definitive agreement with respect to an Alternative Transaction with one or more Persons other than Buyer, or (ii) Sellers file a pleading with the Bankruptcy Court supporting or seeking approval of an Alternative Transaction and such pleading is not withdrawn after (2) days written notice;

(d)     by either the Company or Buyer, if the Closing shall not have been consummated on or before August 18, 2023 (the "**Outside Date**"); provided, further, that the right to terminate this Agreement pursuant to this Section 10.01(d) shall not be available to a Party

73

whose breach of any of its representations, warranties, covenants or agreements contained herein has been the primary cause of the failure of the Closing to occur on or before the Outside Date;

(e)       by the Company, if Sellers are not then in material breach of their obligations under this Agreement and Buyer breaches or fails to perform any of its representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in Section 8.01 or Section 8.03, (ii) cannot be, or has not been, cured within ten (10) days following delivery of written notice to Buyer of such breach or failure to perform and (iii) has not been waived by the Company;

(f)       by Buyer, if Buyer is not then in material breach of its obligations under this Agreement and Sellers breach or fail to perform any of their representations, warranties, covenants or agreements contained in this Agreement and such breach or failure to perform (i) would prevent the satisfaction of a condition set forth in Section 8.01 or Section 8.02, (ii) cannot be, or has not been, cured within ten (10) days following delivery of written notice to the Company of such breach or failure to perform and (iii) has not been waived by Buyer;

(g)       by Buyer, if the Bankruptcy Court enters a final non-appealable order pursuant to section 362 of the Bankruptcy Code lifting or modifying the automatic stay with respect to any material portion of the Purchased Assets;

(h)       by either Buyer or the Company, (i) if (with respect to the Company, other than as a result of a request by the Company or any Seller) the Bankruptcy Court enters an Order dismissing, or converting into cases under Chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under Chapter 11 of the Bankruptcy Code and comprising part of the Chapter 11 Cases, (ii) if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Company is appointed in the Chapter 11 Cases or (iii) an Order or dismissal, conversion or appointment is entered with respect to the Chapter 11 Cases for any reason and not reversed or vacated within fourteen (14) days after entry thereof;

(i)       by either Buyer or the Company, if the Bankruptcy Court or any Governmental Authority issues any Order permanently enjoining or otherwise permanently prohibiting the transactions contemplated by this Agreement and such Order shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 10.01(i) shall not be available to any Party if such Order was primarily caused by (i) such Party's material breach of any provision of this Agreement or (ii) such Party's failure to comply in any material respect with its obligations hereunder.

(j)       by either Buyer or the Company, if an Order of the Bankruptcy Court is entered denying approval of the Sale Order and such Order shall have become final and non-appealable;

(k)       by Buyer if following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (x) amended, modified or supplemented in an adverse way without Buyer's prior written consent or (y) voided, reversed or vacated or is subject to a stay;

(l)       by Buyer upon the occurrence of any "Event of Default" under the DIP Facility that has not been cured (if susceptible to cure) or waived by the applicable percentage of

74

the lenders under the DIP Facility in accordance with the terms of the DIP Facility and the obligations outstanding under the DIP Facility have been accelerated and such acceleration has not been rescinded after three (3) business days and notice thereof;

(m)    by the Company if its board of directors, based on the advice of outside legal counsel, determines in good faith that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties;

(n)    by the Company if (i) all of the conditions set forth in Section 8.01 and Section 8.02 have been satisfied (other than those conditions that, by their nature, are to be satisfied at the Closing, all of which are capable of being satisfied at the Closing) or waived, (ii) the Company has irrevocably confirmed by written notice to Buyer that (A) all conditions set forth in Section 8.03 have been satisfied (other than those that, by their nature, are to be satisfied at the Closing, each of which is capable of being satisfied at the Closing) or that they would be willing to waive any unsatisfied conditions in Section 8.03 at the Closing, and (B) the Sellers are ready, willing and able to consummate the Closing and (iii) Buyer fails to complete the Closing within three (3) Business Days following the date the Closing should have occurred pursuant to Section 2.09;

(o)    by Buyer if (i) all of the conditions set forth in Section 8.01 and Section 8.02 have been satisfied (other than those conditions that, by their nature, are to be satisfied at the Closing, all of which are capable of being satisfied at the Closing) or waived, (ii) Buyer has irrevocably confirmed by written notice to Sellers that (A) all conditions set forth in Section 8.03 have been satisfied (other than those that, by their nature, are to be satisfied at the Closing, each of which is capable of being satisfied at the Closing) or that Buyer would be willing to waive any unsatisfied conditions in Section 8.03 at the Closing, and (B) Buyer is ready, willing and able to consummate the Closing and (iii) Sellers fail to complete the Closing within three (3) Business Days following the date the Closing should have occurred pursuant to Section 2.09;

(p)    by Buyer, at any time after receipt of a Board Determination Notice; or

(q)    by Buyer if any of the Purchased Entities shall have commenced any proceeding relating to bankruptcy, reorganization, insolvency, moratorium, or otherwise affecting creditors' rights generally at any time prior to the Closing.

The Party desiring to terminate this Agreement pursuant to this Section 10.01 (other than pursuant to Section 10.01(a)) shall give written notice of such termination to the other Party in accordance with Section 11.01. For the avoidance of doubt, each condition permitting termination of this Agreement set forth in this Section 10.01 shall be considered separate and distinct from each other such condition and, if more than one termination condition set forth in this Section 10.01 is applicable, the Party exercising any such termination right shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

Section 10.02.    *Effect of Termination*.

(a)    If this Agreement is terminated as permitted by Section 10.01 (i) this Agreement shall become null and void and of no further force, except for the provisions of Section

2.07, Section 7.01(a), this Section 10.02, Section 10.03 and Article 11, which shall survive such termination of this Agreement and remain in full force and effect and (ii) no Party (nor any stockholder, director, officer, employee, agent, consultant or representative of any such Party) shall thereafter have any Liability hereunder; provided that nothing in this Section 10.02 shall be deemed to release any Party from any Liability for any willful and material breach of this Agreement occurring prior to its termination.

      (b)    [Reserved.]

Section 10.03.    *Costs and Expenses*. Except as otherwise expressly provided in this Agreement, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense; provided that all filing fees required under any Antitrust Law and the costs for the notarization of the STA Germany will be equally divided between Buyer, on the one hand, and Sellers, on the other hand.

## ARTICLE 11

## MISCELLANEOUS

Section 11.01.    *Notices*. All notices, requests and other communications to any Party hereunder shall be in writing and shall be delivered to the addresses set forth below (or pursuant to such other address(es) as may be designated in writing by the Party to receive such notice):

if to Buyer or Buyer Guarantor:

IV Media, LLC
38955 Hills Tech Drive
Farmington Hills, Michigan 48331

Attention:    Christopher Fowler

Email:    cfowler@sicapitalgroup.com

with a copy, which shall not constitute notice, to:

Oakland Law Group, PLLC
38955 Hills Tech Drive
Farmington Hills, Michigan 48331

Attention:    Alan Gocha

Email:    agocha@oaklandlawgroup.com

and

Greenberg Traurig, LLP

76

One Vanderbilt Ave
New York, NY 10017
Attention: Oscar Pinkas,
                    Nathan A. Haynes

Email:          pinkaso@gtlaw.com
                haynesn@gtlaw.com

if to Sellers, to:

                iMedia Brands, Inc.
                Shady Oak Road
                Eden Prairie, Minnesota 55344-3433

Attn:           Tim Peterman, Chief Executive Officer
                Alex Wasserburger, General Counsel

Email:          tpeterman@imediabrands.com
                awasserburger@imediabrands.com

with copies, which shall not constitute notice, to:

                Ropes & Gray LLP
                1211 Avenue of the Americas
                New York, NY 10036-8704

Attention:      Ryan Preston Dahl
                Cristine Pirro Schwarzman

Email:          Ryan.Dahl@ropesgray.com
                Cristine.Schwarzman@ropesgray.com

and
                Ropes & Gray LLP
                Prudential Tower, 800 Boylston Street
                Boston, MA 02199-3600

Attention:      C. Michael Roh
Email:          Michael.Roh@ropesgray.com

All such notices, requests and other communications shall be deemed received (a) if delivered prior to 5:00 p.m. New York time on a day which is a Business Day, then on such date of delivery if delivered personally, or, if by email, upon written confirmation of delivery by email (which may be electronic), and if delivered after 5:00 p.m. New York time (whether personally or by email) then on the next succeeding Business Day, (b) on the first (1st) Business Day following the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier or

77

(c) on the earlier of confirmed receipt or the fifth (5th) Business Day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.

Section 11.02.    *Amendments and Waivers*.

(a)    Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each of Buyer and the Company (on behalf of itself and each Seller) or, in the case of a waiver, by the Party against whom the waiver is to be effective; provided that any waiver asserted against any Seller shall be valid if given by the Company on behalf of such Seller. For clarity, Bankruptcy Court approval shall not be required for any amendment to this Agreement.

(b)    No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

Section 11.03.    *Successors and Assigns*. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; provided that each Seller, on the other hand, may not assign, delegate or otherwise transfer any of their respective rights or obligations under this Agreement without the prior written consent of Buyer.  Buyer may, without the consent of Sellers, designate, effective as of the Closing, one or more Persons to acquire all, or any portion of, the Purchased Assets and assume all or any portion of the Assumed Liabilities or pay all or any portion of the Purchase Price. The above designation may be made by Buyer by written notice to Sellers at any time prior to the Closing Date. Notwithstanding anything herein to the contrary, in no event shall Buyer's designation pursuant to this Section 11.03 relieve Buyer or Buyer Guarantor of any Liability or obligation hereunder until such Liability or obligation has been performed.  Any attempted assignment in violation of this Section 11.03 shall be null and void, ab initio.

Section 11.04.    *Governing Law*. Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement and any dispute relating thereto (whether based in contract, tort, or otherwise) shall be governed by and construed in accordance with the Laws of the State of Delaware, without regard to the conflicts of law rules of such State.

Section 11.05.    *Jurisdiction*. The Parties agree that, during the period from the date hereof until the date on which the Chapter 11 Cases are closed or dismissed (the "**Bankruptcy Period**"), any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought exclusively in the Bankruptcy Court. The Parties further agree that, following the Bankruptcy Period, any Proceeding with respect to this Agreement or the transactions contemplated hereby shall be brought against any of the Parties exclusively in (i) the Court of Chancery of the State of Delaware or, if such Court of Chancery lacks subject matter jurisdiction, the Complex Commercial Division of the Superior Court of the State of Delaware, or (ii) the United States District Court for the District of Delaware (unless such courts decline to accept jurisdiction over a particular matter, in which case, in any state or federal court within the State of

78

Delaware), and each of the Parties hereby irrevocably consents to the jurisdiction of such court and the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in such courts or that any such Proceeding which is brought in such courts has been brought in an inconvenient forum. Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court, the Court of Chancery of the State of Delaware or the United States District Court for the District of Delaware. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 11.01 shall be deemed effective service of process on such Party.

Section 11.06.        *WAIVER OF JURY TRIAL*. TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSES OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT OR THE SUBJECT MATTER HEREOF OR THEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 11.06 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

Section 11.07.        *Counterparts; Third-Party Beneficiaries*. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party. No provision of this Agreement is intended to confer upon any Person other than the Parties any rights, benefits, Proceedings or remedies hereunder (except that the Non-Recourse Parties shall be third-party beneficiaries of Section 11.13). Delivery of a .pdf version of one or more signatures to this Agreement shall be deemed adequate delivery for purposes of this Agreement.

Section 11.08.        *Specific Performance*. It is understood and agreed by the Parties that money damages (even if available) would not be a sufficient remedy for any breach of this Agreement by Sellers or Buyer or Buyer Guarantor and as a consequence thereof, after the Bankruptcy Court's entry of the Sale Order, Buyer and Sellers shall each be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach or threatened breach in addition to any other remedy to which such Party may be entitled in Law or in equity, including an Order of the Bankruptcy Court or other court of competent jurisdiction requiring Buyer, Buyer Guarantor or Sellers, as may be applicable, to comply promptly with any of their obligations hereunder. Buyer, Buyer Guarantor and Sellers agrees that they will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that the Buyer, Buyer Guarantor or Sellers, as applicable, have an adequate remedy at Law or that any award of specific performance is not an appropriate remedy for any reason at Law or in equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to

79

enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such Order.

Section 11.09.     *Entire Agreement*. This Agreement, the Confidentiality Agreement and the other Transaction Documents (together with the Schedules and Exhibits hereto and thereto) constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to such subject matter. No Party to this Agreement shall be liable or bound to any other Party in any manner by any representations, warranties, covenants or agreements relating to such subject matter except as specifically set forth herein and therein. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

Section 11.10.     *No Strict Construction*. Buyer and Buyer Guarantor, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer and Buyer Guarantor, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

Section 11.11.     *Severability*. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 11.12.     *Disclosure Schedules*. The representations and warranties of Sellers set forth in this Agreement are made and given subject to the disclosures in the Disclosure Schedules. Inclusion of information in the Disclosure Schedules will not be construed as an admission that such information is material to the business, operations of condition (financial or otherwise) of Sellers or their respective businesses, in whole or in part, or as an admission of Liability or obligation of Sellers to any Person. The sections of the Disclosure Schedules have been organized for purposes of convenience in numbered sections corresponding to the sections in this Agreement; provided, however, that any disclosure in any section of the Disclosure Schedules will apply to and will be deemed to be disclosed with respect to any other representation and/or warranty, so long as the applicability of such disclosure is reasonably apparent on its face. It is understood and agreed that the specification of any dollar amount in the representations and warranties or

covenants contained in this Agreement or the inclusion of any specific item in the Disclosure Schedules is not intended to imply that such amounts or higher or lower amounts, or the items so included or other items, are or are not material, and no Party or other Person shall use the fact of the setting of such amounts or the fact of the inclusion of any such item in the Disclosure Schedules in any dispute or controversy as to whether any obligation, item or matter not described in this Agreement or included in the Disclosure Schedules is or is not material for purposes of this Agreement. Nothing in this Agreement (including the Disclosure Schedules) shall be deemed an admission by either Party or any of its Affiliates, in any Proceedings, that such Party or any such Affiliate, or any third party, is or is not in breach or violation of, or in default in, the performance or observance of any term or provisions of any Contract or Law.

Section 11.13. *Non-Recourse*. Notwithstanding anything herein to the contrary, no current or former director, manager, officer, agent, controlling person or representative of, Affiliate (or director, manager, officer, agent, controlling person or representative of an Affiliate) of, or direct or indirect equity owner in, any Sellers or the Purchased Entities (collectively, the **"Non-Recourse Parties"**) shall have any personal liability to either Buyer, Buyer Guarantor or any other Person as a result of, arising from, the breach or alleged breach of any representation, warranty, covenant, agreement or obligation of Sellers in this Agreement or any other Transaction Document or otherwise in connection with the transactions contemplated hereby. In no event shall any Party or any of its Affiliates seek to enforce this Agreement against, make any claims for breach of this Agreement against, or seek to recover monetary damages from, any Non-Recourse Party, in each case, whether in tort, contract or otherwise. Nothing in this Agreement shall limit any Party from asserting a claim for Fraud.

Section 11.14. *Buyer Guaranty*.

(a)    Buyer Guarantor hereby unconditionally and irrevocably guarantees (the "**Guaranty**") to and for the benefit of Sellers and their respective Affiliates (the "**Guaranteed Parties**") the full, timely and faithful performance and payment by Buyer of each of its obligations under this Agreement and the other Transaction Documents (the "**Guaranteed Obligations**"), including, without limitation, the performance of all obligations and payment of all amounts owed by Buyer pursuant to Section 2.07 and Section 2.09(b), and the timely satisfaction and performance of all of Buyer's covenants, agreements and obligations contained in this Agreement and the Transaction Documents.

(b)    The Guaranty constitutes a guarantee of payment and performance, and not merely of collection, whether or not recovery may be, or hereafter may become, barred by any statute of limitation or otherwise, and is not conditional or contingent upon any event, contingency or circumstance except as expressly set forth in this Agreement, and may be enforced directly against Buyer Guarantor as a primary obligation of Buyer Guarantor. The Guaranteed Obligations will not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any Proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Buyer Guarantor or by any defense that Buyer Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such Proceeding. The Guaranteed Parties shall not be obligated to file any claim relating to the Guaranteed Obligations in the event that Buyer becomes subject to a bankruptcy, reorganization, insolvency or similar Proceeding, and the failure of any Guaranteed Party to so file

81

shall not affect the Guaranteed Obligations hereunder. Buyer Guarantor hereby expressly, irrevocably and unconditionally waives any defenses that would otherwise operate to impair or diminish Buyer Guarantor's Liability under or in connection with the Guaranty, including arising by reason of promptness, diligence, notice of the acceptance of this guarantee and of the Guaranteed Obligations, presentment, demand for payment or performance, notice of non-performance, default, dishonor and protest, notice of the Guaranteed Obligations incurred and all other notices of any kind, all defenses which may be available by virtue of any valuation, stay, moratorium Law or other similar Law now or hereafter in effect, any right to require the marshalling of assets of Buyer, and all suretyship defenses generally, in each case, except for any defense that could be asserted by Buyer with respect to the applicable claim pursuant to the terms of this Agreement, unless such defense has been raised by Buyer with respect to the applicable claim and rejected by a court in a final and non-appealable judgment.

(c)     Buyer Guarantor understands and agrees that the Guaranty is and shall be construed as a continuing, absolute and unconditional guarantee of payment and performance without regard to any circumstance whatsoever (with or without notice to or knowledge of Buyer or Buyer Guarantor) that constitutes, or might be construed to constitute, an equitable or legal discharge of the Guaranteed Obligations in bankruptcy or in any other instance, in each case other than payment or performance in full of the Guaranteed Obligations or any defense that could be asserted by Buyer with respect to the applicable claim pursuant to the terms of this Agreement, unless such defense has been raised by Buyer with respect to the applicable claim and rejected by a court in a final and non-appealable judgment.

(d)     Buyer and Buyer Guarantor, jointly and severally, represent and warrant as follows:

(i)     Buyer Guarantor has all necessary limited liability company power and authority to execute and deliver this Agreement and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer Guarantor of this Agreement, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Buyer Guarantor, and no other limited liability company or similar proceeding on the part of Buyer Guarantor or the board of directions or manager(s) (as the case may be) or equityholders of Buyer Guarantor is necessary to authorize this Agreement or the consummation of the transactions contemplated hereby or thereby. This Agreement has been duly and validly executed and delivered by Buyer Guarantor and, assuming the due authorization, execution and delivery hereof by Sellers, constitutes a legal, valid and binding obligation of Buyer Guarantor, enforceable against it in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a Proceeding in equity or at law).

(ii)     The execution and delivery by Buyer of this Agreement do not, and the performance of this Agreement by Buyer shall not conflict with or violate the organizational documents of Buyer Guarantor, conflict with or violate in any respect any Law or Order applicable to Buyer Guarantor or by which any of its properties, rights or assets is bound or affected, or conflict with, result in a breach or violation of, or require a consent or notice under, or constitute

a default (or an event that with or without notice or lapse of time or both would become a default) under any material contract to which Buyer Guarantor is a party, or by which Buyer Guarantor or its properties, rights or assets is or are bound or affected. Buyer Guarantor has the financial capacity to pay and perform all of its obligations under the Guaranty, and all funds necessary for Buyer Guarantor to fulfill the Guaranteed Obligations are and shall be available to Buyer Guarantor.

        (e)    All the obligations, responsibilities, representations, and any other provisions set forth in this Section 11.14 shall not survive the Closing Date (or the earlier termination of this Agreement pursuant to Article 10).

      Section 11.15.   *DISCLAIMER*. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR OTHERWISE, (A) THE EXPRESS REPRESENTATIONS ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO BUYER IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, AND (B) EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (A) ABOVE, NONE OF THE SELLERS OR ANY OTHER GROUP COMPANY NOR ANY OTHER PERSON HAS MADE OR IS MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE BUSINESS OR ASSETS OR LIABILITIES OF ANY GROUP COMPANY. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR OTHERWISE, EXCEPT FOR THE EXPRESS REPRESENTATIONS, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, OF ANY NATURE, INCLUDING WITH RESPECT TO ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, QUALITY, QUANTITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PURCHASED ASSETS, THE ASSUMED LIABILITIES OR THE BUSINESS OR THE ASSETS OR LIABILITIES OF ANY GROUP COMPANY, ARE HEREBY EXPRESSLY DISCLAIMED. BUYER REPRESENTS, WARRANTS, COVENANTS AND AGREES, ON BEHALF OF ITSELF AND ITS AFFILIATES, THAT IN DETERMINING TO ENTER INTO AND CONSUMMATE THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, IT IS NOT RELYING UPON ANY REPRESENTATION OR WARRANTY MADE OR PURPORTEDLY MADE BY OR ON BEHALF OF ANY PERSON, OTHER THAN THOSE EXPRESSLY MADE BY THE COMPANY AS SET FORTH IN THE EXPRESS REPRESENTATIONS, AND THAT, IF THE CLOSING OCCURS, BUYER WILL ACQUIRE THE PURCHASED ASSETS AND ASSUME THE ASSUMED LIABILITIES WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS AND "WITH ALL FAULTS".

Without limiting the generality of the immediately preceding paragraph, it is understood and agreed by Buyer, on behalf of itself and its Affiliates, (i) that any cost estimate, projection or other

prediction, any data, any financial information or any memoranda or offering materials or presentations, including any memoranda and materials provided by Sellers, any direct or indirect holder of Sellers or any of their respective representatives, are not and shall not be deemed to be or to include representations or warranties, except to the extent explicitly set forth in the Express Representations and (ii) that no such Person has relied on any such cost estimate, projections or other prediction, any such data, any financial information or any such memoranda or materials.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR OTHERWISE, (A) THE REPRESENTATIONS SET FORTH IN ARTICLE 4 AND SECTION 11.14(D) OF THIS AGREEMENT ARE AND SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES TO SELLERS IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, AND (B) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REFERRED TO IN CLAUSE (A) ABOVE, NONE OF BUYER  NOR ANY OTHER PERSON HAS MADE OR IS MAKING ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO BUYER. SELLER REPRESENTS, WARRANTS, COVENANTS AND AGREES, ON BEHALF OF ITSELF AND ITS AFFILIATES, THAT IN DETERMINING TO ENTER INTO AND CONSUMMATE THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY, IT IS NOT RELYING UPON ANY REPRESENTATION OR WARRANTY MADE OR PURPORTEDLY MADE BY OR ON BEHALF OF ANY PERSON, OTHER THAN THOSE EXPRESSLY MADE BY BUYER AS SET FORTH IN ARTICLE 4 AND BY BUYER AND BUYER GUARANTOR IN SECTION 11.14(D) OF THIS AGREEMENT.

*(Signature Pages Follow)*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER:**

**IV MEDIA, LLC**

By: _____

Name: Christopher Fowler
Title:   Manager

[Signature Page - Asset and Equity Purchase Agreement]

DocuSign Envelope ID: 63BEB96B-AAF3-4984-986A-1E34B9E7FA0C

Case 25-10308-JMB-EPN Doc 1116 Filed 05/02/25 Entered 05/02/25 15:22:31 Desc
Exhibit(s) A-1 court pleadings    Page 282 of 327

**BUYER GUARANTOR:**

**INNOVATION VENTURES, LLC**

By: _____  _____

Name: Shawn McCue

Title: CFO

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

**IMEDIA BRANDS, INC.**

By: _____

Name: James Alt

Title:   Chief Transformation Officer

**VALUEVISION INTERACTIVE, INC.**
**VVI FULFILLMENT CENTER, INC.**
**VALUEVISION MEDIA ACQUISITIONS, INC.**
**NORWELL TELEVISION, LLC**
**VALUEVISION RETAIL, INC.**
**JWH ACQUISITION COMPANY**
**867 GRAND AVENUE, LLC**
**PW ACQUISITION COMPANY, LLC**
**EP PROPERTIES, LLC**
**FL ACQUISITION COMPANY**

By: _____

Name:  J. Alex Wasserburger

Title:   Senior VP and General Counsel

[Signature Page – Asset and Equity Purchase Agreement]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

**IMEDIA BRANDS, INC.**

By: _____
Name: James Alt
Title:   Chief Transformation Officer

**VALUEVISION INTERACTIVE, INC.**
**VVI FULFILLMENT CENTER, INC.**
**VALUEVISION MEDIA ACQUISITIONS, INC.**
**NORWELL TELEVISION, LLC**
**VALUEVISION RETAIL, INC.**
**JWH ACQUISITION COMPANY**
**867 GRAND AVENUE, LLC**
**PW ACQUISITION COMPANY, LLC**
**EP PROPERTIES, LLC**
**FL ACQUISITION COMPANY**

By: _____
Name:  J. Alex Wasserburger
Title:    Senior VP and General Counsel

[Signature Page – Asset and Equity Purchase Agreement]

## Exhibit A

**Form of Assumption and Assignment Agreements**

Attached.

<b>Exhibit A</b>

## ASSUMPTION AND ASSIGNMENT AGREEMENT[1]

This ASSUMPTION AND ASSIGNMENT AGREEMENT (this "<u>Agreement</u>") is made and entered into as of the Closing Date (the "<u>Effective Date</u>") by and between iMedia Brands, Inc., a Minnesota corporation, and the other Sellers party to the Purchase Agreement (each an "<u>Assignor</u>" and collectively, "<u>Assignors</u>") and IV Media, LLC, a Michigan limited liability company ("<u>Assignee</u>"). Assignors and Assignee are sometimes referred to collectively herein as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## RECITALS

A.      This Agreement is made and entered into in connection with the transactions contemplated by that certain Asset and Equity Purchase Agreement, dated as of August 15, 2023 (as may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Purchase Agreement</u>"), by and among Assignors and Assignee.

B.      Pursuant to the Purchase Agreement, Assignors have agreed to, among other things, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, free and clear of all Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), the Purchased Contracts to Assignee and/or one or more of its Affiliates as designated by Assignee, and Assignee has agreed to assume all Liabilities related to or arising out of such Purchased Contracts solely in respect of periods following the Closing and not to the extent relating to or arising out of any breach or default thereof or other activities on or prior to the Closing and excluding any Excluded Liabilities.

C.      Assignors are parties to the agreements listed in <u>Exhibit A</u> attached hereto (the "<u>Transferred Agreements</u>")[2].

D.      Subject to the terms and conditions of this Agreement, each Assignor is assigning the Transferred Agreements and all of its rights, title and interest therein and thereto to Assignee.

E.      This Agreement, as duly executed by Assignors and Assignee, is being delivered as of the date hereof by Assignors to Assignee and by Assignee to Assignors effective as of the Closing Date.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

---

[1] <u>Note to Draft</u>: An independent assignment and assumption agreement should be executed between the parties in the event any of the Purchased Contracts requires a particular provision/formality for its assignment.

[2] <u>Note to Draft</u>: Exhibit A should list each Assignor, the counterparty and the name and date of the Transferred Agreement. If all Purchased Contracts are Transferred Agreements, we can delete the defined term.

# AGREEMENT

1.     <u>Definitions</u>. Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.     <u>Assignment and Assumption</u>. From and after the Effective Date, (i) each Assignor hereby sells, transfers, assigns, conveys and delivers, or causes to be sold, transferred, assigned, conveyed and delivered, free and clear of all Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), to Assignee the Transferred Agreements, as applicable, and all of its rights, interests, liabilities and obligations thereunder; and (ii) Assignee hereby assumes the Transferred Agreements and such rights, interests and liabilities and agrees to perform and discharge or otherwise satisfy, and assumes and agrees to be bound by, all of the obligations of Assignors thereunder.

3.     <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, Assignee shall not accept any of the Excluded Assets or assume or otherwise be liable in respect of any of the Excluded Liabilities.

4.     <u>Further Assurances</u>. At and after the Effective Date, and without further consideration therefor, each Assignor and Assignee shall execute and deliver such further instruments and certificates (including deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances) and use commercially reasonable efforts to take, or cause to be taken, all actions, and do or cause to be done all things as may be reasonably necessary, to effectuate the purposes and intent of and consummate the transactions contemplated by this Agreement.

5.     <u>Terms of the Purchase Agreement</u>. This Agreement is executed and delivered pursuant to the Purchase Agreement. In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail to the extent of the conflict. Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant, liability or obligation contained in the Purchase Agreement.

6.     <u>Successors and Assigns</u>. Assignee may freely assign this Agreement and its rights hereunder to any successor or assign. Assignors may not assign this Agreement or any right hereunder to any party without the prior written consent of Assignee. Any attempted assignment or transfer other than as permitted above will be null and void.

7.     <u>Governing Law; Jurisdiction</u>. Section 11.04 and Section 11.05 of the Purchase Agreement are hereby incorporated, *mutatis mutandis*.

8.     <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good

2

faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

     9.    <u>Counterparts</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. No other provision of this Agreement is intended to confer upon any Person other than the Parties any rights, benefits, Proceedings or remedies hereunder. Signatures to this Agreement transmitted by electronic mail in .pdf form, or by any other electronic means designed to preserve the original graphic and pictorial appearance of a document (including DocuSign), will be deemed to have the same effect as physical delivery of the paper document bearing the original signatures.

(<i>Signature Pages Follow</i>)

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

ASSIGNORS

**IMEDIA BRANDS, INC.**

By:_____
Name:
Title:

**VALUEVISION INTERACTIVE, INC.**
**VVI FULFILLMENT CENTER, INC.**
**VALUEVISION MEDIA ACQUISITIONS, INC.**
**NORWELL TELEVISION, LLC**
**VALUEVISION RETAIL, INC.**
**JWH ACQUISITION COMPANY**
**867 GRAND AVENUE, LLC**
**PW ACQUISITION COMPANY, LLC**
**EP PROPERTIES, LLC**
**FL ACQUISITION COMPANY**

By:_____
Name:
Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

<u>ASSIGNEE</u>

**IV MEDIA, LLC**

By:_____
Name:
Title:

[Signature Page to Assumption and Assignment Agreement]

## **Exhibit A**

### **Transferred Agreements**

See attached.

**<u>Exhibit B</u>**

**Form of Bills of Sale**

Attached.

**Exhibit B**

## BILL OF SALE

This BILL OF SALE (this "<u>Bill of Sale</u>") is made and entered into as of the Closing Date (the "<u>Effective Date</u>") by and among iMedia Brands, Inc., a Minnesota corporation, and the other Sellers party to the Purchase Agreement (each an "<u>Assignor</u>" and collectively, "<u>Assignors</u>") and IV Media, LLC, a Michigan limited liability company ("<u>Assignee</u>"). Assignors and Assignee are sometimes referred to collectively herein as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## RECITALS

A.     This Bill of Sale is made and entered into in connection with the transactions contemplated by that certain Asset and Equity Purchase Agreement, dated as of August 15, 2023 (as may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Purchase Agreement</u>"), by and among Assignors and Assignee.

B.     Pursuant to the Purchase Agreement, Assignors have agreed to, among other things, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, free and clear of all Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), to Assignee and/or one or more of its Affiliates as designated by Assignee, and Assignee has agreed to purchase, acquire and accept from Assignors, all of Assignors' right, title and interest in, to and under the Purchased Assets.

C.     The execution and delivery of this Bill of Sale is required by Sections 2.09(a)(ii) and 2.09(b)(iv) of the Purchase Agreement.

D.     This Bill of Sale, as duly executed by Assignors and Assignee, is being delivered as of the date hereof by Assignors to Assignee and by Assignee to Assignors effective as of the Closing Date.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## AGREEMENT

1.     <u>Definitions</u>. Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.     <u>Sale and Transfer of Purchased Assets</u>. Subject to the terms and conditions of the Purchase Agreement, each Assignor hereby sells, transfers, assigns, conveys and delivers to Assignee, and Assignee hereby purchases, acquires and accepts from each Assignor, all of such Assignor's right, title and interest in, to and under all of the Purchased Assets.

3.     <u>Excluded Assets and Excluded Liabilities</u>. Notwithstanding anything to the contrary in this Bill of Sale or in the Purchase Agreement, no Assignor shall sell, transfer, assign, convey or deliver to Assignee, and Assignee shall not purchase, acquire, assume or accept from any Assignor, any of the Excluded Assets and Excluded Liabilities.

4.     <u>Further Assurances</u>. At and after the Effective Date, and without further consideration therefor, each of Assignors and Assignee shall execute and deliver such further instruments and certificates (including deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances) and use commercially reasonable efforts to take, or cause to be taken, all actions, and do or cause to be done all things as may be reasonably necessary, to effectuate the purposes and intent of and consummate the transactions contemplated by this Bill of Sale and the other Transaction Documents.

5.     <u>Terms of the Purchase Agreement</u>. This Bill of Sale is executed and delivered pursuant to the Purchase Agreement. In the event of a conflict between the terms and conditions of this Bill of Sale and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail to the extent of the conflict. Notwithstanding anything to the contrary in this Bill of Sale, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant, liability or obligation contained in the Purchase Agreement.

6.     <u>Successors and Assigns</u>. Assignee may freely assign this Agreement and its rights hereunder to any successor or assign. Assignors may not assign this Agreement or any right hereunder to any party without the prior written consent of Assignee. Any attempted assignment or transfer other than as permitted above will be null and void.

7.     <u>Governing Law; Jurisdiction</u>. Section 11.04 and Section 11.05 of the Purchase Agreement are hereby incorporated, *mutatis mutandis*.

8.     <u>Severability</u>. If any term, provision, covenant or restriction of this Bill of Sale is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Bill of Sale shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Bill of Sale so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

9.     <u>Counterparts</u>. This Bill of Sale may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. No other provision of this Bill of Sale is intended to confer upon any Person other than the Parties any rights, benefits, Proceedings or remedies hereunder. Signatures to this Agreement transmitted by electronic mail in .pdf form, or by any other electronic means designed to preserve the original graphic and pictorial appearance of a document (including DocuSign), will be deemed to have the same effect as physical delivery of the paper document bearing the original signatures.

*(Signature Pages Follow)*

2

IN WITNESS WHEREOF, the Parties have caused this Bill of Sale to be executed by their duly authorized representatives as of the Effective Date.

<u>ASSIGNORS</u>

**IMEDIA BRANDS, INC.**


By:_____
Name:
Title:


**VALUEVISION INTERACTIVE, INC.**
**VVI FULFILLMENT CENTER, INC.**
**VALUEVISION MEDIA ACQUISITIONS, INC.**
**NORWELL TELEVISION, LLC**
**VALUEVISION RETAIL, INC.**
**JWH ACQUISITION COMPANY**
**867 GRAND AVENUE, LLC**
**PW ACQUISITION COMPANY, LLC**
**EP PROPERTIES, LLC**
**FL ACQUISITION COMPANY**


By:_____
Name:
Title:

IN WITNESS WHEREOF, the Parties have caused this Bill of Sale to be executed by their duly authorized representatives as of the Effective Date.

<u>ASSIGNEE</u>

**IV MEDIA, LLC**


By: _____
Name:
Title:

**<u>Exhibit C</u>**

**Form of Assignment of Trademarks**

Attached.

**Exhibit C**

Form of

## ASSIGNMENT OF TRADEMARKS[1]

This ASSIGNMENT OF TRADEMARKS (this "Assignment") is made and entered into as of the Closing Date (the "Effective Date") by and between iMedia Brands, Inc., a Minnesota corporation, and the other Sellers party to the Purchase Agreement (collectively, "Assignor") and IV Media, LLC, a Michigan limited liability company ("Assignee"). Assignor and Assignee are sometimes referred to collectively herein as the "Parties" and individually as a "Party."

## RECITALS

A.    This Assignment is made and entered into in connection with the transactions contemplated by that certain Asset and Equity Purchase Agreement, dated as of August 15, 2023 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), by and among Assignor and Assignee.

B.    Pursuant to the Purchase Agreement, Assignor has agreed to, among other things, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, free and clear of all Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), to Assignee and/or one or more of its Affiliates as designated by Assignee, and Assignee has agreed to purchase, acquire and accept from Assignor, all of Assignor's right, title and interest in and to the Trademarks included in the Purchased Assets, including without limitation the applications and registrations of Trademarks set forth on Attachment A attached hereto, together with the goodwill of the business symbolized thereby (collectively, the "Assigned Trademarks").

C.    Assignee is the successor to Assignor's business or portion of the business to which the applicable Assigned Trademark pertains, which business is ongoing and existing.

D.    Assignee wishes to acquire all of Assignor's right, title and interest in and to the Assigned Trademarks, and Assignor wishes to assign such right, title and interest in and to such Assigned Trademarks to Assignee.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## AGREEMENT

1.    Definitions.  Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.    Transfer of Assigned Trademarks.    Assignor hereby irrevocably and unconditionally sells, transfers, assigns, conveys and delivers to Assignee and its successors and

---

[1] Note to Draft: Given that certain foreign jurisdictions require original copies of trademark assignments, please provide at least 10 copies of the signature page to this Assignment.

assigns, and Assignee does hereby unconditionally accept: (a) all of Assignor's right, title and interest in and to the Assigned Trademarks, together with all goodwill associated with the foregoing; (b) all royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Assignor with respect to any of the foregoing; (c) all claims, causes of action and enforcement rights, whether currently pending, filed, or otherwise, with respect to the Assigned Trademarks, including all rights to damages, injunctive relief and other remedies for past, current and future infringement of the Assigned Trademarks; (d) the right to secure registration of the Assigned Trademarks and of this Assignment; and (e) the right to initiate other proceedings before all Governmental Authorities with respect to the Assigned Trademarks.

3.      <u>Further Assurances; Recordation</u>.  Assignor covenants and agrees that, from time to time, Assignor shall, at Assignee's sole cost and expense, provide any further necessary documentation and do all further acts that are, in each case, reasonably requested in writing by Assignee and necessary to transfer and perfect title in and to the Assigned Trademarks in Assignee, its successors and assigns. Assignor hereby authorizes the Commissioner for Trademarks of the United States Patent and Trademark Office and any other applicable Governmental Authority to record and register this Assignment upon request by Assignee, at the sole cost and expense of Assignee.

4.      <u>Terms of the Purchase Agreement</u>.  This Assignment is executed and delivered pursuant to the Purchase Agreement. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail to the extent of the conflict. The Purchase Agreement shall govern the representations, warranties and obligations of the Parties with respect to the Assigned Trademarks. Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant, liability or obligation contained in the Purchase Agreement.

5.      <u>Entire Agreement</u>.  This Assignment and the Purchase Agreement reflect the entire understanding of the Parties relating to the sale, assignment, transfer, conveyance and delivery of the Assigned Trademarks from Assignor to Assignee, and supersede all prior agreements, understandings or letters of intent between or among the Parties regarding the subject matter of this Assignment and the Purchase Agreement.

6.      <u>Successors and Assigns</u>.  Assignee may freely assign this Assignment and its rights hereunder to any successor or assign. Assignor may not assign this Assignment or any right hereunder to any party without the written consent of Assignee. Any attempted assignment or transfer other than as permitted above will be null and void.

7.      <u>Governing Law; Jurisdiction</u>. Section 11.04 and Section 11.05 of the Purchase Agreement are hereby incorporated, *mutatis mutandis*.

8.      <u>Severability</u>.  If any term, provision, covenant or restriction of this Assignment is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Assignment shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner

materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Assignment so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

9.      <u>Counterparts</u>.  This Assignment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. No other provision of this Assignment is intended to confer upon any Person other than the Parties any rights, benefits, Proceedings or remedies hereunder. Signatures to this Agreement transmitted by electronic mail in .pdf form, or by any other electronic means designed to preserve the original graphic and pictorial appearance of a document (including DocuSign), will be deemed to have the same effect as physical delivery of the paper document bearing the original signatures.

*(Signature Pages Follow)*

IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.

<u>ASSIGNOR</u>

**IMEDIA BRANDS, INC.**


By:_____
Name:
Title:

**VALUEVISION INTERACTIVE, INC., a
Minnesota corporation
VVI FULFILLMENT CENTER, INC., a
Minnesota corporation
VALUEVISION MEDIA ACQUISITIONS,
INC., a Delaware corporation
NORWELL TELEVISION, LLC, a Delaware
limited liability company
VALUEVISION RETAIL, INC., a Delaware
corporation
JWH ACQUISITION COMPANY, a Minnesota
corporation
867 GRAND AVENUE, LLC, a Minnesota
limited liability company
PW ACQUISITION COMPANY, LLC, a
Minnesota limited liability company
EP PROPERTIES, LLC, a Minnesota limited
liability company
FL ACQUISITION COMPANY, a Minnesota
corporation**


By:_____
Name:
Title:

[Signature Page to Assignment of Trademarks]

## <u>ACKNOWLEDGEMENT</u>[2]

COUNTY OF _____         )

                                    )     SS:

STATE OF _____       )

       The foregoing Assignment was acknowledged before me this ___ day of [___], 2023 by _____, the _____ of [_____], a [_____] [_____].  He/She is personally known to me or has produced _____ as identification.

Notary: _____    [NOTARIAL SEAL]

Print Name:_____    Notary Public,  State of _____

                                           My commission expires:

---

[2] <u>Note to Draft</u>: Based on the trademark schedule, there are trademark filings in jurisdictions that require a notarized trademark assignment (*e.g.*, India, Indonesia, Mexico, Norway, South Korea, Thailand).

[Signature Page to Assignment of Trademarks]

IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.

<u>ASSIGNEE</u>

**IV MEDIA, LLC**


By:‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Name:
Title:

## Attachment A

**Assigned Trademarks**

See attached.

## Exhibit D

## Form of Assignment of Domain Names

Attached.

**Exhibit D**

Form of

## ASSIGNMENT OF DOMAIN NAMES

This ASSIGNMENT OF DOMAIN NAMES (this "Assignment") is made and entered into as of the Closing Date (the "Effective Date") by and between iMedia Brands, Inc., a Minnesota corporation, and the other Sellers party to the Purchase Agreement and identified on the signature page hereof (collectively, "Assignor") and IV Media, LLC, a Michigan limited liability company ("Assignee"). Assignor and Assignee are sometimes referred to collectively herein as the "Parties" and individually as a "Party."

## RECITALS

A.    This Assignment is made and entered into in connection with the transactions contemplated by that certain Asset and Equity Purchase Agreement, dated as of August 15, 2023 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), by and among Assignor and Assignee.

B.    Pursuant to the Purchase Agreement, Assignor has agreed to, among other things, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, free and clear of all Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), to Assignee and/or one or more of its Affiliates as designated by Assignee, and Assignee has agreed to purchase, acquire and accept from Assignor, all of Assignor's right, title and interest in and to the Domain Names included in the Purchased Assets, including without limitation the Internet domain name registrations set forth on Attachment A attached hereto (collectively, the "Assigned Domain Names").

C.    Assignee wishes to acquire all of Assignor's right, title and interest in and to the Assigned Domain Names, and Assignor wishes to assign such right, title and interest in and to such Assigned Domain Names to Assignee.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## AGREEMENT

1.    Definitions.  Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.    Transfer of Assigned Domain Names.    Assignor hereby irrevocably and unconditionally sells, transfers, assigns, conveys and delivers to Assignee and its successors and assigns, and Assignee does hereby unconditionally accept: (a) all of Assignor's worldwide right, title and interest in and to the Assigned Domain Names; and (b) all other rights accruing thereunder or pertaining thereto in any jurisdiction throughout the world for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors and assigns, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made, including the rights to pursue and collect damages, costs, injunctive relief and other

remedies for past, current or future infringement, misappropriation, conflict with or other violation of any of the Assigned Domain Names.

3. <u>Transfer of Domain Names</u>.  Assignor hereby authorizes and requests, or will cause any proxy service that registered any of the domain names included in the Assigned Domain Names on Assignor's behalf to authorize or request, the applicable registration authority to transfer such domain names from Assignor or such proxy service, as the case may be, to Assignee. Assignor agrees to reasonably cooperate with Assignee to initiate and complete the transfer process in relation to such domain names electronically from Assignor's account to Assignee's account and servers.

4. <u>Further Assurances</u>.  Assignor covenants and agrees that, from time to time, Assignor shall, at Assignee's sole cost and expense, provide any further necessary documentation and do all further acts that are, in each case, reasonably requested in writing by Assignee or by the applicable registrar of the Assigned Domain Names as necessary to effectuate the transfer and perfect title in and to the Assigned Domain Names in Assignee, its successors and assigns. Assignor hereby authorizes the applicable registrar of the Assigned Domain Names to transfer the Assigned Domain Names to Assignee, at the sole cost and expense of Assignee.

5. <u>Terms of the Purchase Agreement</u>.  This Assignment is executed and delivered pursuant to the Purchase Agreement. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail to the extent of the conflict. The Purchase Agreement shall govern the representations, warranties and obligations of the Parties with respect to the Assigned Domain Names. Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant, liability or obligation contained in the Purchase Agreement.

6. <u>Entire Agreement</u>.  This Assignment and the Purchase Agreement reflect the entire understanding of the Parties relating to the sale, transfer, assignment, conveyance and delivery of the Assigned Domain Names from Assignor to Assignee, and supersedes all prior agreements, understandings or letters of intent between or among the Parties regarding the subject matter of this Assignment and the Purchase Agreement.

7. <u>Successors and Assigns</u>.  Assignee may freely assign this Assignment and its rights hereunder to any successor or assign. Assignor may not assign this Assignment or any right hereunder to any party without the prior written consent of Assignee. Any attempted assignment or transfer other than as permitted above will be null and void.

8. <u>Governing Law; Jurisdiction</u>. Section 11.04 and Section 11.05 of the Purchase Agreement are hereby incorporated, *mutatis mutandis*.

9. <u>Severability</u>.  If any term, provision, covenant or restriction of this Assignment is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Assignment shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the

137553964_4

economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Assignment so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

10.     Counterparts.  This Assignment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. No other provision of this Assignment is intended to confer upon any Person other than the Parties any rights, benefits, proceedings or remedies hereunder. Signatures to this Agreement transmitted by electronic mail in .pdf form, or by any other electronic means designed to preserve the original graphic and pictorial appearance of a document (including DocuSign), will be deemed to have the same effect as physical delivery of the paper document bearing the original signatures.

*(Signature Pages Follow)*

IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.

ASSIGNOR

**IMEDIA BRANDS, INC.**

By:_____
Name:
Title:

**VALUEVISION INTERACTIVE, INC.**
**VVI FULFILLMENT CENTER, INC.**
**VALUEVISION MEDIA ACQUISITIONS, INC.**
**NORWELL TELEVISION, LLC**
**VALUEVISION RETAIL, INC.**
**JWH ACQUISITION COMPANY**
**867 GRAND AVENUE, LLC**
**PW ACQUISITION COMPANY, LLC**
**EP PROPERTIES, LLC**
**FL ACQUISITION COMPANY**

By:_____
Name:
Title:

[Signature Page to Assignment of Domain Names]

IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.

<u>ASSIGNEE</u>

**IV MEDIA, LLC**


By:_____
Name:
Title:

## Attachment A

**Assigned Domain Names**

See attached.

## Exhibit E

**Form of German Share Transfer Agreement**

Attached.

Gefälligkeitsübersetzung
– Nicht Gegenstand der Beurkundung –

Convenience Translation
– Not subject matter of recording –

| | |
|---|---|
| **UV Nr.        / 2023** | **deed no        / 2023** |

| | |
|---|---|
| **Verhandelt** | **Recorded** |
| zu Berlin | in Berlin |
| am [  ]. August 2023 | on [  ] August 2023 |
| Vor mir, dem unterzeichnenden Notar | Before me, the undersigned notary |
| Dr. Matthias Santelmann | Dr. Matthias Santelmann |
| mit dem Amtssitz in Berlin, | with official place of business at Berlin, |

| | |
|---|---|
| erschien heute: | appeared today: |
| 1. **Herr Robert Korndörfer**, geboren am 15. Oktober 1982, geschäftsansässig c/o Noerr Partnerschaftsgesellschaft mbB, Brienner Straße 28, 80333 München, ausgewiesen durch gültigen Personalausweis, handelnd nicht im eigenen Namen, sondern – unter Ausschluss jeglicher persönlichen Haftung – aufgrund schriftlicher Vollmacht, die bei Beurkundung im Original vorlag und dieser Niederschrift in beglaubigter Ablichtung beigefügt ist, für | 1. **Mr. Robert Korndörfer**, born on 15 October 1982, with business address at c/o Noerr Partnerschaftsgesellschaft mbB, Brienner Straße 28, 80333 Munich, identified by his valid identity card, acting not in his own name, but – excluding any personal liability – by virtue of a written power of attorney, the original of which was available at the recording and a certified copy of which is attached hereto, for and on behalf of |
| **iMedia Brands, Inc.**, eine nach dem Recht des US-Bundesstaates Minnesota gegründete Gesellschaft, Geschäftsanschrift: 6740 Shady Oak Road, Eden Prairie, MN 55344-3433, Vereinigte Staaten von Amerika, eingetragen im Unternehmensregister von Minnesota unter Nummer US4524652066, | **iMedia Brands, Inc**, a corporation incorporated under the laws of the US state Minnesota with its principal office in 6740 Shady Oak Road, Eden Prairie, MN 55344-3433, United States of America, registered with the Division of Corporations of the State of Minnesota under number US4524652066, |
| – **"Abtretender"** –, | – **"Assignor"** –, |
| und | and |

2. [ ], geboren am [ ], geschäftsansässig c/o [___], [von Person bekannt/ausgewiesen durch gültigen Bundespersonalausweis], handelnd nicht im eigenen Namen, sondern – unter Ausschluss jeglicher persönlichen Haftung – aufgrund schriftlicher Vollmacht, die bei Beurkundung in Kopie vorlag, die dieser Niederschrift beigefügt ist, wobei das Original nachgereicht und dieser Niederschrift in beglaubigter Ablichtung beigefügt werden sollen, für

[ ], eine nach dem Recht des US-Bundesstaates [ ] gegründete [ ], Geschäftsanschrift: [ ], Vereinigte Staaten von Amerika, eingetragen im Unternehmensregister von [ ] unter Nummer [ ],

— "**Abtretungsempfänger**" —.

Abtretender und Abtretungsempfänger werden gemeinsam als "**Parteien**" bezeichnet.

Der Notar erläuterte das Mitwirkungsverbot nach § 3 Abs. 1 Satz 1 Nr. 7 BeurkG und fragte nach einer Vorbefassung im Sinne dieser Vorschrift. Die Frage wurde verneint.

Gegenstand der Beurkundung und damit dieser Niederschrift sind ausschließlich die deutschsprachigen Erklärungen der Erschienenen, nicht die ihnen gegenübergestellte englische Übersetzung.

Die Erschienenen – handelnd wie angegeben – baten um Beurkundung der folgenden Erklärungen:

**Abtretungsvertrag**

**1.    Vorbemerkung**

---

2. [ ], born on [ ], with business address at c/o [___], [personally known to the notary/identified by his valid identity card], acting not in his own name, but – excluding any personal liability – by virtue of a written power of attorney, a copy of which was available at the recording which is attached hereto, whereas the original shall be submitted subsequently to the notary and a certified copy of which shall be attached hereto, for and on behalf of

[ ], a [ ] incorporated under the laws of the US state [ ] with its principal office in [ ], United States of America, registered with the Division of Corporations of the State of [ ] under number [ ],

— "**Assignee**" —.

Assignor and Assignee are jointly referred to as the "**Parties**".

The notary explained the restrictions on officiating pursuant to sec. 3 para 1 sentence 1 no. 7 of the German Notarisation Act (*BeurkG*) and asked whether there had been a prior involvement within the meaning of the Act. The question was answered in the negative.

The subject matter of the notarisation, and thus also of this written record, exclusively comprises the declarations of the persons appearing in German, not the English translation placed opposite them.

The persons appearing – acting as indicated above – requested the notarisation of the following declarations:

**Share Assignment Agreement**

**1.    Preliminary Remarks**

- 2 -

1.1 Der Abtretende hält sämtliche Geschäftsanteile der iMedia & 123tv Holding GmbH, eingetragen im Handelsregister des Amtsgerichts München unter HRB 267579 (nachfolgend "**Gesellschaft**"). Das Stammkapital der Gesellschaft beträgt EUR 25.000,00 und ist in 25.000 Geschäftsanteile mit einem Nennwert von jeweils EUR 1,00 eingeteilt (diese 25.000 Geschäftsanteile mit den laufenden Nrn. 1 bis 25.000, zusammen die "**Geschäftsanteile**").

1.1 The Assignor holds all shares in iMedia & 123tv Holding GmbH, registered with the commercial register of the local court of Munich under HRB 267579 (hereinafter referred to as "**Company**"). The registered share capital of the Company amounts to EUR 25,000.00 and is divided into 25,000 shares with a nominal amount of EUR 1.00 each (these 25,000 shares with the consecutive nos. 1 - 25,000, jointly the "**Shares**").

1.2 Der Abtretende und der Abtretungsempfänger haben gemeinsam mit anderen Beteiligten am heutigen Tage einen Kaufvertrag ("**Kaufvertrag**") unter anderem über den Verkauf sämtlicher Geschäftsanteile an der Gesellschaft von dem Abtretenden an den Abtretungsempfänger geschlossen. In Erfüllung der Verpflichtung zur Übertragung der Geschäftsanteile aus dem Kaufvertrag schließen die Parteien diesen Abtretungsvertrag.

1.2 The Assignor and the Assignee, together with other parties thereto, entered into an asset Purchase Agreement (the "**Purchase Agreement**") today, relating to, among other things, the sale of all of the Shares in the Company from the Assignor to the Assignee. In fulfillment of the obligation under the Purchase Agreement to transfer the Shares, the Parties enter into this Assignment Agreement.

## 2. Abtretung der Geschäftsanteile

## 2. Assignment of the Shares

2.1 Der Abtretende tritt hiermit die Geschäftsanteile in Erfüllung der Abtretungsverpflichtung nach dem Kaufvertrag an den Abtretungsempfänger ab. Mit abgetreten ist das Gewinnbezugsrecht für alle nicht ausgeschütteten Gewinne. Der Abtretungsempfänger nimmt die Abtretung an.

2.1 The Assignor hereby assigns the Shares to the Assignee in fulfilment of the assignment obligation pursuant to the Purchase Agreement. The right to receive profits for all undistributed profits is also assigned. The Assignee agrees to this assignment.

Der Notar wird hiermit von den Parteien angewiesen, eine aktualisierte Liste der Gesellschafter der Gesellschaft zum Handelsregister einzureichen sowie der Gesellschaft eine Abschrift der aktualisierten Gesellschafterliste zu übermitteln.

The Parties hereby instruct the acting notary to file an updated list of shareholders and provide the Company with a copy of such updated list of shareholders.

2.2 Der Kaufvertrag wird durch die

2.2 The provisions of the Purchase Agreement

- 3 -

Regelungen dieses Abtretungsvertrags in keiner Weise geändert. Der Kaufvertrag regelt abschließend sämtliche Zahlungen für die Abtretung der Geschäftsanteil sowie sämtliche Gewährleistungen und sonstige Pflichten und Verpflichtungen hinsichtlich der Abtretung der Geschäftsanteile.

are not amended by way of this Assignment Agreement. Any consideration for the transfer of the Shares, any representations and warranties and any other obligations and covenants regarding the transfer of the Shares are exclusively subject to the Purchase Agreement.

### 3. Vollmacht

### 3. Power of Attorney

3.1 Der Abtretende erteilt dem Abtretungsempfänger hiermit eine unwiderrufliche Vollmacht zur vollumfänglichen und unbeschränkten Ausübung aller Gesellschafterrechte bei der Gesellschaft, insbesondere dazu, das Stimmrecht in allen Gesellschafterversammlungen von dem Zeitpunkt des Wirksamwerdens der Abtretung gemäß Ziff. 2.1 dieses Abtretungsvertrags bis zu dem Zeitpunkt, in dem der Abtretungsempfänger gemäß § 16 Absatz 1 Satz 1 GmbHG als Gesellschafter gilt, auszuüben.

3.1 The Assignor hereby grants an irrevocable power of attorney to the Assignee to exercise all rights of a shareholder of the Company to their full extent and without restrictions and in particular to pass all shareholder's resolutions of the Company from the effectiveness of the transfer in rem of the Shares pursuant to section 2.1 of this Assignment Agreement until the Assignee is deemed to be shareholder pursuant to Section 16 (1) Sentence 1 of the German Limited Liability Companies Act.

3.2 Der Abtretungsempfänger ist zur Erteilung von Untervollmachten berechtigt. Der Umfang der Vollmacht ist im Außenverhältnis unbeschränkt, jedoch im Innenverhältnis beschränkt mit der Maßgabe, dass dem Abtretenden aus dem Gebrauch der Vollmacht keinerlei finanzielle Verpflichtungen oder Schäden entstehen dürfen. Der Abtretungsempfänger stellt den Abtretenden von jeglichen finanziellen Verpflichtungen und/oder sonstigen Schäden frei, die dem Abtretenden aufgrund des Gebrauchs der Vollmacht durch den Abtretungsempfänger bzw. etwaigen Unterbevollmächtigten entstehen.

3.2 The Assignee is authorized to grant sub-power of attorney. The power of attorney is unlimited in scope internally provided that no financial obligations or damages arise for the Assignor from its use. The Assignee shall indemnify the Assignor from any financial obligations or other damages incurred by the Assignor due to the use of the power of attorney by the Assignee, respectively, any sub-agent.

### 4. Sonstiges

### 4. Miscellaneous

4.1 Die Gesellschaft hat keinen Grundbesitz.

4.1 The Company does not own real estate.

4.2 Die Kosten der Beurkundung dieses Abtretungsvertrags tragen der Abtretende und der Abtretungsempfänger jeweils zur Hälfte.

4.2 The costs for the notarization of this Assignment Agreement shall be borne equally by the Assignor and the Assignee.

4.3 Die Parteien gehen davon aus, dass dieser Abtretungsvertrag dem Recht der Bundesrepublik Deutschland unterliegt. Eine Rechtswahl ist damit nicht verbunden.

4.3 The Parties assume that this Assignment Agreement is subject to the laws of the Federal Republic of Germany. A choice of law is not associated therewith.

4.4 Sind oder werden einzelne Bestimmungen dieses Abtretungsvertrags unwirksam, so bleiben die übrigen Bestimmungen gleichwohl wirksam. Unwirksame Bestimmungen sind einvernehmlich durch solche zu ersetzen, die dem wirtschaftlichen Gewollten möglichst nahekommen. Entsprechendes gilt zur Ausfüllung etwaiger Lücken im Abtretungsvertrag.

4.4 To the extent that a provision of this Assignment Agreement should be or become void the other terms shall remain effective. Void terms shall be replaced (by mutual agreement) by such provisions coming as close as possible to the economic intent of the Parties. The same applies to gaps in the Assignment Agreement.

4.5 Der Notar wird ermächtigt, von dieser Niederschrift beglaubigte auszugsweise Abschriften und/oder Teilausfertigungen zu erteilen.

4.5 The notary is authorized to issue certified copies in parts and partial official copies of the present deed.

## 5. Belehrungen

Der Notar belehrte darüber, dass

- alle Vereinbarungen vollständig und richtig beurkundet werden müssen, nicht beurkundete Abreden nichtig sind und die Unwirksamkeit aller Vereinbarungen bewirken können;

- er verpflichtet ist, unverzüglich nach Wirksamwerden der heute beurkundeten Anteilsübertragung und ohne Rücksicht auf etwa später eintretende Unwirksamkeitsgründe eine aktualisierte Gesellschafterliste zum Handelsregister einzureichen und eine Abschrift der aktualisierten Gesellschafterliste an die Gesellschaft zu übermitteln;

- nach § 16 Abs. 1 S. 1 GmbHG im Fall

## 5. Instructions

The notary advised that

- all agreements must be completely and accurately recorded, that any non-recorded agreements are void and may render the entire agreement null and void;

- he is obliged to file an updated list of shareholders with the commercial register and to provide the company with a copy of such list without undue delay after the transfer of shares becomes effective, irrespective of any circumstances occurring later on which may render this agreement invalid;

- pursuant to section 16 para 1 sentence 1

- 5 -

einer Veränderung in den Personen der Gesellschafter oder des Umfangs ihrer Beteiligung nur derjenige im Verhältnis zur Gesellschaft als Inhaber eines Geschäftsanteils gilt, der als solcher in der im Handelsregister aufgenommenen Gesellschafterliste eingetragen ist;

of the German Limited Liability Companies Act in case of a change of the shareholders or the extent of their participation only such persons are considered shareholders vis-à-vis the Company who are entered in the list of shareholders in the commercial register file;

- Gesellschafterhandlungen bis zur Aufnahme der aktualisierten Liste der Gesellschafter im Handelsregister schwebend unwirksam sind (§ 16 Abs. 1 S. 2 GmbHG);

- about the preliminary ineffectiveness of any shareholder acts done prior to the updated list of shareholders has been assumed in the register file folder (sec 16 para 1 sent. 2 of the German Limited Liability Companies Act);

- Geschäftsanteile u. U. von einem Nichtberechtigten, der in der im Handelsregister aufgenommenen Gesellschafterliste eingetragen ist (§ 16 Abs. 3 GmbHG) gutgläubig erworben werden können;

- about the risk of a bona fide acquisition of shares from an unauthorised person which is entered in the list of shareholders assumed in the register file folder (sec 16 para 3 of the German Limited Liability Companies Act);

- eine Haftung bestehen kann

- about a possible liability

  − für rückständige Einlagepflichten (§ 16 Abs. 2 GmbHG),

  − for unpaid capital contributions (sec 16 para 2 of the German Limited Liability Companies Act),

  − für Ausfälle im Fall der Kaduzierung (§ 24 GmbHG),

  − for capital shortfalls in case of a forfeiture (sec 24 of the German Limited Liability Companies Act),

  − für verbotene Auszahlungen (§ 31 Abs. 3 GmbHG),

  − for forbidden disbursements of the share capital (sec 31 para 3 of the German Limited Liability Companies Act),

  − für Nachschüsse (§ 26 GmbHG) und Nebenleistungen (§ 3 GmbHG),

  − for additional contributions (sec 26 of the German Limited Liability Companies Act) as well as ancillary contributions (sec 3 of the German Limited Liability Companies Act),

  − bei Vorbelastung des Stammkapitals sowie für eine Wertdifferenz bei Sacheinlagen (§ 9 GmbHG),

  − in case of a shortfall of the company's net assets behind its registered share capital at the company's formation and for a shortfall of the actual value of contributions in kind

–  des Rechtsvorgängers nach Kaduzierung (§ 22 GmbHG);

– of a former shareholder in case of a forfeiture of shares (sec 22 of the German Limited Liability Companies Act);

behind their declared value (sec 9 of the German Limited Liability Companies Act),

• der Notar die steuerlichen Auswirkungen des Abtretungsvertrags nicht geprüft hat und einen entsprechenden Auftrag weder erhalten noch angenommen hat,

• that the notary has not checked the tax effects of this Assignment Agreement and that he has neither received nor accepted a corresponding instruction;

• der Notar gesetzlich gehalten ist, dem für die Gesellschaft zuständigen Finanzamt (§ 20 AO) eine beglaubigte Ablichtung dieser Urkunde zukommen zu lassen;

• that the notary is legally obliged to submit a certified copy of this deed to tax authority competent for the Company (sec. 20 German Fiscal Code);

• die personenbezogenen Daten der Beteiligten im Büro des Notars gespeichert und verarbeitet sowie im Rahmen der Amtstätigkeit des Notars an Dritte weitergegeben werden, wozu vorsorglich das Einverständnis erklärt wurde, ebenso wie zu einer elektronischen Übermittlung von Dokumenten (etwa per E-Mail);

• the personal data of the persons involved in the present recording will be stored and processed in the notary's office and, within the notary's official capacity, shared with third persons which was agreed to as a matter of precaution; furthermore, the transmission of documents by e-mail was approved of;

• alle Urkundsbeteiligten für die Notarkosten gesamtschuldnerisch haften.

• about the joint liability of all Parties involved in the present recording for the notary's fees.

Die deutschsprachige Fassung dieser Niederschrift wurde den Erschienenen vom Notar vorgelesen, wurde von ihnen genehmigt und von ihnen und dem Notar eigenhändig unterschrieben:

The German language version of this deed was read out aloud to the persons appearing by the notary, was approved by them and signed by them and the notary in their own hands:

**<u>Exhibit F</u>**

**Form of Assignment of Patents**

Attached.

**Exhibit F**

Form of

## ASSIGNMENT OF PATENTS

This ASSIGNMENT OF PATENTS (this "Assignment") is made and entered into as of the Closing Date (the "Effective Date") by and between iMedia Brands, Inc., formerly known as Evine Live Inc., a Minnesota corporation ("Assignor"), and IV Media, LLC, a Michigan limited liability company ("Assignee"). Assignor and Assignee are sometimes referred to collectively herein as the "Parties" and individually as a "Party."

## RECITALS

A.      This Assignment is made and entered into in connection with the transactions contemplated by that certain Asset and Equity Purchase Agreement, dated as of August 15, 2023 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), by and among Assignor and Assignee.

B.      Pursuant to the Purchase Agreement, Assignor has agreed to, among other things, sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, free and clear of all Claims (other than Assumed Liabilities) and Encumbrances (other than Permitted Encumbrances), to Assignee and/or one or more of its Affiliates as designated by Assignee, and Assignee has agreed to purchase, acquire and accept from Assignor, all of Assignor's right, title and interest in and to the Patents included in the Purchased Assets, including without limitation the patents set forth on Attachment A attached hereto (collectively, the "Assigned Patents").

C.      Assignee wishes to acquire all of Assignor's right, title and interest in and to the Assigned Patents, and Assignor wishes to assign such right, title and interest in and to such Assigned Patents to Assignee.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## AGREEMENT

1.      Definitions. Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.      Transfer of Assigned Patents.  Assignor hereby irrevocably and unconditionally sells, transfers, assigns, conveys and delivers to Assignee and its successors and assigns, and Assignee does hereby unconditionally accept: (a) all of Assignor's right, title and interest in and to the Assigned Patents, including any right of priority and all issuances, provisionals, divisionals, continuations, substitutes, renewals, reissues, extensions, and other related applications thereto which have been or may be filed in the United States or elsewhere in the world; (b) all royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Assignor with respect to any of the foregoing; (c) all claims, causes of action and enforcement rights, whether currently pending, filed, or otherwise, with respect to the Assigned Patents, including all rights to

damages, injunctive relief and other remedies for past, current and future infringement of the Assigned Patents; and (d) the right to initiate other proceedings before all Governmental Authorities with respect to the Assigned Patents.

3.     Further Assurances; Recordation.  Assignor covenants and agrees that, from time to time, Assignor shall, at Assignee's sole cost and expense, provide any further necessary documentation and do all further acts that are, in each case, reasonably requested in writing by Assignee and necessary to transfer and perfect title in and to the Assigned Patents in Assignee, its successors and assigns. Assignor hereby authorizes the Commissioner for Patents of the United States Patent and Trademark Office and any other applicable Governmental Authority to record and register this Assignment upon request by Assignee, at the sole cost and expense of Assignee.

4.     Terms of the Purchase Agreement.  This Assignment is executed and delivered pursuant to the Purchase Agreement. In the event of a conflict between the terms and conditions of this Assignment and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail to the extent of the conflict. The Purchase Agreement shall govern the representations, warranties and obligations of the Parties with respect to the Assigned Patents. Notwithstanding anything to the contrary in this Assignment, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant, liability or obligation contained in the Purchase Agreement.

5.     Entire Agreement.  This Assignment and the Purchase Agreement reflect the entire understanding of the Parties relating to the sale, assignment, transfer, conveyance and delivery of the Assigned Patents from Assignor to Assignee, and supersede all prior agreements, understandings or letters of intent between or among the Parties regarding the subject matter of this Assignment and the Purchase Agreement.

6.     Successors and Assigns.  Assignee may freely assign this Assignment and its rights hereunder to any successor or assign. Assignor may not assign this Assignment or any right hereunder to any party without the prior written consent of Assignee. Any attempted assignment or transfer other than as permitted above will be null and void.

7.     Governing Law; Jurisdiction. Section 11.04 and Section 11.05 of the Purchase Agreement are hereby incorporated, *mutatis mutandis*.

8.     Severability.  If any term, provision, covenant or restriction of this Assignment is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Assignment shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Assignment so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transaction contemplated hereby be consummated as originally contemplated to the fullest extent possible.

9.     Counterparts.  This Assignment may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. No other provision of this Assignment is intended to confer upon any Person

other than the Parties any rights, benefits, Proceedings or remedies hereunder. Signatures to this Agreement transmitted by electronic mail in .pdf form, or by any other electronic means designed to preserve the original graphic and pictorial appearance of a document (including DocuSign), will be deemed to have the same effect as physical delivery of the paper document bearing the original signatures.

*(Signature Pages Follow)*

IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.

<u>ASSIGNOR</u>

**IMEDIA BRANDS, INC.**


By:_____

Name:

Title:

      IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed by their duly authorized representatives as of the Effective Date.

<u>ASSIGNEE</u>

**IV MEDIA, LLC**


By:_____
Name:
Title:

[Signature Page to Assignment of Patents]

## Attachment A

**Assigned Patents**

| Patent | Patent No. | Issue Date | Jurisdiction |
|---|---|---|---|
| Container Lid | D760536 | 7/5/2016 | U.S. |
| Container Lid | D784811 | 4/25/2017 | U.S. |

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

**DEFENDANTS**

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice<br>**PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609<br><br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*
JUDGE _____
DOCKET NUMBER _____

DATE
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____